**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| VIRGINIA COALITION FOR IMMIGRANT RIGHTS; LEAGUE OF WOMEN VOTERS OF VIRGINIA; LEAGUE OF WOMEN VOTERS OF VIRGINIA EDUCATION FUND<br><br>   *Plaintiffs*,<br><br>     v.<br><br>SUSAN BEALS, in her official capacity as Virginia Commissioner of Elections; JOHN O'BANNON, in his official capacity as Chairman of the State Board of Elections; ROSALYN R. DANCE, in her official capacity as Vice-Chairman of the State Board of Elections; GEORGIA ALVIS-LONG, in her official capacity as Secretary of the State Board of Elections; DONALD W. MERRICKS and MATTHEW WEINSTEIN, in their official capacities as members of the State Board of Elections; and JASON MIYARES, in his official capacity as Virginia Attorney General<br><br>   *Defendants*. | Case No. _____ |

<u>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

Plaintiffs Virginia Coalition for Immigrant Rights ("VACIR"), League of Women Voters of Virginia and League of Women Voters of Virginia Education Fund (together "LWVVA" or "the League") bring this action against Susan Beals, in her official capacity as Virginia Commissioner of Elections; the Virginia State Board of Elections Members, in their official capacities; and Jason Miyares, in his official capacity as Virginia Attorney General, and allege the following:

## INTRODUCTION

1.      The right to vote is fundamental and foundational to American democracy. Every American citizen has the right to vote, regardless of where they were born. This action challenges a voter purge effort (the "Purge Program") that patently violates Congress's framework for protecting these fundamental rights through the National Voter Registration Act ("NVRA"). Less than 60 days ago, Defendants announced the latest version of an effort to implement an ongoing program to systematically remove certain voters from the rolls. But federal law mandates that no such voter cancelation or list maintenance programs may be conducted during the 90-day "quiet period" before an election. Congress prohibited such programs from occurring during this period to protect voter registration lists from the inevitable chaos of potentially inaccurate removals. Nevertheless, Defendants brazenly intensified their removal program the very day the quiet period commenced. Even the best designed list maintenance system undertaken with the best of intentions would be barred by federal law when so dangerously close to an election. That is reason alone to enjoin the continued operation of Defendants' Purge Program.

2.      Moreover, Defendants' Purge Program is far from such a well-designed, well-intended list maintenance effort. It is an illegal, discriminatory, and error-ridden program that has directed the cancelation of voter registrations of naturalized U.S. citizens and jeopardizes the rights of countless others. In a purported effort to flag potential noncitizens, Defendants' Purge Program relies on out-of-date information provided to the Department of Motor Vehicles, and perhaps other sources, _stretching back twenty years_. The State knows or should know that countless individuals who obtained drivers' licenses while legal permanent residents have become naturalized citizens, many even registering to vote during naturalization ceremonies. But Defendants make no effort to conduct any individualized analysis. Instead, they have classified any person who has ever

indicated they were a noncitizen as presumptively ineligible to vote unless they receive and respond to a State missive within fourteen days and provide *more* evidence of their citizenship. This violates the NVRA in various ways, including the requirement that list maintenance programs be uniform and nondiscriminatory. Finally, Defendants have conducted their Purge Program under a shroud of secrecy and obfuscation, refusing to provide information or documentation about their system as it has unfolded. The NVRA mandates that states must be transparent about their voter removal programs, even when undertaken outside of the quiet period, far more so when conducted on the eve of a major election.

3.      On August 7, 2024, only 90 days before the upcoming November 5 general election and 45 days before the start of early in-person voting, Virginia Governor Glenn Youngkin issued Executive Order 35 ("E.O. 35"), which provided instructions for the Purge Program of alleged noncitizens, relying on Va. Code § 24.2-427.[1] The Purge Program requires the Commissioner of the Department of Elections ("ELECT") to certify to the governor that it has procedures in place to make daily updates to the statewide voter registration list to "[r]emove individuals who are unable to verify that they are [U.S.] citizens to the Department of Motor Vehicles[.]" E.O. 35 at 3-4; *see also* Va. Code § 24.2-427(B)-(C).

4.      The Purge Program demands the expedition of interagency data sharing between the Department of Motor Vehicles ("DMV") and the Department of Elections ("ELECT") via a daily file of all alleged "non-citizens transactions, including addresses and document numbers."

---

[1] Although E.O. 35 claims to order the implementation of Va. Code § 24.2-429, the process described in E.O. 35 more closely aligns with Va. Code § 24.2-427. *See* E.O. 35 at 4 (Aug. 7, 2024), *available at* https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/eo/EO-35-Comprehensive-Election-Security-Ensuring-Legal-Voters-and-Accurate-Counting---vF---8.7.24.pdf. Plaintiffs therefore presume E.O. 35 intended to cite Va. Code § 24.2-427, but, either way, the Purge Program violates the National Voter Registration Act for the reasons stated herein.

E.O. 35 at 4. ELECT is then required to make daily updates to the voter rolls by comparing "the list of individuals who have been identified as noncitizens to the list of existing registered voters[.]" E.O. 35 at 3-4.  Once ELECT has identified these alleged noncitizens, ELECT sends the data to county registrars and directs them to "notify any matches of their pending cancellation unless they affirm their citizenship within 14 days" of sending the notice, and ultimately cancel the voter's registration if the registrar's office does not receive this affirmation. *Id.*; *see also* Va. Code § 24-2.427(B)-(C).

5.      The Purge Program also directs counties to refer voters removed for alleged noncitizenship to Commonwealth Attorneys for criminal investigation and potential prosecution. E.O. 35 at 4. Some counties have also elected to refer those voters to Defendant Attorney General Miyares.

6.      The Purge Program by design and in implementation threatens the voting rights of eligible Virginia voters who are naturalized citizens. The Purge Program, ordered by Governor Youngkin and implemented by Defendants, affirmatively directs state agencies to identify and purge voters on a systematic and ongoing basis—including during the immediate lead up to the 2024 General Election—in direct violation of the 90-day quiet period mandated by the National Voter Registration Act ("NVRA"). 52 U.S.C. § 20507(c)(2)(A).

