# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

VIRGINIA COALITION FOR IMMIGRANT
RIGHTS; LEAGUE OF WOMEN VOTERS
OF VIRGINIA; LEAGUE OF WOMEN
VOTERS OF VIRGINIA EDUCATION
FUND; AFRICAN COMMUNITIES
TOGETHER,

     *Plaintiffs*,

       v.

SUSAN BEALS, in her official capacity as
Virginia Commissioner of Elections; JOHN
O'BANNON, in his official capacity as
Chairman of the State Board of Elections;
ROSALYN R. DANCE, in her official capacity
as Vice-Chairman of the State Board of
Elections; GEORGIA ALVIS-LONG, in her
official capacity as Secretary of the State Board
of Elections; DONALD W. MERRICKS and
MATTHEW WEINSTEIN, in their official
capacities as members of the State Board of
Elections; and JASON MIYARES, in his
official capacity as Virginia Attorney General,

     *Defendants*.

Case No. 1:24-cv-01778
Judge Patricia Tolliver Giles

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT..................................................................................................1

STATEMENT OF FACTS .....................................................................................................2

    I.      Background ...................................................................................................2

          A.  Virginia's Purge Program...............................................................2

          B.  Executive Order 35 Broadens the Impact of Virginia's Purge Program .................4

    II.     Plaintiffs ......................................................................................................9

ARGUMENT .........................................................................................................10

    I.      Plaintiffs are Likely to Succeed on the Merits...................................................10

          A.  The Purge Program violates the NVRA's 90-Day Provision. ................................10

          B.  The Purge Program Violates the NVRA's Requirement that Removal Programs be "Uniform" and "Nondiscriminatory."...............................................20

    II.     An Injunction is Necessary to Prevent Irreparable Harm. ...........................................23

    III.    The Balance of Equities and Public Interest Favor an Injunction. .............................27

CONCLUSION........................................................................................................28

## TABLE OF AUTHORITIES

**Cases**                                                                                                              **Page**

*Arcia v. Florida Secretary of State*,
   772 F.3d 1335 (11th Cir. 2014) ................................................12, 13, 15, 16, 17, 19, 20, 24

*Boustani v. Blackwell*, 460 F. Supp. 2d 822 (N.D. Ohio 2006) ....................................................23

*Forward v. Ben Hill County Board of Elections*, 509 F. Supp. 3d 1348 (M.D. Ga. 2020) ............16

*Gonzalez v. Governor of Georgia*, 978 F.3d 1266 (11th Cir. 2020)................................................23

*League of Women Voters of North Carolina v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014)..............................................................................................23, 28

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)......................................24

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) ...........................................................27

*Mi Familia Vota v. Fontes (Vota I)*, 691 F. Supp. 3d 1077 (D. Ariz. 2023) ..................................16

*Mi Familia Vota v. Fontes (Vota II)*, No. CV-22-00509-PHX-SRB, 2024 WL 862406 (D. Ariz. 2024) ...........................................................................................................................................22

*North Carolina State Conference of NAACP v. Bipartisan Board of Elections & Ethics Enforcement*, No. 1:16CV1274, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) ....................16

*Othi v. Holder*, 734 F.3d 259 (4th Cir. 2013) ................................................................................11

*Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) .........................15, 20

*Sullivan v. Stroop*, 496 U.S. 478 (1990)........................................................................................14

*Texas League of United Latin American Citizens v. Whitley*, No. SA-19-CA-074-FB, 2019 WL 7938511 (W.D. Tex. Feb. 27, 2019)...................................................................................22

*United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012)...........................................21, 22

*United States v. Simms*, 914 F.3d 229 (4th Cir. 2019)...................................................................14

*U.S. Student Association Foundation v. Land*, 546 F.3d 373 (6th Cir. 2008) ..............................28

*Vitkus v. Blinken*, 79 F.4th 352 (4th Cir. 2023) ............................................................................10

*Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685 (2022)...................................................................13

**Statutes**

52 U.S.C. § 10101(a)(2)(A)............................................................................................................22

52 U.S.C. § 10503(c) ........................................................................................................................5

52 U.S.C. § 20501.........................................................................................................................28

52 U.S.C. § 20507(b)....................................................................................................................14

52 U.S.C. § 20507(b)(1).....................................................................................................2, 20, 21

52 U.S.C. § 20507(b)(2)................................................................................................................14

52 U.S.C. § 20507(c)(2)(A).............................................................................................1, 10, 11, 14

52 U.S.C. § 20507(a)(3)-(4)...................................................................................14

52 U.S.C. § 20507(a)(3)(A)-(B)............................................................................13

52 U.S.C. § 20507(a)(4)(A)...................................................................................13

52 U.S.C. § 20507(c)(2)(B)(i)....................................................................12, 13, 14

52 U.S.C. § 20507(c)(2)(B)(ii)........................................................................13, 14

52 U.S.C. § 20507(d)............................................................................................13

52 U.S.C. § 20507(d)(3).......................................................................................14

52 U.S.C. § 20507(e)(2)(A)...................................................................................14

52 U.S.C. § 20507(f)............................................................................................14

Va. Code Ann. § 24.2-410.1(A).............................................................................2, 4

Va. Code Ann. § 24.2-427(C)............................................................................2, 3, 4

Va. Code Ann. § 46.2-330(A)..................................................................................3

Va. Code Ann. § 46.2-328.1(A)...............................................................................3

Va. Code Ann. § 46.2-328.1(B)...............................................................................3

**Other Authorities**

Merriam-Webster, *Program*, https://www.merriam-webster.com/dictionary/program (last
    accessed Oct. 14, 2024) ...............................................................................11

Merriam-Webster, *Systematic*, https://www.merriam-webster.com/dictionary/program (last
    accessed Oct. 14, 2024) ...............................................................................11

Notice of Determination, 86 Fed. Reg. 233 (Dec. 8, 2021)..........................................5

Press Release, Gov. Glenn Youngkin, *Governor Glenn Youngkin Issues Executive Order to
    Codify Comprehensive Election Security Measures to Protect Legal Voters and Accurate
    Counts*, Aug. 7, 2024, at https://www.governor.virginia.gov/newsroom/news-
    releases/2024/august/name-1031585-en.html..............................................................6

*Virginia's Legal Presence Law*, Virginia Department of Motor Vehicles, available at
    https://www.dmv.virginia.gov/licenses-ids/id-cards/legal-presence (last accessed Oct. 14,
    2024) ...........................................................................................................4

## PRELIMINARY STATEMENT

Plaintiffs respectfully request that this Court grant urgently needed injunctive relief to halt an ongoing purge of Virginia's voters on the eve of a major election and to restore voters removed in violation of federal law.[1] In the National Voter Registration Act of 1993 ("NVRA"), Congress recognized that systematic programs to purge voter rolls on the eve of a federal election inevitably threaten the rights of eligible voters. It thus prohibited "*any* program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" fewer than "90 days prior to the date of a primary or general election for Federal office." 52 U.S.C. § 20507(c)(2)(A) (emphasis added).

