# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ALABAMA COALITION FOR IMMIGRANT JUSTICE; LEAGUE OF WOMEN VOTERS OF ALABAMA EDUCATION FUND; ALABAMA STATE CONFERENCE OF THE NAACP; ROALD HAZELHOFF; JAMES STROOP; CARMEL MICHELLE COE; and EMILY JORTNER, Plaintiffs,<br><br>v.<br><br>WES ALLEN, in his official Capacity as Alabama Secretary of State; STEVE MARHSALL, in his capacity as Alabama Attorney General; and JAN BENNETT, BARRY STEPHENSON, CINDY WILLIS THRASH, and SHEILA COX BARBUCK, in their official capacities as Chairs of Boards of Registrars of Elmore, Jefferson, Lee, and Marhsall Counties,<br><br>Defendants. | CASE NO. 2:24-CV-01254-AMM |
| UNITED STATES OF AMERICA, Plaintiff,<br><br>v.<br><br>STATE OF ALABAMA and WES ALLEN, in his official capacity as Alabama Secretary of State, Defendants. | CASE NO: 2:24-cv-01329-AMM |

**** MOTION HEARING ****

BEFORE THE HONORABLE ANNA MANASCO, UNITED STATES DISTRICT JUDGE, at Birmingham, Alabama, on Wednesday, October 16, 2024, commencing at 10:10 a.m.

**APPEARANCES**

FOR THE PLAINTIFF, ALABAMA COALITION FOR IMMIGRANT JUSTICE, et al.

JOSEPH MITCHELL MCGUIRE
McGuire & Associates, LLC
31 Clayton Street
Montgomery, Alabama 36104

MICHELLE KANTER COHEN
Fair Elections Center
1825 K Street NW
Suite 701
Washington, DC 20006

DANIELLE MARIE LANG
KATHERINE HAMILTON
KATHRYN HUDDLESTON
SHILPA JINDIA
Campaign Legal Center
1101 14th Street Northwest
Suite 400
Washington, DC 20005

FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

DANIEL JOSHUA FREEMAN
KELLI SLATER
RICHARD DELHEIM
United States Department of Justice -
Civil Rights Division
950 Pennsylvania Avenue, Northwest
Washington, DC 20530

FOR THE DEFENDANTS:
MISTY SHAWN FAIRBANKS MESSICK
JAMES SCOTT WOODARD, JR.
ROBERT M. OVERING
Office of the Attorney General, State of Alabama
501 Washington Avenue
Montgomery, Alabama 36130

Proceedings reported by stenographic court reporter, transcript produced using computer-aided transcription.

**Transcript prepared by:**
Kelli M. Griffin, RPR, CSR
Official Court Reporter

(Proceedings commenced at 10:10 a.m. in open court.)

THE COURT: All right. Good morning, everybody.

MR. FREEMAN: Good morning, Your Honor.

MR. DELHEIM: Good morning.

THE COURT: All right. While I get set up, let's take appearances.

Who do I have for the United States?

MR. FREEMAN: Dan Freeman on behalf of the United States.

MR. DELHEIM: Richard Delheim for the United States.

MS. SLATER: Kelli Slater for the United States.

THE COURT: All right. Good morning to all of you.

All right. Who do I have for the private plaintiffs?

MS. HUDDLESTON: Kathryn Huddleston from Campaign Legal Center, Your Honor. And with me are my colleagues, Danielle Lang, Kate Hamilton, and Shilpa Jindia.

MR. MCGUIRE: Good morning, Your Honor. Joseph McGuire for the private plaintiffs.

THE COURT: All right.

MS. COHEN: Good morning, Your Honor. Michelle Kanter Cohen from Fair Elections Center for the private plaintiffs.

THE COURT: Okay. Is that everybody? All right. Good morning to all of you.

All right. Who do I have for the State defendants?

MR. OVERING: Robert Overing for State defendants.

MS. MESSICK: Misty Messick for the State defendants.

MR. WOODARD: Scott Woodard for State defendants.

THE COURT: All right. Good morning to all of you.

