**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **Virginia Coalition for Immigrant Rights, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 1:24-cv-01778** |
| **Susan Beals, in her official capacity as Virginia Commissioner of Elections, et al.,** | ) ) ) | |
| **Defendants.** | ) | |
| **The United States of America,** | ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 1:24-cv-01807** |
| **The Commonwealth of Virginia, et al.,** | ) ) ) | |
| **Defendants.** | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION**

Charles J. Cooper *(Pro Hac Vice)*
Joseph O. Masterman *(Pro Hac Vice)*
Bradley L. Larson *(Pro Hac Vice)*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
cooper@cooperkirk.com

*Counsel for Defendants Susan Beals, John
O'Bannon, Rosalyn R. Dance, Georgia
Alvis-Long, Donald W. Merricks, Matthew
Weinstein, and Jason Miyares*

Jason S. Miyares
   *Attorney General*
Thomas J. Sanford (VSB #95965)
   *Deputy Attorney General*
Erika L. Maley (VSB #97533)
   *Solicitor General*
Graham K. Bryant (VSB #90592)
   *Deputy Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 4

    I.    Statutory Framework and Factual Background ..................................................... 4

    II.   Procedural background ........................................................................................ 13

LEGAL STANDARD...................................................................................................... 15

ARGUMENT .................................................................................................................. 16

    I.    This Court Lacks Jurisdiction Over the Organizational Plaintiffs' Claims ...................... 16

        A.    The Organizational Plaintiffs Lack Article III Standing................................................16

        B.    Sovereign Immunity also Bars the Organizational Plaintiffs' Claims.........................21

    II.   The United States and the Organizational Plaintiffs' Claims Under the NVRA Are Unlikely to Succeed ............................................................................................ 22

        A.    Defendants Did Not Violate the NVRA's 'Quiet Period' Requirements ...................23

            1.    The NVRA Does Not Restrict Removing Noncitizens and Other Persons Whose Registration Was Invalid *Ab Initio* ..................................................... 23

            2.    Defendants' Removal of Noncitizens Was "Individualized" and Not "Systematic"............................................................................................. 30

        B.    Defendants' Process for Removing Noncitizens Is Nondiscriminatory ....................33

    III.  The United States and the Organizational Plaintiffs Cannot Satisfy the Remaining *Winter* and *Merrill* Factors for a Preliminary Injunction............................................................. 36

        A.    Plaintiffs Will Not Be Irreparably Harmed................................................................36

        B.    The Equities Favor the Defendants.............................................................................39

        C.    *Purcell* Does Not Allow an Injunction at This Point..................................................40

CONCLUSION................................................................................................................ 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983).............................................................34

*Arcia v. Detzner*,
  908 F. Supp. 2d 1276 (S.D. Fla. 2012) ...........................................27, 29

*Arcia v. Florida Sec. of State*,
  746 F.3d 1273 (11th Cir. 2014) (Jordan, J., concurring), *vacated by Arcia v.
  Florida Sec. of State*, 772 F.3d 1335 (11th Cir. 2014)..................... *passim*

*Arizona v. Intertribal Council of Ariz.*,
  570 U.S. 1 (2013)..............................................................26

*Bell v. Marinko*,
  367 F.3d 588 (6th Cir. 2004) ................................................28, 29

*Bland v. Roberts*,
  730 F.3d 368 (4th Cir. 2013) ...................................................21

*Burdick v. Takushi*,
  504 U.S. 428 (1992).............................................................34

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).............................................................17

*Crawford v. Marion County Election Board*,
  553 U.S. 181 (2008)..........................................................35, 36

*Davidson v. United Auto Credit Corp.*,
  65 F.4th 124 (4th Cir. 2023) ...................................................23

*DeBauche v. Trani*,
  191 F.3d 499 (4th Cir. 1999) ................................................21, 22

*Di Biase v. SPX Corp.*,
  872 F.3d 224 (4th Cir. 2017) ...................................................36

*DNC v. Wisconsin State Legis.*,
  141 S. Ct. 28 (2020)..........................................................1, 40

*Doe v. Virginia Dep't of State Police*,
  713 F.3d 745 (4th Cir. 2013) ...................................................17

ii

*Edelman v. Jordan*,
    415 U.S. 651 (1974)..................................................................................21

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)............................................................................19, 20

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)..................................................................................17

*Green v. HM Orl-FL, LLC*,
    601 U.S. __ (statement of Kavanaugh, J.) (Slip op. ) (2023)................................38

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)............................................................................19, 20

*Husted v. A. Phillip Randolph Institute*,
    584 U.S. 756 (2018)..........................................................................1, 31, 33, 34

*La Union de Pueblo Entro v. Abbott*,
    -- F.4th __, 2024 WL 4487493 (Oct. 16, 2024).......................................................43

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) ............................................................17, 19, 20

*League of Women Voters of Fla., Inc. v. Florida Sec. of State*,
    32 F.4th 1363 (11th Cir. 2022) ..................................................................43

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ....................................................................37

*Lewis v. Casey*,
    518 U.S. 343 (1996)..................................................................................38

*Libertarian Party of Va. v. Judd*,
    718 F.3d 308 (4th Cir. 2013) ....................................................................16

*Lyons P'ship v. Morris Costumes Inc.*,
    243 F.3d 789 (4th Cir. 2001) ....................................................................40

*McBurney v. Cuccinelli*,
    616 F.3d 393 (4th Cir. 2010) ....................................................................22

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006)....................................................................................26

*Merrill v. Milligan*,
    142 S. Ct. 879 (2022)......................................................................... *passim*

*Mi Familia Vota v. Fontes*,
    691 F. Supp. 3d 1077 (N.D. Ariz. 2023)......................................................................29, 32

*Moore v. Harper*,
    142 S. Ct. 1089 (2022)....................................................................................................40

*N. Carolina State Conf. of the NAACP v. Raymond*,
    981 F.3d 295 (4th Cir. 2020) ..........................................................................................36

*Nken v. Holder*,
    556 U.S. 418 (2009)........................................................................................................39

*Outdoor Amusement Bus. Ass'n v. DHS*,
    983 F.3d 671 (4th Cir. 2020) ..........................................................................................17

*Purcell v. Gonzales*,
    549 U.S. 1 (2006) (per curiam) ......................................................................................40

*RNC v. DNC*,
    140 S. Ct. 1205 (2020) (per curiam) ..............................................................................40

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands,*
    *LLC*,
    713 F.3d 175 (4th Cir. 2013) ..........................................................................................17

*Sampson v. Murray*,
    415 U.S. 61 (1974)..........................................................................................................36

*Short v. Brown*,
    893 F.3d 671 (9th Cir. 2018) ..........................................................................................43

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)........................................................................................................16

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)...................................................................................................17, 18

*Tenn. Conf. of the NAACP v. Lee*,
    105 F.4th 888 (6th Cir. 2024) (per curiam) ...................................................................19

*Thompson v. Dewine*,
    959 F.3d 804 (6th Cir. 2020) ..........................................................................................43

*United Nuclear Corp. v. Cannon*,
    696 F.2d 141 (1st Cir. 1982)...........................................................................................39

*United States v. Florida*,
    870 F. Supp. 2d 1346 (N.D. Fla. 2012).............................................................25, 26, 29

*United States v. Smith*,
  919 F.3d 825 (4th Cir. 2019) .......................................................................23

*Winter v. NRDC*,
  555 U.S. 7 (2008) ...........................................................................15, 36, 37

*Wise v. Circosta*,
  978 F.3d 93 (4th Cir. 2020) (en banc) .......................................................36, 43

*Ex parte Young*,
  209 U.S. 123 (1908)......................................................................................21

**Statutes**

18 U.S.C. § 611 ...............................................................................................5

18 U.S.C. § 20503 ...........................................................................................5

18 U.S.C. § 20504 ...........................................................................................5

52 U.S.C. § 20501 .............................................................................2, 4, 27, 28

52 U.S.C. § 20507 ................................................................................... *passim*

Va. Code Ann. § 24.2-104(A) ...........................................................................22

Va. Code Ann. § 24.2-404 .............................................................................8, 9

Va. Code Ann. § 24.2-404.4 .............................................................................5

Va. Code Ann. § 24.2-410.1 .......................................................................6, 7, 11

Va. Code Ann. § 24.2-416 .....................................................................12, 21, 38

Va. Code Ann. § 24.2-420.1 ...................................................................11, 12, 36

Va. Code Ann. § 24.2-427 ....................................................................... *passim*

Va. Code Ann. § 24.2-427(C) ......................................................................9, 10

Va. Code § 24.2-411.3 .....................................................................................7

Va. Code § 24.2-1004(B)(iii) .............................................................................5

**Other Authorities**

2006 Va. Acts. chs. 926, ..................................................................................6

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Text* (2012) ....................................................................................................24, 26

ELECT, 2023 Annual Virginia Election Retrospective & Look Ahead at 25–26 (Mar. 6, 2024), https://tinyurl.com/229x8z8u..........................................................13

ELECT, *Same Day Voter Registration*, https://tinyurl.com/3t982f3t (last accessed Oct. 18, 2024) ....................................................................................................13

*Eligible*, (https://www.merriam-webster.com/dictionary/eligible) (last accessed Oct. 22, 2024) ........................................................................................................24

H.R. Rep. No. 103-9 (1993).......................................................................................28, 32

*Ineligible*, *supra* (https://www.merriam-webster.com/dictionary/ineligible) (last accessed Oct. 22, 2024) ..............................................................................24

*Mailing*, Merriam-Webster, https://www.merriam-webster.com/dictionary/mailing (last visited Oct. 22, 2024).....................................................................................32

S. Rep. 103-6 (1993) .................................................................................................28, 32

U.S. Const. art I, § 2...........................................................................................................27

U.S. Const. art. III, § 2........................................................................................................16

Va. Const. art. II, § 1............................................................................................................5

Virginia House of Delegates Privileges and Elections Committee Meeting, (Sept. 4 Comm. Meeting)(statement of Commissioner Beals), https://tinyurl.com/54fy6r5n ....................................................................................12

*Voter*, Merriam-Webster (https://www.merriam-webster.com/dictionary/voter) (last accessed Oct. 22, 2024)..................................................................................24

## INTRODUCTION

The 2024 presidential election is now 12 days away, and early voting has already commenced in Virginia. Yet the Plaintiffs in these consolidated cases—the United States and an assortment of advocacy organizations (Organizational Plaintiffs)—ask this Court to inject itself into the Commonwealth's election processes, demanding a preliminary injunction that, among other burdensome measures, orders State and county election officials to place back on the voter rolls people who were recently removed after *identifying themselves as noncitizens* in information they provided to the Virginia Department of Motor Vehicles (DMV).

