1          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF VIRGINIA
2             ALEXANDRIA DIVISION

3  VIRGINIA COALITION FOR        )  Case Nos. 1:24-cv-1778
   IMMIGRANT RIGHTS, *et al.*,   )            1:24-cv-1807
4                                )
                 Plaintiffs,     )
5                                )
        v.                       )  Alexandria, Virginia
6                                )  October 18, 2024
   SUSAN BEALS,                  )  11:00 a.m.
7  *in her official capacity as* )
   *Virginia Commissioner of*    )
8  *Elections, et al.*,          )
                                 )
9            Defendants.         )
                                 )  Pages 1 - 68
10 ─────────────────────────────

11      TRANSCRIPT OF PLAINTIFF'S EMERGENCY MOTION FOR

12                  EXPEDITED DISCOVERY

13        BEFORE THE HONORABLE WILLIAM B. PORTER

14            UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1  APPEARANCES:

2  FOR THE PLAINTIFFS:

3      SIMONE LEEPER, ESQUIRE
       R. BRENT FERGUSON, ESQUIRE
4      SHANNA PORTS, ESQUIRE
       LUCAS DELLA VENTURA, ESQUIRE
5      CAMPAIGN LEGAL CENTER
       1101 14th Street, N.W., Suite 400
6      Washington, D.C.  20005
       (202) 736-2200

7
       JAVON DAVIS, ESQUIRE
8      LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
       1500 K Street, N.W., Suite 900
9      Washington, D.C.  20005
       (202) 662-8600

10
       JOHN POWERS, ESQUIRE
11     ADVANCEMENT PROJECT
       1330 L Street, N.W., Suite 850
12     Washington, D.C.  20005
       (202) 728-9557

13
       ANNA DORMAN, ESQUIRE
14     THE PROTECT DEMOCRACY PROJECT, INC.
       200 Pennsylvania Avenue, N.W., Suite 163
15     Washington, D.C.  20006

16 FOR THE DEFENDANTS:

17     THOMAS J. SANFORD, ESQUIRE
       STANLEY W. HAMMER, ESQUIRE
18     OFFICE OF THE ATTORNEY GENERAL
       COMMONWEALTH OF VIRGINIA
19     202 North 9th Street
       Richmond, Virginia  23219
20     (804) 692-0551

21

22

23

24

25

1                P R O C E E D I N G S

2                THE COURTROOM DEPUTY:  Calling Civil Action

3    Matter 24-cv-1778, *Virginia Coalition for Immigrant*

4    *Rights, et al. v. Susan Beals, et al.*

5                Would counsel please state your name for the

6    record.

7                MS. LEEPER:  Simone Leeper appearing for

8    plaintiffs.  Also with me from the Campaign Legal

9    Center is Brent Ferguson, Shanna Ports, and our law

10   fellow Lucas Della Ventura.

11               THE COURT:  Good morning.

12               MS. LEEPER:  Good morning.

13               MR. SANFORD:  Good morning, Your Honor.

14   Deputy Attorney General Tyler Sanford.  Here with me

15   today is Assistant Attorney General Stanley Hammer.

16   We're here for the defendants.

17               THE COURT:  Good morning.

18               Before we get started, Ms. Leeper, I just

19   noticed in looking through the docket sheet -- or I

20   should say we just noticed in looking through the

21   docket sheet that your *pro hac* has not yet been

22   admitted.  Is that right?

23               MS. LEEPER:  Yes, Your Honor.

24               THE COURT:  Okay.  I've reviewed the

25   material, and I've entered that order admitting you *pro*

1  *hac*.

2  MS. LEEPER:  Thank you, Your Honor.

3  THE COURT:  All right.  We're here today on

4  plaintiffs' emergency motion for expedited discovery in

5  Case No. 1778.

6  I thank counsel for your expedited briefings.

7  They were very helpful to the Court in preparing for

8  today's hearing and evaluating the issues.  I've read

9  them.  I've considered them.  I'm happy to hear from

10  you today as to anything you may want to supplement or

11  emphasize.

12  I'll start with you, Ms. Leeper.

13  MS. LEEPER:  Thank you, Your Honor.

14  As I noted, I'm here to represent the

15  plaintiffs, Virginia Coalition for Immigrant Rights,

16  Legal Women Voters of Virginia, and African Communities

17  Together.

18  Plaintiffs firmly believe that they have

19  satisfied the burden to be granted a motion for

20  preliminary injunction.  However, we are here seeking

21  emergency limited discovery to assist the court in the

22  consideration of that motion.

23  THE COURT:  Let's start with that specific

24  point.  What is it exactly do you think you need for

25  this hearing on Thursday?

1          MS. LEEPER:  Yes, Your Honor.  Specifically,

2    the number of voters that have been removed from the

3    rolls by the purged program and the identities of those

4    voters and the extent and understanding of how the

5    purged program is currently operating to understand the

6    recent harm caused by the program throughout the

7    Commonwealth.

8          THE COURT:  All right.  I noticed in your

9    papers you seem to be seeking also the 6,000 -- I think

10   it's 303 folks who had been identified in Executive

11   Order 35.  Are you walking away from that for purposes

12   of this motion?

13         MS. LEEPER:  Your Honor, for purposes of this

14   motion, plaintiffs are willing to limit even further

15   the discovery that they're seeking.  So that would be

16   the purged list within the 90-day window, the voter

17   file from the day of the executive order and present

18   day to be able to understand that list, and who has

19   been removed.  And, Your Honor, a single deposition of

20   a 30(b)(6) witness from the Department of Elections,

21   the commissioner's office, who is capable of testifying

22   about the way in which the purged program is currently

23   being carried out.

24         THE COURT:  Okay.  And at this point, then,

25   you're not seeking any information relating to the

1  instructions given to the various registrars in

2  implementing the purged program?

3          MS. LEEPER:  Your Honor, if you would be

4  inclined to grant that relief, we'd certainly welcome

5  it.  However, we're willing to limit if that is what

6  you are inclined to do as well.

7          THE COURT:  All right.  Thank you.  You can

8  continue.

9          MS. LEEPER:  Thank you.

10         As I noted, we feel that this information is

11  going to be helpful to guide necessary relief if the

12  motion for preliminary injunction is granted, as well

13  as to allow plaintiffs to better respond to factual

14  issues raised by the defendants in either their

15  response to the motion for preliminary injunction and

16  the hearing itself.  And I'll discuss that a little bit

17  more at length later.

18         I feel it's important to contextualize the

19  moment in which we find ourselves.  Executive Order 35

20  was issued just 90 days before Election Day creating

21  the escalated purged program and revealing the scope of

22  the prior purges.

23         Plaintiffs immediately undertook, Your Honor,

24  a good faith effort to obtain information related to

25  the purged program, including through an October --

1   August 20 -- pardon me, August 13 request for

2   information and NVRA letters on August 30, August 20,

3   and October 3.

4           Defendants in response to those letters and

5   those requests for information refused to provide the

6   information despite admitting in a meeting to

7   plaintiffs' counsel that they had information within

8   their possession, and the reason for not providing that

9   information was simply that they do not believe that

10  NVRA required them to provide it for 90 days.

11          THE COURT:  Let me interrupt you for a

12  moment.  I thought you said in your papers that they

13  provided some limited discovery.  Was it at that point

14  or some later point?

15          MS. LEEPER:  Yes, Your Honor.  It was at that

16  point, and it was limited discovery but certainly not

17  the heart of what plaintiffs have been seeking.

18          THE COURT:  What was it that they provided

19  you at that time, or what have you received since you

20  first requested some information on -- I think it was

21  August 13 or whatever the day it was?

22          MS. LEEPER:  Yes.  That would be the

23  memorandum of understanding between the DMV and Elect.

24  I believe a letter that was sent from Commissioner

25  Beals to the governor that was the certification of

1   participation --

2        (Reporter clarification.)

3        MS. LEEPER:  You know, I said participation,

4   but that's not what I meant to say.  What I meant to

5   say is the certification of compliance with the

6   procedures that are required by Virginia law, including

7   the executive order.

8        THE COURT:  All right.  So those two things,

9   and that's practically it?

10       MS. LEEPER:  Your Honor, I'm going to be

11  honest with you.  I believe there's at least one other

12  thing that I am not remembering at this moment.  But

13  what I can tell you is that it did not at any point

14  include the list of purged voters.  It did not include

15  the voter file as requested so that we can understand

16  who has been removed by the program.  And it did not

17  include information about how the purged program is

18  functioning in operation.

19       THE COURT:  Thank you.

20       Let me maybe move ahead, or maybe it happened

21  at this particular meeting.  Again, in your papers or

22  the Commonwealth's papers -- I can't remember which --

23  there was an indication that you've all had some

24  meet-and-confer to discuss these things.  Is that

25  right?

1    MS. LEEPER:  Yes, Your Honor.  There were

2 some meetings in relation to the letters that were sent

3 requesting information and also a meet-and-confer that

4 has taken place specifically with regard to this

5 motion.

