IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| VIRGINIA COALITION FOR IMMIGRANT RIGHTS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> SUSAN BEALS *in her official capacity as Virginia Commissioner of Elections, et al.*, <br><br> Defendants. | Case No. 1:24-cv-1778 (PTG/WBP) |
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> COMMONWEALTH OF VIRGINIA, *et al.*, <br><br> Defendants. | Case No. 1:24-cv-1807 (PTG/WBP) |

**UNITED STATES' REPLY IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Virginia continues to implement its voter registration list maintenance program (the Program) during a time period forbidden by federal law. U.S. Prelim. Inj. Br., *United States v. Virginia*, No. 1:24-cv-1807, ECF No. 9-1 (PI Br.). Yet Defendants claim that the Program is beyond the purview of the Quiet Period Provision that Congress established in Section 8(c)(2) of the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20507(c)(2). They are incorrect, both as a matter of law and fact. The NVRA indisputably applies to Virginia's program and bars it within 90 days of a federal election. And preclearance of the statutory backdrop for the Program is irrelevant to this Court's analysis under the NVRA. The United States is likely to succeed on the merits of its claim, the United States and Virginia voters will be irreparably harmed absent intervention, and the equities and public interest favor relief. This Court should grant the United States' motion.

**ARGUMENT**

**A.     The Defendants' Statutory Interpretation Fails.**

Virginia's attempt to narrow the meaning of the Quiet Period Provision contorts its text beyond recognition. The Commonwealth's argument boils down to the contention that the Provision prohibits the systematic removal within 90 days of a federal election only of "registrants who become ineligible to vote based on a change in residence." Defs.' Resp. at 27, *Va. Coal. for Immigrant Rts. v. Beals*, No. 1:24-cv-1778, ECF No. 92 (citing *Arcia v. Detzner*, 908 F. Supp. 2d 1276, 1283 (S.D. Fla. 2012) (Defs.' Resp.). Congress prohibited just those sorts of removals in Section 8(d)(1), 52 U.S.C. § 20507(d)(1). But Virginia reads a textual equivalence between Section 8(d)(1) and the Quiet Period Provision that does not exist. *Compare* 52 U.S.C § 20507(d)(1) (instructing states, in some circumstances, to "not remove the

name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence"), *with id.* § 20507(c)(2) (forbidding "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" within 90 days of a federal election, then listing specific exceptions).[1]  Virginia's reading of the statute flouts bedrock principles of statutory interpretation.  *See Polselli v. Internal Revenue Serv.*, 598 U.S. 432, 439 (2023) ("We assume that Congress 'acts intentionally and purposely' when it 'includes particular language in one section of a statute but omits it in another section of the same Act.'") (quoting *Sebelius v. Cloer*, 569 U.S. 369, 378 (2013)); *Chickasaw Nation v. United States*, 534 U.S. 84, 93 (2001) ("'[E]very clause and word of a statute' should, 'if possible,' be given 'effect.'" (quoting *United States v. Menasche*, 348 U.S. 528, 538-539 (1955)) (cleaned up)).  Virginia's grammatical warping ignores that Congress enacted the Quiet Period Provision to prevent a harm—the mistaken disenfranchisement of qualified voters removed from the rolls close to Election Day— that is just as likely to result from the "systematic" removal of voters who have lost their qualifications as it is from the removal of voters who were not qualified to begin with.

B.  **Finding the Program Violates the Quiet Period Provision Would Not Lead to Constitutionality Concerns.**

Defendants next argue that this Court must follow their misguided interpretation of the NVRA because, otherwise, the NVRA would be unconstitutional.  Defs.' Resp. at 25-26.  Not so.

---

[1] Virginia argues that its reading of the Quiet Period Provision is compelled because the meaning of the Quiet Period Provision controls the meaning of Section 8(a)(3), which Virginia terms the "General Registration Provision." Defs.' Resp. at 25-28.  This is yet another attempt to rewrite Section 8 by ignoring that Section 8(a)(3) refers to "registrant[s]" while the Quiet Period Provision refers to "ineligible voters."  *Compare* 52 U.S.C. § 20507(a)(3), with 52 U.S.C. § 20507(c)(2).

2

The NVRA is unquestionably a valid exercise of Congress's plenary authority under Article I of the Constitution, specifically the Elections Clause, U.S. Const. art. I, § 4, cl. 1. *See, e.g., Ass'n of Cmty. Orgs. for Reform Now v. Edgar*, 56 F.3d 791, 792-96 (7th Cir. 1995); *Commonwealth v. United States*, No. 3:95-cv-357, 1995 WL 928433, at *1 (E.D. Va. Oct. 18, 1995). A finding by this Court that the Defendants violated the Quiet Period Provision would not change that. Defendants' constitutional arguments rest on the erroneous notion that requiring them to stop their systematic removal program within 90 days of the election would limit their ability to enforce their qualifications to vote. That is incorrect. The Quiet Period Provision governs only the manner in which a state may remove voters it previously determined to be qualified. Virginia has multiple methods to enforce its citizenship requirements during the Quiet Period, including individualized voter removals and initial determinations of whether new registrants are qualified to be added to the rolls. Because Virginia has an "alternative means of enforcing its constitutional power to determine voting qualifications," no constitutional doubt is raised by giving the Quiet Period Provision its "fairest reading." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 19 (2013) (holding that the NVRA preempted an Arizona statute requiring documentary proof of citizenship for federal form registrants).

