**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

VIRGINIA COALITION FOR IMMIGRANT
RIGHTS; LEAGUE OF WOMEN VOTERS
OF VIRGINIA; LEAGUE OF WOMEN
VOTERS OF VIRGINIA EDUCATION
FUND; AFRICAN COMMUNITIES
TOGETHER,

     *Plaintiffs*,

       v.

SUSAN BEALS, in her official capacity as
Virginia Commissioner of Elections; JOHN
O'BANNON, in his official capacity as
Chairman of the State Board of Elections;
ROSALYN R. DANCE, in her official capacity
as Vice-Chairman of the State Board of
Elections; GEORGIA ALVIS-LONG, in her
official capacity as Secretary of the State Board
of Elections; DONALD W. MERRICKS and
MATTHEW WEINSTEIN, in their official
capacities as members of the State Board of
Elections; and JASON MIYARES, in his
official capacity as Virginia Attorney General,

     *Defendants*.

Case No. 1:24-cv-01178 (Lead)
Case No. 1:24-cv-01807
Judge Patricia Tolliver Giles

<u>**PLAINTIFFS' REPLY IN SUPPORT OF**</u>
<u>**PRELIMINARY INJUNCTION**</u>

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT......................................................................................1

I.    The Purge Program plainly violates the NVRA's 90 Day Provision. ..................................2

      A.  The Purge Program is systematic...........................................................................2

      B.  The NVRA's Quiet Period covers Defendants' Purge Program............................5

II.   The Purge Program is nonuniform and discriminatory in violation of the NVRA.............9

III.  Purcell doctrine is inapplicable to this case. ....................................................................10

IV.   Defendants are proper parties to this lawsuit under Ex parte Young. ...............................11

V.    Plaintiffs have demonstrated organizational and associational standing. ..........................13

VI.   An injunction is necessary to prevent irreparable harm......................................................17

VII.  The balance of equities and public interest favor an injunction. .......................................20

CONCLUSION.........................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page**

*Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015)..........................................16

*Andrus v. Glover Construction Company*, 446 U.S. 608 (1980) ..................................................7

*Arcia v. Florida Secretary of State*, 772 F.3d 1335 (11th Cir. 2014) ....................3, 4, 5, 7, 15, 16

*Arizona v. Inter-Tribal Council of Arizona*, 570 U.S. 1 (2013) ..................................................18

*Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004) ..........................................................................8

*Bowsher v. Synar*, 478 U.S. 714 (1986) ..................................................................................13

*Democracy North Carolina v. North Carolina State Board of Elections*,
    476 F. Supp. 3d 158 (M.D.N.C. 2020)................................................................................15

*Democratic Party of Virginia v. Brink*, 599 F. Supp. 3d 346 (E.D. Va. 2022) ..............................16

*Ex parte Young*, 209 U.S. 123 (1908) ..............................................................................11, 12

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016)........................................................................18

*Florida State Conference of the National Association for the Advancement of Colored People v.*
    *Browning*, 522 F.3d 1153 (11th Cir. 2008)..........................................................................15

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024)..................................................................................................13, 14

*Forward v. Ben Hill County Board of Elections*,
    509 F. Supp. 3d 1348 (M.D. Ga. 2020)..................................................................................5

*Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167 (2000) ......................................................15

*Get Loud Arkansas v. Thurston*, No. 5:24-CV-5121,
    2024 WL 4142754 (W.D. Ark. Sept. 9, 2024) ......................................................................14

*Gonzalez v. Governor of Georgia*, 978 F.3d 1266 (11th Cir. 2020)............................................17

*Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982)....................................................14

*Horne v. Flores*, 557 U.S. 433 (2009)....................................................................................13

*Husted v. A. Philip Randolph Institute*, 584 U.S. 756 (2018) ......................................................5

*La Union Del Pueblo Entero v. Abbott*, 5:21-cv-0844-XR, 2024 WL 4488082 (W.D. Tex. Oct. 11,
    2024) *stayed on other grounds*, 2024 WL 4487493 (5th Cir. Oct. 15, 2024) ..........................14

*League of Women Voters of North Carolina v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014)..............................................................................................20

*March for Our Lives Idaho v. McGrane*, 1:23-cv-00107-AKB,
    2024 WL 4226912 (D. Idaho Sep. 17, 2024)........................................................................14

*Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020) ...............................13

*Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077 (D. Ariz. 2023) ...............................3, 4

*Mi Familia Vota v. Fontes*, CV-22-00509-PHX-SRB, 2024 WL 862406
    (D. Ariz. Feb. 29, 2024) *(Vota II)*.....................................................................9, 10

*Moore v. Harper*, 142 S. Ct. 1089 (2022) .......................................................11

*National Association for the Advancement of Colored People v. State of Alabama ex rel.*
    *Patterson*, 357 U.S. 449 (1958) .............................................................17

*National Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015) ...................16

*North Carolina Alliance for Retired Americans v. Hirsch*, 5:24-cv-275-D,
    2024 WL 3507677 (E.D.N.C. July 19, 2024) ........................................14

*North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999)..........15

*North Carolina State Conference of the National Association for the Advancement of*
    *Colored People v. Bipartisan Board of Elections & Ethics Enforcement*,
    No. 1:16CV1274, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018)...........................17

*North Carolina State Conference of the National Association for the Advancement of*
    *Colored People v. Cooper*, 430 F. Supp. 3d 15 (M.D.N.C. 2019) ..........................19

*North Carolina State Conference of the National Association for the Advancement of*
    *Colored People v. North Carolina State Board of Elections*, No. 1:16CV1274,
    2016 WL 6581284 (M.D.N.C. Nov. 4, 2016) ....................................5, 14

*North Carolina State Conference of the National Association for the Advancement of*
    *Colored People v. Raymond*, 981 F.3d 295 (4th Cir. 2020) ...............................14, 17

