**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| Virginia Coalition for Immigrant Rights, et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:24-cv-01778 |
| Susan Beals, in her official capacity as Virginia Commissioner of Elections, et al., | ) ) ) | |
| Defendants. | ) | |
| | | |
| The United States of America, | ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:24-cv-01807 |
| The Commonwealth of Virginia, et al., | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Charles J. Cooper *(Pro Hac Vice)*
Joseph O. Masterman (*Pro Hac Vice*)
Bradley L. Larson *(Pro Hac Vice)*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants the Commonwealth of Virginia, the Virginia State Board of Elections, Susan Beals, John O'Bannon, Rosalyn R. Dance, Georgia Alvis-Long, Donald W. Merricks, Matthew Weinstein, and Jason Miyares*

Jason S. Miyares
    *Attorney General*
Thomas J. Sanford (VSB #95965)
    *Deputy Attorney General*
Erika L. Maley (VSB #97533)
    *Solicitor General*
Graham K. Bryant (VSB #90592)
    *Deputy Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 4

    I.    Statutory Framework and Factual Background ........................................................ 4

    II.    Procedural Background ............................................................................................ 8

LEGAL STANDARD .......................................................................................................... 9

ARGUMENT ..................................................................................................................... 10

    I.    The Organizational Plaintiffs' claims are jurisdictionally barred ...................... 11

        A.    The Organizational Plaintiffs lack Article III standing to sue for alleged NVRA violations ......................................................................................... 11

        B.    The Organizational Plaintiffs' Quiet Period Provision claims are moot ..................... 17

        C.    Sovereign immunity also bars the Organizational Plaintiffs' claim under the Quiet Period Provision, and all claims against the Attorney General ................................. 19

    II.    The United States and the Organizational Plaintiffs' claims are insufficient as a matter of law ............................................................................................................. 22

        A.    Defendants did not violate the NVRA's 'Quiet Period' requirements ....................... 23

            1.    The NVRA does not restrict removing noncitizens and other persons whose registration was invalid *ab initio* ............................................................. 24

            2.    Defendants' removal of noncitizens was "individualized" and not "systematic" ....................................................................................................... 32

        B.    Defendants' process for removing noncitizens is nondiscriminatory ........................ 35

        C.    Virginia does not violate the NVRA by requiring attestation of citizenship after receiving contradictory information ............................................................................ 38

        D.    The Organizational Plaintiffs' claim for information under the NVRA is moot and fails on the merits ....................................................................................................... 42

CONCLUSION ................................................................................................................... 45

CERTIFICATE OF SERVICE .......................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Wright,*
   468 U.S. 737 (1984) ...............................................................................................17

*Arcia v. Florida Sec'y of State,*
   772 F.3d 1335 (11th Cir. 2014) ......................................................30, 31, 32, 34

*Arizona v. Intertribal Council of Ariz.,*
   570 U.S. 1 (2013) ........................................................................................ *passim*

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...............................................................................................10

*Bell v. Marinko,*
   367 F.3d 588 (6th Cir. 2003) ...............................................................................30

*Bland v. Roberts,*
   730 F.3d 368 (4th Cir. 2013) ...............................................................................19

*Bond v. United States,*
   572 U.S. 844 (2014) ...............................................................................................24

*California v. Texas,*
   593 U.S. 659 (2021) ...............................................................................................18

*Children's Healthcare is a Legal Duty, Inc. v. Deters,*
   92 F.3d 1412 (6th Cir. 1996) ...............................................................................20

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ...............................................................................11, 13, 18

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ...............................................................................................14

*Davis v. FEC,*
   554 U.S. 724 (2008) ...............................................................................11, 18, 38

*DeBauche v. Trani,*
   191 F.3d 499 (4th Cir. 1999) ...............................................................................19

*Do No Harm v. Pfizer Inc.,*
   96 F.4th 106 (2d Cir. 2024) ...............................................................................13

*Doyle v. Hogan,*
  1 F.4th 249 (4th Cir. 2021) ...............................................................................20, 21

*Draper v. Healey,*
  827 F.3d 1 (1st Cir. 2016) ......................................................................................13

*Edelman v. Jordan,*
  415 U.S. 651 (1974) ................................................................................................19

*FDA v. Alliance for Hippocratic Med.,*
  602 U.S. 367 (2024) ...............................................................................15, 16, 17

*Foley v. Connelie,*
  435 U.S. 291 (1978) ................................................................................................37

*Francis v. Giacomelli,*
  588 F.3d 186 (4th Cir. 2009) .................................................................................10

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.,*
  528 U.S. 167 (2000)..........................................................................................12, 17

*Geduldig v. Aiello,*
  417 U.S. 484 (1974) ................................................................................................36

*Greater Birmingham Ministries v. Sec'y of State of Ala.,*
  105 F.4th 1324 (11th Cir. 2024) ..................................................................43, 44, 45

*Guedes v. ATF,*
  920 F.3d 1 (D.C. Cir. 2019) ...................................................................................18

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982)..........................................................................................14, 16

*Husted v. A. Phillip Randolph Institute,*
  584 U.S. 756 (2018)........................................................................................ *passim*

*Kadel v. Folwell,*
  100 F.4th 122 (4th Cir. 2024) ...............................................................................36

*Knox v. Service Employees,*
  567 U.S. 298 (2012)................................................................................................43

*Lane v. Holder,*
  703 F.3d 668 (4th Cir. 2012) .....................................................................11, 15, 16

*Lewis v. Casey,*
  518 U.S. 343 (1996)................................................................................................38

*Lewis v. Continental Bank Corp.*,
494 U.S. 472 (1990) ................................................................................................... 17

*Libertarian Party of Va. v. Judd*,
718 F.3d 308 (4th Cir. 2013) ...................................................................................... 11

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ................................................................................................... 22

*Luna Perez v. Sturgis Pub. Schs.*,
598 U.S. 142 (2023) ................................................................................................... 29

*McBurney v. Cuccinelli*,
616 F.3d 393 (4th Cir. 2010) ...................................................................................... 19

*McCleary v. Evans*,
780 F.3d 582 (4th Cir. 2015) ...................................................................................... 10

*Mi Familia Vota v. Fontes*,
691 F. Supp. 3d 1077 (D. Ariz. 2023) ................................................................... 30, 34

*Murthy v. Missouri*,
603 U.S. __ (slip op. ) (2024) ..................................................................................... 14

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ............................................................................................. 14, 22

*Outdoor Amusement Bus. Ass'n v. DHS*,
983 F.3d 671 (4th Cir. 2020) ...................................................................................... 12

*Reynolds v. Sims*,
377 U.S. 553 (1964) ................................................................................................... 30

*Richmond, Fredericksburg & Potomac R. Co. v. United States*,
945 F.2d 765 (4th Cir. 1991) ...................................................................................... 10

*Roberts v. Sea-Land Servs., Inc.*,
566 U.S. 93 (2012) ................................................................................................ 24, 31

*Ross v. Reed*,
719 F.2d 689 (4th Cir. 1983) ...................................................................................... 17

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996) ..................................................................................................... 19

*South Carolina Wildlife Fed'n v. Limehouse*,
549 F.3d 324 (4th Cir. 2008) ...................................................................................... 20

*Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
   713 F.3d 175 (4th Cir. 2013) ........................................................................12, 13

*Southwest Airlines Co. v. Saxon*,
   596 U.S. 450 (2022)..................................................................................................24

*Spencer v. Kemna*,
   523 U.S. 1 (1998)......................................................................................................18

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)..................................................................................................11

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)......................................................................................12, 13, 18

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)..................................................................................................13

*Taubman Realty Grp. v. Mineta*,
   320 F.3d 475 (4th Cir. 2003) ......................................................................................9

*Tax Analysts v. U.S. DOJ*,
   845 F.2d 1060 (D.C. Cir. 1988) ................................................................................44

*Tennessee Conf. of the NAACP v. Lee*,
   105 F.4th 888 (6th Cir. 2024) ..............................................................................15, 17

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
   484 U.S. 365 (1988)..................................................................................................24

*United States Parole Comm'n v. Geraghty*,
   445 U.S. 388 (1980)..................................................................................................17

*United States v. Florida*,
   870 F. Supp. 2d 1346 (N.D. Fla. 2012)....................................................................26

*United States v. Poole*,
   531 F.3d 263 (4th Cir. 2008) ......................................................................................9

*University of Texas v. Camenisch*,
   451 U.S. 390 (1981)..................................................................................................10

*Virginia Coalition for Immigrant Rights v. Beals*,
   2024 WL 4601052 (4th Cir. 2024) ..............................................................................9

*Virginia Coalition for Immigrant Rights v. Beals*,
   603 U.S. __, 2024 WL 4608863 (slip op. ) (2024) ..............................................9, 26

*Waste Mgmt. Holdings, Inc. v. Gilmore*,
    252 F.3d 316 (4th Cir. 2001) ........................................................................20, 21

*Wisconsin Cent. Ltd. v. United States*,
    585 U.S. 274 (2018) ..............................................................................................24

*Wisconsin Right to Life v. FEC*,
    551 U.S. 449 (2007) ..............................................................................................18

*Ex parte Young*,
    209 U.S. 123 (1908).........................................................................................19, 21

*Younger v. Harris*,
    401 U.S. 37 (1971).................................................................................................22

**Statutes**

18 U.S.C. § 611 ................................................................................................................27

52 U.S.C. § 20501 ..................................................................................................2, 4, 30

52 U.S.C. § 20503 ..............................................................................................................4

52 U.S.C. § 20504 ......................................................................................................4, 41

52 U.S.C. § 20505 ..........................................................................................................38

52 U.S.C. § 20505(a)(1).......................................................................................39, 40, 42

52 U.S.C. § 20507 ................................................................................................. *passim*

52 U.S.C. § 20507(i)...................................................................................................42, 44

52 U.S.C. § 20508 ..........................................................................................................39

Va. Code Ann. § 24.2-104 ..............................................................................................21

Va. Code Ann. § 24.2-104(A) ........................................................................................21

Va. Code Ann. § 24.2-401 ..............................................................................................14

Va. Code Ann. § 24.2-404 ....................................................................................6, 7, 33

Va. Code Ann. § 24.2-404.4 ....................................................................................21, 27

Va. Code Ann. § 24.2-410.1 ..............................................................................................5

Va. Code Ann. § 24.2-416 ................................................................................................7

Va. Code Ann. § 24.2-420.1 ................................................................................7

Va. Code Ann. § 24.2-427 ..................................................................................7

Va. Code Ann. § 24.2-427(C) ...........................................................7, 20, 21, 40

**Other Authorities**

*Eligible*, The American Heritage Dictionary, Houghton Mifflin Co. (2nd Coll. Ed. 1985) ..........................................................................................................28

*Eligible*, The Compact Edition of the Oxford English Dictionary ................28

*Eligible*, Merriam-Webster, https://bit.ly/4e1ydZ1 .....................................28

Fed. R. Civ. P. 12 ........................................................................................9, 22

H.R. Rep. No. 103-9 (1993).......................................................................30, 35

*Ineligible*, The American Heritage Dictionary ...........................................28

*Mailing*, Merriam-Webster, https://bit.ly/4eZbEWg ...................................35

Michael Herz, *Law Lags Behind: FOIA and Affirmative Disclosure of Information*, 7 Cardozo Pub. L., Pol'y & Ethics J. 577 (2009).................43

*Photocopy*, The American Heritage Dictionary of the English Language (3d ed. 1992) ...........................................................................................................44

S. Rep. 103-6 (1993)..................................................................................30, 35

U.S. Citizenship and Immigration Services, https://www.uscis.gov/save...................................37

U.S. Const. art. III, § 2 .....................................................................................11

Va. Const. art. II, § 1.................................................................................21, 27

*Voter*, The Compact Edition of the Oxford English Dictionary, Oxford University Press (1980) ..........................................................................................28

*Voter*, Merriam-Webster, http://bit.ly/3Z12fGJ..........................................28

## INTRODUCTION

The Plaintiffs in these consolidated cases—the United States and an assortment of advocacy organizations (Organizational Plaintiffs)—ask this Court to hold unlawful and permanently enjoin Virginia's processes for removing self-identified noncitizens from its voter rolls, particularly within the 90 day "quiet period" before a federal election. *See* 52 U.S.C. § 20507(c)(2)(A). But Plaintiffs' claims cannot surmount preclusive jurisdictional hurdles, and Virginia's election practices, which have existed for nearly two decades, comply with federal law in any event. The complaints should be dismissed.