7.      Despite Plaintiffs' multiple requests, including through a letter from VACIR sent August 20, 2024, and a letter sent from Plaintiffs on October 3, and in violation of the Public Disclosure of Voter Registration Activities provision of the NVRA, 52 U.S.C. § 20507(i), Defendant Beals has thus far provided little information related to the Purge Program, including refusing to provide the identities of the persons subject thereto. As a result, Plaintiffs have not been able to determine conclusively who has been identified for removal or who has been removed.

What is clear from Plaintiffs' investigation and the clear directives in E.O. 35 is that the Purge Program relies on erroneous data—from the DMV and perhaps other sources—that includes both naturalized and U.S.-born U.S. citizens and is ongoing during the 90-day quiet period.

8.      The Purge Program systematically removes Virginians from the voter rolls shortly before the November 2024 general election based solely on the fact that they were at one point identified as a potential noncitizens—according to databases from the DMV or other sources— even if they have since become naturalized citizens and lawfully registered to vote or even if they are U.S.-born citizens who were mistakenly identified as noncitizens.

9.      Governor Youngkin's ordered Purge Program, by design, identifies and classifies based on national origin without considering naturalized citizenship status. It then relies on that classification to mark individuals for removal from the voter rolls. The data and methodology that forms the basis of the Purge Program discriminates based on national origin and predictably sweeps in naturalized citizens. Many naturalized citizens have had interactions with the DMV prior to becoming a citizen. That is because all naturalized citizens were once legal permanent residents, and legal permanent residents are permitted to obtain driver's licenses and other forms of state identification, which can remain valid for up to eight years.

10.     E.O. 35 claimed that Virginia has made "unprecedented strides in improving…protection against non-citizen registration," but evidence overwhelmingly shows that noncitizen registration and voting is vanishingly rare in Virginia and across the United States, and voter purges aimed at *alleged* noncitizens primarily prevent *eligible* naturalized citizens from casting ballots.

11.     In its implementation, the Purge Program arbitrarily sweeps in both naturalized citizens and U.S.-born citizens not targeted by the program. While U.S.-born citizens would only

be marked as noncitizens in DMV data due to user error in mistakenly checking the wrong box or leaving a box unchecked during electronic transactions with the DMV, the Purge Program has also erroneously removed from the voter rolls at least some eligible voters who are U.S.-born citizens.

12.     Plaintiffs are nonprofit organizations whose missions are to help eligible Virginians register and vote and to provide services to Virginia's immigrant communities, including by providing education and assistance to Virginia's naturalized citizens in voter registration and voting. The organizations' members include naturalized and U.S.-born eligible U.S. citizens whose registrations are at risk under the Purge Program.

13.     The Purge Program harms Organizational Plaintiffs VACIR and LWVVA directly because, instead of registering additional new voters and providing programs for Virginia's immigrant community, they have and will continue to spend time and money (1) identifying new citizens, including those who have been targeted for removal or purged; (2) educating the public, in particular new citizens, on how to respond to being targeted for removal and ensuring that they remain registered or, if they were purged, how to reregister; (3) assisting new citizens who have been targeted for removal with defending their registrations and right to vote; (4) ensuring that any voters who are affected by the Purge Program who are required to vote using a provisional ballot have their votes counted. It further harms Organizational Plaintiffs because they have members who are naturalized citizens. Enjoining the Purge Program is necessary to end these harms to Organizational Plaintiffs.

14.     The Purge Program violates the NVRA because it (1) constitutes systematic voter list maintenance within 90 days preceding a federal election; (2) discriminatorily identifies naturalized citizens for removal and is not being carried out uniformly across local jurisdictions; and (3) requires voters to provide additional proof of U.S. citizenship not required by the National

Mail Voter Registration Application or voter registration applications at the DMV and public assistance agencies in order to remain registered. *See* 52 U.S.C. §§ 20504(c), 20505(a), 20506(a), 20507(b). Defendant Beals has further violated the Public Disclosure of Voter Registration Activities provision of the NVRA, 52 U.S.C. § 20507(i), by refusing to provide Plaintiffs with the list of voters identified as potential noncitizens within a reasonable amount of time despite having those records in her office's possession. Plaintiffs therefore respectfully request that the Court declare the Purge Program unlawful, enjoin Defendants from implementing the Purge Program, restore all unlawfully removed voters to the rolls and provide public and individualized notice thereof, produce the list of voters identified as potential noncitizens, and afford Plaintiffs all other just and proper relief.

## JURISDICTION AND VENUE

15.     This action is brought pursuant to 52 U.S.C. § 20510(b), which provides that "[a] person who is aggrieved by a violation of [the NVRA]…may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation."

16.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1357 because the claims in the action arise under the laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction to grant declaratory and injunctive relief and all other forms of relief available under federal law, including 28 U.S.C. §§ 2201 and 2202.

17.     This Court has personal jurisdiction over the Defendants, who are all elected or appointed officials and citizens of Virginia.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the Defendants engage in their official duties in this District, because a substantial part of the events or omissions

giving rise to the claims occurred in this District, and because at least one Defendant resides in this District and all Defendants are Virginia residents.

## PARTIES

**Plaintiffs**

19.     Plaintiff **Virginia Coalition for Immigrant Rights** is a multi-racial and multi-ethnic coalition of member organizations that exists to win dignity, power, and quality of life for all immigrant and refugee communities. They seek to create a Virginia where immigrant and refugee communities have full access to family, civic, economic, and social life.