Despite these established protections of federal law, Governor Glenn Youngkin issued an executive order on August 7, 2024—exactly 90 days before the 2024 General Election—escalating a purge program already underway. Given that timing, the intention and effect of E.O. 35 is to command state and county election officials to continue systematic voter purges precisely when federal law mandates they must end. The text of the NVRA and relevant precedent are clear: such efforts are unlawful.

Available evidence further indicates that Defendants' system is particularly faulty and error-ridden. The state is relying on a largely automatic process that flags applicants as potential noncitizens by matching registration rolls to records from the Department of Motor Vehicles that are up to twenty years out of date. As the accompanying analysis of Dr. Michael McDonald demonstrates, this methodology has repeatedly proven to be fatally flawed. In states that have employed comparable systems, nearly every record flagged by such processes ultimately belonged

---

[1] On October 8, 2024, Plaintiffs moved for expedited discovery from Defendants concerning aspects of the state's voter removal program. Pls.' Emergency Mot. Disc., ECF No. 4. Plaintiffs reserve the right to supplement their request for injunctive relief with additional evidence if the expedited discovery motion is granted.

1

to an eligible, naturalized citizen.  Here, the prospect of disenfranchising eligible voters is far from abstract. County election officials have stated that they are being required to cancel registrations of individuals who appear to be citizens and have already affirmed their citizenship—sometimes repeatedly. Such a system impermissibly classifies voters based on their national origin and inherently imposes discriminatory burdens on naturalized citizens, violating the NVRA mandate that list maintenance programs be "uniform [and] nondiscriminatory." 52 U.S.C. § 20507(b)(1).

Plaintiffs are likely to succeed on the merits of their claims that Defendants' policies violate the NVRA, and Plaintiffs satisfy the remaining equitable factors for a preliminary injunction. Defendants' voter purge program (the "Purge Program") should therefore be enjoined and Plaintiffs' other requested injunctive relief should be granted as swiftly as practicable.

## STATEMENT OF FACTS

### I.  Background

#### A.  Virginia's Purge Program

Elements of Defendants' Purge Program existed prior to August 2024 but have now been extended into the 90-day period before an election protected under the NVRA. The impact of the program has also been amplified and exacerbated by alterations to Defendants' policies.

Before August 2024, the Virginia Department of Elections (ELECT), Virginia Department of Motor Vehicles (DMV), and local registrars collaborated to implement a purge program that systematically removes new citizen voters from registration lists. Va. Code Ann. § 24.2-410.1(A) requires the DMV to "furnish monthly to [ELECT] a complete list of all persons who have indicated a noncitizen status to the [DMV] in obtaining any document, or renewal thereof, issued pursuant to" Virginia's driver license provisions, and requires ELECT to "transmit the information from [that] list to the appropriate general registrars." Va. Code Ann. § 24.2-427(C) then requires county registrars to "mail notice promptly to all persons known by [them] not to be United States

citizens" based on the DMV's monthly list of alleged noncitizen voters or "from [ELECT] based on information received from the Systematic Alien Verification for Entitlements Program (SAVE Program)." The notice shall:

> inform the person of the report from the [DMV] or from [ELECT] and allow the person to submit his sworn statement that he is a United States citizen within 14 days of the date that the notice was mailed. The general registrar shall cancel the registrations of such persons who do not respond within 14 days to the notice that they have been reported not to be United States citizens.

*Id.*

According to a memorandum of understanding between the DMV and ELECT, the DMV specifically sends monthly to ELECT a list of Virginians who have answered "no" to a citizenship question on DMV paperwork. Ex. A at 4 (Declaration of Michael P. McDonald); Ex. B at 12-14 (DMV & ELECT MOUs). This monthly list extract includes a citizenship identifier ("N = Non-citizen"), and any record identified with an "N" will also include the date of the declaration. ELECT then "matches" the DMV data with voter registration records to identify specific registrants that are potentially noncitizens. Ex. A at 4-6. Section 7.3 of the MOU indicates that a successful match requires an exact match of a Social Security Number, first name, last name, and date of birth. Ex. A at 10; Ex. B at 21-22. In the event a registrant does not provide a Social Security Number, the DMV matches on first name, last name, and date of birth. Ex. A at 10.

Virginia drivers' licenses, permits, and special identification cards are available to citizens and noncitizens alike including legal permanent residents, "conditional resident alien[s]," approved applicants for asylum, and entrants into the United States with refugee status. Va. Code Ann. § 46.2-328.1(A). Those forms of identification can remain valid during an individual's authorized stay in the United States, up to the legal limit of eight years. *Id.* §§ 46.2-328.1(B); 330(A). The DMV does not require individuals to show additional proof of citizenship or lawful residence when they renew their identification, including drivers' licenses (so long as they have

provided such proof since 2004 for legal permanent residents or 2020 for asylees or refugees).[2] Thus, DMV's citizenship information may be up to 20 years old.

B. Executive Order 35 Broadens the Impact of Virginia's Purge Program

On August 7, 2024—90 days before the 2024 General Election on November 5, and 45 days before the start of early in-person voting—Virginia Governor Glenn Youngkin released Executive Order 35 ("E.O. 35") announcing an expansion of Virginia's Purge Program outlined in Va. Code Ann. §§ 24.2-410.1(A) and 24.2-427(C). Ex. C (E.O. 35).  Departing from the monthly process laid out in state law, E.O. 35 directs the DMV to "expedite the interagency data sharing with [ELECT] of non-citizens by generating a daily file of all non-citizen transactions." Ex. C at 4.[3] According to a 2024 memorandum of understanding between the DMV and ELECT, which was entered into shortly after E.O. 35 was issued, the DMV now sends daily to ELECT a list of Virginians who (1) have answered "no" to a citizenship question on DMV paperwork or (2) regardless of how they respond to the citizenship question on DMV paperwork, have "legal presence documents [with the DMV] indicating non-citizenship status." Ex. B at 3.

The executive order, as a result, increases the frequency of improper removals by requiring ELECT to engage in "daily updates" to cancel the registrations of voters identified as potential non-U.S. citizens based on faulty and outdated data from the DMV without a meaningful and

---

[2] *Virginia's Legal Presence Law*, Virginia Department of Motor Vehicles, available at https://www.dmv.virginia.gov/licenses-ids/id-cards/legal-presence (last accessed Oct. 14, 2024).

[3] E.O. 35 also directs the DMV, "[w]hen issuing a credential such as a driver's license," to "verify applicants' proof of identity and legal status with the Department of Homeland Security Systematic Alien Verification and Entitlements (SAVE) database and the Social Security Administration database." Ex. C at 2. Such verification is only required in DMV transactions that involve the issuance of a new credential. However, "[a]ll data collected by the DMV that identifies non-citizens is shared with ELECT . . . ." *Id*. The DMV does nothing, however, to verify citizenship, only the veracity of documents provided to establish proof of identity and legal presence.

individualized inquiry into its accuracy. *See* Ex. C at 3-4. As a practical matter, it also affords DMV officials very little time to capture or correct errors in the records transmitted.

According to ELECT's procedures for "Declared Non-Citizens," "matches" of individuals flagged by the DMV and present on registration rolls are automatically placed within the VERIS system in the "Declared Non-Citizen Hopper." Ex. A at 6; *see also* Ex. D (Hopper Processing and Information Instructions). This procedure is non-discretionary, meaning registrars must place registrants who match the DMV flags in the "Declared Non-Citizen Hopper" *even if* they have reason to believe the individual is in fact a citizen. Ex. A at 6; *see also* Ex. D at 35.