Okay. I appreciate everyone's diligent work yesterday and received all of the submissions and communications overnight, and so I am prepared to proceed this morning unless anybody has anything else we need to take up.

All right. Okay. These cases are before the Court on two motions to dismiss by the State defendants, a motion for a preliminary injunction by the United States, and a motion for preliminary injunction by the private plaintiffs.

The cases are presently consolidated, and at the hearing on some of the issues raised on the motions for a preliminary injunction yesterday, the Court received evidence and heard testimony from Mr. Clay Helms who serves as the Chief of Staff to the Alabama Secretary of State. At the Court's direction, the evidence and argument yesterday was to be limited to the issue of the 90-day provision. During the hearing, all parties agreed that testimony taken was admissible in both cases currently pending before the Court.

At the conclusion of the hearing yesterday, I shared my preliminary views of the evidence and argument and afforded the parties a final opportunity to resolve the matter overnight. The parties engaged in discussions but were not able to agree on a resolution.

So in connection with the forthcoming written order, the Court now makes the following findings of fact and conclusions of law. The Court emphasizes that what follows is limited to the issue of the 90-day provision. Federal law imposes a deadline for programs like the one currently before the Court and Secretary Allen's office blew the deadline for the 2024 general election with real consequences for thousands of Alabamians who the Secretary now acknowledges are, in fact, legally entitled to vote. Accordingly, the Court will find that a preliminary injunction should issue and will not harm the State's ability to investigate and prosecute noncitizens who try to vote in Alabama.

At the present time, the Court will make no other findings or conclusions about any of the other issues in the cases. As to the preliminary injunction standard, the Court first finds that the United States is substantially likely to succeed on the merits of its claim that the Secretary of State violated the 90-day provision of the National Voter Registration Act of 1993, 52 U.S.C. Section 20507(c)(2)(a). The Court's finding in this regard rests entirely on undisputed facts, testimony by Mr. Helms on behalf of Secretary Allen and the State of Alabama, and concessions by counsel for the State defendants.

The 90-day provision states that a state shall complete, not later than 90 days prior to the date of a primary or general election for federal office, any program, the purpose

of which is to systematically remove the names of ineligible voters from the official list of eligible voters.

The Court first turns to the issue whether the process undertaken by Secretary Allen's office was a program for purposes of the 90-day provision. Under controlling Eleventh Circuit precedent, the statutory term, "any program" has a broad meaning and encompasses programs of any kind. That's the Arcia case at page 1344.

In its closing argument, counsel for the State defendant stated his awareness of the discussion of the word "any" by the Eleventh Circuit in Arcia and stated that we're not fighting so much that this isn't a program. And consistent with that acknowledgment, the Court finds that Secretary Allen's announced process fits within the broad meaning based on a plain reading of the statute and Arcia. Because the program modified voter lists on a basis, other than registrant's request for removal, criminal conviction, or mental incapacity, or death, the program was subject to the 90-day provision under 52 U.S.C. Section 20507(c)(2)(b). In deed, if the Secretary's process here is not a program within the meaning of the National Voter Registration Act, it's difficult for the Court to imagine what would qualify as a program.

The Court next turns to the question whether the program was completed 90 days before an election for federal office. Per Secretary Allen's August 13th, 2024 press release, which is

Doc. 49-1 in the CM/ECF record, the Court finds that the program at issue here was initiated 84 days prior to the general election to be held in 2024. The Court further finds that the program remains ongoing to this day, as reflected by multiple declarations from Mr. Helms detailing the actions his office has taken in recent days and weeks in connection with the program.