These self-identified noncitizens were removed pursuant to longstanding Virginia law only after their local registrar sent each one of them notices informing them of the registrar's information about their noncitizenship status and advising them that they could remain on the voter rolls simply by returning an affirmation of their citizenship in a pre-addressed mailer, a process that the Supreme Court has said is a "simple and easy step" that any "reasonable person with an interest in voting" is likely to follow. *Husted v. A. Phillip Randolph Institute*, 584 U.S. 756, 779 (2018). Only if the individual failed to respond to the notice was her name removed from the rolls. Each individual who failed to respond was then sent a second notice and advising her of the removal, and that if the information was incorrect, the registrar would promptly correct the error.

The Plaintiffs' motions therefore fail, for the usual rules for granting preliminary injunctive relief, strict in any context, are much stricter when a federal court is being asked to "alter state election laws in the period close to an election," *DNC v. Wisconsin State Legis.*, 141 S. Ct. 28, 30 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay), and the so-called *Purcell* doctrine is especially strict when, as here, "voting had already begun." *Id.* at 31. The Plaintiffs can satisfy their burden under *Purcell* only by a clear showing that "(i) the underlying merits are

1

entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring in grant of applications for stay). The Plaintiffs do not come close to satisfying any, let alone all, of these factors.

Plaintiffs purport to invoke the protections of the National Voter Registration Act of 1993, colloquially called the "Motor Voter" law, which sought to "enhance[] the participation of eligible *citizens* as voters in elections for federal office" and at the same time "ensure that accurate and current voter registration rolls are maintained" in every State. 52 U.S.C. § 20501(b) (emphasis added). To achieve its goal of citizen participation, the NVRA directed States to allow prospective voters to register to vote while signing up for a driver's license or similar permit, and it also imposed certain specific limits on the ability of States to remove previously eligible voters who became ineligible. Specifically, Plaintiffs' central claim is that Virginia's recent removal of noncitizens violated the NVRA's so-called "Quiet Period Provision," which prohibits states from "systematic[ally]" removing "ineligible voters" from the rolls within 90 days of a federal election, with exceptions for removals based on a voter's request, a voter's death, and a voter's felony conviction or mental incapacity. *Id.* § 20507(c)(2).

Virginia has long complied with the NVRA. The challenged law is no exception, having been enacted in 2006, precleared by the Department of Justice in the same year, and followed by Virginia election officials over multiple presidential and mid-term election cycles, including in the 90-day quiet period, without objection by the Plaintiffs or anyone else. Yet when Governor Youngkin issued an Executive Order reaffirming Virginia's commitment to following its own

longstanding election laws, the Organizational Plaintiffs, followed by the Department of Justice, sought to enjoin Virginia's reasonable statutory process to ensure that only citizens eligible to vote are on the rolls. And although the 90-day quiet period commenced on August 7, the Plaintiffs did not bring these actions until 60 days had already passed, an unconscionable delay given the imminent approach of the election. This last-minute attempt, premised on fatal factual misunderstandings and legal flaws, to obtain a preliminary injunction only two weeks before the 2024 presidential election must be rejected.

Start with jurisdiction. Plaintiffs have not identified a single injured citizen. Without an actual injured eligible voter, the Organizational Plaintiffs call upon, and stretch, standing theories that have been roundly rejected in this Circuit and the Supreme Court. And because this lawsuit came so late, the Defendants have already ceased their allegedly unlawful removal process, as they always planned to do, which means that there is no ongoing alleged violation that would allow the Organizational Plaintiffs to invoke the *Ex parte Young* exception to the Commonwealth's sovereign immunity in federal court.

Even apart from those hurdles, the NVRA provisions at issue simply do not apply to the removal of noncitizens from the rolls. The plain meaning of the text of the Quiet Period Provision, confirmed by the structure, purpose, and legislative history of the NVRA, demonstrates that there are no temporal restrictions on when States may remove noncitizens, as well as others who are not and cannot be "voters," such as minors and fictitious persons, whose registrations were invalid *ab initio*. The majority of federal judges to confront the scope of the NVRA have concluded that its removal provisions do not apply to noncitizens, and this fact alone answers whether "the underlying merits are entirely clearcut in favor of the plaintiff." *Merrill*, 142 S. Ct. at 881.

The problems continue. Virginia's noncitizen removal process is highly accurate and makes *individualized*, not "systematic," determinations on eligibility. Again, the people who are removed from the rolls are those who have self-identified as noncitizens, either by affirmatively stating that they are not citizens on DMV forms or by providing documentation to the DMV showing noncitizenship *and* being recently confirmed as noncitizens by the Department of Homeland Security's database. Virginia's process is individualized, nondiscriminatory, accurate, and lawful.

There is thus no overriding reason to visit on Virginia's election officials, and her voters, the enormous disruption and confusion that the burdensome measures sought by Plaintiffs would inescapably entail, especially less than two weeks before a presidential election. The Supreme Court has said time and again that the rules for elections need to be stable and knowable, and thus free of judicial intervention absent the most compelling reasons. The Plaintiffs waited to file these actions until the last, and worst, possible moment to challenge election procedures. The people of Virginia should not be forced to bear the cost of their strategic litigation choices, and the motions for a preliminary injunction should be denied.

## BACKGROUND

### I.    Statutory Framework and Factual Background

Based on its finding that "the right of *citizens of the United States* to vote is a fundamental right," Congress enacted the National Voter Registration Act, 52 U.S.C. §§ 20501 et seq. Among other things, the NVRA is intended to "enhance[] the participation of *eligible citizens* as voters in elections for Federal office," to "protect the integrity of the electoral process," and to "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(a)(1), (b) (emphasis added). Noncitizens are not eligible to vote; under the Virginia Constitution and both

federal and Virginia law, the right to vote is limited to U.S. citizens. *E.g.*, Va. Const. art. II, § 1; Va. Code Ann. § 24.2-404.4; 18 U.S.C. § 611. Indeed, for a noncitizen to vote is a crime under Virginia and federal law. Va. Code § 24.2-1004(B)(iii); 18 U.S.C. § 611.

To promote eligible citizens' participation in federal elections, the NVRA requires "each State [to] establish procedures to register to vote . . . by application made simultaneously with an application for a motor vehicle driver's license." *Id.* § 20503(a)(1); *see generally id.* § 20504 (establishing procedures for "State motor vehicle authori[ties]" to implement for voter registration). At the same time, the NVRA imposes a duty on States to maintain "accurate and current voter registration rolls" and thus to make "a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." *Id.* § 20507(a)(4).

The NVRA not only requires states to remove "ineligible voters" from the rolls—it also regulates the manner in which states do so. *Id.* The NVRA's General Removal Provision, *id.* § 20507(a)(3), declares that a person "may not be removed from the official list of eligible voters except" in four enumerated circumstances: voter request, death of the voter, voter felony conviction or mental incapacity, and change in voter residence (if certain procedures are followed), *id.* § 20507(a)(3), (4). In addition to the General Removal Provision's blanket ban on voter removals, which applies at all times, the NVRA also contains a special prohibition on removals close to federal elections. Section 20507(c)(2), the so-called Quiet Period Provision, prohibits states from "systematic[ally]" removing "ineligible voters" from the rolls within 90 days of a federal election, with exceptions for voter request, death of the voter, and voter felony conviction or mental incapacity. *Id.* § 20507(c)(2).

Seeking to harmonize its laws with the NVRA and other federal voting statutes, in 2006 Virginia's General Assembly passed, and then-Governor Timothy Kaine signed into law, new

obligations on Virginia's DMV and Department of Elections (ELECT). *See* 2006 Va. Acts. chs. 926, 940. The 2006 amendments required the DMV to ask each applicant for a motor-vehicle operator's license or renewal "if he is a United States citizen" and to "furnish monthly to the Department of Elections a complete list of all persons who have indicated a noncitizen status to the [DMV]." *Ibid.* (enacting new Virginia Code § 24.2-410.1). They further required the general registrar for each jurisdiction in Virginia to "promptly cancel the registration of . . . all persons known by him not to be United States citizens by reason of reports from the [DMV] pursuant to § 24.2-410.1." *Ibid.* (amending Va. Code § 24.2-427(B)).[1] In accordance with the then-prevailing preclearance regime of the Voting Rights Act, these amendments were submitted to the United States Department of Justice, which "did not interpose any objection" to Virginia's changes. October 22, 2024 Declaration of Graham K. Bryant, Ex. A (Bryant Decl.); October 22, 2024 Declaration of Steven L. Koski ¶ 4 (Koski Decl.). These requirements have been applied over the course of the past eight federal elections, including during the 90-day quiet period, and have never been challenged for noncompliance with the NVRA, by the United States or anyone else. October 22, 2024 Declaration of Ashley Coles ¶ 17 (Coles Decl.).

Consistent with these longstanding statutory obligations to ensure that only citizens are registered to vote, the DMV asks every applicant for most DMV "document[s], or renewal thereof," the question, "[a]re you a citizen of the United States?" Va. Code Ann. §§ 24.2-410.1(A), 24.2-411.3; Koski Decl. ¶¶ 5–6; see Bryant Decl. Exs. B–D. The DMV asks the citizenship question when issuing, renewing, or replacing a driver's license or identification card or when changing the address associated with such documents. Koski Decl. ¶¶ 5–6. All individuals

---

[1] A 2020 amendment requires voter-registration forms to be automatically presented to every applicant at the DMV unless they affirmatively decline. *See* Va. Code Ann. §§ 24.2-410.1; 24.2-427.

conducting one of these DMV transactions, whether in-person or online, are presented with the citizenship question, and given the option to decline to answer. Koski Decl. ¶ 7. The question is accompanied by a warning "that intentionally making a materially false statement during the transaction constitutes election fraud and is punishable under Virginia law as a felony." Va. Code § 24.2-411.3; Koski Decl. ¶ 7; Bryant Decl. Ex. D..

In addition to the citizenship question on these forms, all DMV customers are presented with an electronic voter-registration application. Va. Code § 24.2410.1. Because only citizens can vote, the application also asks about citizenship status. If a person answers that he is not a citizen, a second screen will pop up stating that citizens cannot vote and asking him a second time whether he is a citizen. Koski Decl. ¶ 11; Bryant Decl. Ex. D.

Virginia law requires the DMV to "furnish monthly to the Department of Elections a complete list of all persons who have indicated a noncitizen status" on a DMV form. Va. Code § 24.2-410.1(A). Contrary to some assertions, only persons who *affirmatively* state that they are not citizens are on the list sent to ELECT. Koski Decl. ¶¶ 12–14 If an applicant does not answer the citizenship question, his information is *not* passed along to ELECT. Koski Decl. ¶¶ 13–14.

In addition, the DMV obtains information about an individual's citizenship when he presents documentation of residency, such as when obtaining temporary or permanent identification cards. Koski Decl. ¶¶ 6, 15–16. Such legal presence documentation will show that the individual is not a citizen, such as federal documentation of a lawful permanent residence, asylum status, or a resident alien card. Koski Decl. ¶ 17. The DMV also transmits to ELECT information about individuals who affirm in recent DMV transactions that they are citizens, but whose legal presence documentation on file with the DMV indicates the opposite. Koski Dec. ¶ 18. Because the DMV does not require new residency documentation for most transactions, however,

individuals on this list may have subsequently become naturalized citizens. Koski Dec. ¶ 19. Knowing that there is potential for an innocent inconsistency, ELECT's policy is not to send information regarding these individuals on to local registrars, subject to one limited exception discussed below. Koski Dec. ¶ 19.