6    THE COURT:  What's your understanding of the

7 government's rationale as to why they didn't produce

8 anything more?

9    MS. LEEPER:  Their rationale given at the

10 meeting back regarding the letter was that they are not

11 required to do so for a 90-day period under the

12 National Voter Registration Act.  That is not an

13 understanding that we share.

14    THE COURT:  Thank you.

15    MS. LEEPER:  Your Honor, in response to

16 defendants' refusal to provide the core of the

17 information that plaintiffs have been seeking since

18 August, plaintiffs have had to undertake a diligent

19 investigation as to the extent of the purged program

20 and the effect that it was having on voters given the

21 public record.

22    After doing so and when it became clear that

23 the purged program was, in fact, unlawfully removing

24 voters in a systematic manner, plaintiffs filed this

25 complaint on the first day permissible of the NVRA's

1  30-day preelection period and filed this motion the day

2  after.

3         Plaintiffs could not confer with defendants'

4  counsel before the filing of that motion because

5  despite having sent a courtesy copy to the attorney

6  general's office of the complaint, no counsel had

7  entered an appearance at that point.  However, as you

8  just noted, we have since met with defendants' counsel,

9  have engaged in negotiation regarding narrowing the

10 limited request even further, and no response was

11 received from defendants to plaintiffs' proposal.

12        THE COURT:  So prior to filing the lawsuit,

13 when you had meetings with the Commonwealth, no lawyers

14 participated; that was just the, if you will, clients?

15        MS. LEEPER:  Lawyers were participating in

16 the meetings prior regarding the letters requesting

17 information as well.

18        THE COURT:  All right.  Thank you.

19        MS. LEEPER:  Your Honor, there are two

20 possible tests that you could apply in assessing our

21 motion here.  The one that many courts have adopted is

22 the reasonableness or good cause test, and a minority

23 approach would be to modify preliminary injunction

24 standards.  Plaintiffs meet the burden under either

25 test.

1          First, addressing the reasonableness or good

2   cause standard, the first question that the Court must

3   ask is whether the procedural posture weighs in favor

4   of plaintiffs, and here it obviously does.  There is a

5   pending motion for preliminary injunction.

6          A hypothetical motion to dismiss cannot

7   overcome the reality of a preliminary injunction motion

8   to be considered by the court this Thursday.  We are

9   currently 15 days before the election, and that is due

10  to plaintiffs' good faith efforts to obtain this

11  information outside the scope of litigation and

12  defendants' refusal to provide that information.

13         The second question to consider is whether

14  the discovery at issue is narrowly tailored to obtain

15  information that is probative to the preliminary

16  injunction analysis, and here the information is

17  narrowly tailored.  There's a low burden to produce the

18  information already admitted by defendants to be in

19  their possession, which they are required to maintain

20  and make available under the National Voter

21  Registration Act.

22         THE COURT:  How do you perceive using this

23  particular information that you're seeking on Thursday

24  as opposed to some later date?

25         MS. LEEPER:  Thank you, Your Honor.  I'm glad

1  that you asked that.  I can give one chief example, and

2  that is that defendants have in their response here, in

3  public statements, in a memo by the governor's counsel

4  claimed that the program is not systematic in nature.

5          THE COURT:  It's individualized.

6          MS. LEEPER:  That it's individualized,

7  precisely.  However, the public record and, as you say,

8  the evidence that we've put before the Court is already

9  sufficient to show that it is a systematic process and

10  purge in violation of the NVRA.

11          However, at this moment, because defendants

12  are refusing to provide information to the plaintiffs

13  that they have requested for weeks now, months, they

14  have the opportunity to pick and choose beneficial

15  information to them from information that is solely

16  within their control that plaintiffs have no means of

17  accessing.

18          And so plaintiffs find themselves in a

19  fundamentally unfair posture, and the court finds

20  itself in a position where it doesn't have the full

21  record before it in able to access how this program is

22  actually being carried out, just uncited assertions by

23  defendants.

24          Your Honor, as I noted, this request is

25  narrowly tailored, and plaintiffs are willing to

1   narrowly tailor it even further as we discussed before.

2          The third factor, Your Honor, is whether the

3   requesting party would be irreparably harmed by waiting

4   for discovery, and here, of course, 15 days out from

5   the election, the irreparable harm is not just imminent

6   but, in fact, ongoing.  Right now plaintiffs are

7   diverting resources from their core purposes, which are

8   most active during this close election period, of

9   getting out the vote of informing voters of the issues

10  before them and instead have had to divert those

11  resources towards ensuring that the members of the

12  public and their members, plaintiffs' own members, who

13  are naturalized citizens in particular, are not being

14  purged from the rolls, have not been purged, or if

15  they've been purged, that they know how they can

16  reregister.

17         Your Honor, there's also the voters -- and

18  many of whom I'm sure could be members of plaintiffs'

19  organizations -- who have been purged from the rolls

20  and may not even know it but have sent in an absentee

21  ballot and have no way of knowing that their ballot is

22  going to be denied.

23         And then, Your Honor, there's, of course, the

24  voters who may be dissuaded or intimidated by the

25  threat of prosecution.  And even if they know that they

are citizens and have a right to register to vote will

not reregister for fear of that prosecution.  This harm

is, of course, irreparable, the fundamental right to

vote will be denied, and it is imminent.

Finally, Your Honor, the last factor is

whether the documents or information sought will be

unavailable or subject to destruction.  And here that

is not necessarily the case, but that factor is not

dispositive, especially in this posture where there's a

pending motion for preliminary injunction, and making

this information later available would do nothing to

remedy the imminent ongoing irreparable harm.

Your Honor, even if you were to apply the

modified preliminary injunction standard, plaintiffs

would still prevail.  The question is whether the

movement -- the movant has made a sufficiently

colorable claim under its cause of action to justify

limited expedited discovery.

Defendants claim that it should, in fact, be

more of a full preliminary injunction standard where

you show a strong showing of success on the merits and

irreparable harm.

And in either case, again, plaintiffs meet

that burden.  As we explained, the harm -- irreparable

harm is clear here.  And there is clearly by all the

1   evidence that is in the record -- setting aside uncited

2   assertions to the contrary -- sufficient evidence to

3   show that there is a systematic purge taking place

4   within the 90-day window banned by the NVRA.

5           Your Honor, as I've said, plaintiffs will

6   prevail under either the reasonableness and good cause

7   standard or the modified preliminary injunction

8   standard, and we respectfully request and urge this

9   Court to grant plaintiffs' motion.

10          I welcome any further questions the Court may

11  have.

12          THE COURT:  Thank you, Ms. Leeper.

13          Mr. Sanford.

14          MR. SANFORD:  Thank you, Your Honor.

15          And while we aren't here today on the

16  substance of the case, I don't want to let my friend on

17  the other side's remarks go uncommented upon about

18  referring to the purge program.  There is not a purge

19  program.  There is an individualized process in place.

20  And the use of this raised purged program, I think, for

21  the issue that is before us today, discovery, is not

22  helpful because it's exceptionally ambiguous on what

23  they're actually referring to.

24          This process was established in 2006 under

25  Virginia law.  If we're just referring to this

1  nebulous, quote/unquote, purge program, it's incredibly

2  unclear what they're actually seeking information about

3  and at what time period they're looking to, whether

4  this stretches back to 2006 or if they're more focused

5  on the executive order.

6          THE COURT:  Well, you may have a point for

7  Judge Giles on Thursday or maybe for a motion to

8  dismiss or down the line.  But I think what we're

9  talking about here, limiting our discussion today to

10 those issues -- and obviously, you can chat with me

11 about anything you'd like.  But I think my questioning

12 of counsel seems to be that they're now limiting their

13 request for discovery to information since the issuance

14 of Executive Order 35.  Would you agree?

15         MR. SANFORD:  Yes, Your Honor, I think that

16 is what they are now limiting it to.  But the use of

17 the language -- I think we need to use the more precise

18 language of information post Executive Order 35 as

19 what's actually --

20         THE COURT:  You changed it to term "purge

21 program"?

22         MR. SANFORD:  Yes, Your Honor, and I think

23 it's inaccurate and it's not useful for our

24 conversation to reflect the materials that we are

25 actually talking about, which is a far more limited

1  scope.

2        And, Your Honor, even that more narrow

3  request is plainly not available in this case for three

4  main reasons.  And I think, you know, the briefing in

5  this has really set forth the standards and gone

6  through a lot of the arguments.  So I just want to

7  focus on kind of three points that, I think, permeate

8  the analysis, you know, regardless of which standard

9  you've used and which test you're applying and really

10  kind of influences all of the factors under each.

11        And the first of those is that the requested

12  discovery here is inappropriate because it's not needed

13  to litigate the preliminary injunction, which is the

14  only suggested basis for having expedited discovery in

15  this case.