### C. The Program Is Systematic and Not Individualized.

The Program is conducted "systematically" for purposes of the Quiet Period Provision. 52 U.S.C. § 20507(c)(2)(A). This Court should reject Defendants' distorted reading of the term "systematic" for two reasons. First, the Program removes voters without any individual investigation of voter eligibility, rendering the program systematic in nature. Second, the Program runs afoul of *Arcia*'s rule that automated programs utilizing mass data-matching are definitionally systematic. That one of the data points being matched is a registrant's own

3

notation on a form is irrelevant. Allowing the Program to move forward would allow mass computerized data-matching processes to circumvent the Quiet Period provision. *See, e.g.*, Ex. A, Prelim. Inj. Hearing Transcript at 8:10-9:14, *United States v. Alabama, et. al.*, No. 2:24-cv-01329, ECF No 57 (N.D. Ala. Oct. 16, 2024) (Al PI Tr.); *Arcia*, 772 F.3d at 1344. But this Court's analysis of the Defendants' wayward argument can begin and end with the NVRA's text and Congress's clear purpose. *See* U.S Prelim. Inj. Br. at 2-3.

The NVRA requires states to "complete, not later than 90 days prior to [a federal election], any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A); *see also, e.g.*, *Hartford Underwriters Inc. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (noting that courts "begin with the understanding that Congress 'says in a statute what it means and means in a statute what it says there.'") (internal citation omitted). Individualized removal is permissible, *see Arcia*, 772 F.3d at 1348, but Section 8 necessitates that states proceed with meaningful individualized analysis "based on individual correspondence or rigorous individualized inquiry," *see N.C. Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16-cv-1274, 2016 WL 6581284, at *5 (M.D.N.C. Nov. 4, 2016) (quoting *Arcia*, 772 F.3d at 1346); Ex. A, AL PI Tr. at 9:15-18) (comparing voter rolls against driver's license and ID card databases is systematic). A removal program that proceeds without "any reliable first-hand evidence specific to the voters" targeted is "systematic" *N.C. Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16-cv-1274, 2016 WL 6581284, at *5 (M.D.N.C. Nov. 4, 2016); *see also Arcia*, 772 F.3d at 1344 (holding "a mass computerized data-matching process to compare the voter rolls with other state and federal databases, followed by the mailing of notices" and without any "individualized information or investigation" to be systematic for purposes of the Quiet Period Provision); *see*

4

*also, e.g.*, *Bell v. Marinko*, 367 F.3d 588, 590, 592 (6th Cir. 2004) (setting out examples of individualized "investiga[ions] and examin[ations]"); *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d 1348, 1355 (M.D. Ga. 2020) (contrasting systematic programs and "individualized inquiries"); Ex. A, AL PI Tr. at PI Tr. 9:15-18 (noting that the use of template letters "illustrates the systematic nature of the path to removal that the program created"). And this is particularly true where, as here, a state makes no attempt to reconcile or investigate the contradictory information that has been provided by a voter both in attesting to their U.S. citizenship when registering to vote and in checking a box that says otherwise during a DMV interaction.

Defendants' own description of the Program merely confirms its systematic nature. *See* Defs.' Resp. at 30-33. They describe the Program as one in which (1) the DMV passes on various pieces of data to the Department of Elections (ELECT); (2) ELECT matches that data to the potential matches on the voter rolls but conducts no research or analysis on the person's citizenship status; and (3) ELECT sends those matches to local registrars. *See id.* at 8-9. Local registrars then send auto-generated Notices of Intent to Cancel. *See* U.S. Prelim. Inj.Br. at 5-6. Ultimately, officials lack any discretion at any stage in the process of implementing the Program to engage in "individual correspondence," seek "reliable first-hand evidence," or engage in an "individualized inquiries." *Compare N.C. Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16-cv-1274, 2016 WL 6581284, at *5 (M.D.N.C Nov. 4, 2016); *and Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d 1348, 1355 (M.D. Ga. 2020) *with* Ex. B, *Va. Dep't of Elections*, GREB Handbook 2024, Ch. 8, p. 15, https://perma.cc/27VJ-QKBF (Handbook) (directing that the "(DMV) is **required** to furnish to Department of Elections," "[t]he Department of Elections **will** transmit," [t]he general registrar is **required** to mail,

"VERIS will **automatically cancel** the registration of any voter who does not respond to the notice within 21 days.") (emphasis added).