*People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of Western*
    *Maryland, Inc*, 843 F. App'x 493 (4th Cir. 2021) .......................................14

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ...............................................10, 11

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ...............13

*Secretary of the Interior v. California*, 464 U.S. 312 (1984) .......................................13

*Texas League of United Latin American Citizens v. Whitley*, No. SA-19-CA-074-FB,
    2019 WL 7938511 (W.D. Tex. Feb. 27, 2019) .........................................9

*United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012)...............................3, 10

*United States v. Gonzalez*, 520 U.S. 1 (1997)...................................................8

*United States v. State of Alabama et al.*, No. 2:24-cv-01329 (N.D. Ala. October 16, 2024)..........1

*United States Student Association Foundation v. Land*, 546 F.3d 373 (6th Cir. 2008)...............8, 9

*Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002)...........11

*Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021) ............................................................13

*Wise v. Circosta*, 978 F.3d 93 (4th Cir. 2020) ...........................................................................11

**Statutes and Constitutional Provisions**                                     **Page**

18 U.S.C. § 611 ...........................................................................................................................19

52 U.S.C. § 10101(a)(2)(A) ...........................................................................................................9

52 U.S.C. § 20505(a)(1)-(2) ........................................................................................................18

52 U.S.C. § 20507(a)(2) .................................................................................................................8

52 U.S.C. §§ 20507(b) ................................................................................................................20

52 U.S.C. § 20507(b)(2) ................................................................................................................7

52 U.S.C. § 20507(c)(1) .................................................................................................................5

52 U.S.C. § 20507(c)(2)(A) .............................................................................14, 5, 6, 7, 8, 20

52 U.S.C. § 20507(d)(1)(B)(ii) ......................................................................................................5

52 U.S.C. § 20508(b)(2)(A)-(B) ..................................................................................................18

52 U.S.C. § 20510(b)(3) ..............................................................................................................11

Va. Code § 24.2-104(A) ..............................................................................................................12

Va. Code Ann. § 24.2-404 ...........................................................................................................19

Va. Const. art. II, § 1 ..................................................................................................................19

**Other Authorities**                                                          **Page**

H.R. Rep. No. 103-9 (1993)...........................................................................................................5

*Ineligible*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ineligible. ...............6

*Summary of Virginia Registration & Turnout Statistics*, Virginia Department of Elections, https://www.elections.virginia.gov/resultsreports/registrationturnout-statistics/ (last visited 10/23/2024)................................................................................................................................18

*Voter*, Merriam-Webster, https://www.merriam-webster.com/dictionary/voter..............................6

<h1 style="text-align:center">PRELIMINARY STATEMENT</h1>

The record evidence and Defendants' own submissions make clear that their voter removal program patently violates the NVRA. The NVRA's federal deadline for systematic list maintenance governs:

> A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

52 U.S.C. § 20507(c)(2)(A). As an Alabama District Court held just last week: "For decades, federal law has given states [this] hard deadline to complete systematic purges" and state officials who "blew the deadline" must be enjoined under the NVRA. *United States v. State of Alabama et al.*, No. 2:24-cv-01329 (N.D. Ala. October 16, 2024) (enjoining Alabama's purge program for violating NVRA Quiet Period). Defendant Beals similarly "blew the deadline" here.

Defendants' own documents and declarations make crystal clear that the state's Purge Program is ordinary "list maintenance" of registration rolls—indeed, that is what they explicitly call it. Defendants' Exhibit 92-8, aptly titled "Voter Registration List Maintenance," outlines— complete with detailed flow charts—the systems, processes, and steps by which ELECT shares data with the DMV to evaluate citizenship and voter eligibility. And on October 16, 2024, Defendant Beals issued an ELECT advisory which provided an "Updated List Maintenance Calendar." Defs' Ex. J, ECF No. 92-13. In that advisory, she stated that "All statutorily required list maintenance records from state agencies, including noncitizens and felons, have been processed to registrars' hoppers as of October 14, 2024." Per Virginia Code, the regular registration deadline has now passed, as such, ELECT will not process any additional records to your hoppers until after the election[.]" *Id*. Defs' Ex. J, ECF No. 92-13 (emphasis in original). The problem is that Defendants gave themselves a deadline of October 14, 2024, far too late to comply

with the NVRA. Add to that the fact that Defendants admit they are using SAVE database checks only on registrants with records of birth abroad, even when those individuals have affirmed they are citizens both in DMV interactions and on their voter registration forms. Courts have found such systems to discriminate on the basis of natural origin.

Defendants try to sidestep these clear violations of federal law by invoking *Purcell*. But if there were ever a case where that doctrine should categorically not apply, it is here, where Congress expressly authorized suits within 30 days before an election, where Defendants stonewalled Plaintiffs prior requests for documents and information about their Purge Program, and where Plaintiffs filed suit on the first day permissible under the NVRA's pre-election period. No court has ever applied *Purcell* to bar suit under such circumstances and doing so would override express congressional intent permitting injunctive relief.

The harms produced by this program are manifold. Within 24 hours of receiving from the Commonwealth data that they have been seeking since mid-August, Plaintiffs have identified members of their organizations who have been improperly purged by Defendants' policies. County recorders have further attested to the confusion and errors caused by the application of the Purge Program in the chaotic period so close to an election. Because the other equitable factors all weigh in their favor, Plaintiffs respectfully request a preliminary injunction as soon as practicable.