First, the Organizational Plaintiffs' complaint should be dismissed for lack of jurisdiction. The Organizational Plaintiffs seek only forward-looking relief. Yet they do not identify a single member of any of their organizations who is at any non-speculative risk of future injury— particularly now that the 2024 election has passed, and the quiet period has passed with it. Without an actual injured eligible voter, the Organizational Plaintiffs call upon, and stretch, standing theories that have been roundly rejected in this Circuit and the Supreme Court. For similar reasons, there is no ongoing alleged violation that would allow the Organizational Plaintiffs to invoke the *Ex parte Young* exception to the Commonwealth's sovereign immunity in federal court.

Second, both complaints also fail to state a claim on the merits. Noncitizens cannot legally vote. Virginia thus removes noncitizens from its voter rolls pursuant to longstanding Virginia law after they expressly declare their noncitizen status on a Department of Motor Vehicles (DMV) form or when recently verified documentary proof on file with DMV demonstrates their noncitizen status. And before any individual is removed from the rolls, the local registrar sends the individual a notice advising him that he can remain registered to vote by returning an affirmation of citizenship in a pre-addressed mailer within 14 days. This is a process that the Supreme Court has

1

described as a "simple and easy step" that any "reasonable person with an interest in voting" is likely to follow. *Husted v. A. Phillip Randolph Institute*, 584 U.S. 756, 779 (2018). Only if the individual fails to respond by attesting to his citizenship is his name eventually removed from the rolls, and he is then given further notice and another opportunity to correct any error.

This Virginia law was enacted by then-Governor Kaine in 2006, precleared by the Department of Justice in the same year, and followed by Virginia election officials over multiple presidential and mid-term election cycles. No objection to Virginia's practices were lodged in this nearly 20-year period. Yet when Governor Youngkin issued an Executive Order reaffirming Virginia's commitment to following its own longstanding election laws, the Organizational Plaintiffs, followed by the Department of Justice, sought to stop Virginia's reasonable statutory process to ensure that only citizens legally qualified to vote are on its rolls.

Plaintiffs claim that Virginia's process violates the National Voter Registration Act of 1993 (NVRA), which seeks to "enhance[] the participation of eligible *citizens* as voters in elections for federal office" and at the same time "ensure that accurate and current voter registration rolls are maintained" in every State. 52 U.S.C. § 20501(b) (emphasis added). To achieve its goal of citizen participation, the NVRA directs States to allow prospective voters to register to vote while signing up for a driver's license or similar permit, and it also imposes certain specific limits on the ability of States to remove previously eligible voters who become ineligible. Specifically, Plaintiffs' central claim is that Virginia's recent removal of noncitizens violated the NVRA's so-called "Quiet Period Provision." This provision prohibits States from "systematic[ally]" removing "ineligible voters" from the voter rolls within 90 days of a federal election, with exceptions for certain properly registered voters who since became ineligible to vote, such as upon a voter's death or felony conviction. *Id.* § 20507(c)(2).

The Quiet Period Provision simply does not apply to the removal of noncitizens from the rolls. The plain meaning of the text of the Quiet Period Provision, confirmed by the structure, purpose, and legislative history of the NVRA, demonstrates that there are no temporal restrictions on when States may remove individuals who were never eligible to vote. The registrations of noncitizens, as well as others who are not and cannot be "registrants" and "voters" as those terms are used in the Act, such as minors and fictitious persons, were invalid *ab initio*. The NVRA's removal provisions thus do not apply to noncitizens.

The problems continue. Virginia's noncitizen removal process is highly accurate and makes *individualized* eligibility determinations, not the kind of "systematic" determinations prohibited within the 90-day period. Again, the people who are removed from the rolls are those who have self-identified as noncitizens, either by stating that they are not citizens on DMV forms or by providing documentation to the DMV showing noncitizenship *and* being recently confirmed as noncitizens by the Department of Homeland Security's citizenship database. Virginia's process is individualized, nondiscriminatory, accurate, and lawful.

The claims brought solely by Organizational Plaintiffs fare no better. Virginia's use of Alien Identification Numbers to search the federal SAVE database is "nondiscriminatory." 52 U.S.C. § 20507(b)(1). The NVRA does not prohibit facially neutral laws with no discriminatory intent based on an alleged disparate impact. Virginia's noncitizen removal process also does not violate the mandatory federal-form provisions of the NVRA by requiring a person who checks the noncitizen box or fails a SAVE search to sign an attestation of citizenship. Arguing otherwise, the Organizational Plaintiffs make a hash of the word "registration" and scuttle the entire structure of the NVRA. Finally, the Organizational Plaintiffs also fail to state a claim under the public-

inspection provision of the NVRA. Much, if not all, of the information they seek is already in their possession, and they misunderstand how that provision operates.

The Court should dismiss both complaints in their entirety.

## BACKGROUND

### I.  Statutory Framework and Factual Background

Based on the finding that "the right of citizens of the United States to vote is a fundamental right," Congress enacted the National Voter Registration Act in 1993, 52 U.S.C. §§ 20501 *et seq*. Among other things, the NVRA is intended to "enhance[] the participation of eligible citizens as voters in elections for Federal office," to "protect the integrity of the electoral process," and to "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b) (emphasis added).

To promote eligible citizens' participation in federal elections, the NVRA requires "each State [to] establish procedures to register to vote . . . by application made simultaneously with an application for a motor vehicle driver's license." *Id.* § 20503(a); *see generally id.* § 20504. These procedures require that "each State shall . . . ensure that any *eligible applicant* is registered to vote in an election." *Id.* § 20507(a)(1) (emphasis added). "[I]f the *valid voter registration form* of the applicant is submitted to the appropriate State motor vehicle authority," then the applicant must be "registered," *id.* § 20507(a)(1)(A) (emphasis added), and added to the "list of eligible voters," *id.* § 20507(a)(3). The substantive qualifications for a "valid application," such as citizenship status, is a question for the States. *See Arizona v. Intertribal Council of Ariz.*, 570 U.S. 1, 16 (2013) (explaining that States determine and oversee who is eligible to vote).

At the same time that the NVRA required States to allow "eligible applicants" to "register[]" to vote, it imposed restrictions on removing these "registrant[s]" from the rolls. 52

4

U.S.C. § 20507(a)(3). Under the NVRA's General Removal Provision, a person who is an "eligible applicant" and has submitted a "valid" registration form to vote "may not be removed from the official list of eligible voters except" in four enumerated circumstances: voter request, death of the voter, voter felony conviction or mental incapacity, and change in voter residence (if certain procedures are followed). *Id.* § 20507(a)(3)–(4).

In addition to the General Removal Provision's blanket ban on removing "registrants" from the list of "eligible voters," which applies at all times, the NVRA also contains a special prohibition on certain removals close to federal elections. Section 8(c)(2), the Quiet Period Provision, prohibits States from "systematic[ally]" removing "ineligible voters" from the rolls within 90 days of a federal election. *Id.* § 20507(c)(2)(A). It incorporates by cross-reference three of the four exceptions for removals under the General Removal Provision—voter request, death of the voter, and voter felony conviction or mental incapacity. *Id.* § 20507(c)(2).

To ensure that the Commonwealth's rolls remain clean while also complying with the NVRA, Virginia amended its election laws in 2006 to require the Virginia Department of Motor Vehicle (DMV) to send to the Virginia Department of Elections (ELECT) the information of any individual who declares himself to be a noncitizen on a DMV form. Va. Code Ann. § 24.2-410.1. ELECT checks that person's information against the Virginia Election and Registration Information System (VERIS) to ensure that these self-declared noncitizens are not included on the voter rolls. Org. Pl. Amended Compl. ¶ 42. As the Organizational Plaintiffs allege, a match generally "requires an exact match of Social Security Number, first name, last name, and date of birth." *Id.* ¶ 41. Only if there is a match does ELECT forward the information to the local registrars, which then manually "review[] the match to determine if the non-citizen and registered voter identified by VERIS [are] the same person." *Id.* at ¶ 42 (quotation marks omitted).

ELECT's general policy is to send local registrars only the records of persons who affirmatively and contemporaneously declare that they are not citizens on a DMV form. *See* Org. Pl. Ex. 1 (Letter from Susan Beals to Glenn Youngkin) (requiring "declar[ations]" of noncitizenship). It did, however, also recently work with the DMV in an ad hoc review of records to ensure that persons who engaged in DMV transactions within the prior year, and who had documents on file with DMV showing noncitizen status, were not improperly on the voter rolls. *Ibid.* To ensure that any such individuals who had subsequently become naturalized citizens were not mistakenly removed, the DMV ran these individuals' information through the Department of Homeland Security's Systematic Alien Verification for Entitlements (SAVE) database. *Id.* at 2–3 ("DMV is conducting verification, using the Department of Homeland Security's Systematic Alien Verification for Entitlements (SAVE) program, of applicants who present documents indicating legal presence (i.e., non-citizenship)."); *see also* Va. Code Ann. § 24.2-404(E) (requiring ELECT to use SAVE "for the purposes of verifying that voters listed in the Virginia voter registration system are United States citizens").

The SAVE database shows whether a legal alien resident has subsequently obtained citizenship. Only those persons registered to vote who had noncitizen documents on file with the DMV and who also were confirmed as current noncitizens in a fresh SAVE search were transmitted to the local registrars for each jurisdiction to act upon. Org. Pl. Ex. 1, at 2–3. ELECT's individualized approach, which confirmed noncitizen status with a contemporaneous SAVE search, ensured that naturalized citizens were not removed from the voter rolls based on outdated DMV documents during the ad hoc process.