20.     VACIR is comprised of 49 standing member organizations, including legal services providers, civil rights groups, and labor unions, each of which themselves work to support the immigrant community in Virginia through a variety of programs, including by assisting with voter registration and education for eligible naturalized citizens.[2] VACIR unifies those organizations and supports them in achieving their shared goals, including by providing mini-grants to members to

---

[2] As of the filing of this Complaint, VACIR standing member organizations are ACLU People Power – Fairfax; ACLU of Virginia; African Communities Together; American Jewish Committee; AYUDA; Bread for the World; Centreville Immigration Forum; Church World Service; Coalition of Asian Pacific Americans of Virginia; Congregation Action Network; Cornerstone; Domestic Workers Alliance; Dream Project; Dreamers Mothers In Action; Edu Futuro; EMGAGE; Fuego Coalition; Hamkae Korean Community Center; Hispanic Organization of Leadership and Action; Jewish Community Relations Council; Just Neighbors; Korean American Association of Northern Virginia; Latina Institute for Reproductive Justice; League of United Latin America Citizens; Legal Aid Justice Center; Multicultural Community Center; Neighbor's Keeper; New Virginia Majority Education Fund; Northern Virginia Affordable Housing Alliance; NoVA Labor; Progress Virginia; Sacred Heart Catholic Community Center; SEIU 512; SEIU 32BJ; Shirlington Employment and Education Center; Sin Barreras; Tenants and Workers United; The Commonwealth Institute for Fiscal Analysis; Unitarian Universalist for Social Justice; United Food and Commercial Workers Local 400; Virginia Civic Engagement Table; Virginia Coalition of Latino Organizations; Virginia Immigration Intercollegiate Alliance; Virginia Interfaith Center for Public Policy; Virginia League of Planned Parenthood; Virginia League of Women Voters; Virginia Organizing; Virginia Poverty Law Center; and Voices for Virginia's Children.

operate programs directed at assisting with voter registration and education for eligible naturalized citizens.

21.     The Purge Program has harmed and will continue to harm VACIR and its members in various ways. VACIR has had to divert significant resources away from its core activities including removing language barriers to obtain government assistance, oversight of immigration detention facilities, providing support for community oversight to the Temporary Protected Status program, advocacy activities related to expanding state programs affecting immigrant communities including Medicare expansion, and providing support for community mobilization around general voter registration efforts for New Americans, and toward responding to and attempting to mitigate the effects of E.O. 35 and the Purge Program in erroneously removing eligible voters from the rolls and intimidating eligible naturalized citizens from participating in voter registration and voting. VACIR's response efforts are ongoing and include investigating the Purge Program through submitting public records requests and spending thousands of dollars to cover the costs of production, engaging in direct multi-lingual public education and outreach to naturalized citizen voters about maintaining their voter registration and re-registering if they have been removed through the Purge Program, and supporting its members to adjust and redirect general community voter registration and outreach programs toward specifically responding to E.O. 35 and the Purge Program, including through educating and assisting naturalized citizen voters with checking their voter registration status and how to re-register if they have been removed.

22.     A number of VACIR's member organizations are membership organizations themselves whose members include substantial numbers of naturalized citizens, including EMGAGE, African Communities Together, SEIU 32BJ, Hamkae Center, Latina Institute for

Reproductive Justice-Virginia, Domestic Workers Alliance, NoVA Labor, and Tenants and Workers United. These organizations' naturalized citizen members are at particular risk of being purged because they may have previously self-identified as noncitizens with the Virginia DMV while applying for a driver's license and then later registered to vote through another means after obtaining their citizenship. As a direct result of E.O. 35 and the Purge Program, these members must now constantly re-check their registration status, may be forced to provide additional documentation to vote, may be intimidated from registering to vote or voting due to the Purge Program and the explicit public threat of investigation or prosecution in E.O. 35, and face other burdens due to the Purge Program.

23.    A number of VACIR's member organizations have also been directly harmed by being forced to divert resources away from core activities including providing direct support and assistance to community members through a variety of programs and toward responding to and attempting to mitigate the effects of E.O. 35 and the Purge Program in erroneously removing eligible voters from the rolls and intimidating eligible naturalized citizens from participating in voter registration and voting.

24.    Plaintiffs **League of Women Voters of Virginia and League of Women Voters Education Fund,** formed under Section 501(c)(4) and 501(c)(3) of the Internal Revenue Code, respectively, are nonpartisan, nonprofit, membership organizations that seek to encourage informed and active participation in government, work to increase understanding of major public policy issues, and influence public policy through education and advocacy. LWVVA is a state League of the national League of Women Voters, which was founded in 1920 as an outgrowth of the struggle to win voting rights for women, has more than 500,000 members and supporters, and is organized in more than 750 communities in all 50 states and the District of Columbia. LWVVA

has approximately 2,000 members across the state of Virginia. Some of LWVVA's members are naturalized citizens.

25.     LWVVA is comprised of dues-paying members who volunteer in Virginia communities to provide voter services. LWVVA has no paid employees or staff involved with the operation of the League. Through its volunteer leaders, LWVVA provides regular training to its members and to its nonpartisan partners to assist Virginians, including those who are naturalized citizens, in getting registered, voting, and confirming their registration status. LWVVA has also arranged required Virginia training for third party voter registration for its members and nonpartisan partner organizations. LWVVA does this work as a part of its mission to protect the right to vote for Virginia voters and considers its work registering voters, encouraging them to vote, and confirming their registration to be an expression of those core values. LWVVA uses voter registration assistance as a part of a larger dialogue about a citizen's voter registration, voting plan, and the importance of voter turnout: the goal is to ensure all eligible Virginia voters are registered to vote, have a plan to vote, and can and do actually vote.