According to E.O. 35 and ELECT's policies, registrars must send those in the Declared Non-Citizen Hopper a "Notice of Intent to Cancel" letter along with an "Affirmation of United States Citizenship form." Ex. A at 6; *see also* Ex. E (Notice of Intent to Cancel); Ex. F (Affirmation of Citizenship Form).[4] That letter informs the voter that "[w]e have received information that you indicated on a recent DMV application that you are not a citizen of the United States." Ex. E; Ex. A at 6. If the registrant responds and provides their local registrar with a completed Affirmation of Citizenship within 14 days, the registrant is marked as having confirmed their citizenship and removed from the Declared Non-Citizen Hopper.[5] Ex. A at 6. With respect to people who do not

---

[4] All of these documents are provided to recipients exclusively in English, despite the fact that five localities in Virginia, including Fairfax and Prince William Counties are covered by Section 203 of the Voting Rights Act and thus have a "legal obligation to provide . . . minority language assistance." *See* Notice of Determination, 86 Fed. Reg. 233 (Dec. 8, 2021); 52 U.S.C. § 10503(c) ("Whenever any State or political subdivision subject to the prohibition of subsection (b) of this section provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, it shall provide them in the language of the applicable minority group as well as in the English language . . . .").

[5] The Affirmation of Citizenship form requires the voter to provide their name, address, telephone number, and email address, and sign their name under a statement that reads: "SUBJECT TO PENALTY OF LAW, I DO HEREBY AFFIRM THAT I AM A CITIZEN OF THE UNITED STATES OF AMERICA." Ex. F.

return the Affirmation of Citizenship, the Notice of Intent to Cancel provides that "[i]f you do not respond within 14 days, you will be removed from the list of registered voters." Ex. E; Ex. A at 6.

E.O. 35 further directs registrars to "immediately notify the Commonwealth's Attorney for their jurisdiction" of any individuals who do not affirm their citizenship within the 14-day window. Ex. C at 4. As Governor Youngkin explained, the Purge Program is systematic and ongoing:

> We verify the legal presence and identity of voters using DMV data and other trusted data sources to update our voter rolls daily, not only adding new voters, but scrubbing the lists to remove those that should not be on it, like . . . non-citizens that have accidentally or maliciously attempted to register.[6]

Between January 2022 and July 2024, 6,303 registrants were removed from the voter rolls based on DMV data shared with ELECT. Ex. C at 2; Ex. A at 6. Since July, additional registrants have been removed, including during the 90-day "quiet period," as a result of the escalation of the Purge Program. Ex. A at 8-9. Arlington, Fairfax, Prince William, and Loudoun Counties have acknowledged publicly that they followed ELECT's instructions and recently canceled the registrations of voters due to the Purge Program. Ex. A at 8-9; Ex. H (Arlington County Electoral Board Meeting Minutes); Ex. I (Fairfax Policy for Referring Individuals Removed from Voter Rolls); Ex. J (Fairfax County Electoral Board Minutes); Ex. K (Prince William County Meeting Recording); Ex. L (Loudoun County Electoral Board Meeting Agenda). Loudoun County confirmed eight cancellations in August for alleged non-citizenship, Ex. L at 9, and Fairfax confirmed 49 cancellations as a result of the Purge Program, Ex. J at 7; *see also* Ex. A at 8-9. The 49 cancellations in Fairfax County were all due to failure of the voters to reply affirming their citizenship within 14 days of the notice being sent. Ex. J at 7; Ex. A at 9. Originally, 66 voters

---

[6] *See* Press Release, Gov. Glenn Youngkin, *Governor Glenn Youngkin Issues Executive Order to Codify Comprehensive Election Security Measures to Protect Legal Voters and Accurate Counts*, Aug. 7, 2024, at https://www.governor.virginia.gov/newsroom/news-releases/2024/august/name-1031585-en.html.

were identified and noticed as alleged noncitizens, but 17 voters responded confirming their citizenship "and re-registered within the 14-day requirement." Ex. J at 7; *see also* Ex. A at 8. A member of the Fairfax County Electoral Board mentioned that "his understanding was that many of these individuals are citizens who inadvertently checked the wrong box or did not check any box for the citizenship question on the DMV website," but also noted that registrars are unable to do research into the source of the noncitizen DMV demarcation because "the local election offices have 'no way of knowing' how the individual answered the DMV citizenship question." Ex. J at 7; Ex. A at 8. Similarly, in Prince William County, during the September 30 Board of Elections meeting, General Registrar Eric Olsen described 162 individuals as being listed as noncitizens in the VERIS system. Ex. K; Ex. A at 9. Of those individuals, 43 had voted, all 43 had verified their citizenship previously (some as many as five times). Ex. K; Ex. A at 9. Yet, the county still was forced to cancel their registration in order to follow the state protocol dictated by E.O. 35. Olsen noted that being identified as a

> non-citizen in the VERIS system does not mean someone is not dispositively not a citizen. It is a categorization that largely comes from the DMV transfer of data and what it has done, if anything, is more likely has trapped a lot of people who are valid citizens who are being canceled from the process.

Ex. K.

Arlington, Fairfax, Prince William and Loudoun Counties also all referred individuals caught up in this purge process to the local Commonwealth Attorneys for criminal investigation and potential prosecution. *See* Ex. H; Ex. J at 7; Ex. K; Ex. L at 3. Arlington and Fairfax Counties have also both referred these individuals to Defendant Attorney General Miyares for investigation and potential prosecution. *See* Ex. H; Ex. J at 7.

Individuals interacting with the DMV through electronic transactions often mistakenly select the wrong box in fields prompting the individual to indicate whether they are a U.S. citizen.

Ex. A at 8. At least some individuals who are U.S. citizens mistakenly check the box indicating they are not a citizen, which would result in the individual being flagged in the DMV's noncitizen transactions list. Ex. J at 7. Because the Purge Program requires the DMV to transmit the list of noncitizen transactions to ELECT on a daily basis, DMV staff cannot identify and correct any user errors by U.S. citizens mistakenly indicating they are not a citizen prior to transmitting the list to ELECT, leading to these citizens being erroneously identified to ELECT as potential noncitizens. Moreover, citizens may be flagged as noncitizens for simply having the same first name, last name, and birth date as another Virginia resident who happens to be a noncitizen. Ex. A at 9-10.

The Purge Program classifies on the basis of national origin and places a discriminatory burden on naturalized U.S. citizens whose citizenship status has changed since their last interaction with the DMV. No state requires naturalized citizens to immediately update their citizenship status upon achieving U.S. citizenship, including the Commonwealth of Virginia. Ex. A at 7. Moreover, the DMV does not require Virginians to show additional proof of citizenship or lawful residence when they renew their drivers' licenses—which are valid for eight years—so long as they have provided such proof since 2004 for legal permanent residents or 2020 for asylees or refugees. Ex. A at 7. Furthermore, the DMV only attempts to verify citizenship information "[w]hen issuing a credential." Ex. A at 7; Ex. C at 2. Therefore, citizens who became naturalized *over the last twenty years* would likely not have updated citizenship documents on file with the DMV if they obtained a driver's license before their naturalization, which guarantees that they will be incorrectly flagged as noncitizens by the DMV through the daily and monthly update lists. *See* Ex. A at 7-9.