The State defendants conceded, at page 169 of the rough transcript yesterday, that the program was not completed outside the 90-day period. And in response to questions from the Court, Mr. Helms testified that the program would affect the upcoming 2024 general election. As to the issue whether the purpose of the program was to remove the names of ineligible voters from the official list of eligible voters, the Court finds Secretary Allen's August 13th, 2024 press release was titled "Secretary of State, Wes Allen, implements process to remove noncitizens registered to vote in Alabama." The Court finds that that press release stated that Secretary Allen is instructing the Board of Registrars in all 67 counties to immediately inactivate and initiate steps necessary to remove individuals who are not United States citizens.
Mr. Helms testified yesterday that the Secretary stands behind that press release to this day, and he testified yesterday that the program has multiple purposes, one, for noncitizens to remove themselves and, two, for citizens to update their voter

information. In his deposition, Mr. Helms testified that the purpose was to remove noncitizens that were already on the rolls illegally and were potentially voting. That's Exhibit 46 at page 74, line 18. Because the program targeted alleged noncitizens for ultimate removal from the voter registration list, and based on Mr. Helms's deposition testimony, the Court finds that the purpose of the program was to remove ineligible voters from the official list of eligible voters for purposes of the 90-day provision.

The Court now addresses the question whether the purpose of the program was to remove ineligible voters systematically. Mr. Helms testified that the basic methodology for creating the list of 3251 Alabamians was to take information on anyone who provided noncitizenship data to the Alabama Law Enforcement Agency or the Alabama Department of Labor and crosscheck it with the voter file. This methodology was also described by Secretary Allen's office in a letter to the Department of Justice on September 19th, 2024, which is at Doc. 49-7 in the record. Voter removal programs based on mass computerized database matching, such as what is done here or what was done here, are systematic programs under controlling Eleventh Circuit precedent. That's at page 1344 of the Arcia case.

Additionally, Mr. Helms testified that he understood that in any process using data, you're going to have the potential for false positives for other issues. And this testimony

indicates that Mr. Helms understood that when the Secretary's office generated lists that put voters on a path to removal as part of the program, that process was systematic in nature.

The State argues that nevertheless, removals in the program are not systematic because the process merely invites individual voters to engage in a case-by-case dialogue with the State about their eligibility to vote. The Court rejects this interpretation because it, A, misses the reality that putting voters on a path to removal is systematic in this program, B runs afoul of Arcia's rule that programs use a mass computerized data-matching process are definitionally systematic, and, C, would allow mass computerized data-matching programs to completely evade the 90-day provision, which is inconsistent with the text and purpose of the statute.

Finally, the rote use of template letters by County Boards of Registrars in all of Alabama's counties, templates that were provided by the Secretary, illustrates the systematic nature of the path to removal that the program created.

For the following reasons, the Court finds that the United States is likely to establish that the Alabama Secretary of State's program is covered by the 90-day provision and violated it. The State defendants raised two primary arguments against this finding, and the Court now turns to those. One is about the timing of removals that may occur as part of the program, and one is about marking voters as inactive on the rolls. The

Court will reject both arguments.

First, the State defendants argue that there's no statutory violation here because no removals have occurred or will occur before the 2024 election, other than self-removals, and the 90-day provision bars only removals during that time frame. Testimony from Mr. Helms does indicate that other than self-removals no removals have occurred to date in connection with the program, and the only removals, other than self-removals, that will occur, will happen in connection with the 2028 election. But this does not undo the reality that the purpose of the program is to systematically remove ineligible voters from the rolls, which is what brings it within the reach of the statute. And as a practical matter, the Secretary's communications to registrars and voters in August of 2024 were in the context of the 2024 general election. The August press release and August letters stated that voters were on a path to removal from the rolls, and it directed them about resolving that issue before the 2024 general election. It said nothing about 2028. The State defendants make a number of statutory interpretation arguments to the effect that the 90-day provision does not bar the operation of programs within 90 days of an election; it bars only systematic removals within that timeframe. But based on answers to the Court's questions yesterday, the State defendants take this argument too far, so far as to allow the Secretary of State to commence a program

with the purpose of systematically removing ineligible voters from the rolls merely 80 days before the election, tell voters as a part of that program that they have been removed, and escape liability for a statutory violation on a ground that, in truth, that removal has not been accomplished. This interpretation would read the words "purpose" and "complete" out of the statute and give them no meaning. The Court thus rejects the State defendants' statutory arguments on those grounds as well as for the other statutory interpretation reasons articulated by the United States on rebuttal at the close of the hearing yesterday.