The information that the DMV sends to ELECT contains extensive data fields for each person that allow both ELECT and general registrars accurately to compare the individual to the list of registered voters. Coles Decl. ¶ 5. These data fields include, among other data, the person's full name, social security number, birth date, address, sex, DMV customer number, and transaction date. Coles Decl. ¶ 5; Koski Decl. ¶ 20.

When ELECT receives this information regarding self-declared noncitizens from the DMV, it compares the information for each self-declared noncitizen with voter information contained in ELECT's statewide voter registration system, the Virginia Election and Registration Information System (VERIS), to identify potential matches with registered voter records. Coles Decl. ¶ 6. ELECT then sends the records to the local registrar serving the individual's jurisdiction. Coles Decl. ¶¶ 3, 5, 7.

Although ELECT's general policy, as noted above, is to send local registrars only the records of persons who affirmatively and contemporaneously declared that they are not citizens on a DMV form, it did recently collaborate with the DMV to ensure that persons who engaged in DMV transactions between July 1, 2023, and June 30, 2024 and had noncitizen documents on file were not improperly on the voter rolls. Koski Decl. ¶ 21; Coles Decl. ¶ 22. To accurately ensure that noncitizens were not registered, ELECT asked the DMV to run these persons through the Department of Homeland Security's Systematic Alien Verification for Entitlements (SAVE) database. *See* Va. Code Ann. § 24.2-404(E) (requiring ELECT to use SAVE "for the purposes of

verifying that voters listed in the Virginia voter registration system are United States citizens"); Koski Decl. ¶ 22; Coles Decl. ¶ 23. The SAVE database can determine whether a noncitizen resident has subsequently obtained citizenship, ensuring that out-of-date data in the DMV files did not result in naturalized citizens being removed from the rolls. Coles Decl. ¶¶ 27–29. Only those persons registered to vote who had noncitizen documents on file with the DMV and also were confirmed as current noncitizens in a fresh SAVE search were transmitted to the local registrars for each jurisdiction to act upon. Koski Decl. ¶¶ 19, 22–23; Coles Decl. ¶ 24–25. ELECT's transmissions of individuals' information to the local registrars from this ad hoc process occurred in late August 2024. Coles Decl. ¶ 25. ELECT's individualized approach, which confirmed noncitizen status with a SAVE search within the previous 30 days, ensured that no naturalized citizens were removed from the voter rolls based on outdated DMV documents during the *ad hoc* process. Koski Decl. ¶¶ 19, 22; Coles Decl. ¶¶ 22–24; 30–31.

Virginia law requires "general registrars to delete . . . the name of any voter who . . . is known not to be a United States citizen by reason of" that person's self-declaration of noncitizen status or from information ELECT received from a SAVE verification. Va. Code Ann. § 24.2-404(A)(4); *see id.* §§ 24.2-427(C). Accordingly, the registrar manually reviews each potential match on an individual basis to confirm that the noncitizen and the registered voter identified in VERIS are the same person. Coles Decl. ¶ 7. The registrar has discretion in this process to correct any errors she spots. For instance, if after investigating the potential match, the registrar determines that the noncitizen and the registered voter identified in VERIS are different people, the registrar can reject the match. Bryant Decl. Ex. E at 12. The registrar can also refuse to initiate the removal process if she has information verifying citizenship that ELECT and the DMV did not possess. See Va. Code § 24.2-427(B) (registrar is to act based on information

"known by him"). The registrar can additionally note that further research is needed, which holds the potential match in the registrar's hopper pending further action. Bryant Decl. Ex. E at 12–13. If the registrar determines that the noncitizen and the registered voter are the same person, then the registrar will mail the individual a "Notice of Intent to Cancel" that individual's registration to vote. Va. Code Ann. § 24.2-427(C); Bryant Decl. Ex. F at 35.

This Notice of Intent to Cancel explains that ELECT "ha[d] received information that" the individual is "not a citizen of the United States" and that *if* this information "is correct," then the individual is "not eligible to register to vote." Bryant Decl. Ex. G at 1. The notice also instructs that if "the information is incorrect" and the individual is a citizen, the individual should complete an enclosed affirmation of citizenship and return it using a pre-addressed envelope that is enclosed with the notice. *Ibid.* The individual is not required to produce any documentation. Instead, an individual who is in fact a citizen need only complete and return by mail or in person the attestation form, which states: "Subject to penalty of law, I do hereby affirm that I am a citizen of the United States of America." *Id.* at 3. Virginia law allows the individual "to submit his sworn statement that he is a United States citizen within 14 days of the date that the notice was mailed." Va. Code Ann. § 24.2-427(C). The "general registrar shall cancel the registrations of such persons who do not respond." *Ibid.* By default, however, the VERIS system builds in a grace period and only cancels the registrations of individuals who do not confirm citizenship within 21 days. Bryant Decl. Ex. F at 36; Coles Decl. ¶¶ 10–11.

The local registrar then provides the individual a second opportunity to correct a mistake, sending a separate notice informing the individual of the cancellation of his registration. Bryant Decl. Ex. F at 36; Coles Decl. ¶ 12. This Notice of Cancellation explains that the general registrar has cancelled that individual's registration to vote for failing to respond with an affirmation of

citizenship, and it invites the individual to contact the registrar's office if the individual believes the removal "is incorrect." Bryant Decl. Ex. H. If, despite attesting to the DMV that he is not a citizen and then failing to respond to the registrar's notice, a removed individual is in fact a citizen, that person may simply re-register to vote. Coles Decl. ¶ 13. Before October 15, the person could reregister in the ordinary fashion. Coles Decl. ¶ 14. After October 15, he can same-day register while casting an early ballot or an in-person ballot on election day. Coles Decl. ¶ 14.; *see* Va. Code Ann. § 24.2-420.1. As with all voter registrations, the person must attest to his citizenship under penalty of perjury; there is no requirement to provide documentary proof of citizenship, nor is the prior removal from the rolls held against the individual in any way. Coles Decl. ¶ 15.

Executive Order 35, issued by Governor Youngkin on August 7, 2024, expressly recognized that the DMV and ELECT had been carrying out these statutory obligations since the Department of Justice granted preclearance during the Kaine Administration. Bryant Decl. Ex. I. Indeed, ELECT records demonstrate that it has consistently sent information about self-declared noncitizens who match VERIS records for registered voters to local registrars—including during the 90-day period before a primary or general election—since at least 2010. Coles Decl. ¶ 17.

Rather than establish new processes, Executive Order 35 required ELECT to certify to the Governor that it was following Virginia law. Bryant Decl. Ex. I at 2–4. DMV and ELECT also were instructed to increase the frequency of their communications under the procedures already in place. *Id.* at 4. DMV previously transmitted to ELECT a list of individuals who "indicated a noncitizen status" to the DMV on a "monthly" basis. Va. Code Ann. § 24.2-410.1(A). Executive Order 35 instructed the DMV to "expedite" this "interagency data sharing" by "generating a daily file of all non-citizens transactions." Bryant Decl. Ex. I at 4. Consistent with this directive, beginning with data for transactions occurring on August 19, 2024, the DMV began transmitting

data files to ELECT on a daily basis with information from the previous day's transactions. Coles Decl. ¶ 18. In addition, the DMV continued sending simplified monthly files of the same information. Coles Decl. ¶ 19.

Consistent with Virginia law and ELECT's longstanding practice of closing the standard voter registration process 21 days before an election, ELECT ceased transmitting information to local registrars regarding potential noncitizens on the voter rolls after October 14, 2024. *See* Va. Code Ann. § 24.2-416(A) (requiring registration records to "be closed during the 21 days before a primary or general election"); Coles Decl. ¶ 33. Back on September 4, 2024, Commissioner Beals testified to the Virginia House of Delegates Privileges and Elections Committee that only removals from the voter rolls based on death of the voter would be processed by ELECT after October 15. Virginia House of Delegates Privileges and Elections Committee Meeting, September 4, 2024 (Sept. 4 Comm. Meeting), at 3:10:46 pm (statement of Commissioner Beals), https://tinyurl.com/54fy6r5n. All other removals—including of noncitizens—would cease to be initiated by ELECT "after that deadline." *Id*.; *see* Va. Code Ann. § 24.2-427(b) ("The general registrar shall promptly cancel the registration of . . . all persons known by him to be deceased."). Thus, on October 16, 2024, ELECT issued guidance to registrars stating that "ELECT will not process any additional records to your hoppers until after the election, except for weekly death records as required by law." Bryant Decl. Ex. J at 1. Accordingly, ELECT is not currently forwarding to registrars any information regarding noncitizens on the voter rolls and will not resume doing so until after the November 2024 General Election.

Despite the closing of the rolls, eligible citizens may still register to vote—up to and including on Election Day—through same-day registration. *See* Sept. 4 Comm. Meeting, at 3:03:10 pm (statement of Commissioner Beals); Va. Code Ann. § 24.2-420.1. If there is any person

who was removed from the voter rolls pursuant to Virginia Code § 24.2-427(C) after failing to return the attestation of citizenship, but who is in fact an eligible citizen, then that person may attest to his citizenship by same-day registering in person at an early voting site or at the appropriate precinct on election day and can "immediately vote a provisional ballot." ELECT, *Same Day Voter Registration*, https://tinyurl.com/3t982f3t (last accessed Oct. 18, 2024); Bryant Decl. Ex. J at 1; Coles Decl. ¶¶ 13–14. The general registrar then researches the registrant's eligibility, and based on that research, the local electoral board determines whether the provisional ballot should be counted. Coles Decl. ¶¶ 34–35. In doing so, neither the general registrar nor the electoral board considers the registrant's prior removal from the rolls or prior self-declaration of noncitizenship—instead, the sole question is whether the registrant is an eligible voter in the precinct in which he cast the provisional ballot. Coles Decl. ¶¶ 36–37. If the electoral board determines that the registrant is qualified to vote, the ballot will be counted. *Same Day Voter Registration*, *supra*; Coles Decl. ¶ 38[2]

## II.   Procedural background

On October 7, 2024, the Virginia Coalition for Immigrant Rights, the League of Women Voters of Virginia, the League of Women Voters of Virginia Education Fund, and African Communities Together (collectively "Organizational Plaintiffs") filed a complaint challenging the legality of Virginia's longstanding noncitizen removal process used to ensure that only American

---

[2] Notably, ELECT's data from the 2023 General Election demonstrates that "98% or 18,088 of [provisional] ballots cast during the 2023 General Election were counted," and it is not even clear whether the two percent that did not count were disqualified for registration issues or other flaws in the ballot such as voting in the wrong place. ELECT, 2023 Annual Virginia Election Retrospective & Look Ahead at 25–26 (Mar. 6, 2024), https://tinyurl.com/229x8z8u. Again, a person's prior removal under Virginia Code § 24.2-427(C) would not be a reason for rejecting a provisional ballot, so long as the person attests on his voter registration under penalty of perjury that he is a citizen. Coles Decl. ¶ 13–16; 39.

citizens are registered and able to vote. *See* Amended Compl. ¶¶ 1–14 (ECF 23). The Organizational Plaintiffs allege that this individualized process for removing *self-declared* noncitizens from the voter rolls, as required by Virginia law to effectuate the Federal and State requirements limiting the right to vote to U.S. citizens, violates the NVRA by amounting to (1) "systematic voter list maintenance within 90 days preceding a federal election," (2) discrimination against naturalized citizens, and (3) a requirement that "voters . . . provide additional proof of U.S. citizenship" beyond that required in the NVRA Application or other publicly available applications to remain registered. Amended Compl. ¶¶ 14; see *id.* at 67–84.[3] They named as defendants Susan Beals, the Virginia Commissioner of Elections; members of the Virginia State Board of Elections including its chair, John O'Bannon, and members Rosalyn R. Dance, Georgia Alvis-Long, Donald W. Merricks, and Matthew Winstein; and Attorney General Jason Miyares. *Id.* ¶¶ 35–37. About a week after filing the complaint, on October 15, 2024, they moved for a preliminary injunction. Mem. in Supp. of Mot. for Prelim. Inj. (ECF 26-1); *see* Amended Compl. ¶¶ 14, prayer for relief at b.