16        THE COURT:  Well, tell me why.  I mean,

17  they -- you just heard from Ms. Leeper and you've seen

18  in their papers that they're trying to challenge the

19  defendants' argument that this is systematic versus

20  individualized.  And isn't it necessary -- isn't the

21  root of the issue here trying to have the evidence

22  before the court that Judge Giles needs on Thursday to

23  truly evaluate that argument?

24        MR. SANFORD:  Yes, Your Honor.  And I think

25  three responses to that, and the first is answering a

1   question, I think, that you asked about what

2   information were they already provided in response to

3   their FOIA request to the Department of Elections.  And

4   I just want to walk through everything that they've

5   already been given in this case.  Because I think --

6   you know, they refer to this as saying that the

7   department stonewalled them.  That is not the case

8   whatsoever.

9           So I think first -- the first thing that they

10  received is the voter registration list maintenance

11  standard operating procedure for the Department of

12  Motor Vehicles, full State Board of Elections, and

13  non-citizen files.  So they would be standard operating

14  procedures.

15          THE COURT:  You're looking at something.  I

16  assume -- that looks like something that I looked at as

17  well.  Is that the information from the website?

18          MR. SANFORD:  This, I believe, is not from

19  the website.

20          There's also information that is on the

21  website, Your Honor, that is publicly available

22  information, like the GREB handbook, that anyone can

23  access online.  There's the annual list maintenance

24  report that can also be accessed online.  And also, a

25  lot of these materials, Your Honor, were attached to

1  their preliminary injunction motion or to the complaint

2  or to the Department of Justice's complaint or

3  preliminary injunction motion.  This information is out

4  there.  They already have it.

5          THE COURT:  I guess I was focused on the

6  client services page on your website about what's

7  generally available to the public.

8          MR. SANFORD:  So there's generally available

9  things as well, and then there's also these materials

10 that were specifically given to these plaintiffs in

11 response to their request for information prior to this

12 litigation.

13         THE COURT:  I'm sorry.  Start that list for

14 me again.  What was the first thing you identified?

15         MR. SANFORD:  So the first thing is the voter

16 registration list maintenance, Department of Motor

17 Vehicles, full State Board of Elections and noncitizen

18 files standard operating procedures.

19         THE COURT:  What's the date of that?

20         MR. SANFORD:  So the date of this -- the

21 revision date is 2024-08-08.

22         THE COURT:  August 8, 2024?

23         MR. SANFORD:  Correct.

24         THE COURT:  Wasn't there a new MOU, though,

25 that was executed after that?

1          MR. SANFORD:  Yes, Your Honor.  So these are

2   the -- kind of the -- I was walking through the two

3   internal -- or three internal documents first.  They

4   were also provided all of the relevant MOUs.  There's

5   the MOU between the Department of Motor Vehicles and

6   the Department of Elections.  Which that new MOU, that

7   was also provided to them.

8          They were also given the MOU, the new one

9   between the Virginia State Police and the Department of

10  Elections because they also have relevant information.

11          They were also given the memorandum of

12  understanding between the Department of Health and the

13  Virginia Department of Elections.

14          And then along with those MOUs, they were

15  also given more internal documents, including the --

16  this is called the hopper processing and information

17  step-by-step instructions.  And the hoppers are kind

18  of -- the electoral system in Virginia, they use a

19  hopper process for kind of processing information from

20  the Department of Elections to general registrars.  And

21  when something is in your hopper, you take action on

22  it.  So this is kind of the technical step-by-step

23  instructions that they received.

24          They also received the step-by-step

25  instructions to add or update voter information.

1          They received, of course, Executive Order

2    No. 31, which kind of -- and you also have Executive

3    Order 35, which --

4          (Reporter clarification.)

5          MR. SANFORD:  They also received Executive

6    Order 31, Executive Order 35, which sets forth the

7    process for how this kind of individualized inquiry

8    works.

9          And of course, while they weren't provided

10   this in response to the FOIA request, they also have

11   the sections of Virginia Code, which, I believe, are at

12   24.1 -- oh, I'm sorry, 24.2-427 and 24.2-410.1, which

13   in the code it sets out a step-by-step process.  This

14   is the process that's been there since 2006.  That kind

15   of lays it out step-by-step what you do, what

16   information is transmitted, what everyone is required

17   to do under the system.  That is all clearly -- you

18   know, it's the Code of Virginia.  It is available to

19   them.  They have it.

20         Now, in addition to the documents that they

21   were sent, there's the publicly available information

22   that, I think, Your Honor was referring to already, and

23   there's -- you know, that includes the general

24   registrar's handbook.  That's posted online.  It was

25   attached to the DOJ complaint, who is also a plaintiff

1  in this consolidated action.

2         And there's also -- and this is referenced in

3  their complaint -- the full testimony is attached as an

4  exhibit to the DOJ complaint.  Commissioner Beals gave

5  public testimony to the House committee's -- the

6  committee on privileges and elections had a hearing on

7  this back on September 4 where she walked through the

8  process with the House, answered questions from the

9  House of Delegates, explained the process.  And that,

10  too, is entirely publicly available, the entire clip --

11  the entire hearing, the video of it, is online as

12  attached to the DOJ complaint.

13         So they want -- you know, they're talking

14  about taking a deposition of Susan Beals wanting to ask

15  her questions.  She's been asked questions about this

16  already, and it's fully available to them.

17         And on top of all of this, plaintiffs

18  notified the court on Friday afternoon that they now

19  have witnesses that they want to call who -- they

20  haven't disclosed who those witnesses are, but they

21  have witnesses that they want to call at the hearing on

22  the preliminary injunction.

23         So I think at the end of the day, it's fairly

24  clear that they have -- on a preliminary injunction on

25  a very expedited timeline, they have the discovery that

1  they need.  They have the information that they need to
2  make their arguments.

3       THE COURT:  Well, let me ask you about that.
4  I think the things you've identified are standard
5  operating procedures, MOUs, copies of the two executive
6  orders, the code sections, and some other publicly
7  available information.

8       I think the root of the issue, at least as
9  alleged by the plaintiffs in their complaints, are the
10  number of people, if any, who were registered voters
11  who have been removed since August 7, 2024.  What
12  information have you provided them about the number,
13  identity, and reason for those folks being removed from
14  the voter rolls?

15       MR. SANFORD:  So that information has not
16  been provided.

17       THE COURT:  Isn't that what this is all
18  about?

19       MR. SANFORD:  No, Your Honor.  Respectfully,
20  I say that that information is ultimately not relevant
21  to the preliminary injunction.  What they are seeking
22  with respect to that information is the identities --
23  and maybe they're moving away from kind of all of the
24  far breadth of information they wanted on every single
25  individual.  But the identities of the people who have

1   been removed following the noncitizen individual

2   investigation process.

3           THE COURT:  I think they'd stipulate to that.

4           MR. SANFORD:  So the -- those people are --

5   them -- plaintiffs having those identities are not

6   relevant to the preliminary injunction, the merits of

7   the --

8           THE COURT:  Oh, gosh, don't you think it's

9   relevant to the inquiry, one, whether anyone has been

10  removed or, if so, the volume of people who have been

11  removed -- they say improperly.  I guess that's to be

12  determined.

13          MR. SANFORD:  Well, Your Honor, I think the

14  volume -- the challenge here is to the -- what the

15  process is.  It's not a challenge to the number.  I

16  don't think plaintiffs would say, oh, if it's a low

17  number, then our preliminary injunction fails, or if

18  it's a high number, our preliminary injunction

19  succeeds.

20          THE COURT:  Well, I suspect that if they're

21  successful, that they may ask in terms of relief -- and

22  I would think that the court would have some interest

23  in knowing some data about this before she rules --

24  that they may want some reinstatement, or they may want

25  some remedy that relates to the people who have been

1   removed from the list.  And the identity of these folks

2   would be useful both in evaluating the issues as to

3   whether or not there's an issue that deserves a

4   preliminary injunction and, if so, how a remedy might

5   be fashioned.

6           MR. SANFORD:  Yes, Your Honor.  And I think

7   that actually kind of hits the nail on the head about

8   why, if this information is relevant -- and I think

9   plaintiffs have kind of acknowledged this -- it only

10  goes to the remedy or to the relief.

11          And if you look at what plaintiffs are

12  actually asking for in their own proposed order on the

13  preliminary injunction, there is no need for plaintiffs

14  to have individualized information about these

15  individuals.  Because what they're asking for -- and

16  this is ECF No. 26-27.

17          THE COURT:  What are you referring to?

18  What's that document?

19          MR. SANFORD:  That's the proposed order that

20  plaintiffs filed with their preliminary injunction

21  motion.

22          THE COURT:  Okay.

23          MR. SANFORD:  It would direct, "Defendants

24  Beals and State Board of Election Members shall

25  instruct all Virginia county registrars to send letters

1  to affected voters retracting the notice letters

2  already sent out...."

3          All of the relief is directing the defendants

4  to make some kind of communication or announcement to

5  these individuals.  None of it involves plaintiffs

6  reaching out to these individuals or making contact

7  with them.