In fact, some officials have been aware that targeted voters are likely citizens but still felt compelled to issue a Notice of Intent to Cancel. *See* U.S. Prelim. Inj. Br. at 7; Arlington Elections Office, Recording of Electoral Board Meeting - October 1, 2024, at 16:40 (Oct 1, 2024), https://www.youtube.com/watch?v=BT3mbIUWzsk [https://perma.cc/Q78Y-GL3J] ("We have no way of knowing one way or the other whether these fourteen individuals [that were removed] were or were not citizens."). This is borne out by the data produced thus far. Records indicate Loudoun County removed at least 102 people between August 7, 2024, and October 16, 2024. *See* Ex. C, Loudoun County Declared Non-Citizen List. And at least one removed voter had a "NEW CITIZEN" stamp directly on their voter registration application. *See* Ex. D, Arturo Voter Registration Application. Of the 102 removed voters, three voters have submitted reaffirmations of citizenship, and eight voters have re-applied after removal, suggesting that more than just the voter with "New Citizen" on his application were wrongfully removed U.S. citizens. *See* Ex. E, Hong Affirmation of Citizenship; Ex. F, Al Jumaily Voter Registration Application. The evidence shows that the Program is a systematic removal program regulated by the Quiet Period Provision.

### D. Preclearance Under Section 5 of the Voting Rights Act is Irrelevant Here.

Virginia trumpets the United States' lack of objection to the implementation of what eventually became the statutory backdrop for the Program under the preclearance process required at the time by Section 5 of the Voting Rights Act, 52 U.S.C. § 10304. It is true that the United States precleared the 2006 changes. *See* Defs.' Resp., Declaration of Graham K. Bryant, Ex. A, Letter from John Tanner, Chief, Voting Section, to J. Jasen Eige, Senior Assistant

Attorney General (December 14, 2006), ECF No. 92-4 (Tanner Letter).  But, as Virginia surely knows, Section 5 analyses were limited to whether the enacted practice had "the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color [or membership in a language minority group] to elect their preferred candidates of choice."  52 U.S.C. § 10304(b).  That limitation is clear from the letter Virginia attached to its Response, *see* Tanner Letter ("Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes [at issue]."), from federal regulations, *see* 28 C.F.R. § 51.49 (explaining that the lack of an objection under Section 5 to a voting change did "not constitute the certification that the voting change satisfies any other requirement of the law beyond that of section 5") and from caselaw, *see Morris v. Gressette*, 432 U.S. 491, 505 (1977) (holding that constitutional challenges were not barred by a lack of objection by the Attorney General under Section 5); *Mississippi State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1262 (N.D. Miss. 1987) (holding that Section 5 Preclearance of a statute did not prohibit a challenge of the same law under Section 2 of the Voting Rights Act) (*aff'd sub nom. Mississippi State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991)).  The United States' lack of objection during the Section 5 preclearance process to the procedures that would eventually become the Program is irrelevant to Virginia's present violation of the Quiet Period, which imposes an entirely different restriction.

## CONCLUSION

For the reasons set forth in the United States' opening brief and set forth above, the United States' Motion for Preliminary Injunction should be granted.

Date: October 23, 2024

| | |
|---|---|
| KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division | JESSICA D. ABER<br>United States Attorney<br>Eastern District of Virginia |

*/s/ Sejal Jhaveri*  
R. TAMAR HAGLER  
RICHARD A. DELLHEIM  
SEJAL JHAVERI  
KEVIN MUENCH  
BRIAN REMLINGER  
Attorneys, Voting Section  
Civil Rights Division  
U.S. Department of Justice  
950 Pennsylvania Avenue, N.W  
Washington, D.C. 20530  
(202) 305-5451  
Sejal.Jhaveri@usdoj.gov  

*/s/ Steven Gordon*  
STEVEN GORDON  
Assistant United States Attorney  
United States Attorney's Office  
Eastern District of Virginia  
2100 Jamieson Ave.  
Alexandria, VA 22314  
(703) 299-3817  
Steve.Gordon@usdoj.gov  

CHRISTOPHER R. KAVANAUGH  
United States Attorney  
Western District of Virginia  

*/s/ Christopher Kavanaugh*  
United States Attorney  
United States Attorney's Office  
Western District of Virginia  
255 West Main Street  
Charlottesville, VA 22902  
(434) 293-4283  
Christopher.Kavanaugh@usdoj.gov

# CERTIFICATE OF SERVICE

       I hereby certify that on October 23, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to counsel of record.

                                      */s/ Sejal Jhaveri*
                                      Sejal Jhaveri
                                      Civil Rights Division
                                      U.S. Department of Justice
                                      950 Pennsylvania Ave, NW
                                      Washington, DC 20530
                                      (202) 305-5451
                                      Sejal.Jhaveri@usdoj.gov