## I.     The Purge Program plainly violates the NVRA's 90 Day Provision.

### A.     The Purge Program is systematic.

There is no valid way to construe Defendants' own evidentiary submissions describing their "Voter Registration List Maintenance" systems as anything other than a systematic removal program. As described in the accompanying declarations and documents, the DMV and ELECT follow a systematic, largely automatic procedure to initiate notice and removal for individuals

flagged by the database matching program. Ms. Coles states that "ELECT receives from the DMV data listing information for all persons who declare that they are not citizens of the United States on DMV forms related to eligible transactions." ECF No. 92-1 (Coles Decl.) ¶ 4. ELECT then "electronically compares the information" to the voter file and sends those matches to county registrars. *Id.* ¶ 6. From there, after doing nothing more than potentially conducting a check to see if the registered voter is the same person as the individual flagged in the DMV record, the county registrar is directed to "mail[] the individual a Notice of Intent to Cancel." *Id.* ¶ 8. Such database-matching, notice, and cancellation provisions are materially identical to the programs enjoined in prior cases enforcing the NVRA's Quiet Period. *See, e.g.*, *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012); *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077 (D. Ariz. 2023); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014). "[I]f [Defendants'] process here is not a program within the meaning of the National Voter Registration Act, it's difficult . . . to imagine what would qualify as a program." No. 1:24-cv-01807, ECF No. 9-22; *id.* ECF No. 9-23.

Defendants argue that because "DMV forwards the names of *individual[s]*" flagged by the data sharing agreement between ELECT and DMV, the Purge Program is "individualized." ECF No. 92 at 30. That cannot be right. By definition, every removal program involves individuals because only individuals can register to vote. The fact that each of the "1,274 potential matches" flagged by the Purge Program is a literal individual clearly cannot satisfy the "rigorous individualized inquiry" contemplated in *Arcia*. 772 F.3d at 1346. Defendants suggest that individuals are "declared noncitizens" if they populate as a match in the DMV database, but that is also incorrect. Every such individual would have had to declare their *citizenship* in order to register to vote. So, at most, the state would have inconsistent information based on the DMV and voter registration forms—to say nothing of the inherent false positive problems with database

matching. Defendants' declarations do not state the timeframe in which the DMV transactions occurred, so individuals may have naturalized after completing the form. Moreover, Defendants' Purge Program does not account for mistakes in completing the form. The statements of the Prince William County registrar as well as Dr. McDonald's declaration reveal how common such out-of-date documentation and form-completion mistakes are and how ordinary eligible citizens are swept up by the Purge Program. *See* ECF No. 26 at 1718. Of course, a state need not *ignore* inconsistent information about a voter's citizenship and can conduct a systematic program to review ineligible voters. But it must comply with the NVRA, including the requirement that any such program be completed 90 days prior to an election.

Defendants further concede that they conducted a SAVE database matching process in late August after the Quiet Period commenced. ECF No. 92 at 8-9. This is precisely the sort of systematic database matching program that *Arcia* and *Mi Familia Vota* found must be completed before the Quiet Period. 772 F.3d at 1344 ("Certainly, it is telling that the database that Secretary Detzner used before the general election—SAVE—stands for *Systematic* Alien Verification for Entitlements."); *Mi Familia Vota*, 691 F. Supp. 3d at 1093. Nothing in the submitted declarations or documents distinguishes Defendants' use of the SAVE program from the cases where comparable removal programs were found to violate the NVRA during the Quiet Period. Indeed, E.O. 35 explicitly refers to the SAVE database as the source for citizenship information relied upon by the DMV. E.O. 35 at 2, 4.

Defendants next suggest that the *individual voter* has an opportunity to conduct an individualized review of their own eligibility after receiving the automatic notice. ECF No. 92 at 31. Again, this wholly misconstrues the statute and precedent. Congress put the burden on the "*State* [to] complete . . . any program" to remove ineligible voters within 90 days of an election–

not on the voter to ensure they remain registered. 52 U.S.C. § 20507(c)(2)(A) (emphasis added).

Defendants' reliance on *Husted v. A. Philip Randolph Institute*, 584 U.S. 756, 779 (2018)*,* is also

misplaced. *Husted* did not involve the 90 day provision. Further, *Husted* examined a cancellation

system explicitly provided for in the NVRA, *see id.* at 765; 52 U.S.C. § 20507(c)(1), and which

was only triggered after a voter did not participate in two consecutive federal elections—a window

stretching over years, *see id.* § 20507(d)(1)(B)(ii). That is a far cry from being purged shortly

before an election for failure to respond to a notice letter within 14 days. Courts have enjoined

comparable programs involving some form of individualized notice as systematic under the

NVRA. *See Arcia*, 772 F.3d at 1344; *N.C. State Conf. of NAACP v. N.C. State Bd. of Elections*,

No. 1:16CV1274, 2016 WL 6581284, at *6-7 (M.D.N.C. Nov. 4, 2016) (program based on mass

mailing to individual voter registrants was not "individualized" even where a county conducted its

own research before sending); *Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d 1348,

1355 (M.D. Ga. 2020) (requiring certain voters identified from database checks to "present

additional evidence . . . to vote" did not equal "the individualized inquiry required by the NVRA").

The legislative history Defendants cite does not support them either. If door to door

canvassing is insufficient to count as individualized as Defendants note, then certainly a letter

under the same premises would also not be individualized. H.R. Rep. No. 103-9, at 16 (1993); ECF

No. 92 at 28.

B. The NVRA's Quiet Period covers Defendants' Purge Program.

Defendants next pivot to a novel interpretation of the 90 day provision and suggest it

applies only to certain types of removal programs rather than to "any program" as stated in the text

of the statute. § 20507(c)(2)(A). Defendants appear to have abandoned their prior interpretation

that the Purge Program was permissible as a "correction" under the NVRA, relegating that

interpretation to a footnote and thereby waiving it. They now contend that the Quiet Period only applies to removal of voters who were at one point qualified to vote but no longer are. ECF No. 92 at 23. But the text of the statute says nothing of the sort.