When ELECT finds that a person who has declared himself to be a noncitizen on a DMV form or has failed a recent SAVE search matches a person on the VERIS voter rolls, ELECT sends

6

the person's information to the local general registrar for individualized review. *See* Org. Pl. Amended Compl. at ¶¶ 42–43. Virginia law requires "general registrars to delete . . . the name of any voter who . . . is known not to be a United States citizen by reason of" that person's self-declaration of noncitizen status or "based on information received from the . . . SAVE Program," Va. Code Ann. § 24.2-404(A)(4); *see id.* § 24.2-427(C). Accordingly, the registrar manually reviews each potential match on an individual basis to confirm that the noncitizen and the registered voter identified in VERIS are the same person. Org. Pl. Amended Compl. ¶ 41. If the registrar determines that the noncitizen and the registered voter are the same person, then the registrar will mail the individual a "Notice of Intent to Cancel" that individual's registration to vote. Va. Code Ann. § 24.2-427(C).

The Notice of Intent to Cancel explains that ELECT recently received information from the DMV that the recipient may not be a citizen and asks the recipient to fill out an accompanying Affirmation of Citizenship within 14 days to remain on the voter rolls. Org. Pl. Amended Compl. ¶ 45; United States Ex. 1. If the recipient fails to return the printed affirmation of citizenship in the preaddressed envelop within the 14-day period, he is sent another notice advising him of his removal from the rolls and providing a number to call if he thinks there has been a mistake. United States Ex. 2. Even if the person fails to respond to either of these notices, he can still re-register to vote with no impediments. After Virginia's ordinary registration process closes 21 days before an election, Va. Code Ann. § 24.2-416, he can use in-person same-day registration to re-register and vote, either during Virginia's early voting period or on Election Day, *see* Va. Code Ann. § 24.2-420.1. Governor Youngkin's Executive Order 35, issued on August 7, 2024, did not create these longstanding statutory processes. That order simply required the DMV and ELECT to share

data on a daily, instead of monthly, basis and certify that they were following pre-existing law. United States. Ex. 2 at 3–4.

## II.      Procedural Background

On October 7, 2024, the Virginia Coalition for Immigrant Rights, the League of Women Voters of Virginia, and the League of Women Voters of Virginia Education Fund filed a complaint challenging the legality of Virginia's longstanding noncitizen removal process used to ensure that only American citizens are registered and able to vote. *See* Org. Pl. Amended Compl. ¶¶ 1–14 (ECF 23). The complaint was later amended to add African Communities Together as a plaintiff. *Id*. The Organizational Plaintiffs allege that Virginia's individualized process for removing noncitizens from its voter rolls, as required by Virginia law to effectuate the Federal and State requirements limiting the right to vote to U.S. citizens, violates the NVRA by amounting to: (1) "systematic voter list maintenance within 90 days preceding a federal election"; (2) discrimination against naturalized citizens; and (3) an impermissible requirement that "voters . . . provide additional proof of U.S. citizenship" beyond that required in the NVRA's federal registration form. Org. Pl. Amended Compl. ¶¶ 14, 67–84. The Organizational Plaintiffs also bring a claim that they are entitled to certain voting information under the NVRA's "public inspection" provision. *See id.* ¶ 14; 52 U.S.C. § 20507(i). They named as defendants Susan Beals, the Virginia Commissioner of Elections; members of the Board of Elections including its chair, John O'Bannon, and members Rosalyn R. Dance, Georgia Alvis-Long, Donald W. Merricks, and Matthew Weinstein; and Attorney General Jason Miyares (collectively "Defendants"). Org. Pl. Amended Compl. ¶¶ 35–37.

The United States sued the Commonwealth of Virginia, the State Board of Elections, and Commissioner Beals on October 11, 2024. Its complaint is narrower, alleging only that Virginia

violated the Quiet Period Provision by systematically removing noncitizens from the voter rolls within 90 days of an election. United States Compl. ¶ 61. The two cases were consolidated, and both plaintiffs moved for a preliminary injunction. The Organizational Plaintiffs only moved with respect to their quiet-period claim and nondiscrimination claim.

This Court granted the motions in part and denied them in part. *See* ECF 112. Specifically, it concluded that the Plaintiffs were likely to succeed on their quiet-period claim and that the equities favored granting the preliminary injunction. *Id.* at 1–2. It denied the Organizational Plaintiffs' request for a preliminary injunction on the nondiscrimination claim. *Id.* at 4. Defendants filed an emergency motion for a stay of the preliminary injunction pending appeal in the Fourth Circuit. The Fourth Circuit denied the motion. *See Virginia Coalition for Immigrant Rights v. Beals*, 2024 WL 4601052 (4th Cir. 2024). The Supreme Court then granted the motion for a stay pending "the disposition of the appeal in the United States Court of Appeals for the Fourth Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought." *See Virginia Coalition for Immigrant Rights v. Beals*, 603 U.S. __, 2024 WL 4608863 (slip op. at 1) (2024) (mem.).

Defendants now move to dismiss each complaint for lack of subject-matter jurisdiction and failure to state a claim. *See* FED. R. CIV. P. 12(b)(1), (6).

## LEGAL STANDARD

The plaintiff has the burden of establishing subject-matter jurisdiction and standing. *Taubman Realty Grp. v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003). "A court is to presume . . . that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper." *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008). In considering a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, a court "may consider evidence outside the

pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation and citation omitted). Conclusory factual allegations, ones that require "speculation [to] fill the gaps," are to be disregarded. *See McCleary v. Evans*, 780 F.3d 582, 586 (4th Cir. 2015). And where the facts that are well-pleaded in a nonconclusory manner "do not permit the court to infer more than the mere possibility of misconduct" as compared to the plausibility of misconduct, the complaint must be dismissed. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). Although this Court made a number of preliminary likelihood findings for the purposes of deciding the preliminary injunction motion, those findings do not establish law of the case and are not binding. *See University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

## ARGUMENT

Both complaints should be dismissed. As an initial matter, the Organizational Plaintiffs' case is doomed, thrice, at the Court's doorstep. They lacked standing to begin with and still do, their quiet period claim is now moot, and their claims are barred by sovereign immunity. Even if federal jurisdiction existed over those claims, neither the Organizational Plaintiffs nor the United States can prevail on the merits because they fundamentally misunderstand how the NVRA operates. *See infra* Sections I–II.

I.      **The Organizational Plaintiffs' claims are jurisdictionally barred**

A.      **The Organizational Plaintiffs lack Article III standing to sue for alleged NVRA violations**

None of the Organizational Plaintiffs has standing. "Standing is part and parcel of the constitutional mandate that the judicial power of the United States extend only to 'cases' and 'controversies.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting U.S. Const. art. III, § 2). To establish "the 'irreducible constitutional minimum' of standing," plaintiffs must show that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Standing is not dispensed in gross, which means that plaintiffs must establish standing for each claim and type of relief against each defendant. *Davis v. FEC*, 554 U.S. 724, 734 (2008). So even if one party has standing for the claim it brings, that does not help a different party in the case bringing a different claim. *Ibid.* For prospective relief, an ongoing or imminent harm is required; past harm does not suffice. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983).

The same standing rules apply when membership organizations, such as the Organizational Plaintiffs, *see* Org. Pl. Amended Compl. ¶ 12, attempt to invoke federal jurisdiction, *see Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012). An organization can establish Article III standing in two ways. It can show that at least one of its members has standing and that the organization can properly represent the member's interests (associational standing), or it can satisfy the traditional standing test itself (organizational standing). The Organizational Plaintiffs here establish neither.

The Organizational Plaintiffs lack associational standing. "An association has associational standing when at least one of its '*identified*' members 'would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the

11

claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Outdoor Amusement Bus. Ass'n v. DHS*, 983 F.3d 671, 683 (4th Cir. 2020) (emphasis added) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). Thus, to establish associational standing, the Organizational Plaintiffs must specifically "identify members" who will suffer the requisite harm. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see also, e.g.*, *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184–85 (4th Cir. 2013) (denying organizational standing when plaintiff "has failed to identify a single *specific member* injured by" the challenged action).

The Organizational Plaintiffs have not identified a single specific member by name who was suffering harm at the time of filing or will be harmed in the future by Virginia's process to remove noncitizens from the voter rolls. Without an injured member, there can be no plausible case for associational standing. The Organizational Plaintiffs attempt to generate associational standing by asserting that they have many members who are naturalized citizens, *see* Org. Pl. Amended Compl. ¶¶ 29, 32, some of whom, Plaintiffs argue, might have been erroneously removed from the voter rolls, s*ee*, *e.g.*, Ex. W ¶ 40 (declaration of Joan Porte) ("[T]he League's members include Virginians who are naturalized U.S. citizens who likely once received noncitizen identification numbers or identified themselves as noncitizens at the DMV."). This theory is not only based on pure speculation, but also simply a reprisal of the probabilistic-standing theory that the Supreme Court rejected in *Summers*. *See* 555 U.S. at 498. In that case, the Supreme Court held that even if there were a "statistical probability" that one of the organization's roughly 700,000 members would suffer an injury in fact, Article III still required the organization to "make specific

allegations establishing that at least one *identified member* had suffered or would suffer harm." *Id*. (emphasis added).

Plaintiffs' declarations also do not establish associational standing. The declarations identify three individuals who were allegedly injured—Carolina Diaz Tavera, Christine Rabassa, and Shantae Martin—but they do not assert that these individuals are members of any of the plaintiff organizations. *See* Ex. CC, DD, EE. The declarations thus do not support associational standing. The declaration of Gigi Traore of African Communities Together lists three alleged anonymous members of the organization who it asserts were removed from voter rolls, but it does not allege that those three members were removed pursuant to Virginia's noncitizen removal process, as opposed to some other reason. ECF 108. Perhaps more importantly, unnamed alleged members of an organization are insufficient to support Article III standing. *See Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.) ("[T]he Supreme Court has said that an affidavit provided by an association to establish standing is insufficient unless it *names* an injured individual.") (emphasis added). As the Fourth Circuit has explained, an organization needs to "identify a single *specific member* injured by" the challenged action. *Southern Walk*, 713 F.3d at 184–85; *see also Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 115 (2d Cir. 2024) (holding that "an association relying on injuries to its members to establish its standing must identify specific members injured by the challenged conduct"). In any event, as discussed further below, the allegations and declarations do not and cannot identify any member of the Organizational Plaintiffs who has a non-speculative risk of being irreparably harmed in the future. *See* p. 18, *infra*. The Organizational Plaintiffs' complaint seeks only prospective relief (and can seek only prospective relief, see Part I.C, *infra*). But alleged *past* injury does not establish standing for prospective relief. *Lyons*, 461 U.S. at 105; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may

suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013))).

The Organizational Plaintiffs are unable to name a single member with standing given how Virginia's voter-roll process actually works. ELECT sends Notice of Intent to Cancel forms only to individuals who (a) have contemporaneously self-declared on a DMV form that they are *not* American citizens, Org. Pl. Amended Compl. ¶ 49, or (b) have previously self-identified as noncitizens in documents on file with the DMV, and who had their current noncitizen status confirmed by a new SAVE search. *Id.*; Ex. 2. The process used by ELECT, in other words, does not cause naturalized citizens to be removed from the voter rolls *en masse* as the Organizational Plaintiffs seem to believe. Nor, as the Organizational Plaintiffs allege, are people being removed from the voter rolls if they simply "leave a box empty." Org. Pl. Amended Compl. ¶ 64. A person must affirmatively indicate that he is not a citizen to start the verification process. *See* Voter Registration Handbook, List Maintenance, Department of Motor Vehicles: Full SBE & Noncitizens Standard Operating Procedures (SOP), ECF 92-8 *see also* Va. Code Ann. § 24.2-401(B). The Organizational Plaintiffs have not and cannot identify any member who is a citizen, yet is likely to mistakenly declare himself to be a noncitizen on a DMV form in the 90 days prior to a future election. *See Murthy v. Missouri*, 603 U.S. __ (slip op. at 11) (2024); *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). They lack associational standing.