26.     E.O. 35 and the Purge Program have harmed and will continue to harm the League and its members in various ways. First, the League has diverted and will continue to divert resources to counteract the harms created by the Purge Program. At the most consequential period of time for the League's core mission activities, the League first had to use its resources to rapidly understand the impact of E.O. 35 and its effect on Virginia voters. When the League learned of the Purge Program's identification of eligible Virginian voters for removal, the League had to expend its resources to counteract the immediate confusion and misinformation created by the Purge Program. The broadest way of doing so without amplifying false claims of noncitizen voting has been to expand announcements for all Virginians to check their registration, even those who have

no changes in their voter profile. The Purge Program has forced the League to both broaden these "check your registration" efforts beyond its previously targeted audience and to expand its focus on naturalized citizens. For instance, the League has already spent at least $600 to create, translate into multiple languages, and distribute a public service announcement (PSA) throughout the state reminding voters of their right to vote and instructing them to check that their registration is valid before Election Day. The League created and distributed the PSA in direct response to the Purge Program, to ensure that all Virginia voters—including voters that the League has registered and voters who are League members—are registered and are able to vote on Election Day, in furtherance of the League's goals of registering eligible voters and ensuring all eligible voters can vote. In direct response to the Purge Program, the League also increased its budget for digital media impressions on mobile devices by $2,000. These PSAs were necessary because the Purge Program has deregistered thousands of Virginians, including Virginians eligible to vote, and has unquestionably intimidated many more naturalized Virginians who are now less likely to vote for fear of criminal investigation and prosecution. Therefore, the Purge Program will decrease the number of registered voters and decrease voter turnout, directly harming the League's mission of increasing the number of registered voters and increasing voter turnout. The PSA was necessary to ameliorate those harms.

27.     Separately, the League has devoted and will continue to devote resources and members' time to counteract the effects of the Purge Program, such as by helping members and registered voters determine whether they remain eligible and by helping voters who are purged restore their eligibility. This includes direct outreach and public outreach to naturalized citizens through media, such as the League President's September interview at Spanish speaking radio station WRKE 100.3 LP-FM. The League is further burdened by diverting its coordination

resources with other non-profits towards understanding and addressing the effects of E.O. 35 rather than coordinating on core voter assistance programs. Absent such diversion, the League would spend its money and member time on getting out the vote for the 2024 general election and planning its advocacy activities for the next year. It would also hold more voter registration drives.

28.     Aside from resource diversion, the Purge Program directly harms the League's mission. When voters are unlawfully purged, it decreases the number of voters in Virginia, contrary to the League's mission of increasing the number of registered voters and voter turnout. When voters are intimidated or must take additional steps to remain registered, it harms the League's mission of ensuring that voting is easy and open for all eligible Virginians.

29.     The Purge Program also harms the League's members. The League's membership includes naturalized citizens, and those members are at particular risk of being purged because they may have previously self-identified as noncitizens with the Virginia DMV. Those members must constantly re-check their registration status, may need to provide additional documentation to vote, are intimidated by the Purge Program and the threat of investigation or prosecution, and face other burdens due to the Purge Program.

30.     Further, Commissioner Beals's refusal to release information about the Purge Program, including the list of voters who have been removed on the basis of the Purge Program harms LWVVA's mission. Because LWVVA cannot contact the voters who have been removed on the basis of the Purge Program—including any LWVVA members—LWVVA cannot further its goals by ensuring all eligible voters targeted by the Purge Program are registered to vote.

**Defendants**

31.     Defendant **Susan Beals** is the Virginia Commissioner of Elections. The Commissioner of Elections is the "principal administrative officer" of the Department of Elections,

Va. Code § 24.2-102(B), and "the chief state election officer responsible for the coordination of state responsibilities under the National Voter Registration Act," *id*. § 24.2-404.1. Defendant Beals is also responsible for ensuring the implementation of the Purge Program by "certify[ing] in writing to the Governor" that the Purge Program's requirements are being met. E.O. 35 at 3. As the head of the Department of Elections, she is also responsible for generating the Purge Program's daily list of voters alleged to be noncitizens. *Id.* at 4. Defendant Beals is sued in her official capacity.

32.     Defendant **John O'Bannon** is the Chairman of the State Board of Elections ("the Board"); **Rosalyn R. Dance** is the Vice-Chairman of the Board; **Georgia Alvis-Long** is the Secretary of the Board; and **Donald W. Merricks** and **Matthew Weinstein** are members of the Board (collectively "State Board of Election Members"). They are all sued in their official capacities. "The State Board, through the Department of Elections, shall supervise and coordinate the work of the county and city electoral boards and of the registrars to obtain uniformity in their practices and proceedings and legality and purity in all elections." Va. Code § 24.2-103(A). It is the duty of the Board to "make rules and regulations and issue instructions and provide information consistent with the election laws to the electoral boards and registrars to promote the proper administration of election laws." *Id*.

33.     Defendant **Jason Miyares** is the Attorney General of Virginia. Under Virginia law, the Attorney General has "full authority to do whatever is necessary or appropriate to enforce the election laws or prosecute violations thereof." Va. Code § 24.2-104(A); E.O. 35 at 4. Defendant Miyares endorsed the Purge Program, claiming credit for E.O. 35's original announced purge of

14

6,303 alleged noncitizens from the voter rolls.[3] Registrars and County Electoral Boards have since referred to Defendant Miyares for criminal investigation and possible criminal prosecution additional individuals whose voter registration was cancelled because of the Purge Program. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

**I.      The Purge Program and Governor Youngkin's Announcement of E.O. 35**

34.      Governor Youngkin announced E.O. 35 on August 7, 2024—exactly 90 days before the 2024 General Election on November 5 and 45 days before the start of early in-person voting. E.O. 35. With this timing, every subsequent voter removal is necessarily within the NVRA's "quiet period."