Alarmingly, registrants who affirmatively respond to the Affirmation of United States Citizenship form can be repeatedly flagged as potential noncitizens, unless they personally update their DMV citizenship status. Ex. A at 10-11. When a registrant provides citizenship information to ELECT, there is no mechanism for that information to be updated in the DMV customer

database. Ex. A at 10. The Purge Program directly and repeatedly threatens the voting rights of these citizens. Ex. A at 10-11.

## II. <u>Plaintiffs</u>

African Communities Together ("ACT") is a national nonpartisan membership organization of African immigrants advocating for civil rights, opportunity, and a better life for African immigrants and their families. ACT has over 1,000 members in Virginia and dedicated staff who support the thousands of African immigrants residing in the Commonwealth. As a core part of its work, ACT encourages and supports voter registration and participation among eligible African immigrant voters. As discussed in Part II *infra*, the Purge Program has disrupted internal operations and led to significant changes in their approach to voter engagement and advocacy leading up to the general election. *See* Ex. X ¶¶ 17-22 (Declaration of Gigi Traore, ACT) ¶¶ 17-22.

The League of Women Voters of Virginia ("LWVVA" or "the League") is a nonpartisan, nonprofit membership organization whose core mission is encouraging Virginians to participate in government, primarily through voting. In service of that mission, the League helps countless Virginians register to vote and stay registered, especially in the months just before general elections. As described in Part II, *infra*, the Purge Program has impeded that effort by ensuring that fewer voters will be registered and by forcing the League and its members to spend money and time trying to ameliorate the effect of the program on Virginia voters. *See* Ex. W ¶¶ 26-40 (Declaration of Joan Porte, LWVVA).

The Virginia Coalition for Immigrant Rights ("VACIR") is a multi-racial and multi-ethnic coalition of member organizations that exists to win dignity, power, and quality of life for all Virginia immigrant and refugee communities. VACIR is composed of 49 nonpartisan, nonprofit standing member organizations that seek to support Virginia's immigrant community through a

9

variety of initiatives, including voter education, voter empowerment, and programs assisting eligible naturalized citizens with voter registration and voting. As detailed in Part II, *infra*, the Purge Program has upended VACIR's normal activities and has forced VACIR to redirect its resources from other priorities toward responding to and mitigating the harms the Program has caused to immigrant communities in Virginia. *See* Ex. V ¶¶ 14-20 (Declaration of Monica Sarmiento, VACIR).

## ARGUMENT

A preliminary injunction is warranted if Plaintiffs establish: (1) likelihood of success on the merits; (2) irreparable harm absent preliminary relief; (3) that the balance of the equities tips in Plaintiffs' favor, and (4) that an injunction is in the public interest. *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

## I.    Plaintiffs are Likely to Succeed on the Merits.

### A.    The Purge Program Violates the NVRA's 90-Day Provision.

Defendants are engaging in a blatant and continuing violation of the NVRA's prohibition against registration removal programs within the 90-day "quiet period" before an election.  Under the 90-Day Provision:

> A State shall complete, not later than 90 days prior to the date of the primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

§ 20507(c)(2)(A). Both the text of the statute and case precedent confirm that states may not implement any voter removal program or any step in such a program during this period.

We start with the text: Defendants' Purge Program does precisely what the plain text of federal law forbids. Ninety days before the November 5 general election and 45 days before the start of early in-person voting, the Governor announced—not the completion—but the *escalation*

10

of an ongoing program to purge purported noncitizens from voter rolls. The Purge Program requires county election officials and Commissioner Beals to certify that they are comparing records with DMV information (and potentially other agencies) and then canceling the registration of certain voters flagged in those databases. E.O. 35 outlines a required procedure: "The Department of Elections compares the list of individuals who have been identified as non-citizens to the list of existing registered voters and then registrars notify any matches of their pending cancellation unless they affirm their citizenship within 14 days." Ex. C at 4. The purpose of the program is to "[r]emove individuals who are unable to verify that they are citizens to the Department of Motor Vehicles from the statewide voter registration list, should that individual either intentionally or unintentionally attempt to register to vote . . . ." Ex. C at 4. The Governor boasted that prior to August 2024, similar processes (implemented less often) had already led the state to "remove[] 6,303 non-citizens from the voter rolls." Ex. C at 2. Defendants Beals and Miyares have affirmed that they are implementing and following the program including by initiating removals of voters on a daily basis. *See* Ex. P (Susan Beals, Certification of Election Security Procedures); Ex. Q at 6 (Va. Dep't of Elections, Annual List Maintenance Report).

By its own terms, procedures, and asserted goals, the Purge Program constitutes "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). "Unless Congress indicates otherwise, we give statutory terms their ordinary, contemporary, common meaning." *Othi v. Holder*, 734 F.3d 259, 265 (4th Cir. 2013) (citation omitted). *Merriam-Webster* defines a "program" as "a plan or system under which action may be taken toward a goal", and "systematic" as "methodical in procedure or plan." *See* Merriam-Webster, *Program*, https://www.merriam-

webster.com/dictionary/program (last accessed Oct. 14, 2024); Merriam-Webster, *Systematic*, https://www.merriam-webster.com/dictionary/program (last accessed Oct. 14, 2024).

Under any definition, Defendants are engaged in a methodical plan to, as E.O. 35 puts it, "scrub existing voter rolls and remove non-citizens . . . ." Ex. C at 2. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014) ("The fact that the provision now before us applies to 'any program' strongly suggests that Congress intended the 90 Day Provision to encompass programs of any kind, including a program . . . to remove non-citizens."). As outlined by the Governor and Defendant Beals, the steps of the current Purge Plan are (1) obtain a list of individuals from the DMV and potentially other agency sources who have been flagged as potential non-citizens, (2) compare that with the list of registered voters in the VERIS system on a daily basis, (3) send a letter to any registered voter in cases of a match, (4) cancel their registration if they do not respond to reaffirm citizenship within 14 days,[7] and (5) automatically refer any individual with a match for investigation and potential prosecution. This is not an ad hoc approach or case-by-case investigation of an individual's registration status—it is a standardized, systematized program to remove registered voters. Even presuming that such a list maintenance program were otherwise legal under the NVRA—and it is not, *see* Part I.B, *infra*—it would need to be completed 90 days prior to the election. Quite the contrary, Governor Youngkin and Defendants escalated and expanded this program just as the quiet period mandated it stop. The Purge Program flatly violates § 20507(c)(2)(A).

The NVRA does contain a set of circumscribed statutory exceptions permitting removal of registrants during the quiet period. *See* § 20507(c)(2)(B)(i) (clarifying that the 90-Day Provision

---

[7] There are some indications by county election officials that registrations are canceled as soon as a registrant is flagged as a potential noncitizen. Ex. J at 7 (stating that voters are "re-register[ing]" if they respond to the notice within 14 days).