Second, the State defendants argue that there is no violation of the 90-day provision because so far voters have only been inactivated as a part of this program, unless they have self-removed, and inactive voters may still cast a ballot. But the testimony of Mr. Helms and the letters to voters themselves made clear that inactivation is just a precursor step on the path to removal, so the fact that to date the Secretary's office has only inactivated voters as part of the program does not change the fact that the purpose of the program is to remove ineligible voters for the rolls.

The Court next turns to the issue of whether irreparable harm will occur in the absence of preliminary injunctive relief, and the Court has no difficulty finding that following the Secretary's violation of the 90-day provision, both the

United States and voters in Alabama will suffer irreparable harm in the absence of preliminary injunctive relief. First, the harm to the United States is clear as a matter of law. Under controlling precedent, the United States suffers an injury when its valid laws in a domain of federal authority are undermined by impermissible State action. That's United States versus Alabama 691 f.3rd 1269 at 1301 decided by the Eleventh Circuit in 2012. Second, the harm to Alabama voters is obvious and has been obvious to the Secretary since he began this program. Based on the Secretary's own evidence of harm to voters offered in this case in the last four days, the Court rejects unequivocally legal counsel's argument that there is no harm to voters but only a slight inconvenience. In this regard, the Court makes the following specific findings:

One, the Secretary's August 13th, 2024, press release made clear that the Secretary understood that because of the way that the lists were generated, the program would put some citizens on a path to removal even though they are eligible to vote. In that press release, Secretary Allen stated that some of the individuals who were issued noncitizen identification numbers, since receiving them, have become naturalized citizens and are therefore eligible to vote.

Mr. Helms -- two, Mr. Helms testified yesterday that he and Secretary Allen understood that this error and other inclusion errors would occur as part of the program because,

quote, in any process using data, you are going to have the potential for false positives or other issues, end quote.

Three, Mr. Helms also testified yesterday that he and Secretary Allen had no idea how high the error rate would be when the program began back in August.

Four, according to Mr. Helms's declarations and his testimony yesterday, since the program began, the Secretary has learned information that has caused his office to conclude that more than 2,000 of the 3,251 voters originally on the list were inaccurately inactivated, and those voters have been reactivated. Accordingly, the error rate is admitted at well more than 50 percent. Of the remaining approximately 1,000 voters, the record does not establish how many were inaccurately inactivated.

Five, despite knowing that errors would occur, Secretary Allen referred everyone on the list, all 3,251 people to Attorney General Marshall via letter, hand-delivered, on August 13th, 2024, for criminal investigation.

Six, despite knowing now that he inaccurately referred more than 2,000 Alabamians for criminal investigation, Mr. Helms testified that Secretary Allen has taken no steps to correct his inaccurate referral.

Seven, counsel from the Attorney General's office told the Court yesterday that the Attorney General takes referrals of criminal activity by other constitutional officers very

seriously, which comes as no surprise to the Court.

Eight, additionally, the plaintiffs developed evidence, a podcast interview of Secretary Allen, that before this program was implemented, Secretary Allen was aware of the 90-day provision and knew that under federal law the State could not engage in certain kinds of voter roll maintenance within the 90 days preceding a federal election.

Accordingly, the Court has no difficulty finding that the Alabamians who were and/or remain inaccurately inactivated on the voter rolls and who were and/or remain referred for criminal investigation as a part of this untimely program have been harmed by those actions, and that harm will continue to occur absent preliminary injunctive relief.

The Court now turns to the balancing of the equities knowing that Congress designed the NVRA to carefully balance the four competing purposes of the statute. The equities favor injunctive relief when the balance Congress struck is upset through noncompliance with the 90-day provision, and as Arcia explains, quote, at most times during the election cycle the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors. In the final days before an election, however, the calculus changes, end quote. The whole point of the 90-day provision as set forth in Arcia is to be very cautious about programs that may systematically remove and have

the purpose of systematically removing voters on the eve of an election.

As previously explained, Mr. Helms's own testimony, together with evidence that is not in dispute, establishes that Alabama's untimely program worked real harms to Alabama voters mere weeks before the 2024 general election. It led them to believe that they needed to take action to ensure their ability to cast a ballot in that election, and it led the Secretary to inaccurately refer thousands of Alabamians for criminal investigation by the State's chief law enforcement officer. The Secretary's efforts to reactivate large numbers of voters during the pendency of this lawsuit underscores the Secretary's understanding of this harm.