The preliminary-injunction motion demands relief on only two of the four counts in the complaint. First, the Organizational Plaintiffs contend that Virginia's process for ensuring that only American citizens participate in elections violates the NVRA because it is a process that "systematically remov[es] voters from the rolls" during the NVRA's "90-day quiet period before the date of a general election." Amended Compl. ¶ 78 (quoting 52 U.S.C. § 20507(c)(2)(a)). Second, they claim that the process "identifies registered voters based on national origin and type of citizenship status" and consciously burdens naturalized citizens in contravention of the NVRA's

---

[3] The Organizational Plaintiffs also bring a claim that they are entitled to certain voting information under the NVRA *See* Amended Compl. ¶ 14.

requirement that voter list maintenance programs be "uniform" and "nondiscriminatory." *Id.* ¶¶ 81–84 (quoting 52 U.S.C. § 20507(b)(1)). For a remedy, the Organizational Plaintiffs ask this Court to order Defendants to immediately halt implementation of the noncitizen removal process, to affirmatively "place back on the rolls in active status" any person whose registration was previously cancelled as part of this process regardless of their citizenship status, and to undertake an assortment of burdensome public notice and other remedial measures days before a presidential election. Org. Pl. Proposed Injunction at 2 (ECF 26-25).

While this case was getting off the ground, the United States also sued the Commonwealth of Virginia, ELECT, and Susan Beals on October 11, 2024. Its complaint is narrower, alleging only that Virginia is violating the Quiet Period Provision by systematically removing noncitizens from the voter rolls within 90 days of an election. The two cases were consolidated, and the United States moved for a preliminary injunction on October 16, also requesting broad equitable relief on the eve of an election. The motions for preliminary injunctions have been scheduled for a hearing on Thursday, October 24, more than a month after the start of early voting.

## LEGAL STANDARD

Plaintiffs set forth the standard *Winter* four-factor test for granting a preliminary injunction. *See* U.S. Br. at 9-10; Org. Br. at 10 (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)). That test is daunting enough, and Plaintiffs cannot satisfy it. But it is not applicable here. The test for a preliminary injunction applicable here, in the context of an eleventh-hour challenge to a State's election procedures, is much stricter. To obtain the preliminary relief Plaintiffs seek, they must show that "(i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the

election without significant cost, confusion, or hardship." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring in grant of applications for stay). As demonstrated below, they fall far short on every factor.

## ARGUMENT

Neither the Organizational Plaintiffs nor the United States are entitled to the preliminary injunctions they seek on the eve of the 2024 presidential election. No Plaintiff meets *any* of the *Merrill* factors, much less all four. As an initial matter, the Organizational Plaintiffs' case is doomed, twice, at the Court's doorstep, for they lack standing and their claims are barred by sovereign immunity. Even if federal jurisdiction existed over those claims, neither the Organizational Plaintiffs nor the United States could prevail on the merits because they fundamentally misread the scope of the NVRA and misunderstand the facts of this case. *See* pp. 22–35, *infra*. Additionally, no Plaintiff will suffer irreparable harm without a preliminary injunction, and in light of Plaintiffs' unconscionable delay in bringing these suits, the equities favor avoiding, and the *Purcell* doctrine precludes, federal intervention into an election that is already underway. *See* pp. 35–43, *infra*.

## I.   This Court Lacks Jurisdiction Over the Organizational Plaintiffs' Claims

### A.   The Organizational Plaintiffs Lack Article III Standing

None of the Organizational Plaintiffs may obtain injunctive relief because none has standing. "Standing is part and parcel of the constitutional mandate that the judicial power of the United States extend only to 'cases' and 'controversies.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting U.S. Const. art. III, § 2). To establish "the 'irreducible constitutional minimum' of standing," plaintiffs must show that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Plaintiffs "bear the burden of . . . showing that the defendant's actual action has caused the substantial risk of harm," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013), and "[a]n injury . . . must result from the actions of the [defendant], not from the actions of a third party," *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013).

The same standing rules apply when membership organizations, such as the Organizational Plaintiffs, *see* Amended Compl. ¶ 12, attempt to invoke federal jurisdiction, *see Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012). An organization can establish Article III standing in two ways. It can show that at least one of its members has standing and that the organization can properly represent the member's interests ("associational standing"), or it can satisfy the traditional standing test itself ("organizational standing"). The Organizational Plaintiffs here establish neither.

The Organizational Plaintiffs lack associational standing. "An association has associational standing when at least one of its 'identified' members 'would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Outdoor Amusement Bus. Ass'n v. DHS*, 983 F.3d 671, 683 (4th Cir. 2020) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). Thus, to establish associational standing, the Organizational Plaintiffs must specifically "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see also, e.g.*, *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184–85 (4th Cir. 2013) (denying organizational standing when plaintiff "has failed to identify a single *specific member* injured by" the challenged action).

The Organizational Plaintiffs have not identified a single specific member who has allegedly been or will be harmed by Virginia's program to remove noncitizens from the voter rolls.

Without an injured member, there can be no plausible case for associational standing. The Organizational Plaintiffs attempt to generate associational standing by asserting that they have many members who are naturalized citizens, *see* Amended Compl. ¶¶ 29, 32, some of whom, Plaintiffs argue, could be erroneously removed from the voter rolls, s*ee*, *e.g.*, Ex. W ¶ 40 (declaration of Joan Porte) ("[T]he League's members include Virginians who are naturalized U.S. citizens who likely once received noncitizen identification numbers or identified themselves as noncitizens at the DMV."). This theory is not only based on pure speculation, but also simply a reprisal of the probabilistic-standing theory that the Supreme Court rejected in *Summers*. *See* 555 U.S. at 498. Even if there were a "statistical probability" that one of the organization's roughly 700,000 members would suffer an injury in fact, the Supreme Court still required the organization to "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id*.

The Organizational Plaintiffs are unable to identify a single member with standing because they are mistaken about how Virginia's voter-roll process actually works. ELECT has sent Notice of Intent to Cancel forms only to individuals (a) who have contemporaneously self-declared on a DMV form that they are *not* American citizens or (b) who have previously self-identified as noncitizens in documents on file with the DMV, and had their current noncitizen status confirmed by a new SAVE search. Koski Decl. ¶¶ 5, 12, 15, 18–19; Coles Decl. ¶¶ 4, 21, 24, 30–32. The process used by ELECT, in other words, is not causing naturalized citizens to be removed from the voter rolls as the Organizational Plaintiffs suggest. Nor, as the Organizational Plaintiffs allege, are people being removed from the voter rolls for "leaving pertinent citizenship documents blank when filling out DMV forms." Org. Pl. Br. at 18. When applicants leave citizenship questions on DMV forms blank or decline to answer, their information is not provided to ELECT. Koski Decl.

¶¶ 13–14.

The Organizational Plaintiffs likewise lack organizational standing. Organizations have standing "to sue on their own behalf for injuries they have sustained," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n. 19 (1982), but they still must satisfy the same standards for injury-in-fact, causation, and redressability that apply to individuals, *id.* at 378–379. Much like natural persons, "an organization may not establish standing simply based on" harm to its interests "or because of strong opposition to the government's conduct." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). Likewise, "an organization . . . cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Ibid.*

The Complaint and accompanying declarations establish no more than abstract organizational interests and voluntary budgetary decisions based on those interests. The harm that the Organizational Plaintiffs repeatedly and commonly allege is that they were forced to "divert significant resources" away from voter-outreach and other community-building activities and "toward . . . attempting to mitigate the effects" of Virginia's removal of noncitizens from the voter rolls. Amended Compl. ¶ 21 (describing the changes made by the Virginia Coalition for Immigrant Rights); *id.* ¶ 26 (explaining that the League of Women Voters has expended resources to "rapidly understand the impact of E.O. 35 and its effect on Virginia voters"); *id.* ¶ 34 (asserting that African Communities Together diverted resources "by developing and producing new public education materials"). But the Fourth Circuit has long held that an organization's "own budgetary choices" concerning the allocation of funds, such as "educating members, responding to member inquiries, or undertaking litigation in response to legislation," are not enough to establish an injury in fact. *Lane*, 703 F.3d at 675; *see also Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 903 (6th Cir. 2024) (per curiam) (holding that "the decision to spend money to minimize the alleged harms" to

19

other parties caused by government action did not supply organizational standing). Likewise, the Supreme Court has recently reaffirmed that an organization cannot establish standing simply because it feels compelled "to inform the public" that the government's actions are allegedly harmful or illegal. *All. For Hippocratic Med.*, 602 U.S. at 395. Otherwise, every organization in the world could "spend its way into standing" to challenge every law that the organization opposed, and Article III's limitations on the power of the federal judiciary would be illusory. *Id.*; *see Lane*, 703 F.3d at 675.