8          I think it's, you know, kind of clear from

9  their opening brief that plaintiffs are hoping to use

10 this information essentially as their own mailing list

11 to contact these individuals.

12         THE COURT:  Well, couldn't it also be used to

13 challenge your argument that it's an individualized

14 effort that you've undergone versus a systematic one?

15         MR. SANFORD:  No, Your Honor, I don't think

16 it would be relevant to that because that vote -- that

17 analysis focuses on what process is being used, not

18 about, you know, who the particular individual is.  And

19 so, Your Honor, it -- you know, who the particular

20 individual is.  And those individuals aren't parties to

21 this case notably.  It is not relevant to the -- kind

22 of the heart of the issue here, which is whether or not

23 the process is being followed here is systematic or

24 individualized.  That's a question about the

25 defendants.

1          THE COURT:  Yeah.  I mean -- but I think

2     there is something to the plaintiffs' argument here,

3     that if you focus entirely on process and then claim

4     that you're engaging in an individualized effort, that

5     perhaps it's not exactly hitting the mark, that it must

6     at least be relevant on some level, or it might be

7     important to analyzing the issue who was removed, why

8     they were removed, if they share common characteristics

9     or the like.

10          MR. SANFORD:  Well, Your Honor, that's not an

11     argument that is presently before the Court on the

12     preliminary injunction on this Thursday.  I think this

13     sort of brings kind of, you know, the first

14     consideration here and the first issue, just that this

15     information, you know, is not necessary for litigating

16     the preliminary injunction.

17          But there's two more reasons why the

18     discovery shouldn't be provided in this particular case

19     in this particular posture.

20          THE COURT:  Go ahead.

21          MR. SANFORD:  The second of which -- and this

22     is something that plaintiffs do not respond to in their

23     reply brief -- is that the defendants in this case from

24     the private plaintiff suit have sovereign immunity from

25     this action.  And sovereign immunity is not just a

1  defense to the merits of a claim.  It is an immunity

2  from the suit.  It's very well-established that when

3  you have sovereign immunity, you are also immune from

4  the burdens of the suit, including discovery.

5           Now, in their reply, plaintiffs refer to,

6  generally speaking, motions to dismiss do not

7  automatically stay discovery.  But that's not the issue

8  here.

9           The issue here is that the motion to dismiss

10  and the defense would be based upon the sovereign

11  immunity of these defendants.  That sovereign immunity

12  has to be resolved prior to a court subjecting a

13  potentially immune defendant to discovery.

14           And so because of that bar to this case where

15  they -- and opposing counsel has not offered an

16  argument against a sovereign immunity defense here.

17  Discovery cannot proceed even if it would be

18  potentially relevant.

19           And third -- and I think this is sort of a

20  lone dispositive as a practical matter -- there simply

21  isn't time to engage in the discovery that plaintiffs

22  seek in advance of the preliminary injunction hearing.

23  I think the timeline here is brisk to put it mildly.

24           THE COURT:  Before you move on to the

25  timeline, I just want to ask you to follow up a little

bit about your second point.  Are you aware of any

authority in National Voter Registration Act cases

where a preliminary injunction was pending, that the

court denied expedited discovery on the ground of

sovereign immunity?

MR. SANFORD:  I am not aware of a case where

the sovereign immunity defense has been waived, Your

Honor, in response -- sorry, I believe I just said

"waived."  I meant to say "raised."  Where sovereign

immunity was raised as a defense in the preliminary

injunction -- in the preliminary injunction context.

I'm not aware of that.

THE COURT:  That clearly would be helpful to

analyzing the argument as to whether or not I ought to

consider sovereign immunity before authorizing

expedited discovery when you have a preliminary

injunction based on the specific act with somewhat

specific deadlines.

MR. SANFORD:  Well, Your Honor, I think it

would create kind of a perverse incentive for

plaintiffs to delay filing cases, file motions for

expedited discovery to then end-run a defense of

sovereign immunity that they would know would be

raised.

THE COURT:  Well, similarly, one could argue,

1  if one were skeptical, that it's also a perverse

2  incentive to allow someone to stand behind that when

3  there's a tight deadline.

4         MR. SANFORD:  Well, Your Honor, but I think

5  here it's -- you know, the Court can kind of evaluate

6  on its -- you know, look at the sovereign immunity

7  defense that's being raised.  You know, we didn't just

8  say, oh, we will raise sovereign immunity.  We kind of

9  set out in the brief why we're raising sovereign

10 immunity, what the argument looks like.

11        The point is that there is no statutory

12 waiver of the immunity here.  They need to rely on Ex

13 Parte Young.  They haven't made a showing that they can

14 satisfy the narrow exception to sovereign immunity in

15 Ex Parte Young.  And so due to that, we have a

16 sovereign immunity defense that, you know, I think

17 is -- seems to be teed up in our opposition to the

18 preliminary injunction motion, teed up in our motion to

19 dismiss.

20        I think it would be improper and, you know,

21 kind of put the cart before the horse to say we're

22 going to order discovery before we determine whether

23 plaintiffs raising a sovereign immunity defense have

24 sovereign immunity.  I think kind of -- you know, the

25 Fourth Circuit has been, you know, clear about this

1   kind of more generally speaking that sovereign immunity

2   is the defense to discovery -- sorry, is an immunity

3   from discovery as well.  It's not just a defense to the

4   case.  And so because of that, you have to resolve the

5   sovereign immunity issue first before kind of being

6   able to jump the gun and go into discovery, Your Honor.

7           THE COURT:  I understand your position.  You

8   can move on to point three.

9           MR. SANFORD:  And the third point is -- you

10  know, this is really just as a practical matter.  There

11  is not time to engage in the discovery that plaintiffs

12  are seeking here.  The timeline is -- I think I was

13  just saying quite brisk.  We're, you know, already in

14  the middle of the day on Monday.  You know, we'll be,

15  you know, in court until we wrap up this hearing.

16  We'll then need to travel back to Richmond.  Our brief

17  opposing not just plaintiffs' preliminary injunction

18  motion but also the preliminary injunction motion of

19  the United States is due tomorrow at 3:00 p.m.  We then

20  have one day, Wednesday, to prepare for a hearing on

21  Thursday morning at 10:00 a.m.

22          THE COURT:  I know there's a lot of good

23  lawyers in the Office of the Attorney General.

24          MR. SANFORD:  Well, Your Honor, I think --

25  you know, I wish that we had the resources of my

1  friends on the other side here.  You know, I note that

2  I think they had, you know, maybe 14 lawyers on brief.

3  I would love to have those kind of resources in the

4  Office of the Attorney General, Your Honor.

5          THE COURT:  Well, answer me this.  I mean,

6  you've known about this request for discovery since the

7  middle of August.  Why haven't you produced anything or

8  provided any of this information before?  You must've

9  known this was coming.

10          MR. SANFORD:  Your Honor, so I think the

11  middle of August that they're referring to is kind of

12  like the equivalent of an NVRA and FOIA request that

13  was made to the Department of Elections, to which the

14  Department of Elections responded with quite a few

15  documents and then also said that they were responding,

16  according to their normal practice during election

17  season, within 90 days on other information.

18          THE COURT:  But isn't that kind of rich when

19  you know that the election is going to be over by then

20  and this whole case is about the election?

21          MR. SANFORD:  Well, I mean, Your Honor, I

22  think -- you know, the Department of Elections needs to

23  follow its standard process and especially -- during

24  election season, Your Honor, this is not the only FOIA

25  request, the only NVRA request that they get.  They get

dozens and dozens and dozens of these requests.  They
need to respond to them in order and especially with,
you know, the Virginia -- I think kind of -- the aspect
of this that plaintiffs are complaining about are the
NVRA parts of the request, not the FOIA parts of the
request.

I think -- as Your Honor might be familiar
with Virginia FOIA, it is incredibly accelerated
timelines of, you know, five days to respond with a
possible seven-day extension.

THE COURT:  I'm well aware.

MR. SANFORD:  So the department is forced to
prioritize -- or not prioritize.  But to stay in
compliance with the FOIA requests, you have to move
very quickly on those aspects of requests, which is
what they're doing.  They --

THE COURT:  Did they request an extension on
this case?

MR. SANFORD:  On the FOIA?

THE COURT:  Yes.

MR. SANFORD:  I am not aware if they
requested an extension prior to producing these
documents, but they did produce the documents in
response to FOIA.

THE COURT:  Okay.

1          MR. SANFORD:  So, you know, there's just the
2   practical realities of, you know -- and kind of similar
3   to how I would love to have more attorneys to be able
4   to put on this case, I'm sure the Department of
5   Elections would love to have more FOIA officers and
6   records officers who they could have responding to kind
7   of the flood of requests that they get, especially
8   during election season where everyone is looking for
9   information from them, you know, not just about, you
10  know, this issue but about plethora of issues.
11         It's just the practical realities of, you
12  know, government has to go step-by-step through its
13  processes in order to respond to these requests.  And
14  just like how, you know, the state government -- and
15  I'm sure the, you know, taxpayers would be happy about
16  it -- we can't throw 14 lawyers at every case that
17  comes in.
18         And so we will be, I think, substantially
19  burdened and substantially prejudiced if we're ordered
20  to respond to discovery that the plaintiffs are seeking
21  while we're trying to prepare for the preliminary
22  injunction hearing and file our preliminary injunction
23  opposition brief in the next two days.  You know, I
24  think we're dealing with a schedule that's measured in
25  a matter of hours, not a matter of weeks.