The parties agree that "context" matters when interpreting words and can "'often provide[] invaluable clues to understanding the[ir] meaning.'" ECF No. 92 at 23 (citing *United States v. Smith*, 919 F.3d 825, 837 (4th Cir. 2019)). Defendants' novel interpretation fails in part because it ignores the context of the sentence: "A State shall complete [90 days prior to an election] any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." § 20507(c)(2)(A). Defendants suggest that the term "voter" carries an inherent meaning of a person who "has the legal right to vote." ECF No. 92 at 24 (citing *Voter*, Merriam-Webster, https://www.merriam-webster.com/dictionary/voter). But that definition makes particularly little sense in the context of the statutory sentence, which refers specifically to "ineligible voters." Merriam-Webster's definition of "ineligible" is "not qualified for an office or position." *Ineligible*, *supra*, https://www.merriam-webster.com/dictionary/ineligible. Defendants' proposed definition of "voter" is incorrect because importing it glibly into the statute would result in a direct contradiction in terms. The phrase "ineligible voters" would become "a person not qualified to vote who has the legal right to vote." That cannot be what Congress meant.

Defendants try to salvage their interpretation by suggesting that "ineligible voters" means someone who *once* had the legal right to vote but is *no longer* qualified. ECF No. 92 at 24. But that is quite the logical leap and is not what the text of the statute actually says. Defendants are functionally proposing new language to amend the statute: "A State shall complete [90 days prior to an election] any program the purpose of which is to systematically remove the names of ***previously eligible voters who are now ineligible*** from the official lists of ***voters qualified to***

*register*." That is an exercise in legislation, not statutory interpretation. The fact that Defendants' interpretation requires extratextual editing should weigh significantly against it. "If Congress wanted such a limited result, it could have said so." *Arcia*, 772 F.3d at 1348.[1] And "[t]he fact that Congress did not expressly include removals based on citizenship in its exhaustive list of exceptions to the 90 Day Provision is good evidence that such removals are prohibited." *Id.* at 1345; *see also Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-617 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

More broadly, Defendants' contention that improperly registered noncitizens or minors are not "voters" is at odds with their argument later in the brief that "[e]very illegal vote cancels out a valid vote." ECF No. 92 at 37. If Defendants were correct that such individuals "are not 'voters' at all," *id.* at 25, then there could be no cause for any concern. Of course Defendants' actual concern is a risk of "***voting***" by "***ineligible voters***." Their interpretation of the NVRA suggesting that such persons would not be "voters" therefore fails as a matter of logic. Everyone agrees that noncitizens on the rolls, to the extent they exist, are "ineligible voters." But the NVRA's overarching purpose is to ensure that eligible voters remain registered, ineligible voters are removed, and that any removal processes do not improperly disenfranchise eligible voters.

Defendants' interpretative somersaults are entirely unnecessary given the straightforward use of similar terms throughout the statute. Section 20507(b)(2), for instance, refers to the "official list of voters registered to vote in an election for Federal office[.]" The most natural reading is

---

[1] Defendants' hypothetical about a cell phone company demonstrates the required interpretative contortions while illustrating the opposite point. The ordinary meaning of the term "customer" would encompass anyone interested in purchasing service with the company whether or not they already had a cell phone. If the company meant only to offer a promotion to *existing* customers, it would need to make that requirement explicit in the contract of service.

simply that the "official list of voters" refers to the people registered to vote for an election for Federal office. Both Congress and the states recognize that individuals on the list may be "eligible" or "ineligible" for a variety of reasons and that states should conduct programs to maintain the integrity of their voter rolls. Those list maintenance programs are permissible under the NVRA subject to certain conditions including, as pertinent here, the requirement that "any program" be completed 90 days prior to an election. § 20507(c)(2)(A).

Finally, Defendants suggest that the 90 day provision should be read as coterminous with the General Removal Program described in §20507(a). ECF No. 92 at 25-26. But by its terms, the 90 day provision (§20507(a)(2)) covers "any" program, not the "general program" described in §20507(a). Courts cannot read in a limitation Congress did not include. *See United States v. Gonzalez*, 520 U.S. 1, 5 (1997) (finding that "'any' has an expansive meaning," namely, "one or some indiscriminately of whatever kind.") (cleaned up). Defendants seek to raise the specter of constitutional avoidance, but the General Removal Program is simply not implicated in this case. No party has argued that Virginia may not set voter qualifications, nor that it is altogether prohibited from removing noncitizens from registration rolls.

Defendants' reliance on *Bell v. Marinko*, 367 F.3d 588, 592 (6th Cir. 2004) is likewise misplaced and supports Plaintiffs. Plaintiffs agree *Marinko* makes clear that the NVRA permits removal of ineligible voters from the rolls, even if they were never eligible. *Id.* But *Marinko* did not involve the 90 day provision and thus *Marinko* simply reaffirms that Defendants can maintain a uniform and nondiscriminatory program to remove noncitizens from the rolls, but not that may do so within 90 days of an election. Further, the difference between the removal program at issue in *Marinko* and that here is illustrative. *Marinko* involved individualized hearings regarding eligibility. *Id*. at 589-591. The Sixth Circuit itself recognized this in *U.S. Student Association*

*Foundation v. Land*, 546 F.3d 373 (6th Cir. 2008), noting that the removals in *Marinko* were permissible because they followed investigations and hearings in which ineligibility was individually determined. Defendants' Purge Program provides no such individualized process.

## II.     The Purge Program is nonuniform and discriminatory in violation of the NVRA.

Defendants admit that they have used stale documents from the DMV showing noncitizenship to implement a removal program. *See* ECF No. 92-2 (Koski Decl.) ¶ 19. They have also admitted to using SAVE as part of its removal program. *See id.* Both the 2024 MOU and E.O. 35 formalize the use of SAVE as part of the data sharing agreement between DMV and ELECT. Thus, Defendants must admit that the program classifies on the basis of national origin because only people born outside of the United States will be subject to it.