The Organizational Plaintiffs likewise lack organizational standing. Organizations have standing "to sue on their own behalf for injuries they have sustained," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n. 19 (1982), but they still must satisfy the same standards for injury-in-fact, causation, and redressability that apply to individuals, *id.* at 378–379. Much like natural persons, "an organization may not establish standing simply based on" harm to its interests "or

because of strong opposition to the government's conduct." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 394 (2024). Likewise, "an organization . . . cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.*

The Complaint and accompanying declarations establish no more than abstract organizational interests and voluntary budgetary decisions based on those interests. The harm that the Organizational Plaintiffs repeatedly and commonly allege is that they were forced to "divert significant resources" away from voter-outreach and other community-building activities and "toward . . . attempting to mitigate the effects" of Virginia's removal of noncitizens from the voter rolls. Org. Pl. Amended Compl. ¶ 21 (describing the changes made by the Virginia Coalition for Immigrant Rights); *id.* ¶ 26 (explaining that the League of Women Voters has expended resources to "rapidly understand the impact of E.O. 35 and its effect on Virginia voters"); *id.* ¶ 34 (asserting that African Communities Together diverted resources "by developing and producing new public education materials"). But the Fourth Circuit has long held that an organization's "own budgetary choices" concerning the allocation of funds, such as "educating members, responding to member inquiries, or undertaking litigation in response to legislation," are not enough to establish an injury in fact. *Lane*, 703 F.3d at 675; *see also Tennessee Conf. of the NAACP v. Lee*, 105 F.4th 888, 903 (6th Cir. 2024) (per curiam) (explaining that "the decision to spend money to minimize the alleged harms" to other parties caused by government action did not supply organizational standing). Likewise, the Supreme Court has recently reaffirmed that an organization cannot establish standing simply because it feels compelled "to inform the public" that the government's actions are allegedly harmful or illegal. *Alliance for Hippocratic Med.*, 602 U.S. at 395. Otherwise, every organization in the world could "spend its way into standing" to challenge every law that the

15

organization opposed, and Article III's limitations on the power of the federal judiciary would be illusory. *Id.* at 394; *see Lane*, 703 F.3d at 675.

The Organizational Plaintiffs rely on *Havens Realty Corp.*, 455 U.S. at 368, as did this Court when it concluded that the Organizational Plaintiffs could likely establish standing for the purpose of a preliminary injunction, ECF 110. But "*Havens* was an unusual case" that courts should not "extend . . . beyond its context," *Alliance for Hippocratic Med.*, 602 U.S. at 396, and it cannot rescue the Organizational Plaintiffs' deficient standing claims. The plaintiff in that case, a housing-counseling provider, sent employees commonly referred to as "testers" to determine whether a real estate company was falsely telling black renters that no units were available. *Havens Realty Corp.*, 455 U.S. at 366 & n.1, 368. The Supreme Court held that the plaintiff suffered an injury in fact because lying to its employee testers "perceptibly impaired [the plaintiff's] ability to provide counseling and referral services." *Id.* at 379. As the Supreme Court explained, lying to the plaintiff's employees "directly affected and interfered with [the plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Alliance for Hippocratic Med.*, 602 U.S. at 395. That case thus dealt with a unique type of business injury and does not stand for the proposition that the diversion of resources alone establishes organizational standing. Without an employee who suffered an injury that also harmed the Organizational Plaintiffs' "core business activities" and diverted their resources, they cannot establish standing under *Havens*. *Ibid.*

In the preliminary-injunction hearing, the court noted that having to expend resources on public education materials in response to the noncitizen removal process would interfere with African Communities Together's "core mission." ECF 110 at 6. But as the Supreme Court recently explained, the key factor in *Havens* was that the defendants had misled the plaintiffs' *employees*,

not that the organization "divert[ed] its resources in response to a defendant's actions" that it concluded were contrary to its mission. *Alliance for Hippocratic Med.*, 602 U.S. at 395. None of the Organizational Plaintiffs here allege an injury to their employee or agent that can be thus attributed to the organization. Courts of Appeals have held that this clarification of *Havens* means that an organization must allege more than a voluntary "pocketbook" injury and harm to its mission to establish organization standing. *See Tennessee Conf. of the NAACP*, 105 F.4th at 903.

The Organizational Plaintiffs lack both organizational and associational standing, and thus this Court lacks jurisdiction to adjudicate their claims.

### B.   The Organizational Plaintiffs' Quiet Period Provision claims are moot

In addition, the Organizational Plaintiffs' claim that Virginia has violated the NVRA's Quiet Period Provision is moot. The Constitution's "case-or-controversy requirement subsists through all stages of federal judicial proceedings . . . . [I]t is not enough that a dispute was very much alive when suit was filed." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990). The plaintiff's stake in the lawsuit "must continue throughout its existence." *Friends of the Earth, Inc*, 528 U.S. at 189 (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)). Therefore, if "intervening factual . . . events effectively dispel the case . . . the federal courts are powerless to decide the question presented." *Ross v. Reed*, 719 F.2d 689, 693–94 (4th Cir. 1983).

With the 2024 election now concluded, the Organizational Plaintiffs no longer have any stake in their quiet-period claims. They do not seek money damages, and their requested injunctive relief as to the 2024 election now not redressable. Further, any alleged continuing harm to the organizations themselves from the removal of self-identified noncitizens from the voter rolls can no longer be linked to "allegedly unlawful conduct" by the Defendants. *Allen v. Wright*, 468 U.S. 737, 751 (1984). Any continuing effect on the "mission" of the organizations is now due to the removal process occurring *outside of* the 90-day quiet period. *See* 52 U.S.C. § 20507(c)(2)(A)

17

(restricting removal only within 90 days of a federal election). So even if the Organizational Plaintiffs are still engaging in voter outreach and associated programs because of Virginia's policy to remove noncitizens from the voter rolls, these expenditures and inconveniences are not traceable to any allegedly "*unlawful* conduct" with regard to the quiet-period claim. *California v. Texas*, 593 U.S. 659, 674 (2021) (citation omitted) (emphasis in original).

The Organizational Plaintiffs may attempt to argue that this is the type of claim that is "capable of repetition, yet evading review." *Davis v. FEC,* 554 U.S. 724, 735 (2008). But for a plaintiff to establish that exception to mootness, he must demonstrate that "there is a reasonable expectation that the same complaining party will be subject to the same action again." *Wisconsin Right to Life v. FEC*, 551 U.S. 449, 462 (2007) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). The Organizational Plaintiffs cannot make such a showing.

Even if some of their members mistakenly checked the noncitizen box at the DMV and then missed the two follow-up notices, it is nothing less than "speculat[ion]" that this series of events would happen to the same individuals again. *See Guedes v. ATF*, 920 F.3d 1, 12 (D.C. Cir. 2019) (per curiam) (citation omitted). As the Supreme Court has explained, this kind of speculation, as compared to a "reasonable showing" of future harm, cannot satisfy the "exceptional" requirements to keep an otherwise-moot case alive. *Lyons*, 461 U.S. at 109. Nor can the Organizational Plaintiffs argue that some unidentified member of their organizations will likely check the wrong box on a DMV form in the future, as that argument just leads back to *Summers'* rejection of probabilistic standing and the requirement that a specific injured person must be identified. *See* 555 U.S. at 499. The Organizational Plaintiffs' quiet-period claim should therefore be dismissed as moot.

18

**C.**     **Sovereign immunity also bars the Organizational Plaintiffs' claim under the Quiet Period Provision, and all claims against the Attorney General**

States are generally immune from suit unless they consent or Congress has validly abrogated their sovereign immunity, neither of which has happened here. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54, 58 (1996). Sovereign immunity applies in full force to alleged past violations of law, even if an equitable remedy is sought. *See Edelman v. Jordan*, 415 U.S. 651, 666 (1974). The *Ex parte Young* exception to Defendants' constitutional immunity from suit can apply only to the extent that Plaintiffs seek "prospective, injunctive relief against . . . *ongoing* violations of federal law." *Bland v. Roberts*, 730 F.3d 368, 390 (4th Cir. 2013) (quoting *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010)) (emphasis added); *see Ex parte Young*, 209 U.S. 123 (1908). The election took place on November 5, and the quiet period ended on November 6. 52 U.S.C. § 20507(c)(2)(A).

The conduct challenged by Plaintiffs in the Quiet Period Provision claim—initiating the removal of self-declared noncitizens from the rolls during the 90 days prior to the 2024 election— "occurred entirely in the past." *DeBauche v. Trani*, 191 F.3d 499, 505 (4th Cir. 1999). As a result, the injunctive and declaratory relief that Plaintiffs ultimately request for that purported violation— an order that the Defendant ELECT officials take steps to return to the voter rolls persons removed through this process, along with individual notices, public announcements, and other associated measures—is all retrospective, not "prospective." *Bland*, 730 F.3d at 390. In these circumstances, the *Ex parte Young* exception to sovereign immunity "does not apply." *DeBauche*, 191 F.3d at 505.

Further, sovereign immunity bars all of the Organizational Plaintiffs' claims—not just the quiet period claim—against the Attorney General, who has nothing to do with the challenged process. The *Ex parte Young* exception applies only to officials who bear a "special relation" to

"the challenged statute" and who have "acted or threatened" to enforce the statute. *McBurney v. Cuccinelli*, 616 F.3d 393, 399, 402 (4th Cir. 2010) (quotation marks omitted). As this Circuit has explained, the "[g]*eneral authority* to enforce the laws of the state" is insufficient to satisfy the *Ex parte Young* exception to a State's sovereign immunity. *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001) (quoting *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996)). "[T]he officer sued must be able to enforce, if he so chooses, the specific law the plaintiff challenges." *Doyle v. Hogan*, 1 F.4th 249, 254–55 (4th Cir. 2021). Here, the law challenged is Va. Code Ann. § 24.2-427(C). *See* Org. Pl. Amended Compl. ¶¶ 83, 88.

The Attorney General of Virginia plays no role in enforcing Va. Code Ann. § 24.2-427(C). That law requires the "general registrar[s]" to "mail notice promptly to all persons known by him not to be United States citizens by reason of a report from the Department of Motor Vehicles . . . or from the Department of Elections based on information received from the Systematic Alien Verification for Entitlements Program (SAVE Program)." *Ibid.* It does not mention the Attorney General, let alone give him a role in determining who remains on the voter rolls. The Attorney General thus has not participated in any alleged past or ongoing violation of the NVRA. This is true for all of Plaintiffs' claims: the quiet period claims, "discrimination" claim, the claim that Virginia cannot require an attestation of citizenship after a person checks the "noncitizen" box at the DMV, and the claim regarding access to voter information. The Attorney General simply has no role in enforcing any of those laws. He is thus immune not only from liability but also from the burdens of a lawsuit. *Cf. South Carolina Wildlife Fed'n v. Limehou*se, 549 F.3d 324, 332–33 (4th Cir. 2008) (special relation requirement prevents "interfere[nce] with the lawful discretion of state officials").