35.      In his August announcement, Governor Youngkin was clear that the Purge Program had already begun, explaining that between January 2022 and July 2024, 6,303 voters were removed from the voter rolls based on DMV data shared with ELECT. E.O. 35 at 2. He also explained that the Program uses a systematic, ongoing process saying, "We verify the legal presence and identity of voters using DMV data and other trusted data sources to **update our voter rolls daily**, not only adding new voters, but **scrubbing the lists** to remove those that should not be on it, like…non-citizens that have accidentally or maliciously attempted to register."[4]

36.      The Purge Program is intended to and does operate systematically: it requires "daily updates" to cancel the voter registrations of individuals identified as potential non-U.S. citizens

---

[3] Jason Miyares (@JasonMiyaresVA), X (Aug. 7, 2024, 1:57 PM), https://perma.cc/6JGJ-KLJD ("6,303. That's the number of noncitizens identified and removed from Virginia's voting rolls under our watch. I'm proud of my office's work to help ensure election integrity.").
[4] *Governor Glenn Youngkin Issues Executive Order to Codify Comprehensive Election Security Measures to Protect Legal Voters and Accurate Counts*, Office of the Governor (Aug. 7, 2024), https://www.governor.virginia.gov/newsroom/news-releases/2024/august/name-1031585-en.html (emphasis added).

based on faulty and outdated data without a meaningful and individualized inquiry into its accuracy. *See* E.O. 35 at 3-4.

37.     Upon information and belief, neither the DMV, ELECT, nor county officials take any action to verify the veracity of the information suggesting an individual flagged through the Purge Program is in fact a noncitizen prior to sending the 14-day notice and initiating the removal process, instead putting the burden entirely on the voter to re-affirm their citizenship or face removal.

38.     To avoid cancellation of their voter registration, voters who receive a letter must "affirm their citizenship" in response to the single notice within 14 days of its sending. If they do not, registrars must cancel their registration.

39.     The Purge Program further requires that registrars "immediately notify the Commonwealth's Attorney for their jurisdiction of this alleged unlawful conduct." E.O. 35 at 4.

## II.     Implementation of the Purge Program

40.     Virginians have been removed from the rolls in the 90-day "quiet period" as a result of the Purge Program, and more will be removed until it is enjoined.

41.     ELECT has confirmed that it and registrars are daily receiving "non-citizen data" from the DMV and daily "[r]emoving individuals who declare or provide documentation indicating non-citizenship status and who do not respond to an affirmation of citizenship notice." Ex. 1. Indeed, ELECT and the DMV entered a new Memorandum of Understanding on September 3, 2024, ensuring the daily data exchanges will occur. Ex. 2.

42.     Counties are using these daily updates from ELECT to remove Virginians from the voter rolls. For example, Arlington, Fairfax, and Loudoun Counties have all followed ELECT's instructions and cancelled the registrations of voters as a result of the Purge Program. Exs. 3, 4, 5.

Loudoun County confirmed eight cancellations in August for alleged noncitizenship, Ex. 6 at 9, and Fairfax confirmed 49 cancellations as a result of the Purge Program, Ex. 5 at 7.

43. The 49 voter registration cancellations in Fairfax County were all due to a failure of the voter to reply affirming their citizenship within 14 days of the notice being sent. Originally, 66 voters were identified and noticed as alleged noncitizens, but 17 voters responded confirming their citizenship "and re-registered within the 14-day requirement." Ex. 5 at 7. A member of the Fairfax County Electoral Board acknowledged that "his understanding was that many of these individuals are citizens who inadvertently checked the wrong box or did not check any box for the citizenship question on the DMV website" but also noted that registrars are unable to do research into the source of the noncitizen DMV demarcation because "the local election offices have 'no way of knowing' how the individual answered the DMV citizenship question." Ex. 5 at 7.

44. The Fairfax Electoral Board's minutes specifying that 17 voters had "re-registered" in the 14-day window demonstrates that the Purge Program does, in fact, operate as an automatic removal from the moment the alleged noncitizen is identified to the county registrar no matter what terminology is applied.

45. Arlington, Fairfax, and Loudoun Counties also all referred alleged noncitizen voters to the Commonwealth Attorneys for their jurisdictions for criminal investigation and potential prosecution. Exs. 3, 4, 5. Arlington and Fairfax Counties have also both referred alleged noncitizens to Defendant Attorney General Miyares for investigation and potential prosecution. Exs. 3, 5.

### III.     The Purge Program's Impact on Naturalized Citizens

46. On information and belief, the Purge Program has resulted and will continue to result in the cancellation of the voter registration of naturalized U.S. citizens. Even though

naturalized citizens have the same fundamental right to vote as U.S.-born citizens, the Purge Program systematically jeopardizes the voting rights of naturalized citizen voters. The Purge Program requires naturalized citizens to provide further citizenship verification to stay on the rolls or, if they do not do so within 14 days, confirms their removal and refers them for criminal investigation and prosecution.

47.    Data from U.S. Citizenship and Immigration Services (USCIS) shows that thousands of Virginia residents are naturalized every year. In Fiscal Year 2023, the most recent full year for which state-specific data is available, 24,100 Virginia residents became naturalized citizens.[5] Naturalization applications generally increase in advance of general elections,[6] and, according to USCIS data last updated on August 12, 2024, there were still an estimated 270,588 lawful permanent residents in Virginia eligible to naturalize.[7]

48.    The Census Bureau has found that roughly 61% of naturalized citizens are registered to vote.[8]

49.    To become a naturalized citizen, a person must first be a lawful permanent resident (often colloquially called a "green card holder") for years. The sole exceptions are for a small number of people who become naturalized citizens due to certain service in the U.S. military or who were previously noncitizen nationals of the United States because they were born in certain

---

[5]    *Naturalization Statistics*, USCIS, https://www.uscis.gov/citizenship-resource-center/naturalization-statistics (last updated May 9, 2024).
[6]    *U.S. Naturalization Policy* 16-17, Congressional Research Service (Apr. 15, 2024), https://crsreports.congress.gov/product/pdf/R/R43366.
[7]    *Eligible to Naturalize Dashboard*, USCIS (Aug. 12, 2024), https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data/eligible-to-naturalize-dashboard.
[8]    *Voting and Registration in the Election of November 2022,* Table 11, U.S. Census Bureau (Apr. 2023), https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-586.html.