"shall not be construed to preclude . . . the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a) . . . ."). However, these exceptions pertain to (1) removal requests initiated by a registrant, (2) criminal conviction, (3) mental incapacity, and (4) death of the registrant. *See* §§ 20507(a)(3)(A)-(B); 4(A). None of those provisions apply to removals due to other forms of ineligibility such as citizenship. Defendants' Purge Program thus creates an extra-textual procedure for removing possible non-citizens unless they respond to a letter within 14 days.[8] That procedure directly conflicts with the plain language of the 90-Day Provision and is preempted by federal law. *See Arcia*, 772 F.3d at 1345 ("The fact that Congress did not expressly include removals based on citizenship in its exhaustive list of exceptions to the 90-Day Provision is good evidence that such removals are prohibited.").

Defendants appear to erroneously believe the Purge Program is permissible under an NVRA provision stating that the quiet period "shall not be construed to preclude . . . correction of registration records pursuant to this chapter." 52 U.S.C. § 20507(c)(2)(B)(ii). *See* Ex. R (ELECT Correspondence with Fairfax County Board of Elections) ("Removing non-Citizens would be considered correction of the voter records[,] which is precluded from the 90-day prohibition."). If that is Defendants' understanding, it is mistaken for several reasons. First, the "*correction* of registration records" referenced in § 20507(c)(2)(B)(ii) is not the same thing as the "*removal of names* from official lists of voters" in § 20507(c)(2)(B)(i) (emphases added). When interpreting a statute, "differences in language like this convey differences in meaning." *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022) (quotation omitted); *see also id.* (applying "rule against ascribing to one word a meaning so broad that it assumes the same meaning as another statutory

---

[8] By illustrative comparison, the notice requirements outlined to remove voters who are ineligible due to change of address are far more protective and cautious about disenfranchising lawful voters than the procedures enacted by Defendants. *See* § 20507(d).

term.") (quotation omitted). If Congress had meant for "corrections" to include removals from the rolls altogether, it would have used the same term in both (B)(i) and (B)(ii).[9]

Furthermore, § 20507(c)(2)(B)(ii) refers specifically to "correction of registration records *pursuant to this chapter*." (emphasis added). Every other use of the term "correct" in § 20507 refers to address corrections for registrants who have moved.[10] Typically, "identical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (quotation omitted). Thus, the traditional canons of statutory interpretation make clear that Congress did not include the term "correction" to give states free rein to embark on any voter removal program they choose.  Section 20507(c)(2)(B)(ii) simply clarifies that even during the quiet period states may still conduct the various forms of address "correction" authorized "pursuant to this chapter."

More broadly, Defendants' (mis)interpretation of the provision is wrong because it would swallow up the NVRA's quiet period altogether. If Defendants were correct that states could— under the guise of making "corrections"—conduct whatever voter removal program they choose at any point, it would render meaningless § 20507(c)(2)(A)'s directive that states complete such programs "not later than 90 days prior" to an election. "[W]e cannot adopt a reading . . . that renders part of the statute superfluous over one that gives effect to its every clause and word."

---

[9] Likewise, the NVRA uses various terms to refer to "voter rolls" including "official lists of voters," § 20507(b)(2), "official list of eligible voters," *id.* §§ 20507(a)(3)-(4), or "voter registration roll." *Id.* § 20507(b). At no point does it refer to a voter's status on the rolls as a registered voter as the voter's "registration records."

[10] *See, e.g.*, 52 U.S.C. § 20507(c)(1)(B)(i) (outlining procedure by which "registrant may verify or *correct* the address information"); *id.* § 20507(d)(1)(B)(ii) (referring to voter action to "*correct* the registrar's record of the registrant's address"); *id.* § 20507(d)(3) (outlining steps by which "registrar shall *correct* an official list of eligible voters in elections for Federal office *in accordance with change of residence information obtained in conformance with this subsection*.") (emphases added); *see also id.* § 20507(e)(2)(A) (referring to address "correct[ions]" for voter record); *id.* § 20507(f) (same).

*United States v. Simms*, 914 F.3d 229, 241 (4th Cir. 2019) (quotation omitted); *see also Arcia*, 772 F.3d at 1345 n.4 (rejecting interpretation that "would render the 90 Day Provision completely superfluous,").

Although the Fourth Circuit has not directly interpreted the NVRA's 90-Day Provision, it has held in the context of § 20507(i)'s public disclosure requirements that review of voter information is a "'program'" under the NVRA "because it is carried out in the service of a specified end—maintenance of voter rolls . . . ." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012). The same analysis applies here where the Purge Program's explicit objective is to "scrub existing voter rolls." Ex. C at 2.

Precedent from sister jurisdictions is likewise unanimous: systematic removals of purported noncitizens during the quiet period violate the NVRA. *Arcia v. Florida Secretary of State*, where the Eleventh Circuit enjoined a similar program, is squarely on point. 772 F.3d at 1339. In *Arcia*, shortly before an election, the Florida Secretary of State compiled a list of registered voters who had previously presented the state with identification suggesting they were noncitizens, such as green cards or foreign passports. *Id*. He sent that list to county election officials and instructed them to perform additional research, then initiate a notice and removal process. *See id*. The "effort . . . to identify noncitizens was far from perfect"—it included citizens eligible to vote. *Id*.

The Eleventh Circuit concluded that the NVRA means what it says: that states may not operate any program with the purpose of systematically removing ineligible voters within the 90-day window. *Id*. at 1348. Thus, Florida's program was unlawful. *Id. Arcia* further held that the NVRA provision must be interpreted broadly. Congress' use of "the phrase 'any program' suggests that the 90 Day Provision has a broad meaning . . . [because] read naturally, the word 'any' has an

expansive meaning, that is one or some indiscriminately of whatever kind." *Id*. at 1344 (internal quotations omitted) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)).

Decisions by other federal courts follow *Arcia*'s reasoning. In *Mi Familia Vota v. Fontes* (*Vota I*), a district court reviewed an Arizona law requiring county recorders to conduct monthly reviews of registered voters without documentary proof of citizenship on file. 691 F. Supp. 3d 1077, 1085-86 (D. Ariz. 2023). The law required recorders to compare those lists with several local, state, and federal databases and issue notice of pending cancellation to individuals suspected of being noncitizens. *Id*. The court adopted *Arcia*'s reasoning, holding that "states must pause any such systematic purge within 90 days of a federal election . . . ." *Id*. at 1092. Similarly, a North Carolina district court enjoined a county board from removing 138 voters from the rolls during the quiet period after their registration was challenged by other residents under state law. *N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16CV1274, 2018 WL 3748172, at *7 (M.D.N.C. Aug. 7, 2018). The court also followed *Arcia*, finding "[i]f a voter failed to appear in some form before the Beaufort County Board to contest its finding of probable cause, then the voter would have been removed from the rolls—and quite possibly disenfranchised— solely on the basis of a single mailing that may well have been sent to the wrong address. The NVRA prohibits elections officials from making such a grave error." *Id*. (internal citation omitted); *see also Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d 1348, 1355 (M.D. Ga. 2020) (also following *Arcia*).