Mr. Helms has submitted three declarations which in total established that the Secretary's office has directed the reactivation of more than 2,000 voters of the 3,251 who were inactivated as part of the program. Mr. Helms testified about one instance in which a voter was inaccurately instructed by a county registrar to complete a self-removal form even though that voter is eligible to vote. That evidence was the declaration of Mr. Clarence Hunter, an active Alabama voter from Russell County, and that declaration was submitted by the plaintiffs. Mr. Helms testified that the registrar did not follow the instructions and that the Secretary's office worked to address that harm.

On the other side of the equity scale, based on Mr. Helms's testimony, it appears that through this program, the Secretary has identified a handful, at least four, perhaps as many as ten, perhaps more, noncitizens who were somehow on Alabama's voter rolls. In any event, Alabama will suffer no undue prejudice as a result of a preliminary injunction because, A, the Secretary can -- could and should have acted earlier and, B, the Secretary still has the ability to remove noncitizens from the rolls on the basis of individualized information despite the 90-day provision.

Based on the foregoing admissions and findings, the Court rejects the State defendants' argument that for the purposes of evaluating the equities the program has at most caused only a slight inconvenience to inactivated voters that has now been resolved. This was not a no-harm, no-foul instance of noncompliance with the 90-day provisions, and the equities counsel strongly in favor of preliminary injunctive relief.

As to the public interest factor, the public interest, the public has a clear interest in the enforcement of federal statutes that protect constitutional rights, especially voting rights, under United States v. Raines, which is 362 U.S. 17 at page 27, a 1960 decision of the United States Supreme Court. That public interest is served by enforcing federal statutes that are meant to reduce systematic programs that are disruptive to the last 90 days of a federal election cycle, and

this is especially applicable in the facts of this case.

The State argues that the public interest is served by removing noncitizens from voter rolls in Alabama, and that's certainly true, but the Court's orders today will in no way limit the State's authority to investigate and prosecute noncitizens who try to vote in elections in Alabama. Under Arcia and the Court's orders, the 90-day provision does not, quote, bar a state from investigating potential noncitizens and removing them on the basis of individualized information even within the 90-day window, end quote.

So to repeat what the Court said and expressed earlier, Federal law imposes a deadline for programs like this one. Secretary Allen's office blew the deadline for the 2024 general election, and that had real consequences for the thousands of Alabamians who the Secretary now acknowledges are, in fact, legally entitled to vote.

The Court finds that a preliminary injunction should issue, will not harm the State's ability to investigate and prosecute noncitizens who try to vote in Alabama. And the Court will not make, at this time, any other findings or conclusions about any other issues in the case.

A written order will issue momentarily that will grant, in part, the United States motion for a preliminary injunction, reserve ruling on the motion for preliminary injunction filed by the private plaintiffs, deny, in part, the State defendants'

motion to dismiss as to the claim asserted by the United States, and reserve ruling as to the remainder of the motions to dismiss in both cases.

Is there anything else we need to take up while we're together?

MS. MESSICK: May we be heard on exactly what the injunction will be?

THE COURT: Well, I won't limit your opportunity to make a record today, but, I mean, the opportunity to submit proposed orders was open until 6:30 this morning. But if there are arguments you would like to make as to what the injunction should be, I can hear them now.

MS. MESSICK: Okay. Thank you, Your Honor. We had some feedback on the proposal that the United States made and some concerns. Do you want to --

MR. OVERING: Well, it shouldn't be -- shouldn't be long, and I understand that it may already be written and may issue imminently. But we had concerns primarily about the deadline about three days to comply with all of these things. It takes time not only to figure out the status of the people on the list and provide those updates that are in the Helms' declarations, to communicate with 67 boards of registrars to put together personalized letters and to get those out the door. And, you know, if three days being Saturday, that's a lot different than three business days, which could mean Monday

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated: 10/16/2024

Kelli M. Griffin, RPR, CSR