Although the Organizational Plaintiffs fail to mention standing in their motion, their Complaint and declarations suggest that they intend to rely on *Havens Realty Corp.*, 455 U.S. at 368. But "*Havens* was an unusual case" that courts should not "extend . . . beyond its context," *All. For Hippocratic Med.*, 602 U.S. at 396, and it cannot rescue the Organizational Plaintiffs' deficient standing claims. The plaintiff in that case, a housing-counseling provider, sent employees commonly referred to as "testers" to determine whether a real estate company was falsely telling black renters that no units were available. *Havens Realty Corp.*, 455 U.S. at 366 & n.1, 368. The Supreme Court held that the plaintiff suffered an injury in fact because lies told to the plaintiff's employee testers "perceptibly impaired [the plaintiff's] ability to provide counseling and referral services." *Id.* at 379. As the Supreme Court explained, lies told to the plaintiff's employees "directly affected and interfered with [the plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *All. For Hippocratic Med.*, 602 U.S. at 395. *Havens* thus dealt with a unique type of business injury and does not stand for the proposition that the diversion of resources alone establishes organizational standing. Without an employee who suffered an injury that also harmed the Organizational Plaintiffs' "core business activities," they cannot establish standing under *Havens*. *Id.*

The Organizational Plaintiffs lack both organizational and associational standing, and thus this Court lacks jurisdiction to adjudicate their claims. Their motion for a preliminary injunction must therefore be denied.

### B.  Sovereign Immunity also Bars the Organizational Plaintiffs' Claims

Sovereign immunity also bars the Organizational Plaintiffs' claims. Sovereign immunity applies in full force to alleged past violations of law, even if an equitable remedy is sought. *See Edelman v. Jordan*, 415 U.S. 651, 666 (1974). The *Ex parte Young* exception to Defendants' constitutional immunity from suit can apply only to the extent that Plaintiffs seek "prospective, injunctive relief against . . . *ongoing* violations of federal law." *Bland v. Roberts*, 730 F.3d 368, 390 (4th Cir. 2013) (emphasis added); *see Ex parte Young*, 209 U.S. 123 (1908). Yet as Commissioner Beals publicly testified to the Virginia House of Delegates on September 4, 2024, the noncitizen removal program ended on October 15. *See* Beals Statement, *supra*, at 3:10:46 pm. As of that date ELECT officials, consistent with Virginia law, are no longer referring noncitizens to local registrars to begin the 21-day process of removing from local voter rolls those who fail to affirm their citizenship. *See* Va. Code Ann. § 24.2-416 (closing the registration process "during the 21 days before a primary or general election"). Defendants will not resume these referrals until after the election is over.

Thus, there is not an ongoing process to enjoin prospectively, and the only remaining conduct challenged by Plaintiffs—initiating the removal of self-declared noncitizens from the rolls for the upcoming election—"occurred entirely in the past." *DeBauche v. Trani*, 191 F.3d 499, 505 (4th Cir. 1999). As a result, the preliminary injunctive relief that Plaintiffs request for that purported violation—an order that the Defendant ELECT officials take steps to return to the voter rolls persons removed through this process, along with individual notices, public announcements, and other associated measures—is all retrospective, not "prospective." *Bland*, 730 F.3d at 390. In

these circumstances, the *Ex parte Young* exception to sovereign immunity "does not apply." *DeBauche*, 191 F.3d at 505.

In any event, sovereign immunity necessarily bars the Organizational Plaintiffs' claims against the Attorney General, who has nothing to do with the challenged process. The *Ex parte Young* exception applies only to officials who bear a "special relation" to "the challenged statute" and who have "acted or threatened" to enforce the statute. *McBurney v. Cuccinelli*, 616 F.3d 393, 399, 402 (4th Cir. 2010) (quotation marks omitted). The Attorney General plays no role in the noncitizen removal process, which local registrars carry out based on directives from ELECT, prompted by information that ELECT receives from the DMV. The Attorney General thus has participated in no alleged violation of the NVRA, let alone an ongoing one. Plaintiffs recognize as much: their Prayer for Relief asks the Court to order "Defendants Beals and State Board of Election Members," not the Attorney General, "to instruct all Virgina county registrars" to undo removals effected through this process. Amended Compl. prayer for relief at d. The Attorney General does have the authority to prosecute people who vote illegally, *see* Va. Code Ann. § 24.2-104(A) (authority to enforce voting laws), but the legality of Virginia's criminal laws against noncitizen voting is not at issue here. The Court therefore lacks jurisdiction over Plaintiffs' claims against the Attorney General for this reason as well.

## II.     The United States and the Organizational Plaintiffs' Claims Under the NVRA Are Unlikely to Succeed

Neither the Organizational Plaintiffs nor the United States has shown a likelihood of success on their claims under the NVRA. As a threshold matter, the NVRA's Quiet Period Provision simply does not apply to the removal of noncitizens from the voter rolls, just as it does not apply to the removal of minors or fictitious persons. It only applies to the removal of *voters* who validly registered in the first place but who subsequently became ineligible, such as those

who have since been convicted of a felony or have changed their residence. Plaintiffs' Quiet Period claims also fail because Virginia's process for removing noncitizens is a highly individualized process to update voter rolls, not a "systematic" program. Far from the kind of bulk mailing and door-to-door canvassing that Congress contemplated as "systematic" programs, the Commonwealth's noncitizen removal process focuses narrowly on specific individuals who have declared themselves to be noncitizens and involves contacting each such individual—twice—to give the individual an opportunity to correct the record by affirming his citizenship. Finally, the Organizational Plaintiffs' "discrimination" claim, which the United States declined to bring, fails because the noncitizen removal process is facially neutral and does not discriminate against people based on national origin or naturalized citizenship.

### A.    Defendants Did Not Violate the NVRA's 'Quiet Period' Requirements

The United States and the Organizational Plaintiffs claim that Defendants violated the NVRA's Quiet Period Provision, which prohibits certain changes to the voter rolls within 90 days of an election. *See* 52 U.S.C. § 20507(c)(2). Their claims fail for at least two reasons.

### 1.    The NVRA Does Not Restrict Removing Noncitizens and Other Persons Whose Registration Was Invalid *Ab Initio*

The NVRA's Quiet Period Provision does not apply to the removal of persons who were never eligible to vote in the first place. When interpreting the NVRA, courts must start, as always, with the plain language of the text. *See Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 128 (4th Cir. 2023). To understand that language, courts look to the meaning of the words, informed by the context in which they are used, which "often provides invaluable clues to understanding the[ir] meaning." *United States v. Smith*, 919 F.3d 825, 837 (4th Cir. 2019).

The text of the NVRA's Quiet Period Provision requires States to "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the

purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). Like much of the NVRA, the Quiet Period Provision distinguishes between "eligible voters" and "ineligible voters." *Id.* A "voter" is a person who "votes or has the legal right to vote." *Voter*, Merriam-Webster, (https://www.merriam-webster.com/dictionary/voter) (last accessed Oct. 22, 2024). The adjectives "eligible" or "ineligible" then narrow the term "voters" to apply to two subsets of "voters." An "eligible voter" is a person who is "qualified to participate" in a given election. *Eligible*, *supra*, (https://www.merriam-webster.com/dictionary/eligible) (last accessed Oct. 22, 2024). On the other hand, an "ineligible voter" is a person who had "vote[d] or ha[d] the legal right to vote" but is "not qualified" in a given election. *Ineligible*, *supra*, (https://www.merriam-webster.com/dictionary/ineligible) (last accessed Oct. 22, 2024). For example, a voter could become ineligible because he has moved away, been convicted of a felony, or been declared mentally incapacitated. *See* 52 U.S.C. § 20507(a)(3)(B), (a)(4)(B). The key, then, is "voter."

The most natural reading of the Quiet Period Provision, therefore, is that it restricts programs with the "purpose" of "systematic[ally]" removing *voters*—those who "vote[d] or ha[d] the legal right to vote," but who are no longer "qualified" to vote. Indeed, the title of the subsection that houses the Quiet Period Provision is "*Voter* Removal Programs," which confirms that the provision concerns removing people who are or were bona fide voters and not persons who have never possessed the right to register to vote or cast a ballot. *Id.* § 20507(c)(2) (emphasis added); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Text*, 221 (2012) (explaining that titles are a permissive tool when interpreting a statute). The plain-text reading of the Quiet Period Provision therefore does not prohibit removing from the rolls persons who never could have validly registered in the first place because such persons were never "eligible

voters" or even "ineligible voters." 52 U.S.C. § 20507(c)(2)(A). They are not "voters" at all. Therefore, States are free to systematically remove noncitizens, minors, and fictitious persons within 90 days of an election without running afoul of the NVRA.[4]

The structure, purpose, and legislative history of the NVRA confirm what the plain text says: States may exclude noncitizens, minors, and fictitious persons from the voter rolls at any time. If this were not the case, then the blanket ban on removal of eligible voters in the NVRA's substantially similar General Removal Provision of the NVRA would necessarily prohibit states from *ever* removing noncitizens, minors, and fictitious persons. As the United States has conceded in the past, that interpretation simply cannot be correct. *See United States v. Florida*, 870 F. Supp. 2d 1346, 1349 (N.D. Fla. 2012) (acknowledging the government's concession that states can "remov[e] an improperly registered noncitizen").

Because both provisions apply to the same grounds for removal (aside from change of residence), the Quiet Period Provision cannot logically be interpreted to apply to classes of persons who do not and cannot qualify as *voters*: noncitizens, minors, and fictitious persons. If it could apply to noncitizens, then the General Removal Provision would almost certainly be unconstitutional because it would prohibit States from *ever* removing noncitizens from its voter rolls. As the Supreme Court has emphatically explained, the "Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them," and forcing

---

[4] That the noun "voters" is modified by the adjective "ineligible" does not mean that it loses its basic definitional properties. Imagine that a cell-phone company is having a special deal for customers who have been with the company for at least five years. Aaron, who has been with the company for seven years, is an "eligible customer." Brian, who has been with the company for three years, is an "ineligible customer." Carl, who does not own a cell phone, is neither because he is not a customer at all. Both Brian and Carl are not "eligible" for the deal, but only Brian can be properly described as an "ineligible *customer*." Likewise, a noncitizen is "ineligible" to cast a ballot, but he is not an "ineligible voter" because he never entered the category of "voter" in the first place.

States to keep noncitizens on their voter rolls would cross the line into regulating "*who*" may vote in federal elections. *Arizona v. Intertribal Council of Ariz.*, 570 U.S. 1, 16 (2013). "Since the power to establish voting requirements is of little value without the power to enforce those requirements," it "would raise serious constitutional doubts if a federal statute precluded a state from" enforcing its voting requirements, such as citizenship. *Intertribal Council of Ariz.*, 570 U.S. at 17; *see also id.* at 28 (Thomas, J., dissenting) ("[T]he Voter Qualifications Clause gives States the authority not only to set qualifications but also the power to verify whether those qualifications are satisfied.").