1    And I think -- you know, my friends on the
2 other side referred to the case down in Alabama, which
3 I think really kind of hurts their argument here.  In
4 that case, the plaintiffs filed suit on September 13.
5 The court granted very, very limited discovery on
6 October 1, and that was mainly directing the defendants
7 to provide the information that they had given to the
8 DOJ, to also send it to the private plaintiffs in that
9 case.  But there, the PI hearing wasn't happening until
10 October 15.  So the PI hearing was two weeks after the
11 order on expedited discovery, Your Honor.  This is --
12 you know, again, that's a schedule measured in weeks.
13 We're dealing with a schedule that is best measured in
14 hours at this point.
15    For us to go kind of off on this, you know,
16 side project of dealing with the plaintiffs' discovery
17 requests here, every hour that we spend on that,
18 especially if we spend, you know -- or try to spend
19 hours preparing someone for a 30(b)(6) deposition and
20 then taking a 30(b)(6) deposition, I mean, that's going
21 to take at least a full day, if not more.  There's just
22 simply no way it can be done.
23    Or if we're searching for broad document
24 requests, you know, we're going to need to develop
25 search terms, run search terms, review documents for

1  responsiveness, and then review them for privilege, you

2  know, review them for any necessary redactions, and

3  then actually make a production.  I don't see how this

4  could possibly be done prior to the preliminary

5  injunction hearing.  And it certainly couldn't be done

6  in time for plaintiffs to review it and incorporate it

7  into their arguments and us to then respond to it.

8          And so I think this really, you know, brings

9  us back to the point that the Supreme Court of the

10 United States made in *Granny Goose Foods*, which is 415

11 U.S. 423, in Footnote 7.  And that explained that the

12 notice requirement required by Rule 65(a) before

13 preliminary injunction can issue implies a hearing in

14 which the defendant is given a fair opportunity to

15 oppose the application and to prepare for such

16 opposition.

17          If we're forced to go off on this kind of

18 side issue and devote our resources to discovery

19 instead of preparing for the preliminary injunction

20 hearing, that substantially prejudices us and, I think,

21 violates Rule 65(a).

22          THE COURT:  Well, I mean -- Rule 65(a), I

23 don't have it in front of me, but I've heard the

24 portion you just read to me spoke in terms of discovery

25 that you might have to engage in.  But in this case,

1  we're talking about effectively data and numbers that

2  largely, I'm guessing, is coming from the Department of

3  Elections.  And I'm not so naive as to think it's just

4  a matter of pressing a button, but it's all data that's

5  already within your exclusive possession, custody, and

6  control.  And that's what the limited ask here is, is

7  for that data.  And I just don't see this as an issue

8  of you having to learn new information.  This is all

9  information that I suspect you or someone within the

10 departments who are running these programs are fully

11 aware of.

12        MR. SANFORD:  Well, Your Honor, I think it

13 depends on which part of their request --

14        THE COURT:  Let me ask you this:  Does a

15 document exist that has the current numbers to date of

16 folks who have been disenrolled from this program?

17        MR. SANFORD:  The current numbers to date?  I

18 would need to confer with the client on whether that

19 particular document --

20        THE COURT:  I suspect that information that

21 they're looking for is information that is not too

22 difficult to gather.  So I appreciate your argument

23 about the hours to deal with, and I appreciate your

24 argument about what burden it may impose on you

25 depending on, obviously, the scope of the order.  But I

1   suspect that an order can be crafted that limits the

2   scope of discovery to issues that are important and can

3   be raised with the court so the court can evaluate

4   whether or not she believes this is an issue that

5   requires a preliminary injunction and some remedial

6   relief or not.

7          I just don't view this as the sort of parade

8   of horribles that you're suggesting.  Now, obviously,

9   you don't know what I may rule, and that's perfectly

10  appropriate.  But that's sort of the viewpoint from

11  which I'm coming right now.

12         MR. SANFORD:  Yes, Your Honor.  And I think

13  kind of if -- you know, if there's very, very narrow

14  discovery -- I think much narrower than even what

15  plaintiffs are asking for today, you know, possibly

16  that can be done.  You know, I think the scope of --

17  you know, when they kind of in their initial motion,

18  you know, ask for like each, you know, list of

19  individuals to include like seven different pieces of

20  information about that individual, that is something

21  that I know the Department of Elections would need to

22  write new code to try and pull all of that together.

23  And so if you're going very broad on what's being

24  provided, like that is something that I don't think can

25  be done.  I think kind of far more narrower things are

1   maybe possible.

2          But on the issue -- I think especially

3   with -- you know, there's kind of maybe this -- the

4   request for, you know, the number of people who have

5   been subject to this individualized review process

6   since Executive Order 35 may be in one bucket, and then

7   you also have this bucket of they just want a

8   generalized request for documents that go to the

9   process.

10          That calls for kind of -- you know, you

11  actually have to do a search for that kind of thing.

12  That's not a, you know, discrete data point to say,

13  yeah, you know, here's the folder that has everything

14  that has anything to do with this.  You need to, you

15  know, run a search and actually review documents to

16  determine what's responsive.  That's not something that

17  can be done kind of at the -- you know, the snap of a

18  finger.  So, Your Honor, I think it really is -- you

19  know, whether this is feasible or not would very much

20  depend on the scope of what is being ordered.

21          And I do just want to return to the point

22  about plaintiffs claim that they need to know the

23  identities of the individuals since Executive Order 35.

24          First, it would appear that that information

25  may not be exclusively in our control because I believe

plaintiffs have represented that they have contacted

all the individuals from before Executive Order 35 or

sent mailings out to them.  So somehow they have

derived that information, in which case it seems like

they are able to derive this information from public

information and don't need to be receiving it from the

defendants and having kind of us expend our resources

to answer their questions on that.

But secondly, again, that information goes to

the relief that might be afforded if they were to

prevail on the preliminary injunction, and that relief,

as it's stated in their own proposed order, would run

through defendants sending communications.

I think it would be a very bad idea for

plaintiffs to be sending their own communications to

these individuals, especially sending communications

before we have a ruling on the preliminary injunction.

Because then we risk creating, I think, a lot of

confusion if these individuals start receiving multiple

communications that are potentially inconsistent or, at

worse, contradictory.  And they are possibly getting

some very bad advice.

If we prevail on the preliminary injunction

motion, these noncitizens might be getting advice that

they should, you know, go show up and vote.  And that

1   is not something that, I think, anyone would want to

2   wrongly encourage them to do and maybe cause them to

3   make an error that they would not have otherwise made.

4           So unless Your Honor has any further

5   questions, I ask that the motion be denied.

6           Thank you.

7           THE COURT:  Thank you, Mr. Sanford.

8           Ms. Leeper, would you like to respond?

9           MS. LEEPER:  Yes, Your Honor.

10          Your Honor, I'd like to respond to each of

11  opposing counsel's three primary points, the first

12  being the assertion that this is not information needed

13  to litigate the motion for preliminary injunction and

14  that it is only needed to fashion a remedy or relief.

15          Your Honor, first, even if it were only

16  needed to fashion a remedy or relief, that is relevant

17  for what this court will consider and potentially take

18  action for on Thursday, but that is not the case.

19  Defendants' counsel focused on how the identities of

20  those purged would not go to the systematic nature of

21  the purge, and I take issue with that.  But it also

22  surely goes to the irreparable harm, which is being

23  faced by voters and by plaintiffs.

24          In terms of how that information could be

25  used to assess whether or not there is a systematic

1   impact, by way of example, Prince William County has

2   identified voters who had previously affirmed their

3   citizenship up to five times who were nonetheless

4   removed because of the systematic nature of this purge.

5           Now, plaintiffs are unable to do their own

6   similar type of analysis or to understand the extent to

7   which that is the case across the full list of voters

8   purged because that list has been denied to them.  And

9   so that information is relevant for the irreparable

10  harm for assessing systematic nature and for assessing

11  the remedy.

12          To the second point about sovereign immunity,

13  Your Honor, defendants' counsel made a lot of

14  assertions about what is or isn't before this Court or

15  what is or isn't relevant for the preliminary

16  injunction hearing.  But what is certain is that there

17  is not a motion to dismiss before this Court.  There is

18  not a motion to dismiss for any reason, including

19  sovereign immunity.

20          THE COURT:  Well, how do you respond to

21  counsel's argument that folks who enjoy sovereign

22  immunity may also be protected from discovery when they

23  may enjoy sovereign immunity?