The District of Arizona reached a similar holding that a state statutory provision "requir[ing] county recorders to search" the SAVE database "only for naturalized voters who county recorders suspect are not U.S. citizens" was unlawful because it "subject[ed] only naturalized citizens to database checks." *Mi Familia Vota v. Fontes (Vota II)*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *38 (D. Ariz. Feb. 29, 2024). As the court explained, this use of the SAVE database effectively meant that only "[n]aturalized citizens will always be at risk" of removal from this process, in violation of the requirement that state officials refrain from applying discriminatory practices in determining who is qualified to vote. *Id.*; *see also* 52 U.S.C. § 10101(a)(2)(A); *Tex. League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-074-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019) (finding Texas's program likely violated the NVRA by "burden[ing]" naturalized voters with "ham-handed and threatening correspondence from the state," while "[n]o native born Americans were subjected to such treatment.").

Defendants incorrectly suggest that Plaintiffs rely on a disparate impact theory when the

basis for the claim is the Purge Program's method of classification. ECF No. 92 at 34. Though Defendants suggest that they last used SAVE matching in an "ad hoc" process this past August, it is not at all clear that they have never used SAVE database matching to conduct systemic purges previously. *See* ECF No. 92-1 (Coles Decl.) ¶ 22. ("DMV information for individuals whose legal presence documentation on file indicates noncitizenship *usually* does not reach the general registrars") (emphasis added). SAVE matching and data sharing is described in both the 2021 and 2024 MOUs as well as in E.O. 35. ECF No. 26-3.

The overall point, however, is that Defendants agree they use SAVE and that the triggering condition for a SAVE check is evidence of foreign birth. Defendants admit that they accept a registrant's affirmation that they are a citizen in a DMV transaction *unless* the individual has a document indicating foreign origin. This means that an individual will be flagged even if they have consistently attested to citizenship at both the DMV and on their voter attestation form. That is discriminatory classification because the trigger for the check is something only naturalized citizens will be subject to versus natural-born citizens. "A state cannot properly impose burdensome [voter registration] demands in a discriminatory manner," *Florida*, 870 F. Supp. 2d at 1350, including by adopting national origin classifications that inequitably burden naturalized voters. *See Vota II*, 2024 WL 862406, at *22 (describing that because the state motor vehicle division "does not issue foreign-type credentials to native born citizens, only naturalized citizens will ever be misidentified as non-citizens.").

III.    ***Purcell* doctrine is inapplicable to this case.**

Defendants' dependance on the doctrine articulated in *Purcell v. Gonzalez* simply because an election is close is wrong. 549 U.S. 1 (2006). The *Purcell* doctrine is a judicial doctrine that seeks to avoid judicially created confusion in certain circumstances, "especially [from] conflicting

orders," that would "alter state election laws in the period close to an election." *See id.* at 7; *Moore v. Harper*, 142 S. Ct. 1089, 1089 (2022) (Kavanaugh, J., concurring).

Defendants' argument fails primarily because the statutory language of the NVRA specifically enables swift litigation to ensue within 30 days of an election. 52 U.S.C. § 20510(b)(3). The Purcell doctrine does not nullify the NVRA's protections against last minute voter purges. *See Purcell*, 549 U.S. 1 (2006). Under Defendants' construction, the 90 day quiet period would be entirely unenforceable, allowing states carte blanche to completely change their list maintenance procedures during the quiet period if an election is near, as Virginia did here. That is why none of the case law cited by Defendants involves the NVRA's 90 day quiet period. *See cf. Wise v. Circosta*, 978 F.3d 93, 99-100 (4th Cir. 2020) (finding *Purcell* counseled against enjoining a state court consent judgment based on plaintiffs' challenges on constitutional grounds.). The last minute nature of these procedures is entirely of Defendants' making and *Purcell* cannot be construed to reward their violation of the NVRA within the 90 day quiet period.

IV.     **Defendants are proper parties to this lawsuit under *Ex parte Young*.**

Under *Ex parte Young*, when a plaintiff seeks injunctive relief to remedy an ongoing violation of federal law, and names as defendant a state official who has "some connection" to enforcement of the challenged law, the state official is not entitled to sovereign immunity. 209 U.S. 123, 157 (1908). In determining whether *Ex parte Young* applies, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997). "[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Id*. at 646.

Defendants claim that the *Ex parte Young* exception to sovereign immunity does not apply to Defendant Beals because they argue ELECT has halted the Voter Purge Program from October 15 until after the November 5 General Election. ECF No. 92 at 21. But, in fact, Defendants concede that the Voter Purge Program is ongoing and has not been permanently halted. *Id*. ELECT's referrals under the Program will not only continue after the election, but the 14-day period to return an affirmation of citizenship form or VERIS's 21-day "grace period" to return the form prior to cancellation are still ongoing. ECF No. 92 at 10. Therefore, cancellations will continue between now and Election Day. Recent discovery demonstrates that voters have continued being canceled after October 15.

Defendants also argue that the Attorney General is not a proper party to the lawsuit because they incorrectly claim he "plays no role" in the Voter Purge Program. In *Ex parte Young*, which also involved a suit brought against an attorney general defendant, the Court explained that, in determining whether a state official is a proper defendant, "the important and material fact" is "that the state officer, by virtue of his office, has some connection with the enforcement of the act[;]" and whether the connection "arises out of the general law, or is specially created by the act itself, is not material so long as it exists." *Id*. at 157. The Court ultimately found that the attorney general in the case was a proper party because, he, under "power existing at common law, and by virtue of . . . various statutes, had a general duty imposed upon him, which include[d] the right and the power to enforce the statutes of the state . . ." *Id*. at 161.