20

Organizational Plaintiffs do not dispute that the Attorney General plays no direct role in enforcing § 24.2-427(C). Instead, they point to his "full authority to do whatever is necessary or appropriate to enforce the election laws or prosecute violations thereof." *See* Org. Pl. Amended Compl. ¶ 37 (quoting Va. Code Ann. § 24.2-104(A)). But this provision is the precisely type of "general authority" that *Waste Management Holdings* concluded is insufficient. 252 F.3d at 331. As in *Doyle*, the Attorney General here has "no power to make the decision" whether or not to remove a person from the voting rolls. *See* 1 F.4th at 256. That authority is vested in ELECT and the registrars. *See* Va. Code Ann. § 24.2-427(C).

The Attorney General does have the general power, of course, to enforce election laws and thus to prosecute noncitizens who vote. *See* Va. Code Ann. § 24.2-104(A). But the Organizational Plaintiffs do not challenge the validity of Virginia's laws restricting the franchise to citizens, Va. Const. art. II, § 1; Va. Code Ann. § 24.2-404.4, and the Attorney General must bear a "special relation" to the law being challenged, not some other law related to voting. *Ex parte Young*, 209 U.S. at 157. If the authority to institute a prosecution based on a criminal law were the test for bringing the Attorney General within *Ex parte Young* for a civil statute, the "special relationship" requirement would be nugatory. *Ibid.* Accordingly, even if the Attorney General opens a criminal investigation based on a referral that originated with a noncitizen marking the "noncitizen" box at the DMV, he would not be enforcing the noncitizen removal statute, Va. Code Ann. § 24.2-427(C), but the unchallenged criminal statute making it illegal for noncitizens to vote, *id.* § 24.2-404.4.

Plaintiffs recognize as much: their Prayer for Relief asks the Court to order "Defendants Beals and State Board of Election Members," not the Attorney General, "to instruct all Virgina county registrars" to undo removals effected through this process. Org. Pl. Amended Compl. at 31. They do not seek an order requiring the Attorney General to undo the removals because he has

21

no such authority. And any requested relief enjoining a prosecution by the Attorney General of individuals who violated Virginia's valid criminal statutes against noncitizen voting would be particularly improper given the "basic doctrine of equity jurisprudence" that federal courts typically "should not act to restrain a [state] criminal prosecution." *O'Shea*, 414 U.S. at 499 (quoting *Younger v. Harris*, 401 U.S. 37, 43–44 (1971)); *see ibid.* ("[R]ecognition of the need for a proper balance in the concurrent operation of federal and state courts counsels restraint against the issuance of injunctions against state officers engaged in the administration of the State's criminal laws."). The Court therefore lacks jurisdiction over all of Organizational Plaintiffs' claims against the Attorney General for this reason as well.[1]

## II. The United States and the Organizational Plaintiffs' claims are insufficient as a matter of law

Neither the Organizational Plaintiffs nor the United States have stated a claim under the NVRA. *See* FED. R. CIV. P. 12(b)(6). As a threshold matter, the NVRA's Quiet Period Provision does not apply to the removal of noncitizens from the voter rolls, just as it does not apply to the removal of minors or fictitious persons. It only applies to the removal of *voters* who validly registered in the first place but who subsequently became ineligible, such as those who have since been convicted of a felony or have changed their residence. Plaintiffs' Quiet Period claims also fail because Virginia's process for removing noncitizens is a highly individualized process to update voter rolls, not a "systematic" program. Far from the kind of bulk mailing and door-to-door canvassing that Congress contemplated as "systematic" programs, the Commonwealth's

---

[1] For the same reasons, the Attorney General also cannot be sued because an order against him would do nothing to redress the alleged injuries suffered by the Organizational Plaintiffs. It is black letter law that a party can only be sued if the remedy for claims against it can redress the plaintiffs' injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Yet because the Attorney General does not enforce or play a role in the Virginia noncitizen removal process, an order directing him to cease participation would be a nullity.

noncitizen removal process focuses narrowly on specific individuals who have declared themselves to be noncitizens and involves contacting each such individual—twice—to give the individual an opportunity to correct the record by affirming his citizenship.

The additional three claims brought solely by the Organizational Plaintiffs also fail. Their "discrimination" claim under 52 U.S.C. § 20507(b)(1) should be dismissed because the noncitizen removal process is facially neutral and does not otherwise discriminate against people based on national origin or naturalized citizenship.

Their claim that sending the Notice of Intent to Cancel and accompanying Attestation of Citizenship form violates the NVRA's federal-form requirement fares no better. The NVRA requires States to "accept and use" certain forms when registering to vote, and the Supreme Court has held that "accept and use" means that States must register anyone who properly completes the federal form. But mailing a Notice of Intent to Cancel and accompanying attestation is not part of the "registration" process; every individual sent such a form has already completed the registration process and been added to Virginia's voter rolls. The NVRA's provisions on adding applicants to voter rolls simply do not apply to the separate issue of removing individuals from the rolls who are not qualified to vote.

Finally, the claim for information related to Virginia's process used to remove noncitizens from the voter rolls is moot. That information was turned over during the preliminary-injunction discovery and in the normal course of ELECT's response to NVRA requests. To the extent that the Organizational Plaintiffs seek additional documents, they have failed to show that they satisfy the NVRA's requirements.

### A.    Defendants did not violate the NVRA's 'Quiet Period' requirements

The United States and the Organizational Plaintiffs claim that Defendants violated the NVRA's Quiet Period Provision, which prohibits certain changes to the voter rolls within 90 days

of an election. *See* 52 U.S.C. § 20507(c)(2). Their claims fail for at least two reasons: first, the Quiet Period Provision does not apply to the removal of noncitizens; and second, Virginia's process was not "systematic" within the meaning of the provision.

### 1. The NVRA does not restrict removing noncitizens and other persons whose registration was invalid *ab initio*

The NVRA's Quiet Period Provision does not apply to the removal of individuals, such as noncitizens, whose registrations were void *ab initio* and thus who were never eligible to vote in the first place. Virginia's removal of noncitizens within 90 days of the election therefore does not violate the provision.

When interpreting a statute, the Court's "job is to interpret the words consistent with their ordinary meaning . . . at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (citation omitted). Courts thus "begin with the text." *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022). The context and structure of the statute provide invaluable tools to understand the text. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd*., 484 U.S. 365, 371 (1988) (Scalia, J.). Thus, if an interpretation of one part of a statute renders another part absurd, contradictory, or unconstitutional, a court should favor a different reasonable interpretation that renders the statute a "harmonious whole." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012); *see also Bond v. United States*, 572 U.S. 844, 856–57 (2014). Applying these principles to the Quiet Period Provision of the NVRA compels the conclusion that it does not cover programs designed to remove noncitizens.

Section 8 of the NVRA governs "the administration of voter registration for elections for Federal office." 52 U.S.C. § 20507(a). It provides that "State[s] shall . . . ensure that any *eligible applicant* is registered to vote." *Id.* § 20507(a)(1) (emphasis added). The instruction is simple:

applicants who are "eligible" must be "registered" by the State. *Id.* The inverse is equally obvious: those who are not "eligible" shall not be "registered." *Id.*

Section 8 then provides different ways that an applicant with a "valid voter registration form" can register, such as through the DMV. *See id.* § 20507(a)(1)(A)–(D) (emphasis added). Once the "eligible applicant['s]" "valid voter registration form" is accepted, the statute refers to him as a "registrant," and provides him certain protections. *See id.* § 20507(a)(3).

After prescribing how an "eligible applicant" becomes a "registrant" through submitting a "valid voter registration form," Section 8 provides in the General Removal Provision how a "registrant" can be removed from the list of "eligible voters." *Ibid.* The "name of a registrant may not be removed from the official list of eligible voters" at all except in four enumerated circumstances: voluntary removal of the registrant, felony conviction or adjudication of mental incapacity, death of the registrant, or change in residence (if certain procedures are followed). *Id.* § 20507(a)(3)–(4). In short, once an "eligible applicant" becomes a "registrant," Section 8 of the NVRA narrowly specifies the four exclusive reasons he can be removed. *Id.* § 20507(a)(1).

The removal restrictions become stricter in the 90 days before a federal election. At that point, the Quiet Period Provision prohibits "systematic," as compared to individualized, removal programs targeting "ineligible voters." *Id.* § 20507(c)(2). The Quiet Period Provision incorporates three of the four exceptions from the General Removal Provision: request of the registrant, criminal conviction or mental incapacity, and death of the registrant. *Id.* § 20507(c)(2)(B). It does not permit removing registrants based on a change in residence.

In short, an "eligible applicant" becomes a "registrant" upon filing a "valid voter registration form," and is then protected from removal from the "list of eligible voters" at all times, unless such removal is pursuant to one of four enumerated exceptions. Within 90 days of an

election, the rules get stricter, with the "systematic" removal of "ineligible voters" being prohibited, subject to three of the four exceptions. *Ibid.* But the NVRA does not prohibit the removal from the voter rolls of persons, such as noncitizens and minors, who were never "eligible applicant[s]" and thus could not become "registrant[s]" or "voters" in the first place. *Id.* § 20507(a)(1), (3), (c)(2)(B). It follows that the Quiet Period Provision does not cover noncitizens at all, and thus Virginia's removal of noncitizens within 90 days of the election did not violate federal law.

This understanding of the NVRA's text is confirmed by its structure, for concluding that a noncitizen is a "registrant" protected under the NVRA would lead to absurd and unconstitutional results. Again, there are only four exceptions from the Act's blanket prohibition on removing a "registrant." *See* 52 U.S.C. § 20507(a)(3)–(4). A noncitizen who invalidly registers is not one of them. Therefore, if "registrant" includes noncitizens who end up on the rolls, then the NVRA necessarily prohibits States from *ever* removing noncitizens from their rolls. *See United States v. Florida*, 870 F. Supp. 2d 1346, 1349 (N.D. Fla. 2012) (explaining that if a noncitizen is a registrant, "[the General Removal Provision]—which applies at all times, not just in the 90 days before an election—seems to prohibit a state from ever removing from its voting list a noncitizen, even though the noncitizen should never have been registered in the first place"). This Court appeared to agree at the preliminary-injunction stage, observing that "the Commonwealth . . . ha[s] the authority to investigate and remove noncitizens from the registration rolls" outside of the quiet period—presumably because they are not "registrants." ECF 120 at 18. The United States likewise appeared to agree that the General Removal Provision does not prohibit the removal of noncitizens. *See* Brief for United States at 27–28, *Virginia Coalition for Immigrant Rights v. Beals*, 603 U.S. __, 2024 WL 4608863 (2024) (mem.) (discussing "strong contextual indication that a 'registrant'

is someone who *validly* registered," and stating it is "implausible" that "the General Removal Provision prohibits States from removing noncitizens, minors, or others who were never validly registered to begin with").