U.S. territories. For that reason, all (or virtually all) naturalized citizens in Virginia lived in the United States for years before they were citizens, as noncitizens and lawful permanent residents.[9]

50.     Virginia drivers' licenses, permits, and special identification cards are available to citizens and noncitizens alike including legal permanent residents, "conditional resident alien[s]," approved applicants for asylum, and entrants into the United States in refugee status. Va. Code § 46.2-328.1(A). Those forms of identification can remain valid during the applicant's authorized stay in the United States, up to the legal limit of eight years. *Id*. at §§ 46.2-328(B); 330(A).

51.     Because a person must ordinarily be a lawful permanent resident for years before becoming a naturalized citizen, and because a lawful permanent resident may obtain a driver's license, permit, or special identification card in Virginia, it is extremely likely that many naturalized citizen residents of Virginia had a noncitizen exchange with the DMV prior to naturalization.

52.     This means that an individual could obtain a driver's license or form of identification as a non-U.S. citizen and subsequently become a U.S. citizen and lawfully register to vote—for example by using a paper voter registration form at their naturalization ceremony— without updating their DMV record to reflect their citizen status. *See* Va. Code §§ 46.2-328.1(A), 330(A). Under these circumstances, the DMV's records would still indicate that an eligible voter

---

[9] In addition, some children born outside the U.S. who were legal permanent residents become U.S. citizens by operation of law, in what is called "derived citizenship." These children are not required to go through the naturalization process or obtain any documentation when they become citizens. When they turn 18, they can register to vote if they are otherwise eligible. Individuals with derived citizenship were typically children when at least one parent became a naturalized citizen. *See Policy Manual, Chapter 4 - Automatic Acquisition of Citizenship after Birth (INA 320)*, USCIS, https://www.uscis.gov/policy-manual/volume-12-part-h-chapter-4. Derived citizens are subject to the same unlawful practices as naturalized citizens under the Purge Program, and the claims regarding the unlawfulness of the Purge Program with respect to naturalized citizens in this lawsuit apply equally to derived citizens—since they, too, were previously legal permanent residents and could have interacted with the DMV before becoming citizens.

was not a U.S. citizen at the time they obtained their identification, thereby improperly and erroneously triggering the removal process.

53.     The DMV does not require people to show additional proof of citizenship or lawful residence when they renew their drivers' licenses (so long as they showed such proof since 2004 for legal permanent residents or 2020 for asylees or refugees).[10] Thus citizens who became naturalized *over the last twenty years* would likely not have updated citizenship documents on file with the DMV if they obtained a driver's license before their naturalization.  The Purge Program directly threatens the voting rights of these citizens.

54.     Upon information and belief, eligible voters often mistakenly leave a box empty or check the wrong box during electronic transactions with the DMV in a way that indicates they are not a citizen despite having already confirmed their citizenship while registering to vote, thereby improperly and erroneously triggering the removal process. Ex. 5 at 7. This can impact naturalized citizens as well as U.S.-born U.S. citizens.

55.     Further, naturalized citizens in Virginia overwhelmingly come from communities of color that have historically been subject to discrimination in the exercise of their voting rights. For instance, in fiscal year 2022, the top five countries of origin for the 27,324 naturalized Virginia residents were: India (2,060), Afghanistan (1,803), Pakistan (1,357), Philippines (1,356), and El Salvador (1,685).[11]

---

[10] *Virginia's Legal Presence Law*, Virginia Department of Motor Vehicles, available at https://www.dmv.virginia.gov/licenses-ids/id-cards/legal-presence (last accessed Oct. 3, 2024).
[11] *Profiles on Naturalized Citizens*, U.S. Dep't of Homeland Sec., Office of Homeland Sec. Statistics, https://ohss.dhs.gov/topics/immigration/naturalizations/profiles-naturalized-citizens.

56.     In other states, state officials have created similar legally flawed programs in reliance on information provided when an individual obtained a driver's license. In each of those cases, public reporting and lawsuits have uncovered that the programs targeted naturalized citizens.

57.     Registration is the largest obstacle to voting in the United States. H.R. Rep. No. 103-9, at 3 (1993) ("Public opinion polls, along with individual testimony . . . indicate that failure to become registered is the primary reason given by eligible citizens for not voting. It is generally accepted that over 80 percent of those citizens who are registered vote in Presidential elections.").

58.     In passing the NVRA to protect the fundamental right of eligible United States citizens to vote, Congress acknowledged that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3).

59.     On information and belief, Defendants have not taken any meaningful steps to ensure that individuals flagged by the Purge Program are not in fact U.S. citizens, even though (1) DMV data regarding citizenship is known to be outdated and unreliable as an indicator of current citizenship status, and (2) noncitizen designation or transactions in the DMV data are often the sole criterion to trigger voter registration cancellation.

60.     Because the Purge Program by design singles out individuals who were once identified in DMV records as noncitizens and subjects them to scrutiny not generally faced by U.S.-born citizens, the Purge Program discriminates based on national origin and against naturalized citizens.

61.     Beyond its patent violation of the NVRA's quiet period, Virginia's Purge Program subjects naturalized citizens who have previously attested to their U.S. citizenship under penalty

21

of perjury—as all other Virginia voters do—to a duplicative, arbitrary, and discriminatory process to remain registered and vote. Giving alleged noncitizen voters less than two weeks to complete that process (including the time it takes to receive, complete and mail back the form) exacerbates the severity of the additional barrier these citizens are forced to overcome in order to vote.

## IV.     The Purge Program's Impact on U.S.-Born Citizens

62.     On information and belief, the Purge Program has resulted and will continue to result in the cancellation of the voter registration of U.S.-born citizens. Individuals interacting with the DMV through electronic transactions often mistakenly select the wrong box in fields prompting the individual to indicate whether they are a U.S. citizen.

63.     At least some individuals who are U.S. citizens mistakenly check the box indicating they are not a citizen, which would result in the individual being flagged in the DMV's noncitizens transactions list.

64.     Because the Purge Program requires the DMV to transmit the list of noncitizen transactions to ELECT on a daily basis, DMV staff may not be able to identify and correct any user errors by U.S. citizens mistakenly indicating they are not a citizen prior to transmitting the list to ELECT, leading to these citizens being erroneously identified to ELECT as potential noncitizens.