Congress had a strong rationale for prohibiting removal programs during the quiet period: to protect voter registration lists from the inevitable chaos of potentially inaccurate removals. The Eleventh Circuit observed that "*individualized removals*" that arise from "rigorous individualized

16

inquiry" may still occur during the quiet period because such rigorous inquiry will lead to "a smaller chance for mistakes." *Arcia*, 772 F.3d at 1346 (emphasis added). However:

> For programs that systematically remove voters . . . , Congress decided to be more cautious. At most times during the election cycle, the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors. In the final days before an election, however, the calculus changes. Eligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote. This is why the 90 Day Provision strikes a careful balance: It permits systematic removal programs at any time *except for the 90 days before an election because that is when the risk of disenfranchising eligible voters is the greatest.*

*Id.* (emphasis added).

Defendants' Purge Program exemplifies Congress's concerns regarding erroneous removals. Virginia's system is likely worse than those enjoined in Florida and Arizona in terms of risk of disenfranchisement. Under Florida's program, the Secretary had directed local election officials to "conduct additional research" on individuals flagged as potential noncitizens "using 'whatever other sources you have.'" *Id.* at 1339.  In contrast, Defendants' Purge Program operates largely automatically and directs county election officials to trigger notice and removal based simply on the existence of "non-citizen transactions." Ex. C at 4. There is no additional, individualized research. As Dr. McDonald reports, under ELECT's procedures, whenever there is a "match" between data shared between election officials and the DMV, "[r]egistrants matched as non-citizens are placed within the Declared Non-Citizen Hopper." Ex. A at 6. Once that match is made, the process is largely automatic: notice of the pending cancellation "must be sent to a registrant" who must respond and re-affirm citizenship within 14 days. Ex. A at 6.

As Dr. McDonald outlines, there are tremendous risks of disenfranchisement inherent in such a procedure. His examination of comparable list matching systems in other states, like Georgia, Arizona, Texas, and Florida, reveals that nearly all individuals flagged as potential non-

citizens turned out to be eligible voters. Ex. A at 7-8. That is partly because DMV data is often significantly outdated. Ex. A at 7-8. That is certainly true in Virginia where various categories of immigrants—including legal permanent residents—are eligible to obtain drivers' licenses. *See* Statement of Facts, Part I.A, *supra*. The DMV does not require legal permanent residents to show additional proof of citizenship or lawful residence when they renew their driver's licenses (so long as they showed such proof since 2004). Thus, citizens who became naturalized *over the last twenty years* would likely not have updated citizenship documents on file with the DMV if they obtained a driver's license before their naturalization. The Purge Program directly threatens the voting rights of these citizens.

Dr. McDonald's analysis also explains how both natural-born and naturalized citizens can be mistakenly flagged as noncitizens either through first name, last name, date of birth matches or by leaving pertinent citizenship documents blank when filling out DMV forms. Ex. A at 9-10. These concerns are hardly theoretical. In Prince William County, 162 people had been flagged as "Declared Non-Citizens" in the VERIS system. *See* Ex. K; Ex. A at 9. Forty-three of those individuals had voted and all 43 had already sent back affirmations of their citizenship previously, some multiple times. It is unclear whether these were naturalized citizens or natural born citizens. Regardless, there is no system in place to prevent someone previously flagged as a noncitizen from being swept up into the Purge Program again even after having previously confirmed their citizenship. Ex. A at 10.

These serious administrative problems underscore how crucial the quiet period is to protecting the franchise. If a voter—who has already affirmed their citizenship—keeps receiving notices requiring them to reaffirm citizenship yet again, the closer to an election the greater the risk that a voter will not receive or respond to the letter within 14 days. Indeed, Defendant Beals

was asked in a Virginia House of Delegates hearing on September 5, 2024 to identify "the biggest threat" to upcoming elections. Ex. S (Markus Schmidt, *Virginia's Top Elections Official Warns of Possible Delays in Mail-In Voting This Year*, Virginia Mercury (Sep. 5, 2024)).  Beals responded that *U.S. Postal Service delays* were at the top of her list of concerns. *See* Ex. S. Such fears are certainly warranted, but they only underscore the importance of the NVRA's 90-Day Provision in mandating that removals be resolved before voters risk disenfranchisement due to postal delays.

Defendant Miyares has boasted of the "6,303" number of purported "noncitizens identified and removed from Virginia's voting rolls under [his] watch" between 2022 and 2024. Ex. T (Jason Miyares (@JasonMiyaresVA), X (Aug. 7, 2024, 1:57 PM)). Under the Purge Program, each of those purported noncitizens must be referred for investigation and potential prosecution. However, an investigation by *The Washington Post* found that there were no prosecutions for noncitizen registration or voting from 2022 to 2024. Ex. U (Gregory S. Schneider & Laura Vozzella, *Youngkin Stokes Fear of Vast Noncitizen Voting in Virginia*, The Washington Post (Oct. 9, 2024)). Although Defendant Miyares established a special election integrity unit in 2022 to investigate voter fraud, his office confirmed he had never prosecuted any noncitizen for illegal voting. Ex. U. Indeed, *The Washington Post*'s investigation was unable to uncover *any* prosecution for noncitizen voting or registration over the past 20 years. A prosecutorial investigation resembles the sort of "rigorous individualized inquiry" that *Arcia* recognized as permissible during the quiet period due to the "smaller chance for mistakes." *Arcia*, 772 F.3d at 1346.  But the results of the required referrals speak for themselves: zero prosecutions, zero plea deals, zero evidence of a widespread problem with noncitizen voting from the state officials authorized to investigate.  This strongly suggests that the Purge Program's error rate is especially high. And it bolsters Congress's wisdom in

restricting voter removal programs close to an election "when the risk of disenfranchising eligible voters is the greatest." *Id.*

B.   The Purge Program Violates the NVRA's Requirement that Removal Programs Be "Uniform" and "Nondiscriminatory."

Defendants' Purge Program further violates the NVRA by impermissibly classifying based on a registrant's national origin and placing discriminatory burdens on naturalized citizens. The NVRA mandates that any list maintenance programs be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 . . . ." 52 U.S.C. § 20507(b)(1). As the Fourth Circuit has stated, this provision reflects Congress's view that the right to vote "is a fundamental right," that government has a duty to "promote the exercise of that right," and that discriminatory and unfair registration laws can have a "direct and damaging effect on voter participation" and "disproportionately harm voter participation by various groups, including racial minorities." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012) (quoting 52 U.S.C. § 20501(a)).

Defendants' Purge Program classifies registrants with DMV or other agency records indicating they are not natural born U.S. citizens as presumptively ineligible to vote. This is discrimination based on national origin and is impermissible under the NVRA.  As detailed *supra*, the Purge Program uses a separate electronic "bucket"—a "Declared Non-Citizen Hopper"—to classify any individual with a record of foreign birth or a "non-citizen transaction" with the DMV. Ex. A at 6; Ex. C at 4. As discussed *supra*, the problem with that classification is that the data ELECT receives from the DMV and other agencies is typically out of date. Ex. A at 7-8. In the case of DMV records, it may be up to twenty years out of date and does not account for people who have become naturalized citizens. Thus, the "Declared Non-Citizen Hopper" is *not* in fact a bucket for noncitizens; it almost always includes naturalized citizens. The Hopper instead

20

classifies individuals based on their records of foreign birth—those who were at some point noncitizens.  Disenfranchising eligible voters based on that classification is the essence of national origin discrimination.