Therefore, as a matter of traditional constitutional avoidance, the General Removal Provision's blanket prohibition on removing persons from the list of "eligible voters" must be intended to apply only to persons who were validly entered into the list in the first place. *See Florida*, 870 F. Supp. 2d at 1349. And because the Quiet Period Provision is part of the same Code section, uses the same term "list[] of eligible voters," and incorporates by reference three of the same exceptions to the General Removal Provision, it must be given the same meaning, reaching only individuals who at one time had the right to vote. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 86 (2006); Scalia & Garner, *supra*, at 170; *see also Florida*, 870 F. Supp. 2d at 1349–50 (noting the "inescapable" conclusion that if the General Removal Provision "does not prohibit a state from removing an improperly registered noncitizen, then [the Quiet Period Provision] does not prohibit a state from systematically removing improperly registered noncitizens during the quiet period").[5]

_____

[5] Further, although the Quiet Period Provision applies only in the three months preceding an election, the Constitution contains no clause that permits the federal government to place a time limit on a state's power to control who may vote as the election approaches. Indeed, that is the time the State most urgently needs to protect the ballot. Thus, the Quiet Period Provision should

No court has *ever* held that the General Removal Provision stops States from removing names from the voter rolls that were null on day one. And if the General Removal Provision cannot be read to apply to originally invalid registrations, then the textually adjacent Quiet Period Provision cannot either. *See Florida*, 870 F. Supp. 2d at 1349–50 (adopting this view); *see also Arcia v. Florida Sec. of State*, 746 F.3d 1273, 1286 (11th Cir. 2014) (Jordan, J., concurring), *vacated by Arcia v. Florida Sec. of State*, 772 F.3d 1335 (11th Cir. 2014); *Arcia v. Detzner*, 908 F. Supp. 2d 1276, 1284 (S.D. Fla. 2012). In the simplest of terms, the entire NVRA scheme is limited to the removal of once-valid registrations, and no part of it abrogates a State's authority to remove registrations that were void *ab initio*. Thus, while the statutory scheme is admittedly complicated, the takeaway is simple: States can systematically remove within 90 days of an election the same persons they can remove at any other time, except for those "registrants who become ineligible to vote based on a change in residence." *Arcia v. Detzner*, 908 F. Supp. 2d 1276, 1283 (S.D. Fla. 2012); *id.* § 20507(a)(3), (4), (c)(2).[6]

Statutory purpose, as enacted in the text of the NVRA itself, confirms that neither the General Removal Provision nor the Quiet Period Provision prohibit the removal at any time of inherently invalid registrations. The "Findings and Purposes" section of the statute declares that the goal of the NVRA is to "promote the exercise of" the "right of *citizens* of the United States to vote" and to "ensure that *accurate and current* voter registration rolls are maintained." 52 U.S.C. § 20501(a), (b) (emphases added). It is difficult to see how a statute that values "citizen[ship]" and "accura[cy]" would prohibit the removal at any time of noncitizens who cannot lawfully participate

---

not be interpreted to stop or inhibit States from removing noncitizens from the list of eligible voters, for if it is, it violates the Constitution. *See* U.S. Const. art I, § 2.

[6] States may also make "corrections" to their registration records within the 90-day timeframe. 52 U.S.C. § 20507(c)(2)(B)(ii).

in federal elections. *Id.* As the Sixth Circuit explained, the NVRA's constant references to "eligible voters" and the voting rights of "citizens" make clear that, "[i]n creating a list of justifications for removal, Congress did not intend to bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in the first place." *Bell v. Marinko*, 367 F.3d 588, 591–92 (6th Cir. 2004).

Finally, the legislative history of the NVRA also indicates that the Quiet Period Provision applies only to the removal of originally valid registrations. The Senate Report described the Provision's goal as forcing "[a]ny program which the States undertake to verify addresses" to be "completed not later than 90 days before a primary or general election." *See* S. Rep. 103-6, at 18–19 (1993). The Report's concern was with systematic mailings and canvassing programs to address verification for previously eligible voters, not void registrations from noncitizens. Likewise, the House Report stated that the Quiet Period Provision simply "applies to the State outreach activity such as a mailing or a door to door canvas and requires that such activity be completed by the 90-day deadline." H.R. Rep. No. 103-9, at 16 (1993). Not only does the House Report's description only cover verification efforts for originally valid registrations through address verification, the Report goes out of its way to confirm that the NVRA "should not be interpreted in any way to supplant th[e] authority" of election officials "to make determinations as to [an] applicant's eligibility, such as citizenship, as are made under current law and practice." *Id.* at 8. Both reports make clear that the goal of the Quiet Period Provision, as reflected in the text, structure, and purpose of the NVRA, was to put a stop date on systematic programs to verify the continued residential eligibility of originally valid registrations, not to prohibit the removal of void, noncitizen registrations.

To be sure, courts have not uniformly interpreted the NVRA's Quiet Period Provision, and

some have held, erroneously, that the Provision bars removal of noncitizens from the rolls within the 90-day period. *See Arcia*, 772 F.3d at 1348 (majority adopting the view that the Quiet Period Provision covers the removal of noncitizens); *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1092–93 (N.D. Ariz. 2023) (same). But a majority of federal judges to address the scope of the NVRA have correctly concluded that "Congress did not intend to bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in the first place." *Bell*, 367 F.3d at 591-92; *see Arcia*, 772 F.3d at 1348-49 (Suhrheinrich, J., dissenting) ("I would affirm the judgment of the district court for the reasons set forth in the district court's opinion, *see Arcia v. Detzner*, 908 F. Supp. 2d 1276 (S.D. Fla. 2012), as well as the reasoning of *United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012)").

None of the cases holding that the Quiet Period Provision prohibits the removal of noncitizens examined the plain meaning of the word "voter," and as previously demonstrated, noncitizens do not fall into that category. The NVRA, after all, "is premised on the assumption that citizenship" is necessary to register to vote. *Arcia*, 772 F.3d at 1344. Instead of engaging in a plain-text analysis, both the *Arcia* majority and the district court in *Mi Familia Vota* drew a negative inference from the existence of the three previously discussed exceptions to the Quiet Period Provision to conclude that no exception existed for noncitizens. *Id.* at 1345; *Mi Familia Vota*, 691 F. Supp. 3d. at 1093. This inference is unwarranted. Because noncitizens are not "voters" within the meaning of the Quiet Period Provision to begin with, there was no need for an exception allowing them to be removed, just as there is no exception for minors or fictitious persons. If anything, these courts should have drawn the opposite inference: If the NVRA creates mere procedural restrictions for the removal of persons who were at one point eligible to vote and are no longer, then it surely would not provide greater protection against removal of persons who were

*never* eligible to vote. Indeed, all three exceptions in the Quiet Period Provision allow for removal only of persons who would have been previously eligible to vote. Congress did not prohibit the removal of persons whose registrations were void *ab initio*; it left the issue to the States, where it previously resided.

        **2.     Defendants' Removal of Noncitizens Was "Individualized" and Not "Systematic"**

Even if this Court concludes that the NVRA's Quiet Period Provision applies to the removal of persons who were never eligible to vote, the Plaintiffs have still not shown a likelihood of success on their claim that Virginia is "purpose[fully]" conducting a "systematic" program to update its voter rolls. 52 U.S.C. § 20507(c)(2)(A).

The Quiet Period Provision prohibits States from operating any "program" whose "purpose" is to "systematic[ally]" remove voters from the rolls fewer than 90 days before the election. 52 U.S.C. § 20507(c)(2)(A). But the Quiet Period Provision allows removals during this 90-day period if the actions are performed on an individualized basis. *See* 52 U.S.C. § 20507(c)(2)(B); *see also Arcia*, 772 F.3d at 1348 ("[T]he 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information, even within the 90-day window."). This much is not in dispute. *See* Org. Pl. Br. at 16-17 (agreeing with *Arcia* on this point); *See* U.S. Br. at 14 (same).

Virginia's method for determining whether a person is a citizen clearly falls on the "individualized" side of the line. *Arcia*, 772 F.3d at 1348. As the declarations from Ashley Coles and Steve Koski set out in detail, DMV forwards the names of individual self-declared noncitizens to ELECT, which in turn forwards those self-declared noncitizens who appear on voter rolls to local registrars to begin the removal process. Coles Decl. ¶¶ 3–8; Koski Decl. ¶¶ 5, 12–20. There is another step of individualized review when the local registrar mails the Notice of Intent to Cancel

to each self-declared noncitizen, at which point he has an opportunity to correct any mistake in ELECT's records by mailing back within 14 days a pre-printed form affirming his citizenship. As the Supreme Court has noted with respect to this very type of procedure, "a reasonable person with an interest in voting is not likely to ignore notice of this sort," and thus can be expected to "take the simple and easy step of mailing back the pre-addressed" card. *Husted v. A. Phillip Randolph Institute*, 584 U.S. 756, 779 (2018). And if he does not return the pre-printed affirmation of citizenship, he is sent a Notice of Cancellation that invites him *a second time* to contact the local registrar to correct any mistake concerning his citizenship.

The process thus begins with a personal attestation of noncitizenship and ends in the removal of that person from the voter rolls only when he is sent two individualized letters offering opportunities for an individual corrective response. This is the very definition of an individualized process.

It is true that ELECT conducted a one-time *ad hoc* examination of certain individuals with recent DMV transactions who had legal presence documents indicating noncitizenship on file in DMV, coupled with a *fresh* search of the SAVE database. Coles Decl. ¶¶ 22–24, 29–31; Koski Decl. ¶¶ 21–22. But the *ad hoc* search—which was separate from the individualized process of removing self-declared noncitizens—was not "systematic," either. Simply having a residency document on file with the DMV that indicated noncitizenship was not enough for a person to have his name forwarded to the local registrar based on the one-time DMV search. Coles Decl. ¶¶ 23–24, 29–30; Koski Decl. ¶¶ 13–14, 19. Confirmation of noncitizen status through a new SAVE search was also required before ELECT sent a person's name to the registrar. Coles Decl. ¶ 24. Moreover, this process was a discrete exercise to ensure that noncitizens had not registered to vote, and ELECT completed it in late August 2024. Coles Decl. ¶ 25. It is not currently ongoing, and

ELECT has not sent any names to the general registrars over the last six weeks because of residency documents in the DMV's possession or a SAVE search. Coles Decl. ¶ 25; 33.

The programs in the cases cited by the United States and the Organizational Plaintiffs are far afield from Virginia's tailored inquiry into citizenship. For example, in *Aricia*, "the Secretary used a mass computerized data-matching process to compare the voter rolls with other state and federal databases, followed by the mailing of notices." 772 F.3d 1335, 1344 (11th. Cir. 2017). The process lacked contemporaneous, individualized information from each potential noncitizen, so it fell on the "systematic" side of the line. *Id.* In *Mi Familia Vota*, the defendants conceded that their program was systematic, and it was again unlike Virginia's process because it only required "reason to believe" that a person was not a citizen, not documentary evidence like Virginia requires. *See* 691 F. Supp. 3d. at 1087–92.