24          MS. LEEPER:  Well, Your Honor, I think that

25  defendants' counsel referred to perverse incentives,

1  and that is what would happen here in terms of delaying

2  providing documents until the last moment so that

3  plaintiffs have no choice but to seek information and

4  seek litigation and challenge under the National Voter

5  Registration Act until what is a late hour.  And then

6  defendants would just be able to raise a sovereign

7  immunity defense without providing any actual briefing

8  on that matter leaving plaintiffs without the ability

9  to have relief.

10         Your Honor, it's also instructive that there

11 have been many cases in the past under the National

12 Voter Registration Act, including one very recently,

13 like the one in Alabama, which indicates just such as

14 this and in which the court granted an expedited

15 limited discovery request and ultimately found in favor

16 of the plaintiffs.

17         Your Honor, to the last point about the lack

18 of time or the feasibility of producing this

19 information, the timeline, as the Court properly

20 identified, is not from today until Thursday.  This

21 timeline began back in mid August and, even generously,

22 13 days ago when this motion was filed.  Defendants

23 cannot now claim surprise that plaintiffs are seeking

24 this information.

25         In fact, plaintiffs have already, through

1  their attempt to negotiate with defendants about

2  narrowing the scope of discovery, narrowed in on

3  precisely the key information which is sought by

4  plaintiffs now.  So defendants were even on notice of

5  which of the information was the most integral and

6  which plaintiffs would be certainly seeking.

7       Your Honor, defendants' counsel also noted

8  that this Commonwealth needs to follow the standard

9  process for producing information, and what that

10 emphasizes is that there is a standard process here.

11 There is a regular process by which the department is

12 in its regular course used to providing this

13 information to voters and to political committees.  And

14 that information includes many of the factors which

15 were listed and requested by plaintiffs to be included

16 about these voters.

17      I'm looking at the publicly available website

18 on the Department of Elections website on data

19 available for sale and client services, and a

20 registered voter list already includes the full name,

21 resident's address, mailing address, gender, year of

22 birth, registration date, last registration form

23 received, registration status, locality, precinct,

24 voting district, and voter identification number for

25 voters.  This information, most of it is already kept

1    in the regular course and offered for sale for monthly

2    update subscriptions.

3            THE COURT:  I just note that it suggests that

4    the process can take up to ten business days.

5            MS. LEEPER:  Yes, Your Honor, and it's been

6    13 since this motion was filed and nearly two months.

7            THE COURT:  That was my point.

8            MS. LEEPER:  Yes.  Thank you.

9            Your Honor, also defendants' counsel noted

10   the need to follow the regular course of the FOIA

11   process and ensuring that public information is

12   provided to voters in the order in which it was

13   requested and ensuring that those representations and

14   that information to voters is fulsome.

15           Plaintiffs made that request on August 13

16   under FOIA, and I assure you that we have not received

17   information in a fulsome way.  We have not received

18   that information in the regular speedy course in which

19   it is provided.  That has been denied.

20           Finally, Your Honor, I would just like to

21   make a point about voter confusion, which was cited by

22   defendants' counsel.  And there's nothing more

23   confusing to a voter than being denied their

24   fundamental right to vote, not understanding why this

25   is happening to them and why they're being told or

1 fearful that if they reregister, they may be subject to

2 political -- to criminal prosecution.

3        Confusing is a mild term for what voters are

4 currently experiencing and the irreparable harm that is

5 ongoing.  And this discovery is needed in order for the

6 plaintiffs to fully present their case and for the

7 court to have all the information before it so that it

8 can assess the motion for preliminary injunction.

9        THE COURT:  Thank you, Ms. Leeper.

10        MS. LEEPER:  Thank you, Your Honor.

11        THE COURT:  Mr. Sanford, just one more

12 question of you if you don't mind --

13        MR. SANFORD:  Absolutely, Your Honor.

14        THE COURT:  -- because I'm looking at that

15 website and flagging that ten-day issue.  I just want

16 to give you a chance to respond.  What was the basis

17 for the Department of Elections or whoever it was who

18 made the decision to state that it needed 90 days to

19 respond to this request for information back on

20 August 13?

21        MR. SANFORD:  Yes, Your Honor.  So that

22 was -- it takes -- its process is it's 90 days to

23 respond to NVRA requests for information.  I think

24 the -- I don't have the website in front of me that

25 you're looking at.  I believe that's for the sale of

various voter files that is provided by a section of

the code that limits it to particular organizations or

entities that are allowed to purchase that information.

THE COURT: So are you telling me that a

certain --

MR. SANFORD: I don't think the --

THE COURT: Well, hold on. Let me finish my

question. Are you telling me that if certain

organizations ask for it, it can be produced within ten

days if they pay for it but not if anyone else asks for

it?

MR. SANFORD: Your Honor, I believe that that

is a request for a different type of information. I

believe that's for like a voter file, not a request

for -- of what they're seeking here, is the list of

individuals subject to the process to determine if

they're a noncitizen registrant. I think those are

kind of two different things is my understanding.

Again, I don't have the page in front of me of what

particular process Your Honor and opposing counsel is

referring to right now.

THE COURT: I'll tell you, just at least if

nothing else for the record, what I'm referring to is

the Virginia Department of Elections client services

page, which outlines the data for sale, people who

1 qualify, the data included, how to order, and the

2 disclaimer says that the process can take up to ten

3 business days to be completed.

4        MR. SANFORD: Yes, Your Honor. And so I

5 believe that is for a kind of different set of data

6 than what plaintiffs are requesting here. And so

7 there's an existing -- it's always dangerous for

8 lawyers to start getting into technology, but I

9 understand there's like an existing query to pull that

10 information and to be able to generate that to provide

11 is how I understand that works. Whereas if you're

12 creating different lists with all the information that

13 plaintiffs were seeking in their initial motion, that

14 would require writing a new query to pull all that out

15 from various files. And that's kind of where the delay

16 comes in. It's not --

17        THE COURT: There's an established process

18 versus making a custom search?

19        MR. SANFORD: Yeah, you need to come up with

20 the new thing. So I think that's where the difference

21 is. They're not just -- I don't understand them to

22 just be asking for access to what sort of entities are

23 able to purchase. I don't believe that's the request

24 of what they're seeking, Your Honor. And so it's sort

25 of a different process that follows, you know,

1  different timelines.  I --

2          THE COURT:  I understand.  I didn't mean to

3  cut you off.  Do you have something more you want to

4  add?  Otherwise, I have another question for you.

5          MR. SANFORD:  Yeah.  The only other thing I

6  was remiss that I didn't mention is just, I think, it's

7  fairly telling, you know, this case has now been

8  consolidated with the action brought by the United

9  States, and I think it's telling that the Department of

10  Justice has not sought any discovery in this action.

11  They didn't even think that a hearing was needed on

12  the -- their motion for preliminary injunction.  I

13  think that's revealing, that discovery is not needed to

14  further litigate the preliminary injunction in this

15  case.

16          The information that is needed is known.  The

17  parties are able to place their positions, and you

18  know, I think the private plaintiffs don't need to kind

19  of have access to even more to make their case, Your

20  Honor.

21          THE COURT:  Well, you very well may be right,

22  and I'm not here to make any arguments for the

23  Department of Justice.  But I suspect that a

24  counterargument could be they knew that this was in the

25  works and thought it might be available.  But I

1  appreciate your point.

2          Let me ask you another more specific

3  question.  I get your point about how the information

4  identified on the client services web page or the

5  Department of Elections may be somewhat specific to

6  various preformulated searches.  I suspect that since

7  August 7, 2024, there's been some heightened interest

8  in the folks who may have been removed from the rolls

9  based on Executive Order 35.  And I also suspect that

10  there maybe be data that's kept on a regular basis of

11  the people who were removed and their identity and

12  their voter information.

13          Standing here at this podium right now, are

14  you telling me data of that sort, documents of those

15  sort, information of that sort does not currently

16  exist?

17          MR. SANFORD:  No, Your Honor, I'm not saying

18  that the -- that that -- I mean, I think you maybe

19  referenced additional data in there but kind of who the

20  individuals are.

21          THE COURT:  Yes, sir.  If you're making a

22  burden argument, I want to know if there's a burden.

23          MR. SANFORD:  Yes.  I believe that

24  information exists, Your Honor, and could be -- you

25  know, kind of the more narrow iteration of that

1 information exists.  I don't know if it exists in kind

2 of the scope of everything plaintiffs wanted included.

3          THE COURT:  What narrow information currently

4 exists?

5          MR. SANFORD:  I believe that they would know

6 kind of the individuals who were subject to the

7 individual process for identifying a noncitizen

8 registrant.

9          THE COURT:  Well, that's what I figured.

10          MR. SANFORD:  Yes, but kind of note -- like

11 noting whether, you know, their full prior registration

12 history and things like that, to pull that all into

13 one, you know, document --

14          THE COURT:  What information currently

15 exists?