Similarly here, Virginia law gives the Attorney General "full authority to do whatever is necessary or appropriate to enforce the election laws or prosecute violations thereof." Va. Code § 24.2-104(A); E.O. 35 at 4; ECF No. 23 at 16. In addition, as alleged in Plaintiffs' Amended Complaint, the Attorney General endorsed the Voter Purge Program, claimed credit for E.O. 35's

announced purge of 6,303 alleged noncitizens, actively investigates voters purged by the Program, and counties like Arlington County refer voters purged by the Program to him for criminal investigation and potential prosecution. ECF No. 23 at 16. Thus, the Attorney General is a proper defendant under *Ex parte Young*'s exception to sovereign immunity. *See also Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535, 544 (2021).

## V.    Plaintiffs have demonstrated organizational and associational standing.

As an initial matter, this Court need not address Defendants' various standing challenges to Private Plaintiffs' claim with respect to the NVRA 90 day quiet period. It is well-established that "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006); *see also Horne v. Flores*, 557 U.S. 433, 445 (2009) ("the critical question is whether at least one petitioner has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.") (internal quotations and emphasis omitted); *Bowsher v. Synar*, 478 U.S. 714, 715 (1986) (addressing standing by plaintiffs in consolidated cases); *Sec'y of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) (applying same principle in litigation "instituted through separate but similar complaints"); *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 209 (4th Cir. 2020). Both Private Plaintiffs and the United States have alleged a 90 Day Provision violation, *see* ECF 26; No. 24-cv-01807, ECF No. 9-1 at 10, a claim no party disputes that the United States has standing to bring. Therefore, any dispute regarding standing is limited to Plaintiffs' second claim on the uniform and nondiscriminatory provision violation.

Regardless, Plaintiffs have both direct organizational and associational standing. As to organizational standing, *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), re-affirmed that when defendants' "actions directly affect[] and interfere[] with [plaintiffs'] core

business activities," organizational plaintiffs suffer an injury in fact. *Id.* at 395. Just as in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), Plaintiffs not only engage in issue advocacy but also provide direct services: instead of *Havens'* housing counseling, Plaintiffs provide *voting* counseling. *See FDA*, 602 U.S. at 395. Defendants' Purge Program "directly affect[s] and interfere[s] with" Plaintiffs' core activities of direct voter registration assistance, including by requiring them to identify and reregister purged voters and ensure previously active voters remain active and registered. *Id.*; *see* ECF No. 26-24 (Porte Decl.) ¶¶ 2, 5-25; ECF No. 26-25 (Traore Decl.) ¶¶ 12-16; ECF No. 26-23 (Sarmiento Decl.) ¶¶ 5, 12. Courts routinely recognize that policies that directly harm voter registration activities also harm organizations providing voter registration assistance—including since *FDA*.[2]

Defendants misunderstand both *FDA* and the nature of Plaintiffs' injury. Both *FDA* and Fourth Circuit precedents have carefully distinguished between resource diversion designed to manufacture standing and uncompelled budgeting choices on the one hand, *see FDA*, 602 U.S. at 394-95; *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020), and resource expenditures and compliance costs that must be incurred in order to continue conducting core organizational activities on the other, *see Havens*, 455 U.S. at 379. *See also PETA v. Tri-State*

---

[2] *See, e.g.*, *Get Loud Ark. v. Thurston*, No. 5:24-CV-5121, 2024 WL 4142754, at *13 (W.D. Ark. Sept. 9, 2024) (recognizing impairment to "registering voters" and "assisting voters who have been purged from voter rolls" as supporting organizational standing under *FDA*); *La Union Del Pueblo Entero v. Abbott*, 2024 WL 4488082 (W.D. Tex. Oct. 11, 2024), *stayed on other grounds*, 2024 WL 4487493 (5th Cir. Oct. 15, 2024); *March for Our Lives Idaho v. McGrane*, 2024 WL 4226912 (D. Idaho Sep. 17, 2024) (finding organization injury when the challenged law "increased [plaintiff's] costs for its core activities of educating and registering voters" consistent with *FDA*); *N.C. All. for Retired Ams. v. Hirsch*, 2024 WL 3507677 (E.D.N.C. July 19, 2024) (reiterating, even in light of *FDA*, that diverting resources away from "planned voter-mobilization, voter-protection, and voter-education activities . . . in order to investigate, respond to, mitigate, and address the concerns of [] members" could support organizational standing if shown) (quoting *N.C. State Conf. of NAACP v. N.C. State Bd. of Elections*, 283 F. Supp. 3d 393, 402 (M.D.N.C. 2017).

*Zoological Park of W. Md., Inc.*, 843 F. App'x 493, 496 (4th Cir. 2021); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 182 (M.D.N.C. 2020) ("Organizational standing requires impaired ability to provide its intended services, including a drain of resources."). It would be impossible for Plaintiffs to provide their core voter registration services to their naturalized-citizen members and other naturalized Virginians without ensuring those voters have not been swept up in the Purge Program and assisting those who have. Indeed, no amount of resource diversion will allow Plaintiffs to ensure that all the individuals it has helped register and encouraged to vote will remain able to do so under the Purge Program. *See* ECF No. 26-24 (Porte Decl.) ¶¶ 27, 29, 39; ECF No. 26-25 (Traore Decl.) ¶¶ 17, 19-21; ECF No. 26-23 (Sarmiento Decl.) ¶¶ 18-19. That is a far cry from diverting resources simply to "advocate against the defendant's action." *FDA*, 602 U.S. at 394. Thus, Defendants' attempt to refashion that impairment of Plaintiffs' voter assistance services, and its "consequent drain on the organization's resources," into mere voluntary diversion of resources runs squarely into the core of *Havens*, which *FDA* explicitly reaffirmed. *Havens*, 455 U.S. at 379; *see FDA*, 602 U.S. at 395.