This conclusion makes perfect sense, as a contrary one would also render the provisions unconstitutional. The Supreme Court has made clear that the "Elections Clause empowers Congress to regulate how federal elections are held, but not who may vote in them," and forcing States to keep noncitizens on their voter rolls would cross the line into regulating "who" may vote in federal elections. *Intertribal Council*, 570 U.S. at 16. Indeed, "serious constitutional doubts" would be raised if Congress interfered with voter eligibility in a lesser way, such as restricting how States can gather information related to their eligibility requirements. *Id.* at 17. The text and structure of the General Removal Provision thus demonstrate that "registrant" only refers to those who were originally "eligible applicants." 52 U.S.C. § 20507(a)(1). Noncitizens do not qualify; the right to vote is limited to U.S. citizens. Va. Const. art. II, § 1; Va. Code Ann. § 24.2-404.4; 18 U.S.C. § 611.

Given that noncitizens are not and cannot be "registrants," there is no textual basis to divorce the Quiet Period Provision from the General Removal Provision. Because the General Removal Provision does not apply to the removal of noncitizens, who were never "eligible applicants" or "registrants" to begin with, it follows that the adjacent Quiet Period Provision does not apply to noncitizens either. The Quiet Period Provision states that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). As noted previously, it then incorporates by cross-reference three of the four exceptions from the General Removal Provision:

"request of the registrant," "criminal conviction or mental incapacity," and "the death of the registrant." *Id.* § 20507(c)(2)(B)(i).

The provision only limits the removal of "ineligible voters," *id.* § 20507(c)(2)(A), and only a "registrant" can become a "voter" in the first place. And becoming a voter, eligible or otherwise, requires one to be a "registrant" because the cross-references refer to "ineligible voters" as "registrants." *See id.* § 20507(c)(2)(B)(i) (referencing *id.* § 20507(a)(3)–(4)). Despite the complexity of the statutory scheme, the logic behind this conclusion is simple: If a person cannot become a "registrant" because he is not and cannot be an "eligible applicant," then he cannot become a "voter." And he does not become a "voter" by illegally casting a ballot that is void and, thus, a nullity. And if the person is not a "voter," eligible or otherwise, then he is not protected under the Quiet Period Provision.

The plain text of the Quiet Period Provision confirms this logical chain. The term "voter," standing alone, excludes noncitizens. A "voter" is "one who has a right to vote." *Voter*, The Compact Edition of the Oxford English Dictionary, Oxford University Press (1980); *see Voter*, Merriam-Webster, http://bit.ly/3Z12fGJ (last accessed Nov. 21, 2024) (a person who "votes or has the legal right to vote"). The adjectives "eligible" or "ineligible" then divide the term "voters" into two subsets of "voters." An "eligible voter" is a person who is "qualified" to participate in a given election. *Eligible*, The American Heritage Dictionary, Houghton Mifflin Co. (2nd Coll. Ed. 1985); see *Eligible*, Merriam-Webster, https://bit.ly/4e1ydZ1 (last accessed Nov. 21, 2024) (same); *Eligible*, The Compact Edition of the Oxford English Dictionary ("Fit or proper . . . for an office or position"). On the other hand, an "ineligible voter" is a person who had the "right to vote" but is "not qualified" in a given election. *Ineligible*, The American Heritage Dictionary. For example,

a voter or registrant could become ineligible because he has moved away, been convicted of a felony, or been declared mentally incapacitated. *See* 52 U.S.C. § 20507(a)(3)(B), (a)(4)(B).[2]

Thus, the Quiet Period Provision restricts programs with the "purpose" of "systematic[ally]" removing voters—those who had the "right to vote," but who are no longer "qualified" to vote in a given election (for instance, because they moved to a different jurisdiction). The plain text of the Quiet Period Provision therefore does not prohibit removing from the rolls individuals who never could have validly registered in the first place because such individuals were never "eligible voters" or even "ineligible voters." 52 U.S.C. § 20507(c)(2)(A). They are not "voters" or "registrants" at all. Therefore, States are free to systematically remove noncitizens, as well as minors and fictitious persons, at any time, including within 90 days of an election, without running afoul of the NVRA.[3]

The statutory-purpose section of the NVRA further indicates that the Quiet Period Provision does not protect noncitizens. The "Findings and Purposes" section of the NVRA declares that the goal of the statute is to "promote the exercise of" the "right of *citizens* of the United States

---

[2] The argument that "voter" and "registrant" cannot be rough synonyms is unpersuasive: § 20507 uses the terms interchangeably. *Compare, e.g.*, 52 U.S.C. § 20507(a)(3) (referring to when a "registrant" may "be removed" from the "list of eligible voters") and (a)(4) (referring to when "ineligible voters" may be removed from the "list of eligible voters," including upon "death of the registrant" or "change in residence of the registrant"); *see Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 148 (2023) (holding that "contextual clues persuade us" that federal statute used two different terms "as synonymous").

[3] The Organizational Plaintiffs previously contended that Virginia's definition of "ineligible voter" leads to the "absurd[ity]" that a person is both eligible and ineligible to vote at the same time. ECF 18-1. But a person can be eligible to vote in one jurisdiction, and thus a "voter," while being "ineligible" in other jurisdictions. 52 U.S.C. § 20507(c)(2)(A). Indeed, a person who has moved his residence will be an "ineligible voter" in his old jurisdiction while also being an "eligible voter" in his new jurisdiction. *Ibid.* Far from being contradictory, this definition of "ineligible voter" perfectly describes the people the NVRA is seeking to protect. Indeed, 52 U.S.C. § 20507(c)(1), the provision directly adjacent to the Quiet Period Provision, is solely dedicated to the removal processes for such persons.

to vote" and to "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(a)–(b) (emphasis added). Interpreting the NVRA to restrict the removal of noncitizens, who Section 8(a)(1) makes clear are not allowed even to become "registrants," would make a mockery of the goal of ensuring "accurate and current voter registration rolls." *Ibid.* It would also inevitably result in diluting the weight of citizens' votes. *See Reynolds v. Sims*, 377 U.S. 553, 555 (1964).

The legislative history of the NVRA also indicates that the Quiet Period Provision applies only to the removal of originally valid registrations. The Senate Report described the Provision's goal as forcing "[a]ny program which the States undertake to verify addresses" to be "completed not later than 90 days before a primary or general election." *See* S. Rep. 103-6, at 18–19 (1993) (emphasis added). Likewise, the House Report stated that the Quiet Period Provision "applies to the State outreach activity such as a mailing or a door to door canvas." H.R. Rep. No. 103-9, at 16 (1993). The Report specifically confirms that the NVRA "should not be interpreted in any way to supplant th[e] authority" of election officials "to make determinations as to [an] applicant's eligibility, such as citizenship, as are made under current law and practice." *Id.* at 8.

To be sure, some courts have come out the other way. *See Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1348 (11th Cir. 2014); *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1092–93 (D. Ariz. 2023). But other judges have correctly concluded that "Congress did not intend to bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in the first place." *Bell v. Marinko*, 367 F.3d 588, 591–92 (6th Cir. 2003). And although the Eleventh Circuit concluded, over a dissent, that the Quiet Period Provision applies to noncitizens, it failed to analyze the plain meaning of the terms "registrant" and "voter," or the statutory language making clear that only "eligible applicant[s]" can become "registrants" or

"voters." *Arcia*, 772 F.3d at 1347. The Eleventh Circuit also recognized that the logical conclusion of its interpretation was the absurdity that Congress had banned States from ever removing noncitizens from their voter rolls under the General Removal Provision, a reading that would likely render the provision unconstitutional. *Ibid.* Yet it brushed these concerns aside by declaring that "Congress could change the language of the General Removal Provision to assuage any constitutional concerns." *Ibid.*

Ignoring the implications of its interpretation reflects a serious error in *Arcia's* reasoning. Although the General Removal Provision was not directly at issue in that case (much like this one), courts must read statutes as a "harmonious whole." *Sea-Land Servs., Inc.*, 566 U.S. at 100. If a court's interpretation of one statutory phrase means that another part of the statute plainly violates the Constitution, that is strong evidence that the interpretation of the first phrase is incorrect. Because the meaning of the General Removal Provision bears on the meaning of the Quiet Period Provision, *Arcia* was wrong to brush it off as a problem for another day.

Like *Arcia*, the Plaintiffs have failed to grapple with the meaning of the terms "registrant" and "voter." Instead, they rely on the *expressio unius* canon of interpretation. Because the Quiet Period Provision contains three exceptions, the argument goes, it cannot contain one for noncitizens. This argument has two flaws that render the canon inapposite. First, as explained above, noncitizens do not fit within the Quiet Period Provision to begin with, so there was no need to create an exception to exclude them. The second flaw is that if the *expressio unius* canon applies to the Quiet Period Provision, there is no reason it would not also apply to the General Removal Provision. Both provisions contain a blanket prohibition followed by a list of enumerated exceptions, which do not include noncitizens. And there is no textual or logical basis for distinguishing the two provisions. As this Court appeared to acknowledge at the preliminary

injunction state, the *expressio unius* canon cannot apply to the General Removal Provision. ECF 120 at 18. Thus, it cannot apply to the Quiet Period Provision either.

There is no doubt that the NVRA is a complicated statute with many interlocking parts and thus requires careful parsing to understand. Yet when the act is interpreted as a whole, it becomes clear that Congress did not require States to leave voter registrations that were void *ab initio* on their voter rolls when they are discovered within 90 days of an election.

### 2.   Defendants' removal of noncitizens was "individualized" and not "systematic"

Even if this Court concludes that the NVRA's Quiet Period Provision applies to the removal of persons who were never eligible to vote, Virginia's process does not have the "purpose" of "systematic[ally]" removing voters from its rolls. 52 U.S.C. § 20507(c)(2)(A).

The Quiet Period Provision prohibits States from operating any "program" whose "purpose" is to "systematic[ally]" remove voters from the rolls fewer than 90 days before the election. 52 U.S.C. § 20507(c)(2)(A). But the Quiet Period Provision allows removals during this 90-day period if the actions are performed on an individualized basis. *See* 52 U.S.C. § 20507(c)(2)(B); *see also Arcia*, 772 F.3d at 1348 ("[T]he 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information, even within the 90–day window."). This much is not in dispute. *See* Org. Pl. Preliminary Inj. Br. at 16-17 (agreeing with *Arcia* on this point); *See* United States Preliminary Inj. Br. at 14 (same).

Virginia's method for determining citizenship falls on the "individualized" side of the line. *Arcia*, 772 F.3d at 1348. As the Plaintiffs readily admit, DMV forwards the names of individual self-declared noncitizens to ELECT, which matches them to the VERIS database, generally by using "an exact match of Social Security Number, first name, last name, and date of birth." Org.

Pl. Amended Compl. ¶ 41. If the individual appears to match a person on the voter rolls, ELECT forwards the self-declared noncitizen to the local registrar who the manually "review[s] each entry on the list and confirm[s] that it matches a voter on their jurisdiction's voter rolls." United States Compl. at ¶ 31; *see* Org. Pl. Amended Compl. at ¶ 42. There is a third step of individualized review when the local registrar mails the Notice of Intent to Cancel to each self-declared noncitizen, at which point he has an opportunity to address any issue with ELECT's records by mailing back within 14 days a pre-printed form affirming his citizenship. United States Compl. ¶ 45. As the Supreme Court has noted with respect to this very type of procedure, "a reasonable person with an interest in voting is not likely to ignore notice of this sort," and thus can be expected to "take the simple and easy step of mailing back the pre-addressed, postage prepaid card." *Husted v. A. Phillip Randolph Institute*, 584 U.S. 756, 779 (2018). And if he does not return the pre-printed affirmation of citizenship, he is sent a Voter Registration Cancellation Notice, which invites him *a second time* to contact the local registrar to correct any mistake concerning his citizenship. United States Compl. ¶ 35, 37.