## V.     Plaintiffs' Thwarted Effort to Obtain Information from the State

65.     On August 20, 2024, Plaintiff VACIR sent a letter to Defendant Beals, Defendant Miyares, the DMV, and the Office of the Governor requesting copies of all records relating to the removal from the voter registration rolls of Virginia registered voters on the basis that they have been identified as a potential "non-citizen." Ex. 7. The request was made pursuant to the Public Disclosure of Voter Registration Activities provision of the NVRA, 52 U.S.C. § 20507(i).

Defendant Beals made only a limited initial production of responsive records, despite a September 9 meeting with Defendant Beals's staff and numerous emails discussing the specific records responsive to the request.

66.     On October 3, 2024, Plaintiffs sent a letter entitled "Notice of Violation of National Voter Registration Act and Demand for Remediation and Documents" to Defendants Beals and Miyares. Ex. 8. That letter, sent pursuant to the NVRA (52 U.S.C. § 20510(b)(2)), informed Defendants Beals and Miyares that the Purge Program violates the three provisions of the NVRA listed in Counts One through Three, *infra*. The letter also demanded records pursuant to 52 U.S.C. § 20507(i)(1), including, among other things: individualized voter information for voters affected by the Purge Program; instructions provided to Boards of Registrars regarding implementation of E.O. 35; and communications between Defendant Beals and Defendant Miyares regarding the Purge Program. ELECT responded to that letter on October 7, 2024, asserting that its "established voter list maintenance processes comply with all applicable state and federal laws" and that it will provide the list of individuals cancelled due to being declared a non-citizen within 90 days from the date of VACIR's August request. Ex. 9.

## CLAIMS

### COUNT ONE
**Violation of the National Voter Registration Act, 52 U.S.C. § 20507(c)(2)(A)**
(*Ex parte Young*, 52 U.S.C. § 20510)
All Plaintiffs Against All Defendants

67.     Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

68.     The NVRA requires that Virginia complete "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" "not later than 90 days prior to the date of a[n] . . . election for Federal office." 52 U.S.C.

§ 20507(c)(2)(A). This provision, called the "90-Day Provision," means that Virginia may not take any steps to implement any program to systematically remove voters within the 90-day period before the date of a general election—the "quiet period."

69.     The Purge Program violates the NVRA's 90-Day Provision because it (1) is a program with the purpose of systematically removing voters from the rolls and (2) has not been completed before the 90-day quiet period before the 2024 general election and was not completed before the 90-day quiet period before the 2024 primary elections.

70.     The NVRA provides that "[i]f the violation occur[s] within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State…before bringing a civil action." 52 U.S.C. § 20510(b)(3). By its own terms, the Purge Program is ongoing, with potential purges occurring daily, all within 30 days before the November 5, 2024 election for Federal office. E.O. 35 at 3-4. Plaintiffs can, therefore, bring a civil action without notice to Virginia's chief election official.

**COUNT TWO**
**Violation of the National Voter Registration Act, 52 U.S.C. § 20507(b)(1)**
(*Ex parte Young*, 52 U.S.C. § 20510)
All Plaintiffs Against All Defendants

71.     Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

72.     The NVRA requires that voter list maintenance programs be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1).

73.     The Purge Program violates the NVRA's requirement that voter list maintenance programs be "uniform" and "nondiscriminatory" because it identifies registered voters based on national origin and type of citizenship status. Because Defendants' Purge Program is triggered by DMV data indicating a voter had previously been identified as a noncitizen, the Purge Program is

directed at individuals who were formerly noncitizens versus U.S.-born, citizens. It inevitably and predictably (indeed, by design) identifies and places burdens on citizens born outside the United States whom Defendants know or should know may be naturalized.

74.     The NVRA provides that "[i]f the violation occur[s] within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State…before bringing a civil action." 52 U.S.C. § 20510(b)(3). By its own terms, the Purge Program is ongoing, with potential purges occurring daily, all within 30 days before the November 5, 2024 election for Federal office. E.O. 35 at 3-4. Plaintiffs can, therefore, bring a civil action without notice to Virginia's chief election official.

## COUNT THREE
**Violation of the National Voter Registration Act, 52 U.S.C. §§ 20508(b)(1), 20505(a)(1)-(2)**
(*Ex parte Young*, 52 U.S.C. § 1983)
All Plaintiffs Against All Defendants

75.     Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

76.     The NVRA limits proof of citizenship to an attestation under penalty of perjury that the registrant is a U.S. citizen. *See Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1 (2013); *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016); 52 U.S.C. §§ 20505(a)(1)-(2), 20508(b)(2)(A)-(B).

77.     The NVRA provides that a state voter registration form "may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. §§ 20505(a)(1)-(2), 20508(b)(1). Under the NVRA, a state voter registration form "shall include a statement that (A) specifies each eligibility

requirement (including citizenship); (B) contains an attestation that the applicant meets each such requirement; and (C) requires the signature of the applicant, under penalty of perjury." *Id.* §§ 20505(a)(1)-(2), 20508(b)(2); *see also id.* § 20504(c).

78.     By requiring certain voters to reaffirm their U.S. citizenship to remain registered, the Purge Program violates the NVRA's command that voters need only complete a voter registration form to be a registered voter in federal elections.

79.     By inserting an additional requirement that certain voters provide additional citizenship information about themselves as part of the State's DMV data checks and motor voter forms, the Purge Program also violates the NVRA's long-established principle that states may not add unnecessary voter registration requirements at any stage of the registration process by inserting an additional requirement that certain voters provide additional citizenship information about themselves as part of the State's DMV data checks and motor voter forms.

80.     The NVRA provides that "[i]f the violation occur[s] within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State…before bringing a civil action." 52 U.S.C. § 20510(b)(3). By its own terms, the Purge Program is ongoing, with potential purges occurring daily, all within 30 days before the November 5, 2024 election for Federal office. E.O. 35 at 3-4. Plaintiffs can, therefore, bring a civil action without notice to Virginia's chief election official.