As detailed by Dr. McDonald, "Virginia's citizenship verification procedures subject naturalized citizens to additional voter registration-related burdens that are not faced by natural-born U.S. citizens." Ex. A at 8. Those burdens are significant. Not only must a noncitizen receive and timely respond to a written notice mailed by the state, the Purge Program requires them to be referred for criminal prosecution if they do not respond. A presumption of ineligibility to vote combined with a criminal referral due to an individual's national origin constitutes a severe and discriminatory burden by any measure. Scholarship shows that far lower burdens that affect the "cost" of registering and voting can have significant impacts on voter turnout. Ex. A at 11-12.

This form of inequitable treatment violates the text of 52 U.S.C. § 20507(b)(1), which requires "uniform[ity] and "nondiscrimin[ation]" in removal programs. It likewise violates the purpose of the NVRA to promote the exercise of the fundamental right to vote. Many former noncitizens are welcomed to register to vote at their naturalization ceremonies. Ex. W ¶ 12. But the Purge Program punishes new citizens if they exercise their fundamental right and further threatens them with criminal investigation if they fail to receive or respond within 14 days to a state missive demanding reaffirmation of citizenship.

Courts have repeatedly affirmed that citizenship matching protocols that similarly burden naturalized citizens are unlawful. For example, the court in *United States v. Florida* concluded that a comparable program likely violated Section 8(b). 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012). There, Florida's Secretary of State compiled a list that included all registered voters who had disclosed that they were noncitizens at the time they applied for a driver's license, had

subsequently naturalized and registered to vote, and had not updated their citizenship status with the state agency responsible for driver's licenses. *Id*. at 1347-48. The court explained that the program likely violated § 20507(b)(1) because its "methodology" for identifying suspected noncitizens swept in many naturalized citizens. *Id*. at 1350. Such a "burdensome" program "was likely to have a discriminatory impact" on eligible voters in violation of § 20507(b)(1). *Id*. Virginia's Purge Program employs a nearly identical, faulty methodology.

The District of Arizona reached a similar holding that a state statutory provision "requir[ing] county recorders to search" the SAVE database "only for naturalized voters who county recorders suspect are not U.S. citizens" was unlawful because it "subject[ed] only naturalized citizens to database checks." *Mi Familia Vota v. Fontes* (*Vota II*), No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *38 (D. Ariz. 2024). As the court explained, this use of the SAVE database effectively meant that only "[n]aturalized citizens will always be at risk" of removal from this process, in violation of the requirement that state officials refrain from applying discriminatory practices in determining who is qualified to vote. *Id*.; *see also* 52 U.S.C. § 10101(a)(2)(A); *Tex. League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-074-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019) (finding Texas's program likely violated the NVRA by "burden[ing]" naturalized voters with "ham-handed and threatening correspondence from the state," while "[n]o native born Americans were subjected to such treatment.").

"A state cannot properly impose burdensome [voter registration] demands in a discriminatory manner," *Florida*, 870 F. Supp. 2d at 1350, including by adopting national origin classifications that inequitably burden naturalized voters. *See Vota II*, 2024 WL 862406, at *22 (describing that because the state motor vehicle division "does not issue foreign-type credentials

to native born citizens, only naturalized citizens will ever be misidentified as non-citizens.").[11] Defendants' Purge Program is both inherently discriminatory and fundamentally flawed in its methodology. It is due to be enjoined.

## II.    An Injunction is Necessary to Prevent Irreparable Harm.

"[M]issing the opportunity to vote in an election is an irreparable harm." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1272 (11th Cir. 2020). "Courts routinely deem restrictions on fundamental voting rights irreparable injury," especially "discriminatory voting procedures." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) [hereinafter *LWVNC*] (collecting cases). "[O]nce the election occurs, there can be no do-over and no redress." *Id.*

The Purge Program immediately threatens both naturalized citizens and natural-born citizens who have erroneously filled out DMV forms—including members of Plaintiff organizations—with the irreparable injury of disenfranchisement and, furthermore, criminal investigation. As E.O. 35 notes, over 90% of Virginia voters register to vote online through ELECT, which requires a DMV credential, or when conducting transactions with the DMV. Ex. C at 1. But as discussed *supra*, DMV databases lack accurate information for naturalized citizens. Ex. A at 4. If, for any reason, a citizen falsely flagged in the Purge Program fails to respond to a citizenship affirmation letter within 14 days, they may be disenfranchised and investigated criminally.

Absent an injunction before the November election, and each day that the Purge Program continues, Plaintiffs' citizen members will be at risk of being erroneously flagged and therefore

---

[11] *See also Boustani v. Blackwell*, 460 F. Supp. 2d 822, 825 (N.D. Ohio 2006) (invalidating statute that "discriminate[s] based on national origin" by requiring differential treatment of naturalized citizens)

deprived of their right to vote and/or being subjected to criminal investigation and prosecution. *See, e.g., Arcia*, 772 F.3d at 1341 (finding a realistic probability that naturalized citizens would be misidentified by a program implemented within the 90-day window before an election). These processes also cause confusion about whether and how they can exercise their fundamental right. Ex. W ¶ 31. They further risk being identified or even re-identified in "daily updates" at any time. The deadline to register to vote online or by mail is October 15; after then, affected voters' options to re-register will be sharply curtailed.

Moreover, the Purge Program directly interferes with Plaintiffs' core organizational activities and perceptibly impairs their work. Ex. V ¶ 14; Ex. X ¶ 19. Helping Virginians register to vote and vote is a core organizational activity for each Plaintiff. Ex. V ¶12; Ex. X ¶ 5. Further, providing services specifically to Virginia's immigrant communities—including naturalized citizens—is core to both VACIR's and ACT's missions. Ex. V ¶¶ 4-5; Ex. X ¶¶ 13-14. The Purge Program threatens to purge voters that Plaintiffs helped register, and may have already done so, and chills voting by naturalized citizens with whom Plaintiffs work to encourage to vote. Ex. V ¶ 16; Ex. X ¶ 17. That harm is irreparable: voters whom Plaintiffs seek to assist who are unable to stay registered and vote in November or any particular election will never get that vote back. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding irreparable harm where policies "ma[d]e it more difficult for [plaintiff organizations] to accomplish their primary mission of registering voters" prior to voter registration deadline).

Further, the Purge Program interferes with Plaintiffs' core activities by forcing them to continue to divert limited resources from voter registration to respond to the Purge Program prior to the election, and by making it more difficult for each Plaintiff to successfully register as many voters as possible. *See, e.g.*, Ex. W ¶¶ 28, 30, 34.