The legislative history of the NVRA further demonstrates that Virginia has not crossed the "systematic" line here, for it makes clear what Congress meant by the term "systematic." The Senate report explains: "Almost all states now employ some procedure for updating lists at least once every two years. . . . About one-fifth of the states canvass all voters on the list. The rest of the states do not contact all voters, but instead target only those who did not vote in the most recent election . . . . Whether states canvass all those on the list or just the non-voters, most send a notice to assess whether the person has moved." S. Rep. No. 103-6, at 46. The House Report likewise gives examples of prohibited activity such as a "mailing[7] or a door to door canvas" to verify addresses. H.R. Rep. No. 103-9, at 30. Both mailings and door-to-door canvasses involve mass communication that is not targeted at any one individual based on personalized data, such as an

---

[7] A "mailing" is not the sending of any piece of mail but "mail sent at one time to multiple addressees by a sender (as for promotional purposes)." *Mailing*, Merriam-Webster, https://www.merriam-webster.com/dictionary/mailing (last visited Oct. 22, 2024).

individual's recent attestation to the DMV that he is not a citizen.

**B.      Defendants' Process for Removing Noncitizens Is Nondiscriminatory**

The Organizational Plaintiffs (but not the United States) also allege that Virginia's process for removing noncitizens does not qualify as "nondiscriminatory"[8] under the NVRA. 52 U.S.C. § 20507(b)(1). The Organizational Plaintiffs' theory is that the challenged actions violate the NVRA "by impermissibly classifying based on a registrant's national origin and placing discriminatory burdens on naturalized citizens." Org. Pl. Br. at 20. This theory is fatally flawed in multiple respects.

First, the Defendants are not classifying *anyone* based on that person's national origin or status as a naturalized citizen. A person is subject to the noncitizen removal process only when that person states contemporaneously on a DMV form that he is not an American citizen, or when his DMV documentation, confirmed by a fresh SAVE search, indicates a lack of citizenship. Coles Decl. ¶¶ 4–8, 22–25. Again, in either case ELECT sends the individual a form asking him to "take the simple and easy step," *Husted,* 584 U.S. at 779, of returning the preprinted affirmation of his citizenship to remain on the voter rolls.

Nothing in this process selects individuals on the basis of naturalized citizenship or national origin. If a natural-born citizen erroneously answers "no" to the citizenship question on a DMV form, he is treated exactly the same as a naturalized citizen who erroneously checks the "no" box. Both will receive a letter in the mail asking them to clarify their citizenship and will remain on the rolls if they respond to the letter confirming their citizenship status. Persons who were identified in the *ad hoc* program, those who had provided the DMV with documentation indicating

---

[8] Although their complaint alleges that the program is not "uniform," the preliminary injunction motion does not argue that the program fails the uniformity requirement, so this memorandum only focuses on the "nondiscrimination" requirement.

noncitizenship and for whom a fresh SAVE search confirmed ineligibility, were also subject to the same individualized process. Coles Decl. ¶ 23. Notably, because SAVE distinguishes naturalized citizens from noncitizens, naturalized citizens who were reviewed in this *ad hoc* process will not have received a Notice of Intent to Cancel. Coles Decl. ¶ 24.

Virginia's noncitizen removal process is thus facially "nondiscriminatory." What the Organizational Plaintiffs are really complaining about is an alleged disparate impact on naturalized citizens. But the NVRA requires discriminatory intent, not disparate impact alone, as the Supreme Court recently made clear in *Husted*. A majority of Justices rejected Justice Sotomayor's argument in dissent that Ohio's process for removing nonresidents from its voter rolls failed the NVRA's "nondiscriminatory" requirement because it "disproportionately burden[ed]" minorities and other disadvantaged communities. 584 U.S. at 806–10. The majority succinctly responded that there was no "evidence in the record that Ohio instituted or has carried out its program with discriminatory intent." *Id.* at 779.

The *Husted* Court's interpretation of the term "nondiscriminatory" follows a long line of precedent in the context of election law interpreting the term to mean "without discriminatory intent." Only a year before Congress enacted the NVRA, the Supreme Court determined the constitutionality of a statute that prohibited "write-in" votes. *See Burdick v. Takushi*, 504 U.S. 428, 430 (1992). There was no question that the statute had a disparate impact on certain groups, yet the Supreme Court applied the doctrinal test for politically "nondiscriminatory" regulations because the statute made no classifications on its face and was not enacted with discriminatory intent. *Id.*; *see also Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (equating "nondiscriminatory" with "generally applicable" in the election-law context). The Court has continued to use the term "nondiscriminatory" to reference intentional discrimination since then.

34

For example, in *Crawford v. Marion County Election Board*, 553 U.S. 181, 196-97, 206 (2008), both Justice Stevens's plurality and Justice Scalia's concurrence described Indiana's voter-ID law as "nondiscriminatory" because it was facially neutral, despite its disparate impact on those who were less likely to possess identification.

To be sure, these cases did not concern alleged discrimination on the basis of national origin, but the fact remains that the term "nondiscriminatory" has been consistently used in the election-law context to refer to policies that do not discriminate intentionally. Thus, when the Supreme Court opined in *Husted* that intentional discrimination was required in a challenge to NVRA's residential removal provisions, it was not merely interpreting the isolated term "nondiscriminatory" in the NVRA; it was drawing on the decades of practice that informed Congress' own usage of the term.

Finally, Plaintiffs present no evidence that Virginia's noncitizen removal program has a disparate impact in any event. There is no evidence that naturalized citizens are unusually likely to check a box misidentifying themselves as noncitizens. Additionally, the *ad hoc* program's utilization of DHS's SAVE database ensures that noncitizens are not at a disadvantage because of now-superseded documents on file with the DMV. Coles Decl. ¶¶ 23–24. Only those confirmed not to be citizens within the past 30 days are sent to the general registrars. The Organizational Plaintiffs cannot show that the SAVE process has a disparate impact because they simply misunderstand the process.

Absent any discrimination against naturalized citizens on the face of Va. Code Ann. § 24.2-427(C) or Executive Order 35, and without even an allegation of intentional discrimination, this claim must fail.

### III.     The United States and the Organizational Plaintiffs Cannot Satisfy the Remaining *Winter* and *Merrill* Factors for a Preliminary Injunction.

#### A.     Plaintiffs Will Not Be Irreparably Harmed

Plaintiffs must show that "they are likely to suffer irreparable harm without an injunction." *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 302 (4th Cir. 2020). To that end, it is not sufficient that they show "just a 'possibility' of irreparable harm." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter*, 555 U.S. at 22). Indeed, the "possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

The United States contends that "eligible U.S. citizens" will be irreparably harmed because they "risk disenfranchisement." United States Motion at 17. But Virginia is not prohibiting a single eligible citizen from voting in the 2024 election. Any bona fide citizen who shows up to vote, even on election day itself, may still fill out a simple voter-registration form and vote that very day. *See* Va. Code Ann. § 24.2-420.1. Indeed, ELECT records indicate that same-day registration is an extremely effective way to vote, with nearly 100% of provisional ballots being counted. *See* footnote 2, *supra*. Casting a provisional ballot thus cannot be considered a "denial[] of a voter's 'right to participate in elections on an equal basis.'" United States Motion at 19. To the contrary, as Justice Stevens has explained, the ability "to cast a provisional ballot provides an adequate remedy for problem[s]" a person may encounter in the voting process. *Crawford v. Marion County Elec. Bd.*, 553 U.S. 181, 197-98 (2008) (opinion of Stevens, J.). Thus there is no irreparable harm to any citizen. *Cf. Wise v. Circosta*, 978 F.3d 93, 100, 103 (4th Cir. 2020) (en banc) (holding that there is no irreparable harm from a voting regulation that "does not in any way infringe upon a single person's right to vote: all eligible voters who wish to vote may do so on or before Election

Day"). In this case then, any potential harm is mitigated, if not eliminated, by same-day registration and voting, and there is no need for the extraordinary relief of an injunction.[9]

If anything, irreparable harm will occur to eligible voters in Virginia if this Court enters either of the proposed injunctions. Every illegal vote cancels out a valid vote. Both the United States and the Organizational Plaintiffs ask the Court to re-enroll self-identified noncitizens without any way to verify their citizenship. *See* Org. Pl. Proposed Order at 2 (ECF 26-25); U.S. Proposed Order ¶ 4 (ECF 9-24). In short, putting noncitizens back on the rolls and allowing them to vote dilutes the votes of actual citizens in an irreparable way. As this Circuit has explained, "there can be no do-over and no redress" for this injury to legal voters "once the election occurs." *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). The requested injunctive relief could also irreparably harm noncitizens who are re-enrolled, by confusing them into believing that they may vote, when doing so is actually a crime. *See* p. 5, *supra*.

Irreparable harm is also lacking for the Organizational Plaintiffs for largely the same reasons that they fail to show any concrete harm at all. Again, these plaintiffs have not identified a single member who is an eligible voter but is threatened with being unable to vote in the upcoming election; their alleged organizational injury is a voluntary redirecting of funds from

---

[9] Perhaps realizing that same-day registration is a perfectly valid way to cast a vote, the United States speculates that a citizen could have accidentally checked the wrong box at the DMV, missed both of the notices mailed to his house, and then remembered that he wants to vote absentee within 21 days of the election but cannot obtain a ballot because he is not registered, and is unavailable to head to the polling place in the three weeks that Virginia allows same-day in-person registration. United States Motion at 18-19. There is no evidence that this hypothetical scenario will happen to a single person, much less an identifiable one. It is black-letter law that "irreparable injury" must be "likely in the absence of an injunction," and speculative injuries do not count. *Winter*, 555 U.S. at 22. Fanciful hypotheticals are not "likely." *Id.* Further, as discussed below, changing Virginia's absentee ballot deadline at this late date would be highly burdensome, likely to lead to errors and confusion, and contrary to *Purcell*. *See infra*, Section III.C.

certain organizational goals to other concerns. *See generally* Amended Compl. ¶¶ 19-34. Tellingly, the Organizational Plaintiffs hardly even argue that the alleged diversion of resources is sufficiently irreparable to obtain a preliminary injunction.

There is another reason that the diversion-of-resources theory makes granting an injunction particularly inequitable: The only remedy the Organizational Plaintiffs ask for here is the most drastic one in a federal judge's toolkit, a universal injunction. *See Green v. HM Orl-FL, LLC*, 601 U.S. __ (statement of Kavanaugh, J.) (Slip op. at 1–3) (2023) (questioning the authority of district court to issue injunctions that prohibit enforcing the law against everyone). Universal injunctions are extremely disfavored, and the Organizational Plaintiffs should not be allowed to use the fact that they did not identify an injured member-voter to obtain one. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (concluding that only the actual persons suing are "the proper object of this District Court's remediation").

Finally, the process that Plaintiffs are suing to enjoin is not ongoing. As Commissioner Beals explained in her September 4 testimony, ELECT stopped sending self-identified noncitizens to local registrars on October 15, as it had planned all along. *See* Beals Statement, *supra*, at 3:10:46 pm. The reasons are two-fold. First, it typically takes a total of 21 days from the mailing of a Notice of Intent to Cancel until the person is actually removed from the registration. Coles Decl. ¶ 11. Therefore, notices sent by local registrars after October 15, 2024 would have no effect for the election. Second, the Virginia registration process is required by law to shut down 21 days before an election (aside from same-day registration). *See* Va. Code Ann. § 24.2-416. Because the challenged process has already concluded, Defendants are not engaged in any prospective conduct that a preliminary injunction could affect. *See* p. 21, *supra*. And the retrospective remedies they request are barred by both sovereign immunity, *ibid*, and the *Purcell* doctrine, see p. 39, *infra*.