16          MR. SANFORD:  I believe that information

17 exists, Your Honor, the individuals and --

18          THE COURT:  What's the "that"?

19          MR. SANFORD:  The individuals and, I believe,

20 their addresses, Your Honor, would exist.  I think to

21 add information to that -- and that's my understanding

22 from discussions with my client.  I haven't kind of,

23 you know, been in the weeds of their database systems

24 and kind of understanding, you know, what is and isn't

25 in there in full, Your Honor.  But that's my

1  understanding of what there is.

2         You know, there's kind of records that would

3  link to a voter that maybe you could write a query to

4  pull more information in about them.  But I think you

5  would have to kind of go, you know, either with a

6  search or go with individual by individual to try and

7  find that, Your Honor.

8         THE COURT:  In support of your burdensome

9  argument, do you want to give me an order of magnitude

10 of what we're dealing with?

11        MR. SANFORD:  In terms of pulling all that

12 information?

13        THE COURT:  The number of people.

14        MR. SANFORD:  Oh, the number.  I don't know

15 what the number of people is off the top of my head,

16 Your Honor.

17        THE COURT:  Obviously, if you're making a

18 burdensome argument, it would be useful to know that

19 number.  But if you want to not tell me that, I

20 understand that as well.

21        MR. SANFORD:  Your Honor, I just don't know

22 the number, and so I don't want to represent -- I

23 think, given the attention this case has received, I

24 don't want to say a number up here that turns out to be

25 inaccurate.

1          THE COURT:  Understood.

2          MR. SANFORD:  I don't know.  I don't want to

3  misconvey information, Your Honor.

4          THE COURT:  Understood.

5          Unless you have anything else, I don't have

6  any more questions for you.

7          MR. SANFORD:  Thank you, Your Honor.

8          THE COURT:  You're welcome to add anything

9  you'd like.

10          MR. SANFORD:  No.  I believe that's all I was

11  hoping to say, Your Honor.

12          THE COURT:  All right.  Ms. Leeper, I do have

13  one more question for you, and then we're going to

14  stop.  We're not going to go back and forth.

15          MS. LEEPER:  All day.

16          THE COURT:  Any response to anything

17  Mr. Sanford said since you do get the last word, and

18  then I do have a question for you about --

19          MS. LEEPER:  Yes, Your Honor, sort of two

20  points of clarification.  One is that we are, in fact,

21  seeking the voter files kept in the regular course and

22  produced in the regular course.  That is part of the

23  production that plaintiffs are seeking, is that voter

24  file snapshot from August 7 and from present day.

25          THE COURT:  Yeah, I saw that.

1          MS. LEEPER:  Yes.

2          THE COURT:  And maybe I took for granted what

3  that means.  So I can make sure that before I impose

4  anything on anyone that I understand the impact of it.

5  What is the voter file snapshot?

6          MS. LEEPER:  Yes, Your Honor.  So that is on

7  sort of a website that we've been looking at.  That is

8  sort of the registered voters list.  And so that's that

9  information there as I listed earlier different --

10         THE COURT:  Meaning specific names of

11 registered voters as of -- I think you requested as of

12 August 7 and as of some other date.

13         MS. LEEPER:  Yes, present day so that we

14 could see when the voters -- you know, which voters

15 were present and then which ones have been removed or

16 since re-added to the list.  Yes, Your Honor.

17         THE COURT:  Okay.  Anything else to add?

18 Otherwise, I have a question.

19         MS. LEEPER:  Yes.  The second point of

20 clarification -- and I don't know if it's so much

21 clarifying as asking my own question, which is that

22 there was a process by which the state was able to

23 develop the list of 6,303 voters that they claimed in

24 Executive Order 35 were taken off the rolls for alleged

25 noncitizenship.  That number was generated in a way.

1  And so to the extent that there already exists a

2  process and a way to parse out this voter or voter that

3  has been removed of this type, it seems that that

4  already exists.

5         THE COURT:  I took Mr. Sanford's comments to

6  mean that that does exist.  But what exists -- at least

7  as he's informed me, the only thing that exists is

8  their name and their address.

9         MS. LEEPER:  Yes, Your Honor.  We, obviously,

10  don't have knowledge of the type of information that's

11  included in that.  Though it would seem that it would

12  be linked to the general voter file with the additional

13  information because that information is, in fact,

14  needed by the local registrars to perform the matches

15  of the local rolls before they send out the

16  notification.

17         THE COURT:  Well, let me ask you this

18  question:  If -- for your purposes on Thursday --

19         MS. LEEPER:  Yes, Your Honor.

20         THE COURT:  -- would you need -- do you need

21  name and address information?  And if so, tell me why.

22         MS. LEEPER:  Yes, Your Honor.  So the

23  information of the actual number of individuals purged,

24  the names of the people that were purged from the voter

25  roll is necessary in order to show a fulsome picture.

1  Because just looking at the snapshot from August 7 and

2  then the snapshot from today would show you who has

3  been removed, but it wouldn't show you potentially who

4  has been removed and has reregistered, which is what

5  would demonstrate that these were faulty and that, in

6  fact, individuals that are citizens are being removed

7  for alleged noncitizenship.

8           THE COURT:  Okay.  Perhaps I didn't

9  understand the answer to my specific question, which is

10  tell me why you need the name and the address

11  information before Thursday.

12           MS. LEEPER:  The name and address

13  information --

14           THE COURT:  And subquestion, why couldn't you

15  wait for the voter file information until some later

16  date if Judge Giles enters a preliminary injunction?

17           MS. LEEPER:  So the name and address

18  information is needed in order to understand who

19  there's been a notification sent out to, who has been

20  notified that they could be removed for alleged

21  noncitizenship.  That information is needed.  Then we

22  need the voter file information to put that into

23  context:  How many of those individuals were actually

24  removed?  How many of those individuals were not

25  removed or perhaps were removed and have since

1  reregistered because they are, in fact, citizens and

2  their removal was improper?

3          THE COURT:  I understand.

4          MS. LEEPER:  So we need the list of

5  individuals, and then we need the voter file snapshots

6  to provide the context.

7          THE COURT:  So your point, as I'm

8  understanding it, is the name and address information

9  does not give you the information that you believe is

10 necessary to make the argument on Thursday that folks

11 have been removed improperly and not restored?

12         MS. LEEPER:  Exactly, which goes to the very

13 nature of sort of the systematic nature of this voter

14 purge, as we're alleging, and also the irreparable

15 harm.

16         THE COURT:  All right.  Anything further to

17 add?

18         MS. LEEPER:  No, Your Honor.  Thank you very

19 much.

20         THE COURT:  Thank you both very much.  Thank

21 you both very much for your arguments today.  Give me

22 one minute, if you would.

23         All right.  Thank you, Counsel.

24         This action is before the Court on

25 plaintiffs' emergency motion for expedited discovery,

1   which has been briefed and argued on an expedited

2   schedule.  All parties have had an opportunity to be

3   heard both in writing and orally.  Based on the urgent

4   nature of this case and the Court's broad discretion to

5   manage discovery and its docket, the Court makes the

6   following findings and rulings:

7          Plaintiffs' amended complaint alleges four

8   violations of the National Voter Registration Act, and

9   the hearing on plaintiffs' preliminary injunction has

10  been scheduled for this Thursday, October 24, 2024.

11         In support of their arguments for preliminary

12  injunction, plaintiffs have filed a motion with this

13  Court seeking expedited discovery, including documents

14  and two depositions.  This request comes before the

15  parties have held a Rule 26(f) conference or the Court

16  has otherwise authorized discovery.

17         The defendants' primary objection, as well as

18  other objections they've highlighted today, to

19  providing expedited discovery is their assertion that

20  plaintiffs waited too long to bring this action to

21  request this discovery and that it would be burdensome.

22         The record reflects the plaintiffs tried

23  without success to engage defendants to voluntarily

24  provide this information for months, but the defendants

25  refused to provide any of it until after the election.

1        Specifically, on August 7, the governor

2  issued Executive Order 35.

3        On August 13 and August 20, plaintiffs asked

4  defendants for information relating to the

5  Commonwealth's program to remove people from the voting

6  rolls.

7        On September 9, the parties met to discuss

8  plaintiffs' request for information.

9        On October 3, plaintiffs sent defendants a

10 violation letter.

11       On October 7, the defendants informed

12 plaintiffs that they would not produce any information

13 until after the election.

14       That same day, October 7, plaintiffs filed

15 their action in this court.

16       The next day, October 8, plaintiffs filed a

17 motion with this Court requesting expedited discovery.

18       On October 14, the parties met and conferred

19 again about the motion and plaintiffs' request for

20 information.  But to date, none of the requested

21 information has been provided.

22       The Court has considered the totality of the

23 circumstances, as well as the factors identified in *Kia*

24 *Motors v. Greenbrier* and *Lapp v. United States* and

25 finds that plaintiffs' request for expedited discovery

1   is reasonable and supported by good cause.   In

2   particular, the case is scheduled for a preliminary

3   injunction later this week.

4           The discovery plaintiffs seek is narrowly

5   tailored to obtain information probative to the

6   preliminary injunction analysis, and plaintiffs who are

7   advancing the interest of Virginia voters will be

8   irreparably harmed by waiting until the parties have

9   conducted a Rule 26(f) conference.