Plaintiffs also have associational standing because at least one their members has standing to sue in their own right. *Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 181 (2000). At least one member of Plaintiffs League of Women Voters of Virginia appears on the Purge List, but that individual does not wish to be identified. Ex. AA (Supp. Porte Decl.) at ¶¶ 3–5.

Additionally, when members are faced with a credible threat of criminal prosecution for simply having exercised or exercising their right to vote or are faced with the risk of being purged, organizations must have standing to vindicate the fundamental rights of their members. *See N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999); *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1160-61 (11th Cir. 2008); *Arcia*, 772 F.3d at 1342 (finding that the "risk

of false positives and mismatches" in voter registration removals created a "realistic danger" that organizational plaintiffs' naturalized-citizen members would be misidentified, conferring associational standing without requiring the organizations to identify specific injured members). As membership organizations composed of naturalized citizens and U.S. born citizens, Plaintiffs' members seeking to exercise their suffrage rights are threatened with both the threat of criminal prosecution and the threat of being purged. *See* ECF No. 26-24 (Porte Decl.) ¶ 40; ECF No. 26-25 (Traore Decl.) ¶¶ 21-22. Similar to the three organizational plaintiffs in *Arcia*, Plaintiffs represent "represent a large number of people" that "face a realistic danger of being identified" by Defendants removal program, thus creating "a high probability that at least one of the members" will be subject to the faulty and last minute nature of the Purge Program. 772 F.3d at 1342.

Defendants fault Plaintiffs for not naming specific members in its complaint, ECF No. 92 at 17-18, but publicly naming naturalized-citizen members is neither necessary nor prudent here. Plaintiff League of Women Voters of Virginia has already confirmed that one of its members appears on the Purge List, *see* Ex. AA ¶ 3, and given the many naturalized-citizen members among Plaintiffs' ranks (or, for VACIR, among its member organizations' ranks), *see* ECF No. 26-25 (Traore Decl.) ¶ 8; ECF No. 26-24 (Porte Decl.) ¶ 4; ECF No. 26-23 (Sarmiento Decl.) ¶ 5-6, the "common sense inference is strong enough to lead [Plaintiffs] reasonably to believe that" that other members have been or are at risk of being purged, subject to prosecution, or deterred from voting. *See Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 270 (2015); *Democratic Party of Va. v. Brink*, 599 F. Supp. 3d 346, 355 n.10 (E.D. Va. 2022) (citing *ALBC*, 575 U.S. at 270) ("[A] prominent political organization need not identify individual members so long as a reasonable inference can be drawn that such individuals exist."); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015). What's more, given that Plaintiffs brought this suit in part to

protect their members from Defendants' threats of prosecution and attendant intimidation, the value of disclosure, which is minimal, should be weighed against the "repressive effect" that public disclosure of membership might have. *NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449, 463 (1958); *see, e.g.*, ECF No. 26-25 (Traore Decl.) ¶ 11 (describing risk of "doxxing, harassment, intimidation, or other adverse ramifications" from membership disclosure).

## VI.     An injunction is necessary to prevent irreparable harm.

Plaintiffs have demonstrated that eligible voters' fundamental voting rights are and will continue to be irreparably harmed by Defendants Purge Program absent an injunction. *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1272 (11th Cir. 2020); *Raymond*, 981 F.3d at 302. Plaintiffs have presented uncontested evidence that Defendants have operated a flawed Purge Program, including within the 90 day quiet period, that has erroneously flagged eligible citizens, causing them to be removed from the Commonwealth's voter rolls, and referred for criminal prosecution to the local Commonwealth Attorney and the Attorney General. *See* ECF Nos. 26-9, 26-11 at 7, 26-12, 26-13 at 3. Defendants' program directly harms the rights of their naturalized citizen members and the organizations themselves.

Defendants assert that, despite harming the rights of their citizens by treating fundamental suffrage rights differently depending on where a citizen is born, no irreparable harm can be found, because they claim "Virginia is not prohibiting a single eligible citizen from voting in the 2024 election." ECF No. 92 at 36. In Defendants' view, no citizen can be irreparably harmed by their Program so long as they are ultimately able to vote provisionally. *See id.* However, this framing misses the mark in terms of the burden created by Defendants and the harm inflicted. *See N. C. Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16CV1274, 2018 WL 3748172 at *13 n.11 (M.D.N.C. Aug. 7, 2018) (finding that being offered a provisional ballot

could not cure the violation caused by the cancellation of a voter's registration in violation of the NVRA).

Defendants' theory of provisional ballots also does not take into consideration the harms both currently registered voters and removed registered voters have experienced. For registered voters that may be swept into Defendants' Program, including those with DMV transactions and naturalized citizens, that includes facing the threat of being removed from the voter rolls *and* being criminally investigated, as well as constantly re-verifying registration and general voter confusion. ECF No. 23 at 10-15; ECF No. 26-1 at 6-8. Voters already removed from the voter rolls face similar and active threats, as well as being burdened with additional procedural hurdles that will prevent some from being able to participate in the democratic process as any other citizen, such as being able register to vote by the registration deadline or to submit a mail-in ballot. *See* ECF No. 26-1 at 23-24.