The process thus begins with a personal attestation of noncitizenship, requires multiple levels of review to ensure a match, and ends in the removal of that person from the voter rolls only after he has been sent two letters offering opportunities for an individual corrective response. This is the definition of an individualized process.

ELECT did conduct a one-time *ad hoc* examination of the voter rolls using legal presence documents indicating noncitizenship on file in DMV, coupled with a *fresh* search of the SAVE database. *See* Org. Pl. Ex. 1 at 3–4 (Letter from Susan Beals to Glenn Youngkin); Va. Code Ann. § 24.2-404(E) ("The Department shall apply to participate in the Systematic Alien Verification for Entitlements Program (SAVE Program) operated by U.S. Citizenship and Immigration Services

of the U.S. Department of Homeland Security for the purposes of verifying that voters listed in the Virginia voter registration system are United States citizens."); *see also* Org. Pl. Amended Compl. ¶ 8 (alleging that the Defendants use "databases from the DMV or other sources"). But the *ad hoc* search—which was separate from the individualized process of removing self-declared noncitizens—was not "systematic," either. The same individualized verification procedures as described above, from ELECT's matching process to the local registrars manual review and sending of letters, was used.

The programs held to be systematic in other cases are far afield from Virginia's tailored inquiry into citizenship. For example, in *Arcia*, "the Secretary used a mass computerized data-matching process to compare the voter rolls with other state and federal databases, followed by the mailing of notices." 772 F.3d at 1344. The process lacked contemporaneous, individualized information from each potential noncitizen, and it also did not involve the manual review from the local registrar than Virginia conducts to weed out false matches. *See* Org. Pl. Amended Compl. ¶ 41. It thus fell on the "systematic" side of the line. *Arcia*, 772 F.3d at 1344. In *Mi Familia Vota*, the defendants conceded that their program was systematic, and it was again unlike Virginia's process because it only required "reason to believe" that a person was not a citizen, not documentary evidence like Virginia does. *See* 691 F. Supp. 3d at 1087–92.

The legislative history of the NVRA further demonstrates that Virginia has not crossed the "systematic" line here, for it makes clear what Congress meant by the term "systematic." The Senate report explains: "Almost all states now employ some procedure for updating lists at least once every two years. . . . About one-fifth of the states canvas all voters on the list. The rest of the states do not contact all voters, but instead target only those who did not vote in the most recent election . . . . Whether states canvass all those on the list or just the non-voters, most send a notice

to assess whether the person has moved." S. Rep. 103-6, at 46. The House Report likewise gives examples of prohibited activity such as a "mailing or a door to door canvas" to verify addresses. H.R. Rep. No. 103-9, at 16; *see* S. Rep. No. 103-6, at 32 (same).[4] Both mailings and door-to-door canvasses involve mass communication that is not targeted at any one individual based on personalized data, such as an individual's recent attestation to the DMV that he is not a citizen.

### B.    Defendants' process for removing noncitizens is nondiscriminatory

The Organizational Plaintiffs (but not the United States) also allege that Virginia's process for removing noncitizens does not qualify as "nondiscriminatory" under the NVRA. 52 U.S.C. § 20507(b)(1). The Organizational Plaintiffs' theory is that the challenged actions violate the NVRA "by impermissibly classifying based on a registrant's national origin and placing discriminatory burdens on naturalized citizens." Org. Pl. Preliminary Inj. Br. at 20. This theory is fatally flawed in multiple respects.

First, the Defendants are not classifying *anyone* based on that person's national origin or status as a naturalized citizen, and the complaint does not allege facts showing otherwise. A person is subject to the noncitizen removal process only when that person states contemporaneously on a DMV form that he is not an American citizen, or when his DMV documentation, confirmed by a fresh SAVE search, indicates a lack of citizenship. Org. Pl. Amended Compl. ¶ 61; Org. Pl. Ex. 2 at 3–4. Again, in either case ELECT sends the individual a form asking him to "take the simple and easy step," *Husted,* 584 U.S. at 779, of returning the preprinted affirmation of his citizenship to remain on the voter rolls.

---

[4] A "mailing" is not the sending of any piece of mail but "mail sent at one time to multiple addressees by a sender (as for promotional purposes)." *Mailing*, Merriam-Webster, https://bit.ly/4eZbEWg (last visited Nov. 21, 2024).

Nothing in this process discriminates against individuals on the basis of naturalized citizenship or national origin. If a natural-born citizen erroneously answers "no" to the citizenship question on a DMV form, he is treated exactly the same as a naturalized citizen who erroneously checks the "no" box. The complaint makes no allegations to the contrary. Both individuals will receive a letter in the mail asking them to clarify their citizenship and will remain on the rolls if they respond to the letter confirming their citizenship status. Org. Pl. Amended Compl. ¶ 43. Persons who were identified in the *ad hoc* process, those who had provided the DMV with documentation indicating noncitizenship and for whom a fresh SAVE search confirmed ineligibility, were also subject to the same individualized process. *Ibid.*

Virginia's noncitizen removal process is thus facially "nondiscriminatory." 52 U.S.C. § 20507(b)(1). The fact that only naturalized citizens have ever been noncitizens, by definition, does nothing to change this analysis. As the Supreme Court has consistently held, the fact that one class of people may fall under a facially neutral regulation but another may not does not make that regulation discriminatory against that class. The prime example is *Geduldig v. Aiello*, 417 U.S. 484 (1974). In that case, a woman challenged on equal protection grounds California's practice of excluding "pregnancy" from a list of conditions that merited payouts under disability insurance. *Id.* at 486. In upholding California's policy, the Court explained that "[w]hile it is true that only women can become pregnant[,] it does not follow that every legislative classification concerning pregnancy is a sex-based classification" that is subject to heightened scrutiny. *Id.* at 496 n.20. And to conclude that a facially neutral classification is a "proxy" for a different, suspect classification, it must be "incredibly clear" that the legislature so intended. *Kadel v. Folwell*, 100 F.4th 122, 151 (4th Cir. 2024) (en banc).

36

Here, that naturalized citizens are the only kind of citizen who would have noncitizen documents does not mean that checking those documents against the federal government's SAVE database is discriminatory against them. Indeed, the entire purpose of the SAVE database is to allow governments "to verify immigration status and naturalized/acquired U.S. citizenship of applicants" to determine their "eligibility." U.S. Citizenship and Immigration Services, https://www.uscis.gov/save. If merely checking a federal database to determine whether an individual is a naturalized citizen or a noncitizen who cannot legally vote constituted unlawful "discrimination," the NVRA would profoundly hamstring the ability of States to fulfill their obligation under the NVRA to maintain accurate voter rolls. *See Foley v. Connelie*, 435 U.S. 291, 295–96 (1978) ("[W]e have recognized a State's historical power to exclude aliens from participation in its democratic political institutions, as part of the sovereign's obligation to preserve the basic conception of a political community." (cleaned up)). Such an interpretation, again, would raise serious constitutional concerns. *See* p. 27, *supra*.

If the Organizational Plaintiffs' theory is that removing noncitizens from voter rolls has a disparate impact on naturalized citizens, any such claim fails. The NVRA requires discriminatory intent, not disparate impact alone, as the Supreme Court recently made clear in *Husted.* In that case, a majority of Justices rejected the dissent's argument that a State's process for removing nonresidents from its voter rolls failed the NVRA's "nondiscriminatory" requirement because it "disproportionately burden[ed]" minorities and other disadvantaged communities. 584 U.S. at 806–10. The majority succinctly responded that there was no "evidence in the record that [the State] instituted or has carried out its program with discriminatory intent." *Ibid.*

Absent any discrimination against naturalized citizens on the face of Va. Code Ann. § 24.2-427(C) or Executive Order 35, and without even an allegation of intentional discrimination, this claim must fail.

### C. Virginia does not violate the NVRA by requiring attestation of citizenship after receiving contradictory information

The Organizational Plaintiffs—but not the United States—next claim that Virginia's process violates the NVRA's requirement that each State "accept and use" a federal voter-registration form. 52 U.S.C. § 20505(a)(1). They claim that this provision mandates only a single "attestation under penalty of perjury that the registrant is a U.S. citizen" after which the State must maintain the individual on its rolls indefinitely. Org. Pl. Amended Compl. ¶ 86. Thus, they contend, the NVRA preempts Virginia from asking individuals who have provided contradictory information about their citizenship to state agencies to provide an Affirmation of Citizenship. This claim fails for multiple reasons.

First, the Organizational Plaintiffs lack standing to bring this claim. *See* Part I, *supra*. Their organizational-standing argument is especially weak for this claim, because the complaint contains no allegations addressing how the attestation requirement forces any of the organizations to divert their resources or otherwise alter their practices. Indeed, their entire complaint focuses on the effect of Virginia's removal of noncitizens within the quiet period, but "standing is not dispensed in gross." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). A plaintiff must establish standing for each claim and form of relief. *Ibid.* Likewise, the Organizational Plaintiffs have failed to identify any member of their organizations who would have standing. The claim should therefore be dismissed for lack of jurisdiction.

Second, if the Court reaches the merits, the claim should be dismissed under Rule 12(b)(6). The Organizational Plaintiffs fundamentally misinterpret the NVRA's "accept and use" provision:

it applies only to the initial registration of applicants, not to State's later efforts to maintain accurate voter rolls. Thus, the provision simply does not apply to the Virginia process that the Organizational Plaintiffs challenge.

The NVRA requires States to "accept and use the mail voter registration application form" mandated by the Federal Government. 52 U.S.C. § 20505(a)(1). That form "may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* § 20508(b)(1). Additionally, the form "shall include a statement that—(A) specifies each eligibility requirement (including citizenship); (B) contains an attestation that the applicant meets each such requirement; and (C) requires the signature of the applicant, under penalty of perjury." *Id.* § 20508(b)(2).

The Supreme Court has explained that the requirement to "accept and use" the federal form for mail-in registration means that States cannot reject a validly completed federal form based on a state-law requirement that the applicant verify eligibility in a manner that the form does not allow. *See Intertribal Council*, 570 U.S. at 16. Thus, for instance, a State may not require voter-registration applications to contain documentary proof of citizenship (such as a United States passport), rather than an attestation of citizenship under penalty of perjury. *Id.*

The Organizational Plaintiffs assert that *removing* persons from the voter rolls based on the failure to attest to citizenship is preempted by the NVRA's requirement to "accept and use" the federal form. Org. Pl. Amended Compl. ¶¶ 86–89. But Virginia does "accept and use" the federal form to register applicants to vote. 52 U.S.C. § 20505(a)(1). The challenged process goes to an entirely different problem: removing persons wrongfully on the voter rolls after a State later

39

learns that they provided inaccurate information on the federal registration form. The Organizational Plaintiffs' argument thus fails.