## COUNT FOUR
**Violation of the National Voter Registration Act, 52 U.S.C. § 20507(i)**
(*Ex parte Young*, 52 U.S.C. § 1983)
All Plaintiffs Against Defendant Beals

81.     Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

82.     The Public Disclosure of Voter Registration Activities provision of the NVRA

provides that states "shall maintain for at least 2 years and shall make available for public inspection… all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1). The Public Disclosure Provision covers individualized records for registered voters subject to removal programs. *See PILF v. N.C. State Board of Elections*, 996 F.3d 257 (4th Cir. 2021); *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012); *see also* 52 U.S.C. 20507(i)(2).

83.     Defendant Beals has thus violated the Public Disclosure of Voter Registration Activities provision of the NVRA by refusing to provide Plaintiffs with the list of voters identified as potential noncitizens within a reasonable time period despite having those records in her office's possession at the time Plaintiff VACIR requested these records on August 20 and when all Plaintiffs requested records on October 3.

84.     Defendant Beals's and her office's continuing refusal to provide the requested records up to and including the time of filing of this lawsuit—which now falls within the 30-day period prior to a federal election within which aggrieved parties have immediate standing to sue to vindicate their rights under the NVRA, 52 U.S.C. § 20510(b)(3)—is certainly unlawful and the requested records must now be produced immediately.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

a.     Declare that Defendants' Purge Program violates the NVRA;

b.     Preliminarily and permanently enjoin Defendants from implementing the Purge Program and from cancelling any voter's registration as part of the Purge Program or on the basis of failing to respond to a notice letter issued as a result of the implementation of the Purge Program;

c.     Order Defendants Beals and State Board of Election Members to instruct all Virginia county registrars to place back on the rolls in active status any persons whose voter registration was cancelled or marked inactive as part of the Purge Program, except for any voter who responded to a notice letter by affirming that they are not a U.S. citizen, and instruct that all impacted voters should be allowed to cast regular ballots if they appear at the polls so long as they are otherwise eligible to do so;

d.     Order Defendants Beals and State Board of Election Members to instruct all Virginia county registrars to send letters to affected voters retracting the notice letters already sent out on the basis of the Purge Program;

e.     Order all Defendants to take all such steps and instruct Virginia county registrars to take all such steps as are necessary to alert the public and all individuals who were sent notice letters as a result of the implementation of the Purge Program that the notice letters sent pursuant to the Purge Program are being rescinded, that all eligible voters whose voter registration was cancelled or marked inactive due to the Purge Program may vote in the November 2024 general election, and that all eligible voters whose voter registration was cancelled or marked inactive due to the Purge Program are on the voter rolls and need not re-register to vote;

f.      Order Defendants Beals and State Board of Election Members to retract all referrals made to Virginia law enforcement for investigation or prosecution of individuals made based on the Purge Program;

g.      Order all Defendants to take all such steps as are necessary and instruct Virginia county registrars to take all such steps as are necessary to alert the public and all individuals whose voter registration was cancelled or marked inactive due to the Purge Program that no voter will be criminally investigated or prosecuted on the basis of the Purge Program, absent specific, individualized information that they have violated a law;

h.      Order all Defendants to provide Plaintiffs with all records concerning the implementation of the Purge Program, including, but not limited to, the lists of the names and addresses and other individualized data available of all persons to whom removal notice were sent and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made, as well as the lists of the names and addresses and all other individualized data available of all persons who have been subject to investigation for alleged violations of law as a result of the Purge Program and all records related to such investigations;

i.      Award Plaintiffs their costs and reasonable attorneys' fees in this action;

j.      Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

k.      Grant Plaintiffs such other relief as this Court may deem just and proper.

Date: October 7, 2024                    Respectfully submitted,

Ezra D. Rosenberg*                       /s/ Shanna Ports
Ryan Snow*                               Shanna Ports* (VSB No. 86094)
Javon Davis*                             Danielle Lang*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS      Kevin Hancock*
UNDER LAW                                Brent Ferguson*
1500 K Street, NW, Ste. 900              Simone Leeper*
Washington, DC 20005                     CAMPAIGN LEGAL CENTER
(202) 662-8600                           1101 14th Street NW, Suite 400
erosenberg@lawyerscommittee.org          Washington, DC 20005
rsnow@lawyerscommittee.org               Tel: (202) 736-2200
jdavis@lawyerscommittee.org              Fax: (202) 736-2222
                                         sports@campaignlegalcenter.org
                                         dlang@campaignlegalcenter.org
                                         khancock@campaignlegalcenter.org
                                         bferguson@campaignlegalcenter.org
                                         sleeper@campaignlegalcenter.org


Orion Danjuma*                           John Powers*
John Paredes*                            Hani Mirza*
THE PROTECT DEMOCRACY PROJECT, INC.      ADVANCEMENT PROJECT
82 Nassau Street, # 601                  1220 L Street Northwest, Suite 850
New York, NY 10038                       Washington, D.C. 20005
Telephone: (202) 579-4582                (202) 728-9557
orion.danjuma@protectdemocracy.org       jpowers@advancementproject.org
john.paredes@protectdemocracy.org        hmirza@advancementproject.org

Benjamin L. Berwick*
THE PROTECT DEMOCRACY PROJECT, INC.
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org


Anna Dorman*                             *Attorneys for Plaintiffs Virginia Coalition for*
THE PROTECT DEMOCRACY PROJECT, INC.      *Immigrant Rights, the League of Women Voters*
200 Pennsylvania Ave. NW, Suite # 163    *of Virginia, and the League of Women Voters of*
Washington, DC 20006                     *Virginia Education Fund*
Telephone: (202) 579-4582
anna.dorman@protectdemocracy.org         *\*Motions for pro hac vice participation*
                                         *forthcoming.*