Specifically, Plaintiff VACIR has had to divert significant resources away from its core activities, including supporting community mobilization around general voter registration efforts for New Americans, toward responding to and attempting to mitigate the effects of E.O. 35 and the Purge Program. Ex. V ¶¶ 14-18. VACIR's response efforts are ongoing and include: investigating the Purge Program through submitting public records requests and spending thousands of dollars to cover the costs of production; engaging in direct multilingual public education and outreach to naturalized citizen voters about maintaining their voter registration and re-registering if they have been removed through the Purge Program; and supporting its members to adjust and redirect general community voter registration and outreach programs toward specifically responding to E.O. 35 and the Purge Program, including through educating and assisting naturalized citizen voters with checking their voter registration status and how to re-register if they have been removed. *Id.*

LWVVA is likewise irreparably harmed by the Purge Program. It has diverted and will continue to divert resources to counteract the harms created by the Program. At the most consequential period of time for the League's core mission activities, the League first had to use its resources to rapidly understand the impact of E.O. 35 and its effect on Virginia voters. Ex. W ¶ 30. When the League learned of the Purge Program's identification of eligible Virginian voters for removal, the League had to expend resources to counteract the immediate confusion and misinformation created. Ex. W ¶ 30. LWVVA is currently distributing 6,000 postcards to registered voters purged from the voter list prior to May 2024 to advise them of their right to vote if they are naturalized citizens. Ex. W ¶ 32.[12] The postcards are being mailed to voters that the

---

[12] The League has been unable to contact more recently affected voters because of ELECT's refusal to timely share information about who has been purged.

League and its partners identified as highly likely to have been purged as a result of the early version of this Purge Program. The Purge Program has further required the League to broaden its "check your registration" efforts beyond its previously targeted audience in order to combat misinformation and to expand its focus on naturalized citizens. Ex. W ¶ 28. For instance, the League has already spent at least $600 to create, translate into multiple languages, and distribute a public service announcement (PSA) throughout the state reminding voters of their right to vote and instructing them to check that their registration is valid before Election Day. Ex. W ¶ 31. In direct response to the Purge Program, the League also increased its budget for digital media impressions on mobile devices by $2,000. Ex. W ¶ 35. The Purge Program has deregistered Virginians eligible to vote and has intimidated many other naturalized Virginians who will be less likely to vote for fear of criminal investigation and prosecution. The Purge Program directly harms the League's mission of increasing registered voters and improving turnout.

Separately, the League has devoted and will continue to devote resources and members' time to counteract the effects of the Purge Program, such as by helping members and registered voters determine whether they remain eligible and by helping voters who are purged restore their eligibility. Ex. W ¶¶ 27-31. This includes direct outreach and public outreach to naturalized citizens through media, such as the League President's September interview at Spanish-speaking radio station WRKE 100.3 LP-FM. Ex. W ¶ 33. The League is further burdened by diverting its coordination resources with other non-profits towards understanding and addressing the effects of E.O. 35 rather than coordinating on core voter assistance programs. Ex. W ¶ 34. Absent such diversion, the League would spend its money and member time on getting out the vote for the 2024 general election and planning its advocacy activities for the next year. Ex. W ¶ 38. It would also hold more voter registration drives. Ex. W ¶ 38.

Likewise, Plaintiff ACT has had to continuously divert staff and resources from its core activities to address the harms caused to its members and Virginia's African immigrant community by the Purge Program. Ex. X ¶ 19. These efforts include preparing to help voters who received removal notices or were purged from voter rolls, guiding them through re-registration, and providing reassurance about their eligibility–especially in light of threats of law enforcement referrals under E.O. 35. Ex. X ¶¶ 18-21. This has involved redirecting its voter engagement efforts by creating new public education materials, revising canvasser and phone banker scripts, and retraining staff and volunteers to support affected voters. *Id*. Many ACT members, particularly naturalized citizens, may have received removal notices, been purged from the rolls, or are at greater risk of removal due to having obtained a driver's license before becoming a citizen and never updating their citizenship status with the DMV. Ex. X ¶ 22.

Absent injunctive relief, Plaintiffs will suffer irreparable harm.

### III.   The Balance of Equities and Public Interest Favor an Injunction.

The ongoing injury to Plaintiffs and the public threatens the right to vote and outweigh any interest Defendants may have in carrying out the Purge Program. The public will be best served by an injunction. Plaintiffs and other Virginians are suffering violations of their rights under the NVRA. The state has no interest in defending actions that violate federal law. *See, e.g.*, *Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011) (indicating that the State "is in no way harmed by issuance of an injunction that prevents [it] from enforcing unconstitutional restrictions.").

Congress, in creating the NVRA, has already struck the balance in Plaintiffs' favor. "Though the public certainly has an interest in a state being able to maintain a list of electors that does not contain any false or erroneous entries, a state cannot remove those entries in a way which

risks invalidation of properly registered voters." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388 (6th Cir. 2008).

Here, an injunction serves the public interest, because "the public has a strong interest in exercising the fundamental political right to vote." *LWVNC*, 769 F.3d at 248 (quotation omitted). "By definition, the public interest favors permitting as many qualified voters to vote as possible." *Id.* at 247 (quotation omitted). Moreover, there is an inherent public interest in fulfilling the NVRA's purpose of ensuring that every voter can vote. *See* 52 U.S.C. § 20501.

## CONCLUSION

This Court should grant Plaintiffs' motion for preliminary injunctive relief.

Ezra D. Rosenberg*
Ryan Snow*
Javon Davis*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street, NW, Ste. 900
Washington, DC 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
rsnow@lawyerscommittee.org
jdavis@lawyerscommittee.org


Orion Danjuma*
John Paredes*
THE PROTECT DEMOCRACY PROJECT, INC.
82 Nassau Street, # 601
New York, NY 10038
Telephone: (202) 579-4582
orion.danjuma@protectdemocracy.org
john.paredes@protectdemocracy.org

/s/ Shanna Ports
Shanna Ports (VSB No. 86094)
Danielle Lang**
Kevin Hancock**
Brent Ferguson**
Simone Leeper*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
sports@campaignlegalcenter.org
dlang@campaignlegalcenter.org
khancock@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
sleeper@campaignlegalcenter.org


John Powers**
Hani Mirza**
ADVANCEMENT PROJECT
1220 L Street Northwest, Suite 850
Washington, D.C. 20005
(202) 728-9557
jpowers@advancementproject.org
hmirza@advancementproject.org

28

Benjamin L. Berwick*
THE PROTECT DEMOCRACY PROJECT, INC.
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Anna Dorman*
THE PROTECT DEMOCRACY PROJECT, INC.
200 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582
anna.dorman@protectdemocracy.org

*Attorneys for Plaintiffs Virginia Coalition for Immigrant Rights, the League of Women Voters of Virginia, the League of Women Voters of Virginia Education Fund, and African Communities Together*

*\*Motion for pro hac vice participation forthcoming.*
*\*\*Motion for pro hac vice participation pending*

**CERTIFICATE OF SERVICE**

I certify that on October 15, 2024, I electronically filed the above document with the

Clerk of Court using the ECF system, which will provide electronic copies to any counsel of

record. Plaintiffs' Counsel will also send courtesy copies to attorneys at the Virginia Attorney

General's Office who have met with Plaintiffs' counsel regarding this matter.

/s/ Shanna Ports
Shanna Ports

**CERTIFICATE OF COMPLIANCE**

I certify that this memorandum conforms to the typeface and page limitations set out in Local

Civil Rule 7(F)(3).

/s/ Shanna Ports
Shanna Ports