The lack of ongoing conduct is especially relevant to the *ad hoc* process. ELECT not only stopped sending the names of people who failed a recent SAVE search in late August, but precisely because each person removed was verified as a noncitizen through a SAVE search, the only effect of an injunction would be to add noncitizens back to the voter rolls. None of these noncitizens can legally vote, so none of them has suffered an irreparable injury. With these facts in mind, enjoining the Defendants from continuing the process will not have real-world implications.

### B.      The Equities Favor the Defendants

Nor can the Organizational Plaintiffs or the United States satisfy the last two *Winter* factors—the balance of equities and the public interest. The United States contends that these factors merge in its suit against the Defendants because it is presumed to be acting in the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). That may be the case in a lawsuit against a private party, but Virginia is also sovereign and has an equal claim to be acting in the public interest within its borders. *Cf. United Nuclear Corp. v. Cannon*, 696 F.2d 141, 144 (1st Cir. 1982) ("The state is charged with representing the public interest.").

Regardless of how the presumptions shake out, the balance of the equities and public interest favor the Defendants in these cases. Both the Organizational Plaintiffs and the United States delayed unconscionably in bringing their lawsuits. The law requiring Virginia to remove noncitizens from its voter rolls was signed by then-Governor Kaine, and precleared by the Justice Department, in 2006. Yet neither the Organizational Plaintiffs nor the United States challenged its operation in the many general elections since then. And they brought these suits two months into the three-month quiet period and just weeks before a presidential election.

Because of both groups' unjustified delay, this Court has been forced to resolve their motion for a preliminary injunction on an extremely short timetable with rushed briefing and discovery. "Equity aids the vigilant, not those who sleep on their rights" and then sprint for

emergency relief. *Lyons P'ship v. Morris Costumes Inc.*, 243 F.3d 789, 797 (4th Cir. 2001).

### C.  *Purcell* Does Not Allow an Injunction at This Point

Finally, an injunction under these circumstances would violate the *Purcell* doctrine, which counsels against judicially ordered changes to electoral processes on the eve of an election. *See Purcell v. Gonzales*, 549 U.S. 1 (2006) (per curiam). The Supreme "Court has repeatedly emphasized that federal courts ordinarily should not alter state election laws in the period close to an election." *DNC. v. Wisconsin State Legis.*, 141 S. Ct. 28, 30 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay). The rationale for the *Purcell* principle is straightforward: "When an election is close at hand, the rules of the road should be clear and settled . . . because running a statewide election is a complicated endeavor." *Id.* at 31. *Purcell* instructs courts to avoid "judicially created confusion," *RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020) (per curiam), by declining to issue injunctions that would "alter state election laws in the period close to an election," *Moore v. Harper*, 142 S. Ct. 1089, 1089 (2022) (Kavanaugh, J., concurring in denial of application for stay).

As previously noted, *see* p. 15, *supra*, under *Purcell*, a federal court should enjoin state election officials close to an election only if the Plaintiffs satisfy four criteria that are stricter than the traditional *Winter* factors. They satisfy none of them.

First, the merits are not "entirely clearcut in favor of the plaintiffs," *Merrill*, 142 U.S. at 881 (opinion of Kavanaugh, J.), given that the majority of federal judges to confront the issue have concluded that the NVRA does not apply at all to void *ab initio* registrations. To the contrary, as demonstrated above, the merits are "in favor of" the Defendants.[10] Nor will Plaintiffs suffer

---

[10] From the Supreme Court's recent caselaw, it is clear that the "entirely clearcut" burden is a formidable one. For example, the Supreme Court granted a stay in *Merrill* on *Purcell* grounds but also granted certiorari and later affirmed the lower court. 142 S. Ct. at 879. The takeaway here is that *Purcell* does real work, even when a claim may be meritorious.

irreparable harm absent the requested injunction, for the reasons explained above: every single eligible citizen can cast a vote in Virginia, regardless of whether that person is on the rolls before election day.

The last two *Purcell* factors also cut against the Plaintiffs. Both the United States and the Organizational Plaintiffs could have brought their claims at the beginning of the 90-day quiet period, but both waited two months to initiate a lawsuit. Further, the Department of Justice precleared the noncitizen removal program in 2006, and records show removals of noncitizens during the so-called quiet period over at least the past 15 years. *See* Bryant Decl. Ex. A; Coles Decl. ¶ 17. Plaintiffs argue that the nature of the quiet period means that *Purcell* applies with less force, as the Quiet Period Provision only takes effect within 90 days of an election. But the time-limited nature of the quiet period is all the more reason for plaintiffs to file as soon as possible. And even if *Purcell* would not prohibit injunctions against ongoing conduct during the quiet period, there is no such ongoing conduct here. *See* p. 21, *supra*. The *Purcell* doctrine applies with full force to Plaintiffs' remaining requests for preliminary relief, which would require Virginia to alter its election laws significantly very shortly before the election. Among other things, the requested relief would require Virginia to make changes to its voter rolls after the state-law period for doing so has closed, see p. 12, *supra*, apparently require Virginia to provide absentee ballots past the state-law deadline for requesting such ballots, United States Proposed Injunction ¶ 5(c), and require ELECT to send widespread mailings and guidances not provided for by state law.

Such significant changes this late in the game will cause "significant cost, confusion, and hardship" on the Virginia election machinery. *Merrill*, 142 S. Ct. at 881 (opinion of Kavanaugh, J.). The Organizational Plaintiffs seek an injunction ordering Defendants to add back to the voter rolls every person removed for self-proclaiming noncitizenship or presenting legal presence

documents showing noncitizenship and failing a new SAVE search during the *ad hoc* process. *See* Org. Pl. Proposed Injunction at 2. Ordering such relief will inevitably require Virginia to place noncitizens on its voter rolls only two weeks before an election, thus diluting the votes of eligible citizens and potentially confusing noncitizens into thinking that they can vote, exposing them to criminal liability. They also seek a mandatory injunction instructing registrars to send out notices rescinding the prior notices that asked self-declared noncitizens to confirm citizenship. *Id.* Plaintiffs also want this Court to force the Defendants to send out additional mailings to potentially affected voters and "to issue guidance to county registrars in every local jurisdiction" concerning their ability to remove noncitizens. *Id.* As the Coles declaration explains, attempting to send such notices and to give last-minute guidance to general registrars will create confusion and make even-handed administration of the election much more difficult. Coles Decl. ¶¶ 44–46. And all of this would cause a massive influx of work in the registrars' offices and confusion among voters just days before a presidential election. Coles Decl. ¶¶ 44–46.

The injunction requested by the United States is narrower in some respects but still undeniably implicates *Purcell*. The United States asks for an injunction forcing the Defendants to place persons who indicated that they are not citizens back on the voter rolls without any means for verifying that they actually are citizens and removing them was a mistake, and it wants Virginia to conduct a last-minute mailing to these likely noncitizens. U.S. Proposed Order ¶ 4. It also requests an injunction that this mailing inform these persons that they "may cast a regular ballot through any other method, including requesting and voting an absentee ballot by mail." *Id.* ¶ 5(c). But the last day to request such an absentee ballot is October 25, leaving no time for any such person to do so without making highly burdensome last-minute changes to Virginia's election

process. Coles Decl. ¶ 42. This type of last-minute federal-court supervision of elections sows the chaos that *Purcell* is designed to avoid.

For just these kinds of reasons, the Fourth Circuit invoked *Purcell* in the last presidential election to deny an injunction of a state voting regulation when, as here, early voting was already underway. *Wise v. Circosta*, 978 F.3d 93, 98–99, 103 (4th Cir. 2020). And the other federal courts of appeals have similarly invoked *Purcell* to stay district-court injunctions of state election laws in the time leading up to an election. See, *e.g.*, *League of Women Voters of Fla., Inc. v. Florida Sec. of State*, 32 F.4th 1363, 1371 (11th Cir. 2022); *Thompson v. Dewine*, 959 F.3d 804, 813 (6th Cir. 2020); *Short v. Brown*, 893 F.3d 671, 680 (9th Cir. 2018). Just last week the Fifth Circuit invoked *Purcell* in granting a stay of an injunction issued against election officials. *See La Union de Pueblo Entro v. Abbott*, -- F.4th __, 2024 WL 4487493, at *3 (Oct. 16, 2024); *see also id.*, at *5 (Ramirez, J., concurring in the judgment).

In sum, "the balance of equities is influenced heavily by *Purcell* and tilts against federal court intervention at this late stage." *Wise*, 978 F.3d at 103.[11]

## CONCLUSION

For the foregoing reasons, this Court should deny the Motions for Preliminary Injunction.

---

[11] To the extent that the United States asserts that "local registrars cannot decline to cancel" the registration of someone sent to them is a reason to grant the injunction, it is mistaken. The Organizational Plaintiffs' own expert gives examples of registrars taking steps to ensure that the persons being sent a Notice of Intent to Cancel are actually noncitizens. *See* McDonald Declaration at 9; Va. Code § 24.2-427(B).

Dated: October 22, 2024

RESPECTFULLY SUBMITTED,

COMMONWEALTH OF VIRGINIA;
VIRGINIA STATE BOARD OF ELECTIONS;
SUSAN BEALS, in her official capacity as Virginia
Commissioner of Elections; JOHN O'BANNON,
in his official capacity as Chairman of the State
Board of Elections; ROSALYN R. DANCE, in her
official capacity as Vice-Chairman of the State
Board of Elections; GEORGIA ALVIS-LONG, in
her official capacity as Secretary of the State Board
of Elections; DONALD W. MERRICKS and
MATTHEW WEINSTEIN, in their official
capacities as members of the State Board of
Elections; and JASON MIYARES, in his official
capacity as Virginia Attorney General

By: ___/s/ Charles J. Cooper___

Charles J. Cooper (*Pro Hac Vice*)
Joseph O. Masterman (*Pro Hac Vice*)
Bradley L. Larson (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
cooper@cooperkirk.com

*Counsel for Defendants Susan Beals, John
O'Bannon, Rosalyn R. Dance, Georgia
Alvis-Long, Donald W. Merricks, Matthew
Weinstein, and Jason Miyares*

Jason S. Miyares
   *Attorney General*
Thomas J. Sanford (VSB #95965)
   *Deputy Attorney General*
Erika L. Maley (VSB #97533)
   *Solicitor General*
Graham K. Bryant (VSB #90592)
   *Deputy Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that on October 22, 2024, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to all parties of record.

_/s/ Charles J. Cooper_
Charles J. Cooper (Pro Hac Vice)
*Counsel for the Defendants*