10          Alternatively, while this Court has no

11  jurisdiction to resolve whether plaintiffs should be

12  awarded a preliminary injunction and makes no findings

13  here, a review of plaintiffs' amended complaint

14  satisfies the Court that plaintiffs have alleged a

15  sufficiently colorable claim to justify limited

16  expedited discovery.

17          In enacting the National Voter Registration

18  Act, Congress explained that the right to vote is a

19  fundamental right and that governments must promote the

20  exercise of that right.   And the Court finds that the

21  potential harm to any U.S. citizen who has been denied

22  the right to vote outweighs the burden on the

23  Commonwealth to produce information on an expedited

24  basis.

25          For these reasons, plaintiffs' motion for

1  expedited discovery is granted in part and denied in

2  part.

3          The defendants are ordered to provide on a

4  rolling basis beginning now and with a completion date

5  of Wednesday, October 23, 2024, at noon the following

6  information:

7          Individualized voter registration information

8  for the registered voters defendants have identified

9  and removed from the official list of eligible voters

10 on or after August 7, 2024.

11         Individualized voter registration information

12 for voter registration applicants denied registration

13 based on alleged noncitizenship on or after August 7,

14 2024.

15         The Virginia voter file snapshot for

16 August 7, 2024, and the Virginia voter file snapshot

17 for today, October 21, 2024.

18         Plaintiffs' request for the list of the 6,303

19 registered voters referred to in Executive Order 35 as

20 having been removed from the official list of eligible

21 voters between January 2022 and July 2024 is denied

22 without prejudice to plaintiffs' right to pursue this

23 information after the Court has authorized nonexpedited

24 discovery, as is plaintiffs' right to seek other

25 information relating to the creation and implementation

1  of Executive Order 35 and the training and other

2  material related to it.

3          My ruling today requires the disclosure of

4  information only for the registered voters who have

5  been removed from the official list of eligible voters

6  on or after August 7, 2024.

7          Plaintiffs' request for two short 30(b)(6)

8  depositions during the window of expedited discovery is

9  denied for several reasons.  Plaintiffs have not

10 identified topics for the requested depositions as

11 required by Rule 30(b)(6), and the Commonwealth would

12 be prejudiced by a general deposition without any sense

13 of the topics or an opportunity to object to them.

14 Given the short time between today's hearing and the

15 preliminary injunction on Thursday, sufficient time

16 does not exist for the Commonwealth to prepare their

17 witness properly.  Even a short deposition in a narrow

18 window of time runs the risk of becoming chaotic, and I

19 don't think it would materially add to Thursday's

20 hearing in a way that could not be addressed through

21 the production of documents.

22          Defendants's state in their papers and they

23 argue today that Commissioner Beals testified and

24 answered questions about the program on September 4,

25 2024.  So there is some information available from her

1  as well.

2          This Court's ruling is unrelated to Judge

3  Giles' hearing on Thursday but is meant only to provide

4  the parties with access to information that may help

5  decide the issues before the court.

6          I will enter a written order consistent with

7  this ruling this morning, but this oral ruling is

8  effective immediately.

9          Any questions?

10          MS. LEEPER:  No, Your Honor.

11          MR. SANFORD:  Just to make sure that I have

12  the list correct?

13          THE COURT:  Yes, sir.  And I have a written

14  order I'll put together so you will have it today.

15          MR. SANFORD:  I just wanted to make sure we

16  had it exactly on point.

17          THE COURT:  It will not be an expansive order

18  as to the reasons, but it will be as to the information

19  I'm ordering to be produced.

20          MR. SANFORD:  You said that the 6,300, that

21  was -- that request is being denied, and it's just the

22  post August 7?

23          THE COURT:  Yes, sir.

24          MR. SANFORD:  And then just on the voter --

25  on the snapshot issue, I just want to make the Court

1  aware that for snapshots -- because that's a snapshot

2  of a live database -- the August 7 snapshot is -- you

3  know, you can get very close to what it looked like.

4  You would have to run it on August 7.  But I don't

5  think there's something -- if a general registrar

6  changed some information, it could be slightly

7  different from if you ran the process on August 7

8  itself.  That's my understanding of the technology.

9            THE COURT:  Can you give me a "for example"?

10            MR. SANFORD:  I think if a general registrar

11  were to, like, backdate something and change a date,

12  that could be what is altered in it, but I am not

13  particularly familiar with how the technology works,

14  Your Honor.  I just wanted to flag that issue.  I think

15  kind of producing it will still work.  You have to run

16  a query to do it, but I understand that they should be

17  able to do that, Your Honor.

18            THE COURT:  All right.  Ms. Leeper, any

19  questions based on counsel's comment?

20            MS. LEEPER:  Not based on that

21  representation.  We'll keep our ability to ask

22  questions after the fact depending on what's produced.

23            THE COURT:  All right.

24            MR. SANFORD:  Your Honor, just on the

25  individual voter information, I just want to check.

1   What information does that include?

2           THE COURT:  The plaintiffs identified that

3   information in their -- I believe it was in a footnote

4   in their brief.  That's what I was referring to by the

5   voter information.  I'm happy to articulate that.  It

6   probably makes sense to do it on the record anyway.

7   That includes the full name; residential address;

8   mailing address, if different; date of birth; phone

9   number; voter ID number; any associated state-issued ID

10  number, such as a driver's license number; all

11  registration dates, including earliest and most recent

12  registration date; and race if available.

13          MR. SANFORD:  So, Your Honor, I believe some

14  of that information is not available and would require

15  writing a new program to pull that all together into,

16  like, a file that could be produced.  I think we could

17  produce kind of the more limited information on a

18  faster basis.

19          THE COURT:  What can't you produce?

20          MR. SANFORD:  I believe -- the all

21  registration dates, I think you would need to run

22  searches across the system because it doesn't -- the

23  system doesn't kind of care about prior registrations.

24  It cares about whether you are registered because it's

25  a voting system.  And so to look up that information, I

1  think they need to do deep dive searches to figure out

2  how you were registered.

3          I'm also not sure -- I know that they have

4  voter IDs -- whether state-issued IDs are -- I think

5  race isn't maintained.  State-issued IDs, I think, may

6  be available in some locations but not others.  So kind

7  of -- there's a more complicated process to pull all of

8  that in.  I think I need to talk to the technology

9  folks to figure out how long it would take to actually

10 do that type of process, Your Honor.

11         THE COURT:  Ms. Leeper, is the registration

12 number really critical?

13         MS. LEEPER:  I do not want to speak for our

14 expert and say it's not.  This is what we have been

15 told is important, Your Honor.

16         THE COURT:  Okay.  I'm going to accept

17 Mr. Sanford's representation.

18         MS. LEEPER:  Your Honor, if you would allow

19 me a little bit of something untypical --

20         THE COURT:  Yes, ma'am.

21         MS. LEEPER:  We have a different member of

22 our counsel team here who is much more familiar with

23 the data aspect.  Would you mind if I confer with him

24 quickly?

25         THE COURT:  Please do.

1            MS. LEEPER:  Thank you.

2        (Counsel confer.)

3            MS. LEEPER:  Yes, Your Honor.

4            THE COURT:  Come to the podium, if you would,

5    only because I know we have a court reporter here

6    today, but we're technically a court of recording and

7    not of record.  So I want to make sure we have a clean

8    audio record as well.  If you don't mind, step to the

9    podium.

10            MS. LEEPER:  Happy to do so, Your Honor.

11            Yes, we've confirmed that we do, in fact,

12   need the registration number.

13            THE COURT:  Why?

14            MS. LEEPER:  In order to make the comparison

15   and to identify and match the voters that have been

16   removed with the voter on the voter file, Your Honor.

17            THE COURT:  All right.  Mr. Sanford, you've

18   got to do the best you can.  I take your representation

19   that race doesn't exist and some of this information

20   may be difficult to find.  But I expect you and your

21   clients to do the best they can to comply with the

22   Court's order.

23            MR. SANFORD:  Yes, Your Honor.  As I said, we

24   will do everything we can to comply with the order.

25   Just given the tight timeline, I did want to flag that

1  we might have problems with it, but we will get

2  everything together that we can.

3          THE COURT:  I appreciate it.  I know this is

4  a burden to you and your client, but I think this is an

5  important issue that takes precedent over what the

6  workload may be.

7          Any other questions?

8          MR. SANFORD:  No.  Thank you, Your Honor.

9          THE COURT:  Anything further from the

10  plaintiffs?

11          MS. LEEPER:  No, Your Honor.

12          THE COURT:  All right.  The Court stands in

13  recess.

14          -----------------------------------
                    Time:  12:08 p.m.

15

16

17

18

19

20

21

22      I certify that the foregoing is a true and

23   accurate transcription of my stenographic notes.

24
                                    /s/
25                          _____
                            Rhonda F. Montgomery, CCR, RPR

        Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599