Defendants venture into a hypothetical in which an absentee voter is not able to vote due to their Program. ECF No. 92 at 36, n. 9. However, far from being "fanciful," Defendants' hypothetical is exactly the kind of harm that is a near certainty to occur to thousands of voters that must vote absentee in 2024 in light of the over 2.5 million that did vote absentee in the last presidential elections. *See id.*; *Summary of Virginia Registration & Turnout Statistics*, Virginia Department of Elections, https://www.elections.virginia.gov/resultsreports/registrationturnout-statistics/ (last visited 10/23/2024). Finally, for any suspected "noncitizen" voter that is able to submit a provisional ballot, Defendants offer few assurances that their vote will count without having to jump through additional hoops prohibited by the NVRA to prove they are indeed citizens. *See* ECF No. 92 at 37; *Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1 (2013); *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016); 52 U.S.C. §§ 20508(b)(2)(A)-(B), 20505(a)(1)-(2).

Plaintiffs' members and the organizations themselves have demonstrated that, barring an injunction from the Court, they will be irreparably harmed due to the Purge Program. The Purge Program continues to threaten Plaintiffs' members with both the threat of criminal prosecution and the threat of being purged. *See supra*. Organizational Plaintiffs have civic participation and education as core tenants of their missions and the Purge Program uniquely impacts their ability to serve their members and audiences. Courts have found that similar plaintiffs in voting rights cases would be irreparably harmed without a preliminary injunction. See *N.C. State Conference of NAACP v. Cooper*, 430 F. Supp. 3d 15, 51 (M.D.N.C. 2019) ("organizations with core voter-advocacy missions, like Plaintiffs in this case, are irreparably harmed when 'the defendant's actions perceptibly impair the organization's programs, making it more difficult to carry out its mission.'") (quoting *Action NC v. Strach*, 216 F. Supp. 3d 597, 642 (M.D.N.C. 2016)). Since the inception of the Purge Program, Plaintiffs have been forced to act to protect their members and groups they serve from being disenfranchised from the general election. *See* ECF No. 26-24 (Porte Decl.) ¶¶ 26-40; ECF No. 26-25 (Traore Decl.) ¶¶ 17-22; ECF No. 26-23 (Sarmiento Decl.) ¶¶ 14-20. This has severely impaired their ability to fulfill their programmatic goals for the year, especially as it relates to engaging with voters ahead of the general election. *See id.* Despite Defendants' assertions that the program is no longer ongoing, the threat remains and Plaintiffs continue to respond to the effects of the Purge Program.

Nothing Plaintiffs argue or propose suggests that noncitizens are eligible to vote or that Defendants must re-enroll noncitizens. Federal and Virginia law already prohibit noncitizens from voting. Va. Const. art. II, § 1; Va. Code Ann. § 24.2-404; 18 U.S.C. § 611. What Plaintiffs do contend is that Defendants may not alter their voter registration procedures on the 90th day, or within the 90 day quiet period, before an election, in a manner that systematically targets a subset

of voters and adds additional burdens on those voters to prove they are eligible to vote. As this Circuit has explained and Defendants note (ECF No. 92 at 38), "there can be no do-over and no redress" for this injury to legal voters "once the election occurs." *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). In recognition of the irreparable harm Plaintiffs bear at the hands of Defendants' Purge Program, the court must enjoin their ongoing program.

## VII.   The balance of equities and public interest favor an injunction.

In this case, Congress has balanced the equities: removal programs conducted within 90 days of an election risk disenfranchisement and are prohibited. Absent preliminary relief, the quiet period would be largely unenforceable. As another court recently held in a similar case involving a removal program within 90 days of the 2024 election, "the equities counsel strongly in favor of preliminary injunctive relief." ECF No. 91-1, *Alabama Coal. for Immigrant Justice v. Allen*, No. 24-CV-01254 (N.D. Ala. Oct. 22, 2024), at 16:16-17.

Plaintiffs only seek enforcement of longstanding federal law: that list maintenance be uniform and nondiscriminatory, and that programs the purpose of which is to remove voters from the rolls be completed before the 90 day quiet period. 52 U.S.C. §§ 20507(b), (c)(2)(A). Defendants inexcusably waited until 90 days before an election to launch this program. Particularly given that fact, Defendants' complaints about Plaintiffs' timing ring hollow in the balance of equities.

## CONCLUSION

This Court should grant Plaintiff's motion for preliminary injunctive relief.

Date: October 23, 2024                    Respectfully submitted,

                                          /s/ Shanna Ports
Ezra D. Rosenberg**                       Shanna Ports (VSB No. 86094)

Ryan Snow**
Javon Davis**
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street, NW, Ste. 900
Washington, DC 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
rsnow@lawyerscommittee.org
jdavis@lawyerscommittee.org

Danielle Lang**
Kevin Hancock**
Brent Ferguson**
Simone Leeper*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
sports@campaignlegalcenter.org
dlang@campaignlegalcenter.org
khancock@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
sleeper@campaignlegalcenter.org

Orion Danjuma**
John Paredes**
THE PROTECT DEMOCRACY PROJECT, INC.
82 Nassau Street, # 601
New York, NY 10038
Telephone: (202) 579-4582
orion.danjuma@protectdemocracy.org
john.paredes@protectdemocracy.org

John Powers**
Hani Mirza**
ADVANCEMENT PROJECT
1220 L Street Northwest, Suite 850 Washington,
D.C. 20005
(202) 728-9557
jpowers@advancementproject.org
hmirza@advancementproject.org

Benjamin L. Berwick**
THE PROTECT DEMOCRACY PROJECT, INC.
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Anna Dorman**
THE PROTECT DEMOCRACY PROJECT, INC.
200 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582
anna.dorman@protectdemocracy.org

*Attorneys for Plaintiffs Virginia Coalition for
Immigrant Rights, the League of Women Voters
of Virginia, the League of Women Voters of
Virginia Education Fund, and African
Communities Together*

*Motion for pro hac vice participation pending
**Admitted pro hac vice*

## CERTIFICATE OF SERVICE

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record on October 23, 2024 through the Electronic Case File System of the Eastern District of Virginia.

/s/ Shanna Ports
Shanna Ports