The NVRA provisions cited by the Organizational Plaintiffs only apply to the process of registering to vote in the first instance. For example, 52 U.S.C. § 20505(a)(1) only requires States to "accept and use" the federal form "for the registration of voters." In turn, 52 U.S.C. § 20508(b)(2) governs the content of that form (and any potential state forms), but it has no impact outside of the registration process. Neither of these provisions govern how persons are removed once they have already gone through the registration process. Removing persons who are on the voter rolls is governed by the General Removal Provision, *id.* § 20507(a)(3)–(4), the Nondiscrimination Provision, *id.* § 20507(b)(1), and the Quiet Period Provision, *id.* § 20507(c)(2)(A). It is not governed by the Mail-In Registration Form Provision. *Id.* § 20505(a)(1).

Because Virginia's Notice of Intent to Cancel and accompanying attestation are not part of its initial registration process, issuing these documents does not mean that Virginia has failed to "accept" the federal registration form. 52 U.S.C. § 20505(a)(1). These documents are sent after the registration process is complete, as evinced by the Organizational Plaintiffs' own allegation that Virginia requires an attestation of citizenship "to *remain* registered." Org. Pl. Amended Compl. ¶ 88 (emphasis added). Indeed, until a person is removed from the rolls if he fails to return the requested attestation, he remains registered to vote. Because the Notice of Intent to Cancel and Attestation of Citizenship are not part of "the registration of voters," 52 U.S.C. § 20505(a)(1), they cannot conflict with the Mail-In Registration Form Provision. *See* Va. Code Ann. § 24.2-427(C).

The Organizational Plaintiffs' theory that removals are governed by the "accept and use" clause would essentially prohibit states from *ever* removing *anyone* from the voter rolls. 52 U.S.C. § 20505(a)(1). Their complaint asserts that "[b]y requiring certain voters to reaffirm their U.S.

citizenship *to remain registered*," the Defendants "violate the NVRA's command that voters need only complete a voter registration form *to be a registered voter* in federal elections." Org. Pl. Amended Compl. ¶ 88 (emphases added). But under this interpretation, the only requirement to "remain" on the rolls indefinitely is to have completed the federal "voter registration form." *Id.* The Organizational Plaintiffs' theory would bar any state program, system, or process, whether individualized or systematic, that requires any additional information from a voter to determine if he is qualified to vote. Such a requirement would obviously cross the line into determining "who" can vote. *Intertribal Council*, 570 U.S. at 17.

Not only is this interpretation facially absurd, but it is also undercut by the rest of the NVRA, which contemplates requesting information from voters in order for them to stay on the rolls. For example, the NVRA sets out processes by which a state can remove a voter who has changed his residence. 52 U.S.C. § 20507(a)(4)(B), (b)(2), (c)(1). Part of that process involves mailing a postcard notice to the person who has moved and requiring him to "return the card" to remain actively on the rolls. *Id.* § 20507(d)(2); *Husted*, 584 U.S. at 779 (describing the process). Yet the NVRA's registration provisions make no mention of this postcard as a part of the registration process, *see* 52 U.S.C. § 20504, indicating that the requirement to "accept and use" the federal form does not reach roll-maintenance measures. Voter roll maintenance does not fit within the plain meaning of "registration," and instead is addressed in a different part of the NVRA with totally different requirements.[5]

---

[5] To the extent that the Organizational Plaintiffs challenge the Commonwealth's practice of asking for citizenship information in "DMV data checks and motor voter forms," Org. Pl. Amended Compl. ¶ 89, they have also failed to state a claim. The complaint contains no facts that flesh out what a "DMV data check[]" is, much less how it requires the submission of additional information, nor is there reason to think that this unexplained "data check[]" is part of the registration process instead of the removal process. *Ibid.* The complaint also fails to plead any facts

In addition, the Notice of Intent to Cancel and accompanying attestation do not require anything different than the federal form, so there is no preemption issue. As the Organizational Plaintiffs explain, all the Notice of Intent to Cancel requires is an attestation that the person is a citizen. Org. Pl. Amended Compl. ¶ 88. This is exactly the same requirement as the federal form. *See Intertribal Council*, 570 U.S. at 16. This case is not like *Intertribal Council* where the State was requiring a different type of proof, a passport or other document, than the federal form requires. *Ibid.* Thus, even if the Notice of Intent to Cancel somehow fell within the purview of the registration process, it would still not be preempted.

In sum, nothing in Va. Code Ann. § 24.2-427(C) or Virginia's noncitizen removal process concerns the requirement to "accept and use" a federal form when registering voters. 52 U.S.C. § 20505(a)(1). The form is accepted, and so long as it contains accurate information, the registrant is eligible to vote. Only if a registrant provides contradictory information about his citizenship to a different state agency does Virginia later require more information. Moreover, the only information that is required is an affirmation that the registrant is in fact a citizen.

### D.   The Organizational Plaintiffs' claim for information under the NVRA is moot and fails on the merits

Finally, the Organizational Plaintiffs also claim entitlement to certain information under the NVRA's disclosure provision. *See* 52 U.S.C. § 20507(i) ("Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."). The

---

that support the conclusion that Virginia requires additional information on its "motor voter forms." *Ibid.* It is possible that the Organizational Plaintiffs are referencing the optional "are you a citizen" box on the top of some DMV forms, but because people filling out a DMV form are not required to answer the question, it is not an improper "requirement" to register to vote.

Organizational Plaintiffs allege that Commissioner Beals violated their right to "public inspection" by "refusing to provide Plaintiffs with the list of voters identified as potential noncitizens." Org. Pl. Amended Compl. ¶ 93. But Commissioner Beals has since provided "the list of voters identified as potential noncitizens" during the quiet period in discovery. *Ibid.*; *see* ECF 72 at 2. Furthermore, pursuant to its normal course, ELECT has recently furnished the entire list of instances of removals since January of 2022 until the issuance of Executive Order 35. Commissioner Beals has also turned over the entire Virginia Voter File snapshot through October 21, 2024. ECF 72 at 2. The claim demanding production of the list of persons removed from the rolls is thus moot. A claim becomes moot when "it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Service Employees*, 567 U.S. 298, 307 (2012) (internal quotation marks omitted). The Organizational Plaintiffs wanted the list of voters who had been removed, and they now possess that list.

Further, the Organizational Plaintiffs have failed to state a claim under the Public Inspection Provision of the NVRA. *See* 52 U.S.C. § 20507(i)(1). That provision of the NVRA does not give any person an unfettered right to *receive* state voting records in any way he pleases. As the Eleventh Circuit has made clear, the phrase "public inspection" has definite meaning in the information-litigation realm, and it does not require the electronic *production* of documents. *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 105 F.4th 1324 (11th Cir. 2024).

The phrase "public inspection" was transplanted from its original location in FOIA's "reading-room provision," which allowed individuals to come to the agency in-person and review documents in a physical room. Michael Herz, *Law Lags Behind: FOIA and Affirmative Disclosure of Information*, 7 Cardozo Pub. L., Pol'y & Ethics J. 577, 586–87 (2009). If a document was available for "public inspection," it was "exempted from an agency's FOIA obligation to produce

records upon request." *Greater Birmingham Ministries*, 105 F.4th at 1332; *see also Tax Analysts v. U.S. DOJ*, 845 F.2d 1060, 1066–67 (D.C. Cir. 1988). Thus, the "public inspection" requirement does not force States to electronically produce documents to private parties. 52 U.S.C. § 20507(i). It simply requires them to open the doors to the file room if the party shows up in person and requests to see them.

The Organizational Plaintiffs do not request in-person access to a file room in Richmond. They request that the Defendants "electronically" produce the requested records. Org. Pl. Ex. 7 (copy of document request). Production and inspection are not the same thing, and a right to one does not create a right to the other. *See Greater Birmingham Ministries*, 105 F.4th at 1332. They therefore fail to state a claim under the "public inspection" provision.

The Organizational Plaintiffs do not attempt to plead facts sufficient to invoke the photocopy requirement in the Public Inspection Provision, and for good reason. That provision mandates that States "shall" provide for, "where available, photocopying [of voting records] at a reasonable cost." 52 U.S.C. § 20507(i). This provision, as it plainly states, creates a mandatory duty to (1) furnish "photocopies" when they are (2) "available" to create at a (3) reasonable price. *Id.* The complaint does not attempt to explain how "photocop[ies]" of the electronic data it requests are "available." 52 U.S.C. § 20507(i)(1). Indeed, the word "photocopy" does not appear in the complaint a single time. Without these allegations, the complaint does not create a plausible inference that the Organizational Plaintiffs are entitled to relief.

Even if the Organizational Plaintiffs did attempt to invoke this provision, their attempt would fail. A photocopy is "a photographic reproduction of (printed or graphic material)." *Photocopy*, The American Heritage Dictionary of the English Language (3d ed. 1992). And as the Eleventh Circuit plainly put it, a "photocopy" does not "include electronic production." *Greater*

*Birmingham Ministries*, 105 F.4th at 1332. "As any former intern can tell you, if your boss asks for a photocopy of a document, you walk over to the photocopier, feed the original into the machine, and return with a physical, printed copy." *Id.* at 1334. One cannot "photocopy" a database. The complaint is clear that the data being sought is contained in "databases," and does not seek paper copies of physical files. Org. Pl. Amended Compl. ¶¶ 8, 41, 42, 62. The closest that the Organizational Plaintiffs come to alleging that the documents sought were "available" for photocopying is the allegation the Commissioner Beals had a list of all the persons removed during the quiet period "in her office's possession." *Id.* ¶ 93. But that allegation also encompasses possession of a database, and in any event, the list was turned over during discovery, so it cannot be the basis of a claim now.

## CONCLUSION

This Court should dismiss both complaints with prejudice.

Dated: November 21, 2024

Respectfully submitted,

**COMMONWEALTH OF VIRGINIA;
VIRGINIA STATE BOARD OF ELECTIONS;
SUSAN BEALS**, in her official capacity as Virginia Commissioner of Elections; **JOHN O'BANNON**, in his official capacity as Chairman of the State Board of Elections; **ROSALYN R. DANCE**, in her official capacity as Vice-Chairman of the State Board of Elections; **GEORGIA ALVIS-LONG**, in her official capacity as Secretary of the State Board of Elections; **DONALD W. MERRICKS** and **MATTHEW WEINSTEIN**, in their official capacities as members of the State Board of Elections; and **JASON MIYARES**, in his official capacity as Virginia Attorney General

By: <u>   /s/ Erika Maley      </u>

Charles J. Cooper *(Pro Hac Vice)*
Joseph O. Masterman (*Pro Hac Vice*)
Bradley L. Larson *(Pro Hac Vice)*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants the Commonwealth of Virginia, the Virginia State Board of Elections, Susan Beals, John O'Bannon, Rosalyn R. Dance, Georgia Alvis-Long, Donald W. Merricks, Matthew Weinstein, and Jason Miyares*

Jason S. Miyares
    *Attorney General*
Thomas J. Sanford (VSB #95965)
    *Deputy Attorney General*
Erika L. Maley (VSB #97533)
    *Solicitor General*
Graham K. Bryant (VSB #90592)
    *Deputy Solicitors General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

**CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on November 21, 2024, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to all parties of record.


_/s/ Erika Maley_
Erika L. Maley (VSB #97533)
*Counsel for Defendants*