**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

VIRGINIA COALITION FOR
IMMIGRANT RIGHTS; LEAGUE OF
WOMEN VOTERS OF VIRGINIA;
LEAGUE OF WOMEN VOTERS OF
VIRGINIA EDUCATION FUND; AFRICAN
COMMUNITIES TOGETHER,

     *Plaintiffs*,

     v.

SUSAN BEALS, in her official capacity as
Virginia Commissioner of Elections; JOHN
O'BANNON, in his official capacity as
Chairman of the State Board of Elections;
ROSALYN R. DANCE, in her official
capacity as Vice-Chairman of the State
Board of Elections; GEORGIA ALVIS-LONG, in
her official capacity as Secretary of the State
Board of Elections; DONALD W.
MERRICKS and MATTHEW WEINSTEIN,
in their official capacities as members of the
State Board of Elections; and JASON
MIYARES, in his official capacity as Virginia
Attorney General,

     *Defendants*.

Case No. 1:24-cv-01778 (Lead)
Case No. 1:24-cv-01807
Judge Patricia Tolliver Giles

**<u>PRIVATE PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS</u>**

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

TABLE OF AUTHORITIES...............................................................................................ii

INTRODUCTION ..........................................................................................................1

BACKGROUND ............................................................................................................2

I.     Statutory Framework and Factual Background ...................................................2

II.    Procedural Background.......................................................................................4

LEGAL STANDARD .....................................................................................................6

ARGUMENT .................................................................................................................7

I.     Plaintiffs' claims are not jurisdictionally barred. ..............................................7

     A.    Plaintiffs have Article III standing. ..........................................................7

     B.    Plaintiffs' 90-Day Provision claim is not moot....................................13

     C.    Defendants are proper parties to this lawsuit........................................15

II.    Plaintiffs have sufficiently stated their claims. ...............................................19

     A.    Plaintiffs have sufficiently stated that Defendants systematically purged voters in violation of the 90-Day Provision of the NVRA. ................................................19

          i.    Defendants' removals within the 90-Day Provision were systematic........19

          ii.    The 90-Day Provision protects the voters removed by Defendants' Purge Program..........................................................................................20

     B.    Plaintiffs have sufficiently stated that Defendants' Purge Program is nonuniform and discriminatory in violation of the NVRA.......................................22

     C.    Plaintiffs have sufficiently stated that Defendants' Purge Program violates the NVRA's command that voters need only complete a voter registration form to be a registered voter in federal elections. ..................................................23

     D.    Plaintiffs have sufficiently stated that Defendants have violated the Public Disclosure of Voter Registration Activities Provision of the NVRA....................27

          i.    The claim for records under the NVRA is not moot................................27

          ii.    The NVRA public disclosure provision covers voter information in databases. ........................................................................................29

CONCLUSION................................................................................................................30

CERTIFICATE OF SERVICE .......................................................................................32

CERTIFICATE OF COMPLIANCE...............................................................................33

**Cases**                                                                         **Page**

*Alabama Coalition for Immigrant Justice v. Allen*, No. 2:24-cv-1254, 2024 WL 4510476 (N.D. Ala. Oct. 16, 2024) ("*ACIJ*") ........................................22

*Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015)........................................10

*Allco Finance Limited v. Klee*, 861 F.3d 82 (2d Cir. 2017) ........................................27

*American Alliance for Equal Rights v. Fearless Fund Management, LLC*, 103 F.4th 765 (11th Cir. 2024) ........................................10

*Arcia v. Florida Secretary of State*, 772 F.3d 1335 (11th Cir. 2014) ................................12, 20, 21

*Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1 (2013) ("*ITCA*")....................24, 25, 26, 27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................2, 6, 19

*Bland v. Roberts*, 730 F.3d 368 (4th Cir. 2013) ........................................17

*Bowsher v. Synar*, 478 U.S. 714 (1986) ........................................13

*Caicedo v. DeSantis*, No. 6:23-cv-2303, 2024 WL 4729160 (M.D. Fla. Nov. 8, 2024) ................. 8

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)........................................12

*Coakley v. Welch*, 877 F.2d 304 (4th Cir. 1989)........................................16

*Commodity Futures Trading Commission v. Board of Trade of City of Chicago*, 701 F.2d 653 (7th Cir. 1983) ........................................13

*CSX Transportation, Inc. v. Board of Public Works of State of West Virginia*, 138 F.3d 537 (4th Cir. 1998) ........................................16

*DeBauche v. Trani*, 191 F.3d 499 (4th Cir. 1999) ........................................17

*Democratic Party of Virginia v. Brink*, 599 F. Supp. 3d 346 (E.D. Va. 2022) ...............................11

*Doe v. Public Citizen*, 749 F.3d 246 (4th Cir. 2014) ........................................11

*Doyle v. Hogan*, 1 F.4th 249 (4th Cir. 2021) ........................................18

*Evans v. United States*, 105 F.4th 606 (4th Cir. 2024) ........................................6

*Ex parte Young*, 209 U.S. 123 (1908) ........................................16, 17, 18

*FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ("*WRTL*")..............................13, 14, 28

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016)........................................24, 26

*Florida State Conference of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008).....................12

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ("*AHM*")...........................................................................7, 8

*Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167 (2000) ........................................10

*Get Loud Arkansas v. Thurston*, No. 5:24-cv-5121,
2024 WL 4142754 (W.D. Ark. Sept. 9, 2024) ...........................................................8

*Giarratano v. Johnson*, 521 F.3d 298 (4th Cir. 2008)..................................................6

*Greater Birmingham Ministries v. Secretary of State of Alabama*,
105 F.4th 1324 (11th Cir. 2024)................................................................................29

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ...............................................7

*Husted v. A. Philip Randolph Institute*, 584 U.S. 756 (2018) .....................................23

*Kerns v. United States*, 585 F.3d 187 (4th Cir. 2009) ...................................................6

*Knox v. Service Employees International Union, Local 1000*, 567 U.S. 298 (2012)...................28

*La Union Del Pueblo Entero v. Abbott*, No. 5:21-cv-0844,
2024 WL 4488082 (W.D. Tex. Oct. 11, 2024) ..........................................................8

*Lighthouse Fellowship Church v. Northam*, 20 F.4th 157 (4th Cir. 2021)...................14

*Lux v. Judd*, 651 F.3d 396 (4th Cir. 2011)........................................................14, 15

*March for Our Lives Idaho v. McGrane*, No. 1:23-cv-00107,
2024 WL 4226912 (D. Idaho Sep. 17, 2024).........................................................8, 10

*Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077 (D. Ariz. 2023) ........................21, 23

*National Association for the Advancement of Colored People v. State of Alabama ex rel.
Patterson*, 357 U.S. 449 (1958) .............................................................................11

*National Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015) ..................11

*North Carolina Right to Life Committee Fund for Independent Political Expenditures v. Leake*,
524 F.3d 427 (4th Cir. 2008)....................................................................................14

*North Carolina State Conference of the NAACP v. North Carolina State Board of Elections*,
No. 1:16-CV-1274, 2016 WL 6581284 (M.D.N.C. Nov. 6, 2016) ..........................20

*Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) .........22, 29

*Public Interest Legal Foundation v. Bellows*, 92 F.4th 36 (1st Cir. 2024).....................30

*Public Interest Legal Foundation v. Chapman*, 595 F. Supp. 3d 296 (M.D. Pa. 2022)................30

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
996 F.3d 257 (4th Cir. 2021) ...................................................................6, 27

*Pulsifer v. United States*, 601 U.S. 124 (2024) ...............................................21

*Republican National Committee v. North Carolina State Board of Elections*,
120 F.4th 390 (4th Cir. 2024) ................................................................8, 9

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) .....................13

*Schneider v. Rusk*, 377 U.S. 163 (1964) ............................................................1

*Secretary of the Interior v. California*, 464 U.S. 312 (1984) ..........................................13

*Sharma v. Hirsch*, 121 F.4th 1033 (4th Cir. 2024) .................................................14

*South Carolina Wildlife Federation v. Limehouse*, 549 F.3d 324 (4th Cir. 2008) .........................17

*Tennessee Conference of the National Association for the Advancement of Colored People v. Lee*,
105 F.4th 888 (6th Cir. 2024) ....................................................................9

*United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012)......................................23

*Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002) ..........15

*Virginia Coalition for Immigrant Rights v. Beals*, No. 24-2071,
2024 WL 4601052 (4th Cir. Oct. 27, 2024) .................................................5, 19, 21

*Beals v. Virginia Coalition for Immigrant Rights*, No. 24A407,
2024 WL 4608863 (slip op.) (U.S. Oct. 30, 2024).................................................6

*Voter Reference Found., LLC v. Torrez*, 727 F. Supp. 3d 1014 (D.N.M. 2024)............................30

*Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021) ............................................18

*Wilson v. Johnson*, 535 F.3d 262 (4th Cir. 2008) .................................................6

**Statutes and Codes**

52 U.S.C. § 20501........................................................................................2

52 U.S.C. § 20505(a)(1)-(2)...............................................................................2, 23

52 U.S.C. § 20507.......................................................................................2, 21

52 U.S.C. § 20507(a)......................................................................................21

52 U.S.C. § 20507(a)(3)..................................................................................21

52 U.S.C. § 20507(b)(1) .................................................................................2, 22

52 U.S.C. § 20507(c)(2)(A)..............................................................................2, 20, 21

52 U.S.C. § 20507(i) ..........................................................................................2

52 U.S.C. § 20507(i)(1) ....................................................................................29

52 U.S.C. § 20508(b)(1) ..............................................................................24, 25

52 U.S.C. § 20510(b)(3) ....................................................................................4

Va. Code § 24.2-104(A) ....................................................................................18

Va. Code § 24.2-104.1 ......................................................................................18

Va. Code § 24.2-410.1(A) ............................................................................3, 14

Va. Code § 24.2-427(B)(iii) ............................................................................... 3

Va. Code § 24.2-427(C) ...............................................................................4, 17

**Other Authorities**

Complaint, *United States v. The Commonwealth of Virginia*, No. 24-cv-01807
    (E.D. Va. Oct. 11, 2024) .............................................................................12

Emergency Application for Stay, *Beals v. Virginia Coalition for Immigrant Rights*, No. 24A407
    (U.S. Oct. 28, 2024) ................................................................................3, 4

H.R. Rep. No. 103-9 (1993) ........................................................................20, 22

S. Rep. No. 103-6 (1993) .............................................................................20, 22

## INTRODUCTION

The right to vote is fundamental and foundational to American democracy, and American citizens hold that right in equal measure regardless of where they were born. *See Schneider v. Rusk*, 377 U.S. 163, 165 (1964). In passing the National Voter Registration Act (NVRA), Congress sought to protect that fundamental right, in particular defending it against voter registration and list maintenance programs that threaten to exclude eligible voters from the ballot box and/or operate in a nonuniform or discriminatory manner. Defendants are operating such a program that is systematically purging eligible voters from Virginia's voter rolls based on state statute and an executive order (hereinafter collectively the "Purge Program"). Virginia Coalition for Immigrant Rights (VACIR); League of Women Voters of Virginia and League of Women Voters of Virginia Education Fund (LWVVA); and African Communities Together (ACT) (hereinafter "Plaintiffs") challenged Defendants' Purge Program, alleging that it violates the NVRA's framework for protecting the fundamental right to vote.

Defendants now ask that this Court dismiss Plaintiffs' claims, arguing that they are jurisdictionally barred and that Plaintiffs have failed to state a claim on the merits. Because Plaintiffs have Article III standing, Plaintiffs' claims are not moot, and Defendants are proper parties to this lawsuit, Plaintiffs' claims are not jurisdictionally barred. Plaintiffs have also sufficiently stated their claims that Defendants have systematically purged voters in violation of the NVRA's 90-Day Provision and will continue to do so; that the Purge Program is nonuniform and discriminatory in violation of the NVRA; that the Purge Program violates the NVRA's command that voters need only complete a voter registration form to be a registered voter in federal elections; and that Defendants violated the NVRA's Public Disclosure Provision. Defendants' factual assertions to the contrary on all these claims are inappropriate for consideration of this

motion, for which the Court must take as true the allegations in Plaintiffs' complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court should deny Defendants' motion in its entirety.

## BACKGROUND

### I.     Statutory Framework and Factual Background

The United States Congress enacted the National Voter Registration Act of 1993 to protect and promote the "fundamental right" to vote. 52 U.S.C. §§ 20501 *et seq*. The NVRA contains several key provisions at issue here. First, the 90-Day Provision prohibits systematic voter purges on the eve of an election because they could strip eligible citizens of their fundamental right to vote. 52 U.S.C. § 20507(c)(2)(A). Second, the NVRA requires that all voter list maintenance programs "be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." *Id*. § 20507(b)(1). Third, states must "accept and use" the federal voter registration form and a state equivalent, and those forms may only require information that "is necessary to enable" an assessment of an applicant's eligibility. *Id*. §§ 20505(a)(1)-(2), 20508(b)(1). These provisions are intended to "increase the number of eligible citizens who register to vote in elections for Federal office," to protect "the integrity of the electoral process," and ensure the maintenance of "accurate and current voter registration rolls." 52 U.S.C. § 20501(b). Fourth, the NVRA's Public Disclosure of Voter Registration Activities Provision requires that states "shall maintain for at least 2 years and shall make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i).

The Virginia Code provides that general registrars shall cancel the registrations of all persons who are known not to be U.S. citizens by reasons of report from the Department of Motor Vehicles (DMV) or from the Department of Elections (ELECT) based on information received

from the Systematic Alien Verification for Entitlements Program (SAVE). Va. Code § 24.2-427(B)(iii). Virginia law also requires the DMV to provide to ELECT on a monthly basis a list of people "who have indicated a noncitizen status." Va. Code § 24.2-410.1(A). On August 7, 2024, the beginning of the 90-Day pre-election period for the 2024 General Election, Governor Youngkin announced Executive Order 35 (E.O. 35), which mandates a departure from the list maintenance procedures established by the Virginia Code. ECF 26-4. E.O. 35 directs the DMV to "expedite the interagency data sharing with [ELECT] of noncitizens by generating a *daily* file of all noncitizen transactions." *Id.* at 4.

The precise design, structure, and operation of Defendants' Purge Program remains unknown, as does the extent of the Program's effect on Virginia voters. Throughout this litigation, Defendants have sought to avoid revealing details about the Program, including which types of registrants the Program captures and how the removal process operates.[1] According to Defendants, they implemented voter purge processes, including an "ad-hoc" removal process and a daily data matching scheme, both outside and within the NVRA's 90-day window. The "ad-hoc" review purported to remove, after applying a SAVE search, voters who indicated citizenship in a DMV transaction but also had noncitizen documents on file. ECF 92-1 at 5. Separately, the daily removals ordered by E.O. 35 remove individuals who checked a box indicating noncitizenship during a DMV transaction. ECF 92-2 at 2-3. At the time E.O. 35 was adopted, the DMV stopped checking or verifying the status of people whose files have both an indication of noncitizenship (such as erroneously checking the noncitizenship box), as well as indications of citizenship. The

---

[1] Defendants' representations about the Program have sometimes been misleading. For example, defining individuals who *once* identified themselves as noncitizens, perhaps many years ago, as "self-identified noncitizens," regardless of whether they later affirmed citizenship, is deeply flawed. *See, e.g.*, ECF 122 at 1; Emergency Application for Stay at 1, *Beals v. VACIR*, No. 24A407 (U.S. Oct. 28, 2024).

result was that many registrants with contradictory indicators of citizenship were automatically subjected to the removal process. ECF 26-4 at 4; ECF 23 ¶ 44.

Once ELECT notifies a registrar that a registered voter is allegedly a noncitizen, the registrar performs no additional citizenship check—the registrar verifies only that the purported noncitizen is the same person as the one listed on the voter rolls. ECF 26-5 at 36-37. Indeed, Virginia law does not allow registrars to conduct any further inquiry into the individual's citizenship status.[2] When there is an identity match, the registrar sends a notice letter to each matched voter stating that they have been identified as a potential noncitizen. ECF 120 at 10. The notices direct the recipient that they have 14 days to respond by completing and attaching an attestation of citizenship. *Id.* If the person does not respond, the registrar can manually cancel that person's registration starting 14 days from the date the letter was mailed by the registrar. *Id.* The person is automatically canceled and removed from the voter rolls by the Virginia Election and Registration Information System (VERIS) after 21 days. *Id.* From the start of the 90-day pre-election period on August 7, 2024 until October 21, 2024—the date on which Defendants provided the Purge List to Plaintiffs—over 1,600 voters were purged. *See* ECF 110-1.

## II.    Procedural Background

Plaintiffs filed their complaint on October 7, 2024, the first day permissible under the NVRA's 30-day preelection period. *See* 52 U.S.C. § 20510(b)(3); ECF 1. Plaintiffs filed an emergency motion for expedited discovery the day after the complaint, and eight days later, they amended their complaint and moved for a preliminary injunction. ECFs 4, 23, 26. This Court held

---

[2] Defendants have conceded no further inquiry is conducted. *See* Emergency Application for Stay at 7, *Beals v. Virginia Coalition for Immigrant Rights*, No. 24A407 (U.S. Oct. 28, 2024); ECF 119 at 95-97; ECF 92-1 at 2l; Va. Code § 24.2-427(C).

a hearing on the discovery motion and ordered Defendants to provide a list of alleged noncitizens removed pursuant to the Purge Program. ECF 72.

Following a full-day hearing, this Court granted a preliminary injunction on Plaintiffs' 90-day claim. ECF 120 at 24. This Court first held that "Plaintiffs [had] established organizational standing under *Havens Realty*, as well as *Hippocratic Medicine*" and that it is "likely that they are going to be able to establish associational standing as well." *Id.* at 6-7. The Court found that Plaintiffs showed a "likelihood of success by clear and convincing evidence," having demonstrated that "the Defendants' process is a program whose purpose is to systematically remove the names of ineligible voters which was continued or not completed later than 90 days before the general election." *Id.* at 13-14. Next, the Court found that Plaintiffs suffered irreparable harm from Defendants' Program, which "curtailed the right of eligible voters to cast their ballots in the same way as all other eligible voters." *Id.* at 20. Lastly, the Court determined that the balance of equities and the public interest favored Plaintiffs. *Id.* at 23-24.

Defendants asked this Court to stay its preliminary injunction and, after the Court denied their motion, filed an emergency stay motion with the Court of Appeals for the Fourth Circuit. A panel of the Fourth Circuit denied Defendants' stay motion almost entirely. The Court concluded that Defendants' Purge Program constitutes a "program" that "most certainly is" systematic, and that at least some "eligible citizens have had their registrations canceled and were unaware that this was even so." *See VACIR v. Beals*, No. 24-2071, 2024 WL 4601052, at *1–2 (4th Cir. Oct. 27, 2024) (internal quotations omitted). Subsequently, Defendants submitted an emergency motion to stay to the United States Supreme Court, which granted the motion pending "the disposition of the appeal in the United States Court of Appeals for the Fourth Circuit and disposition of a petition for

a writ of certiorari." *VACIR v. Beals*, No. 24A407, 2024 WL 4608863 (slip op. at 1) (U.S. Oct. 30, 2024) (mem.).

On November 21, 2024, Defendants filed their Motion to Dismiss and a Memorandum in Support of that motion. ECFs 121, 122.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In assessing a 12(b)(6) motion, the Court must "accept[] the plaintiff's allegations as true and draw[] all reasonable inferences in the plaintiff's favor." *Public Interest Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 263 (4th Cir. 2021); *see also Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). Likewise, under Rule 12(b)(1), "[w]hen a defendant makes a facial challenge to subject matter jurisdiction, . . . the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (internal quotation and citation omitted); *see also, e.g.*, *Evans v. United States*, 105 F.4th 606, 615 (4th Cir. 2024); *Wilson v. Johnson*, 535 F.3d 262, 264 (4th Cir. 2008).

**ARGUMENT**

**I. Plaintiffs' claims are not jurisdictionally barred.**

**A. Plaintiffs have Article III standing.**

Plaintiffs have organizational and associational standing. As to the former, organizational plaintiffs suffer injury in their own right when defendants' "actions directly affect[] and interfere[] with [plaintiffs'] core business activities." *FDA v. All. for Hippocratic Med.* (*AHM*), 602 U.S. 367, 395 (2024). In *Havens Realty Corp. v. Coleman*, for example, the Supreme Court found injury because the challenged racial steering practices "perceptibly impaired" the plaintiff organization's housing counseling services. 455 U.S. 363, 379 (1982).

Like the plaintiffs in *Havens Realty*, Plaintiffs here provide counseling—*voting* counseling, in the form of voter registration assistance and voter engagement efforts. And, as Plaintiffs have alleged, the Purge Program "directly affect[s] and interfere[s] with" those core organizational activities, *AHM*, 602 U.S. at 395, including by requiring Plaintiffs to identify and reregister purged voters and ensure previously active voters remain active and registered. *See* ECF 23 ¶¶ 21–23, 26–27, 34; ECF 26-24 (Porte Decl.) ¶¶ 2, 5–25; ECF 26-25 (Traore Decl.) ¶¶ 12–16; ECF 26-23 (Sarmiento Decl.) ¶¶ 5, 12. For example, as a direct response to the Purge Program, LWVVA has had to dedicate more resources to "'check your registration' efforts" targeted at naturalized citizens, "distribute a public service announcement (PSA) throughout the state . . . instructing [voters] to check that their registration is valid before Election Day," and expend resources on "helping members and registered voters determine whether they remain eligible and by helping voters who are purged restore their eligibility." ECF 23 ¶¶ 26–27. ACT has similarly expended its resources "producing new public education materials," "revising the resources and scripts used by canvassers and phone bankers," and "re-training paid staff and volunteers" to assist purged voters

and help them re-register if necessary. *Id.* ¶ 34. And Plaintiffs' injury goes further still: No amount of resources will allow Plaintiffs to ensure that all the individuals they have helped register and encouraged to vote will remain able to do so under the Purge Program. *See* ECF 23 ¶¶ 26, 30; ECF 26-24 (Porte Decl.) ¶¶ 27, 29, 39; ECF 26-25 (Traore Decl.) ¶¶ 17, 19–21; ECF 26-23 (Sarmiento Decl.) ¶¶ 18–19. For those reasons, courts routinely recognize that policies that directly impair voter registration also harm organizations that provide voter registration assistance.[3]

*AHM* did not abrogate *Havens Realty* in the way Defendants imagine. *See* ECF 122 at 15-17. In fact, *AHM* expressly re-affirmed the core of *Havens Realty*: that plaintiff organizations have standing when a defendant's actions "perceptibly impair[]" their core organizational activities "with the consequent drain on the organization's resources." *Havens Realty*, 455 U.S. at 379; *see AHM*, 602 U.S. at 395. The *AHM* plaintiffs, by contrast, incurred no similar injury. They alleged only that they had incurred costs by "advocat[ing] against the defendant's actions," *AHM*, 602 U.S. at 394, but not that those actions "imposed any similar impediment" to their core organizational activities, *id.* at 395. *AHM* Plaintiffs were just "concerned bystanders" without a concrete stake in the dispute. *Id.* at 382. In other words, *AHM* merely clarified that, absent an impairment of core organizational activities as in *Havens Realty*, plaintiffs had done nothing more than "assert standing simply because they object to [defendant's] actions." *Id.* at 394.

The Fourth Circuit recently foreclosed Defendants' proposed reading of *AHM*. In *Republican National Committee v. North Carolina State Board of Elections*, the Court explained

---

[3] This includes numerous court findings since the *AHM* decision. *See, e.g.*, *Get Loud Ark. v. Thurston*, No. 5:24-cv-5121, 2024 WL 4142754, at *13 (W.D. Ark. Sept. 9, 2024); *March for Our Lives Idaho v. McGrane*, No. 1:23-cv-00107, 2024 WL 4226912, at *5–6 (D. Idaho Sep. 17, 2024); *La Union Del Pueblo Entero v. Abbott*, No. 5:21-cv-0844, 2024 WL 4488082, at *35–36 (W.D. Tex. Oct. 11, 2024), *stayed on other grounds by* 119 F.4th 404 (5th Cir. 2024); *Caicedo v. DeSantis*, No. 6:23-cv-2303, 2024 WL 4729160, at *4–5 (M.D. Fla. Nov. 8, 2024).

that alleged non-compliance with a federal voter-registration law "directly affected and interfered with" the core organizational activities of "counseling interested voters and volunteers on election participation," because the alleged inaction forced plaintiffs to "divert significantly more of their resources into combatting election fraud" and "frustrated their organizational and voter outreach efforts." 120 F.4th 390, 397 (4th Cir. 2024) (internal citations and quotation marks omitted). In light of *AHM* and prior Fourth Circuit precedent, the *North Carolina State Board of Elections* court distinguished between an "uncompelled choice to expend resources" "not [made] in response to a threat to the organization's core mission," which cannot establish standing, and resource expenditures necessary to continue conducting core organizational activities, which can. *Id.* at 396–97. Defendants elide that critical distinction altogether, instead reading *AHM* to mean that resource diversion is categorically irrelevant to organizational standing and reading *Havens* (in light of *AHM*) as limited to "lying to the plaintiff's employees." ECF 122 at 16–17. Far from it. *AHM* simply confirms the commonsense notion that "Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *N.C. State Bd. of Elections*, 120 F.4th at 409 (Diaz, J., concurring) (quoting *AHM*, 602 U.S. at 381). And *AHM* "did not question—and, indeed, approvingly cited—many other cases in which the Court has allowed 'unregulated' parties to sue a defendant even though the defendant's conduct harmed those parties indirectly." *Tenn. Conf. of NAACP v. Lee*, 105 F.4th 888, 905 (6th Cir. 2024).

Defendants also argue that Plaintiffs lack organizational standing to bring Count Three, which alleges that the Purge Program violates the NVRA's requirement that states "accept and use" certain voter registration forms. ECF 122 at 38. But Plaintiffs have standing to bring this claim as well. Plaintiffs' core organizational activities include multi-lingual efforts to "educat[e] and assist[]

naturalized citizen voters with checking their voter registration status and how to re-register if they have been removed." ECF 23 ¶ 21; *see id.* ¶ 33. Helping voters navigate this additional (and unlawful) requirement of the re-registration process is necessarily part of the impairment imposed by the Purge Program that Plaintiffs have alleged. *See March for Our Lives Idaho*, 2024 WL 4226912, at *5–6 (finding voter-assistance organization had organizational standing to challenge law imposing additional registration requirements). That re-registration process, and its harms, remain ongoing, *see generally* ECF 122 at 5–7, even sweeping in voters who have already "verified their citizenship previously," ECF 23 ¶ 54.

Plaintiffs also have associational standing, because at least one member has standing in their own right, and organizations have standing to sue on behalf of their members. *See Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 181 (2000). As previously submitted materials show, at least one member of Plaintiff League of Women Voters of Virginia, who does not wish to be named, appears on the Purge List and was removed from the voting rolls pursuant to Defendants' Purge Program. ECF 103-1 (Suppl. Porte Decl.) ¶¶ 3–5; *see* ECF 103 at 16. A purged voter, whose fundamental right to vote has been directly impaired by removal from the voter rolls and referral for investigation, would undoubtedly have standing. Even Defendants do not deny that having a member who appears on the Purge List would establish associational standing with respect to Counts One and Two, but they contend the individual must be named. ECF 122 at 12. But public disclosure is neither necessary nor prudent here. *See Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 270 (2015) (*Alabama*); *Am. All. for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024) (concluding that there is no "requirement that an organizational plaintiff identify affected members by their legal names"). While Defendants rely on *Summers v. Earth Island Institute*, *see* ECF 122 at 12, "*Alabama* moderates [*Summers*] slightly in that a

prominent political organization need not identify individual members so long as a reasonable inference can be drawn that such individuals exist," especially where defendants have not factually challenged the existence of such persons. *Democratic Party of Va. v. Brink*, 599 F. Supp. 3d 346, 355 n.10 (E.D. Va. 2022) (citing *Alabama*, 575 U.S. at 270). At no point—not during the preliminary injunction proceedings and not in their motion to dismiss briefing—have Defendants challenged the Supplemental Porte Declaration's confirmation that a LWVVA member was purged.

Given that Plaintiffs brought this suit in part to protect their members from Defendants' threats of prosecution and attendant intimidation, *see* ECF 23 ¶¶ 5, 22, 26, 29, 34, it is unsurprising that affected individuals do not wish to be identified by name. The value of disclosure should be weighed against the "repressive effect" that public disclosure of membership might have. *NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449, 463 (1958); *see also Doe v. Pub. Citizen*, 749 F.3d 246, 274 (4th Cir. 2014) (requiring "balancing the party's stated interest in anonymity against the public's interest in openness and any prejudice that anonymity would pose to the opposing party" in pseudonymous litigation context); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015), *abrogated on other grounds by Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165 (9th Cir. 2024) ("Where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured."). And whatever the value of disclosure when particular facts about an individual member might bear on standing, that value is minimal when, as here, all the relevant facts—namely, that the individual is a member of the organization and that they were purged pursuant to the Purge Program—have already been alleged. *See* ECF 122 at 13 (suggesting

that Plaintiffs needed to have alleged its "members were removed pursuant to Virginia's noncitizen removal process" to establish standing). The costs of disclosure, by contrast, are significant. *See, e.g.*, ECF 26-25 (Traore Decl.) ¶ 11 (describing risk of "doxxing, harassment, intimidation, or other adverse ramifications" from membership disclosure).

The many naturalized-citizen members in Plaintiff organizations' ranks further bolsters associational standing because those members also face threatened harm—such as removal from the voter rolls and referral for investigation—due to the Purge Program, *see* ECF 23 ¶¶ 22, 24, 29, 32, 34, including an identified member.[4] Indeed, the Eleventh Circuit recognized, that the "risk of false positives and mismatches" in voter registration removals creates a "realistic danger" that organizational plaintiffs' naturalized-citizen members will be erroneously swept up by such programs, conferring associational standing on behalf of naturalized-citizen members. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014). And there, as here, Defendants have "not offered to refrain from similar programs within the 90–day window in the future," *id.* at 1343, and in fact describe the Purge Program as ongoing, *see* ECF 122 at 5–7, amplifying the risk of future harm. Nor is this harm speculative: both the mechanism of harm—errors and mismatches—and the threatened result—purging naturalized citizens—are actually occurring and entirely traceable to Defendants' actions. *See* ECF 26-1 at 17–19; ECF (McDonald Decl.) 26-2 at 4, 7–9; *see also Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1163–64 (11th Cir. 2008) (distinguishing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), on that basis in the context of a similar voter purge program).[5]

---

[4] Plaintiffs can provide the name of a naturalized-citizen member of LWVVA, who is willing to be named, under seal with this Court or pursuant to a protective order if necessary. Defendants have indicated they are open to the same. *See* ECF 119 at 11:5–12.

[5] In any event, the presence of the United States as a Plaintiff, whose standing no party disputes, is sufficient to establish standing for Private Plaintiffs' 90-Day Provision claim. *See* ECF 23 ¶¶

## B. Plaintiffs' 90-Day Provision claim is not moot.

Defendants incorrectly contend that Plaintiffs' 90-Day Provision claim is moot, since the 2024 elections are over. *See* ECF 122 at 17. Though the 2024 elections have indeed passed, Defendants have repeatedly asserted that they have removed voters during the 90-day periods prior to federal elections for many years and election cycles. *See* ECF 122 at 2. Thus, Plaintiffs challenge a longstanding and ongoing policy of violating federal law, albeit one that bars action during certain cyclical periods of time. Since Defendants make no claim of cessation of that policy, they cannot reasonably claim mootness simply because we are not presently within a 90-day quiet period. *See, e.g.*, *Commodity Futures Trading Comm'n v. Bd. of Trade of City of Chicago*, 701 F.2d 653, 655 (7th Cir. 1983) (explaining that the passage of the challenged delivery cycle did not moot the case, since Plaintiffs sought "a broader injunction" that would affect future delivery cycles as well).

In any event, this Court retains jurisdiction over the 90-Day Provision claim because it "fit[s] comfortably within the established exception to mootness for disputes capable of repetition, yet evading review." *FEC v. Wis. Right to Life, Inc.* (*WRTL*), 551 U.S. 449, 462 (2007). That exception applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (quotations omitted). The Fourth Circuit has explained that "[e]lection-related disputes qualify as 'capable of repetition' when there is a

---

85–90; Complaint, *United States v. The Commonwealth of Virginia*, No. 24-cv-01807, ¶ 61 (E.D. Va. Oct. 11, 2024). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006). That remains true of parties to consolidated cases. *See Sec'y of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) (applying same principle in litigation "instituted through separate but similar complaints"); *Bowsher v. Synar*, 478 U.S. 714, 715 (1986) (same).

reasonable expectation that the challenged provisions will be applied against the plaintiffs again during future election cycles." *Sharma v. Hirsch*, 121 F.4th 1033, 1039 n.1 (4th Cir. 2024) (quotations omitted). "[T]he Supreme Court has repeatedly instructed that the exception is especially appropriate when mootness would have otherwise been the result of a completed election cycle." *Id.*; *see also Lux v. Judd*, 651 F.3d 396, 401 (4th Cir. 2011); *N.C. Right to Life Comm. Fund for Indep. Political Expenditures v. Leake*, 524 F.3d 427, 435 (4th Cir. 2008).

That exception unmistakably applies here, because there is a reasonable expectation that Plaintiffs will suffer injury during future quiet periods.[6] Importantly, the Fourth Circuit has made clear that "reasonable expectation" in this context does not require anything approaching certainty. For instance, "an ex-candidate's claims may be capable of repetition, yet evading review" even if she does not allege an intent to run for office, since she "'[ran] for office before and may well do so again.'" *N.C. Right to Life*, 524 F.3d at 435-36 (quoting *Int'l Org. of Masters, Mates & Pilots v. Brown*, 498 U.S. 466, 473 (1991)). That standard is easily met here, because there is every reason to believe the Purge Program will continue in future quiet periods: A statute requires some version of the Program to be carried out, Va. Code § 24.2-410.1(A); Defendants have repeatedly argued that the 90-Day Provision allows the Program to continue during the quiet period; they have not offered to halt purges during future quiet periods; and the accelerated purge required by E.O. 35 is ongoing.

---

[6] Defendants do not dispute that the "challenged action [was] in its duration too short to be fully litigated prior to cessation or expiration," *WRTL*, 551 U.S. at 462, and the Fourth Circuit has not focused on the duration inquiry in election-related cases. *See Sharma*, 121 F.4th at 1039 n.1; *Lux*, 651 F.3d at 401. Even if it were relevant here, there is no question that the duration of Defendants' action during the previous 90-day quiet period was too short to be fully litigated. *See Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 165 (4th Cir. 2021) ("Notably, the Supreme Court has found a period of as long as two years too short to complete judicial review in the context of the exception for wrongs capable of repetition yet evading review.").

Defendants assert that the exception does not apply because it is unclear whether Plaintiffs' members will be purged during the next quiet period. *See* ECF 122 at 18. But that improperly narrows the inquiry—the exception applies not just if a specific member might be purged, but if there is a reasonable expectation that the challenged provision will be applied in a way that harms the Plaintiff organizations. *See, e.g.*, *Lux*, 651 F.3d at 401. As explained in detail above, any extension of the Purge Program into the next quiet period will harm Plaintiffs in all the ways Plaintiffs were harmed by the previous quiet period purge. *See* Part I.A., *supra*. And even if Defendants were correct that the inquiry were limited to future harms to members, the exception would nonetheless apply. Defendants' Purge Program has *already* ensnared at least one of Plaintiffs' members, and it has targeted some of the same naturalized citizens more than once. In fact, it has required some individuals to verify their citizenship as many as five times. ECF 23 ¶ 54. Contrary to their contentions then, the erroneous removal of some of Plaintiffs' members during future quiet periods hardly requires a "specula[tive]" "series of events." ECF 122 at 18. Rather, where, as here "repeated conduct is before the court in the present, the prospect of future repetition becomes all the more likely." *Sharma*, 121 F.4th at 1039 n.1.

### C. Defendants are proper parties to this lawsuit.

Under *Ex parte Young*, when a plaintiff seeks injunctive relief to remedy an ongoing violation of federal law and names as defendant a state official who has "some connection" to enforcement of the challenged law, the state official is not entitled to sovereign immunity. 209 U.S. 123, 158, 161 (1908). In determining whether *Ex parte Young* applies, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261,

296 (1997)). "[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Id.* at 646.

Here, the *Ex parte Young* exception to sovereign immunity applies because, despite Defendants' claims to the contrary, *see* ECF 122 at 19, Plaintiffs' 90-Day Provision claim challenges and seeks prospective relief from an ongoing Purge Program that will continue to improperly remove voters from the rolls within 90 days before every federal election until the Program is enjoined. ECF 23 ¶¶ 48, 78-79; *id.* at 31 ¶¶ (c), (h), (i), (l). The language of the Amended Complaint and the circumstances make this clear. For example, the Amended Complaint alleges both that voters were removed from the rolls in the previous 90-day quiet period, and that more will continue to be removed until the law is enjoined. *Id.* ¶ 48. And the statute allowing for such removals—which Defendants argue may be applied during the 90-day quiet period—will continue to operate, unless repealed. Based on that concern, Plaintiffs did not only seek a preliminary injunction; they seek a *permanent* injunction that will prevent Virginia's Purge Program from operating just before *any* federal election. ECF 23 at 31 ¶ (c). Plaintiffs also seek prospective relief requiring Defendants ELECT and the Board to instruct local election officials to "place back on the rolls in active status" voters removed by the Purge Program, including voters removed within 90 days before any federal election. ECF 23 at 31; *see, e.g.*, *Coakley v. Welch*, 877 F.2d 304, 305, 307 n.2 (4th Cir. 1989) (former state employee's challenge of his termination satisfied *Ex parte Young* because loss of benefits of employment caused ongoing harm and employee requested injunctive remedy of reinstatement); *see also, e.g.*, *CSX Transp., Inc. v. Bd. of Pub. Works*, 138 F.3d 537, 541 (4th Cir. 1998).[7] Defendants ignore all of those portions of

---

[7] Should this Court find that the relief sought is insufficiently prospective to satisfy *Ex parte Young*, Plaintiffs will seek leave to amend their complaint to address the issue.

Plaintiffs' complaint and can cite no comparable case in which a court held that a similarly-situated plaintiff had failed to meet *Ex parte Young*'s requirement.[8]

Defendants also claim, under the Fourth Circuit's "special relation" test for *Ex parte Young*, that the Attorney General is not a proper party to the lawsuit because he "has nothing to do with" the Purge Program.[9] ECF 122 at 19. But importantly, the Fourth Circuit's "special relation" test does not require the connection between a state official and a challenged process to "be *qualitatively* special; rather, 'special relation' under *Ex parte Young* [serves] as a measure of *proximity to* and *responsibility for* the challenged state action." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008) (emphasis in original). As *Ex parte Young* explains, in determining whether a state official is a proper defendant, "the important and material fact" is "that the state officer, by virtue of his office, has some connection with the enforcement of the act[;]" and whether the connection "arises out of the general law, or is specially created by the act itself, is not material so long as it exists." 209 U.S. at 157.

The Attorney General satisfies the Fourth Circuit's "special relation" test. As alleged in the Amended Complaint, the Attorney General has helped implement the Purge Program, claimed credit for E.O. 35's announced purge of 6,303 voters, actively investigates for prosecution voters purged through the Program, and receives referrals from counties—like Arlington County and

---

[8] Indeed, the relevant cases, including those relied on by Defendants, involve one-time events that are unlikely to recur, unlike here. *See* ECF 122 at 19. In *DeBauche v. Trani*, 191 F.3d 499 (4th Cir. 1999), the plaintiff's claim alleged that a university president unlawfully excluded her from a gubernatorial debate; the Court found the plaintiff's allegation that the same thing could happen in a future election mere "conjecture." *Id*. at 505; *see also Bland v. Roberts*, 730 F.3d 368, 390 (4th Cir. 2013) (holding that claim for monetary relief was barred by the Eleventh Amendment, but claim for reinstatement of employment was not).

[9] Defendants improperly confine what constitutes as the Purge Program to only the text of Va. Code § 24.2-427(C). The Purge Program includes the process outlined in E.O. 35, and Va. Code § 24.2-427(C) only constitutes one aspect of it. ECF 23 ¶¶ 1-14; ECF 26-4.

others—to investigate and prosecute voters purged by the Program.[10] ECF 23 ¶ 37; ECF 26-4 at 3.

Moreover, as alleged in the Amended Complaint and highlighted in E.O. 35, Virginia law gives the Attorney General "full authority to do whatever is necessary or appropriate to enforce the election laws or prosecute violations thereof." Va. Code § 24.2-104(A); ECF 26-4 at 4; *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535, 544 (2021) (category of state officials that may be sued under *Ex parte Young* includes those "who may or must take enforcement actions" with respect to the challenged law). The Attorney General also has the authority to "commence a civil action . . . for appropriate relief" "[w]henever the Attorney General has reasonable cause to believe that a violation of an election law has occurred[.]" Va. Code § 24.2-104.1. As the Fourth Circuit noted, the Attorney General's "authority to seek *prospective* relief" may provide "an adequate connection between the [a]ttorney [g]eneral and the enforcement of the [a]ct to permit . . . suit under *Ex parte Young*." *Doyle v. Hogan*, 1 F.4th 249, 257 (4th Cir. 2021) (emphasis in original).

---

[10] Defendants claim in a footnote that the Attorney General cannot redress Plaintiffs' injuries for the same reasons they claim the Attorney General is not a proper party under *Ex parte Young*. In making these arguments, Defendants ignore Plaintiffs' clear and concise requests for injunctive relief seeking to: permanently enjoin the Attorney General from implementing a Purge Program he has admitted his office plays a role in; instruct voters harmed by the Purge Program that they will not be criminally investigated or prosecuted solely based on being flagged by that error-ridden and unlawful Program; and provide Plaintiffs with records concerning the implementation of the Purge Program. ECF 23 at 31 ¶¶ (c), (h), (i), (l). Defendants also imply that Plaintiffs' requested relief improperly restrains the Attorney General's administration of state criminal laws, even though Plaintiffs' requested relief is precisely crafted only to enjoin criminal investigation and prosecution solely based on a voter being referred by Defendants' unlawful Purge Program, and the requested relief acknowledges the Attorney General's authority to investigate or prosecute a voter based on information showing that they have violated a law. ECF 23 at 31 ¶ (h).

## II.     Plaintiffs have sufficiently stated their claims.

### A.     Plaintiffs have sufficiently stated that Defendants systematically purged voters in violation of the 90-Day Provision of the NVRA.

Plaintiffs have alleged facts sufficient to show that Defendants have engaged in a systematic Purge Program impacting persons protected by the NVRA. As this Court has already found, Defendants' Program is systematic, is not based on individualized determination, and has resulted in the improper removal of eligible voters from the voter rolls. ECF 120 at 14-17. All of this is clearly laid out in the operative complaint. ECF 23 ¶¶ 8-11, 55. Thus, under the NVRA's 90-Day Provision, Plaintiffs have included "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal citation and quotations omitted). For the purposes of this motion, it is unnecessary to again rebut all of Defendants' statutory arguments, but those arguments also lack merit.

### i.     *Defendants' removals within the 90-Day Provision were systematic.*

As the Fourth Circuit concluded, the Purge Program is systematic: it "does not require communication with or particularized investigation into any specific individual. Rather, the inclusion of a person's name on a list electronically compared to other agency databases is enough for removal from the voter rolls." *VACIR v. Beals*, 2024 WL 4601052, at *1-3; ECF 23 ¶¶ 39-43. Defendants appear to assert that because they initially collect data from individual transactions, any subsequent data matching process should be considered individualized. ECF 122 at 32-33. But as the Amended Complaint alleges, the Purge Program systematically selects voters for removal

based on a mass database matching exercise. ECF 23 ¶¶ 40-44. Defendants' Program amounts to "simply checking data fields, matching in mass." ECF 120 at 16.[11]

Defendants also point to the NVRA's legislative history to extrapolate what Congress meant by "systematic." ECF 122 at 34. But the material they rely on is unhelpful—while the reports indicate that activities "*such as* a mailing or a door to door canvas" would violate the 90-Day Provision, H.R. Rep. No. 103-9, at 16 (1993) (emphasis added), S. Rep. No. 103-6, at 32 (1993), that certainly does not imply that Virginia's own mass mailing is permissible. In any event, consistent with the plain meaning of "systematic" and that same legislative history, courts have uniformly held that mass mailing to affected voters does not make the process "individualized." *See, e.g.*, *Arcia*, 772 F.3d at 1344; ECF 91-1 at 9; *N.C. State Conference of the NAACP v. N.C. State Bd. of Elections*, No. 1:16-CV-1274, 2016 WL 6581284, at *6-7 (M.D.N.C. Nov. 6, 2016).

> ## ii. *The 90-Day Provision protects the voters removed by Defendants' Purge Program.*

The plain language of the 90-Day Provision states in simple terms that programs like Defendants' are prohibited: "A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). As this Court noted, "the only exceptions" to that prohibition include removals at "the request of the registrant," "by reason of criminal conviction or mental incapacity," or due to "the death of the registrant." ECF 120 at 14. The 90-Day Provision is designed not to protect ineligible voters—be they noncitizens or nonresidents—but the *eligible* voters ensnared in

---

[11] Defendants concede that they perform no individualized investigation into the citizenship status of removed individuals. *See* ECF 120 at 16; ECF 122 at 33. The only process resembling individualized investigation is limited to identification purposes. *Id.*

systematic list maintenance prior to an election. *See* 52 U.S.C. § 20507. As Plaintiffs have alleged, the Purge Program was a "program" that "systematically removed" the names of both eligible and ineligible voters from the voter rolls within the meaning of § 20507(c)(2)(A), and no exceptions apply. ECF 23 ¶¶ 2-8.

Defendants' suggested reading of the 90-Day Provision is "inconsistent with Congress' intent" to protect eligible voters from erroneous last-minute purges and indeed would circumvent that purpose entirely. ECF 120 at 17. Defendants argue that, because the NVRA's General Removal Provision prohibits removal of "registrants" unless an enumerated exception applies and because none of those exceptions relate to noncitizenship, the term "registrants" and the 90-Day Provision's separate reference to "ineligible voters" cannot be read to include noncitizens. Reading otherwise, they claim, would "prohibit[] States from *ever* removing noncitizens from their rolls." *See* ECF 122 at 26; 52 U.S.C. § 20507(a)(3). However, no court or state, including the parties and courts in this case, has concluded that the NVRA disallows states from ever removing noncitizens.[12] And Congress' decision to use different words in the 90-Day and General Removal provisions is a strong reason to conclude that they should be given different meanings. *See Pulsifer v. United States*, 601 U.S. 124, 149 (2024).

Furthermore, Defendants' reading of the NVRA would permit states to remove any eligible citizens so long as the states used the correct pretense of suspected noncitizenship or any other category that fits Defendants "*ab initio*" construction. ECF 122 at 24. This statutory construction has been rejected by this Court, the Fourth Circuit, and established jurisprudence in the federal courts. *See* ECF 120 at 17-18; *VACIR v. Beals*, 2024 WL 4601052; *Arcia*, 772 F.3d at 1348; *Mi*

---

[12] This is likely because the word "registrant" refers only to an "eligible applicant" who submitted a "valid voter registration form," (*see* 52 U.S.C. § 20507(a)), a description that does not apply to noncitizens.

*Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1093 (D. Ariz. 2023); *Ala. Coal. for Immigrant Justice v. Allen* (*ACIJ*), No. 2:24-cv-1254, 2024 WL 4510476 (N.D. Ala. Oct. 16, 2024).

**B.      Plaintiffs have sufficiently stated that Defendants' Purge Program is nonuniform and discriminatory in violation of the NVRA.**

Plaintiffs have stated a plausible claim for relief on their claim that the Purge Program is nonuniform and discriminatory in violation of 52 U.S.C. § 20507(b)(1). ECF 23 ¶¶ 2, 9, 14, 55-71, 83. "The NVRA reflects the view of Congress that the right to vote 'is a fundamental right,' that government has a duty to 'promote the exercise of that right,' and that discriminatory and unfair registration laws can have a 'damaging effect on voter participation' and 'disproportionately harm voter participation by various groups, including racial minorities.'" *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012) (*quoting* 52 U.S.C. § 20501(a)). The NVRA sought to eliminate non-uniform, discriminatory practices such as "selective purging of the voter rolls" with a specific concern that "[s]uch processes must be structured to prevent abuse which has a *disparate impact* on minority communities." S. Rep. No. 103-6, at 3, 18 (emphasis added); *see also* H. Rep. No. 103-9, at 15. Voter list maintenance programs must accordingly be applied uniformly throughout the jurisdiction and cannot discriminatorily single out specific subsets of voters, such as voters born outside the United States (i.e., naturalized citizens), for purging under the NVRA. 52 U.S.C. § 20507(b)(1).

Plaintiffs have alleged more than enough factual content to allow the Court to draw the reasonable inference that Defendants' Purge Program discriminates based on national origin and thus also citizenship classification. The Purge Program "by design singles out individuals who were once identified in DMV records as noncitizens and subjects them to scrutiny not generally faced by U.S.-born citizens." ECF 23 ¶¶ 70-71; *see also* ECF 23 ¶ 69 ("[N]oncitizen designation or transactions in the DMV data are often the sole criterion to trigger voter registration

cancellation.").[13] The Program is therefore exactly the sort of discriminatory, selective purge that federal courts have repeatedly held violates the NVRA's uniform and nondiscriminatory provision. *See, e.g.*, *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 999 (D. Ariz. 2024) (where "[o]nly naturalized citizens would be subject to scrutiny," law had "non-uniform and discriminatory impact on naturalized citizens"); *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012) (selective purge that swept in "primarily newly naturalized citizens" likely violated the NVRA's uniform and nondiscriminatory requirement). And, because Plaintiffs have alleged facts sufficient to show that the Purge Program classifies individuals on the basis of naturalized citizenship status and national origin, Plaintiffs need not otherwise demonstrate discriminatory intent: such a policy is flatly unlawful under the NVRA. *See, e.g.*, *Florida*, 870 F. Supp. 2d 1346; *Mi Familia Vota*, 719 F. Supp. 3d at 999.

Defendants' citation to *Husted v. A. Philip Randolph Institute*, 584 U.S. 756 (2018), is inapposite: there, the state defended the non-uniform and discriminatory effects of its purge by arguing that plaintiffs had not brought a claim under § 20507(b)(1). Here, there is no dispute that Plaintiffs have brought such a claim. *Compare Husted*, 584 U.S. at 809 (Sotomayor, J., dissenting) (describing state's position at oral argument) *with* ECF 23 ¶¶ 81-84.

### C.  Plaintiffs have sufficiently stated that Defendants' Purge Program violates the NVRA's command that voters need only complete a voter registration form to be a registered voter in federal elections.

Count Three alleges that the Purge Program violates Sections 6 and 9 of the NVRA. Section 6 requires states to "accept and use" the federal voter registration form (Federal Form) and its state equivalent (State Form). 52 U.S.C. § 20505(a)(1)-(2). Section 9 provides that those forms may

---

[13] Plaintiffs' factual assertions about the Program's operation, not Defendants', are accepted as true in assessing the Motion.

require "*only*" information that "is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id*. § 20508(b)(1) (emphasis added). Defendants maintain that no voter removal program can ever violate Sections 6 and 9, because they govern the registration process. ECF 122 at 39-41. But that ignores Plaintiffs' allegations about potential procedural hurdles the Purge Program erects during the initial registration process. *See* ECF 23 ¶ 89; note 17, *infra*. And more broadly, Supreme Court precedent and common sense demonstrate the flaw in Defendants' reasoning: a voter purge that renders registration forms functionally useless conflicts with the scheme Congress designed in Sections 6 and 9 of the NVRA. Because Plaintiffs have plausibly alleged that Virginia's Purge Program does just that, dismissal is inappropriate here, where discovery has not yet revealed the nature and scope of the Purge Program's operation.[14]

In *Arizona v. Inter Tribal Council of Arizona* (*ITCA*), the Supreme Court held that Section 6 of the NVRA requires that states use the Federal Form "as a complete and sufficient registration application" for federal elections; states may not erect additional barriers to registration. 570 U.S. 1, 9 (2013). Thus, the Court invalidated an Arizona law requiring registration applicants to provide documentary proof of citizenship (DPOC), because it was preempted by the NVRA's requirement that Arizona "accept and use" the Federal Form, which did not require DPOC. *Id*. at 20.

Therefore, under *ITCA*, Virginia's Purge Program is preempted by the NVRA if it "conflicts with the NVRA's mandate that [Virginia] 'accept and use' the Federal Form." *Id*. at 9. If there is a conflict, "the state law, so far as the conflict extends, ceases to be operative." *Id*. (quotations omitted); *see also Fish v. Kobach*, 840 F.3d 710, 729 (10th Cir. 2016) (holding that Kansas' DPOC

---

[14] Defendants make a separate standing argument regarding Count Three, *see* ECF 122 at 38, which is addressed in Part I.A., pp. 9-10, *supra*.

requirement was preempted by Section 5 of the NVRA and concluding that "[t]he Elections Clause does not require Congress to expressly foreclose such modifications by the states").

Here, Plaintiffs allege that the Purge Program conflicts with Sections 6 and 9 because Virginia does not in fact "accept and use" the Federal or State Form "as a complete and sufficient registration application." *ITCA*, 570 U.S. at 9. For certain voters, Defendants require applicants to complete additional paperwork before allowing them to vote. *See* ECF 23 ¶¶ 88-89; *see also id.* ¶¶ 2, 39.[15] That additional requirement means that a registration form is not "a complete and sufficient registration application," and the Purge Program therefore conflicts with the NVRA, undercutting Congress' purpose of guaranteeing registration with a simple, single form.[16]

Defendants now assert that as long as they *nominally* accept the Federal and State Forms and place voters on a registration list, they can never violate Sections 6 and 9. ECF 122 at 39-40.[17] But that proves far too much—under that reading of the law, any state could avoid the requirements of Section 6 and 9 by accepting forms from all voters, then immediately purging every voter who had not cleared some additional hurdle, such as submitting DPOC. But states are not allowed to

---

[15] As noted above, in addition to Count Three's allegations related to voter removals, *see* ECF 23 ¶ 88, the Amended Complaint also alleges that Defendants require applicants to submit "additional citizenship information about themselves as part of the State's DMV data checks and motor voter forms." ECF 23 ¶ 89. That is supported by E.O. 35's directive for the DMV to "verify applicants' . . . legal status" using the SAVE and Social Security Administration databases when issuing a new credential. ECF 26-4 at 4. At this point—before any discovery has begun—it is unclear what additional steps applicants must take in relation to the database checks required by E.O. 35, demonstrating that dismissal is inappropriate here.

[16] That additional information is also more than what "is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process," as determined by the Election Assistance Commission. 52 U.S.C. § 20508(b)(1).

[17] Notably, even if Defendants' theory were correct, it would not resolve Count Three as applied to the alleged practice of requiring additional information at the time of registration. *See* note 15, *supra*; ECF 23 ¶ 89; ECF 26-4 at 4 (requiring DMV to perform SAVE and Social Security database checks when issuing new credentials). For that reason alone, dismissal of Count Three is inappropriate.

circumvent federal law by relabeling their processes, and there is simply no question that such a system would conflict with the NVRA's requirement that the forms serve as a complete and sufficient registration application. If such circumvention were allowed, "the Federal Form ceases to perform any meaningful function, and would be a feeble means of 'increas[ing] the number of eligible citizens who register to vote in elections for Federal office.'" *ITCA*, 570 U.S. at 13 (quoting 52 U.S.C. § 20501(b)(1));[18] *see also Fish*, 840 F.3d at 729 (refusing to "finely parse the [NVRA] for gaps or silences into which state regulation might fit" because doing so would allow state law to "fundamentally alter [its] structure and effect").

Defendants are wrong to maintain that this common-sense understanding of Sections 6 and 9 "would essentially prohibit states from *ever* removing *anyone* from the voter rolls." ECF 122 at 40. To the contrary, Sections 6 and 9 do not prohibit states from operating removal programs after they have, in good faith, accepted Federal and State Forms as "complete and sufficient registration application[s]." 570 U.S. at 9. The law merely prevents states from operating "removal" programs that in fact prevent the forms from serving their intended purpose. And the fact that Section 8 of the NVRA sets out removal processes for specific situations, *see* ECF 122 at 41, reinforces the point: Sections 6 and 9 do not prevent good-faith removal programs that comply with the law.

This all demonstrates that dismissal of Count Three is inappropriate here, before discovery has commenced. Plaintiffs have plausibly alleged that "the Federal Form ceases to perform any meaningful function" due to the Purge Program, and that the Program therefore conflicts with Sections 6 and 9 of the NVRA. *ITCA*, 570 U.S. at 13. Defendants respond by claiming that

---

[18] Defendants' contention that such a system is permissible is similar to Arizona's argument, rejected by the *ITCA* Court, that the NVRA "requires merely that a State receive the Federal Form willingly and use that form as one element in its (perhaps lengthy) transaction with a prospective voter." *Id*. at 9.

"Virginia's Notice of Intent to Cancel and accompanying attestation are not part of its initial registration process," ECF 122 at 40, but that factual assertion and other assurances that the Purge Program is a good-faith list maintenance effort cannot be accepted as true at this stage.[19] *See Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 97 (2d Cir. 2017) (asking whether plaintiffs "provide[d] factual allegations" that "might sustain a preemption claim"); *Pub. Int. Legal Found.*, 996 F.3d at 263 (explaining that court must "accept[] the plaintiff's allegations as true and draw[] all reasonable inferences in the plaintiff's favor" when assessing a motion to dismiss).

**D. Plaintiffs have sufficiently stated that Defendants have violated the Public Disclosure of Voter Registration Activities Provision of the NVRA.**

***i.   The claim for records under the NVRA is not moot.***

In their pre-litigation notice letter and complaint, Plaintiffs requested numerous documents from Defendants to ascertain the nature and scope of their Purge Program, and to identify voters affected by it. While Defendants assert that Plaintiffs' claim is now moot because they have provided certain records, ECF 122 at 43, many of those requests have not been fulfilled, rendering their mootness claim meritless.

While Defendants fulfilled some of Plaintiffs' records requests after being forced to by court order, and subsequently provided the long list of affected voters after the 2024 election, they have yet to produce documents to which Plaintiffs are entitled under the NVRA's disclosure

---

[19] Defendants rely on another factual assertion when arguing that "the Notice of Intent to Cancel and accompanying attestation do not require anything different than the federal form, so there is no preemption issue." ECF 122 at 42. But even if that turns out to be true, it does not solve Defendants' problem—as explained herein, the Federal and State Forms are intended to simplify the registration process and serve "as a complete and sufficient registration application." 570 U.S. at 9. Requiring voters to complete additional forms that provide no new information undoubtedly conflict with that goal. Indeed, Defendants' claim that they are seeking no new information when contacting voters provides a strong indication that the Purge Program does nothing more than erect new burdens for targeted voters.

provision. Specifically, Defendants have not produced all records related to their implementation of the Purge Program, including records evidencing their process for identification and removal of voters identified; information concerning which voters responded to the notices of removal; and information regarding all persons who have been subject to investigations as a result of the Purge Program—information that is essential to understanding the Purge Program and for the Court to adjudicate the claims brought by Plaintiffs. A claim is moot "*only* when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *See Knox v. Service Employees*, 567 U.S. 298, 307 (2012) (emphasis added) (internal quotation marks omitted). Thus, Plaintiffs' records claim is not moot because the Court has the power to grant relief to Plaintiffs by ordering Defendants to produce those additional requested documents. *See id.*

Moreover, even with respect to the limited records that have been produced—the list of affected voters—Defendants' violation of the NVRA records provision is clearly subject to the capable of repetition yet evading review exception to the mootness doctrine. As explained in Part I.B., *supra*, the exception applies in cases where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *WRTL*, 551 U.S. at 450 (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). Given the tight 90-day timeline that NVRA claims operate under, and the related work that Plaintiffs do for each election, judicial efficiency is best served by adjudicating the merits of the case at this juncture. Holding otherwise would eviscerate the NVRA's records provision, paving the way for states to simply withhold records until the action becomes moot. Indeed, that is exactly what Virginia has attempted to do here and, absent relief from this Court, will be emboldened to do again, shielding illegal voter purges from scrutiny. ECF 26-15 at 6-7; ECF 23-9.

*ii.*     ***The NVRA public disclosure provision covers voter information in databases.***

A practical reading of the NVRA, understanding advances in technology since it was enacted, shows that the digital systems Virginia uses for list maintenance are subject to records request claims. Defendants rely on a strained, overly-narrow reading of the NVRA to suggest that Plaintiffs have not properly pleaded their records claim, because they have not included a request to "photocopy" records or to review records via "in-person access to a file room in Richmond." ECF 122 at 43-45. To support their position, Defendants rely on *Greater Birmingham Ministries v. Secretary of State of Alabama*, 105 F.4th 1324 (11th Cir. 2024), an out of circuit case that does not create binding precedent. *Id.* But if Defendants' proposed reading of the NVRA were accepted, the NVRA's public records provision would be rendered useless in the modern age where states rely on digital databases to carry out list maintenance. In any event, Defendants have not argued (nor could they) that they have made the requested records available for public inspection in lieu of electronic production. As such, Defendants' arguments about what means of disclosure would be adequate under the NVRA are premature at the motion to dismiss stage.

The NVRA requires states to disclose "all records" related to any effort by the state to ensure "the accuracy and currency" of voter registration lists. *See* 52 U.S.C. § 20507(i)(1). As the Fourth Circuit has recognized in the context of interpreting the NVRA's public disclosure provision, "the use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth." *See Project Vote/Voting for Am., Inc.*, 682 F.3d at 336 ("[T]he fact that [Section 8(i)(1)] very clearly requires that 'all records' be disclosed brings voter registration applications within its reach.") (quotations omitted). Consistent with this, numerous courts have concluded that voter databases are subject to the public records disclosure provision, because the information housed in those databases is "the output and end result" of voter list registration and

29

maintenance activities and therefore "plainly relates" to said activities. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 47 (1st Cir. 2024) (holding that the database used by Maine to carry out its voter list registration and maintenance activities was subject to disclosure under the NVRA); *see also, e.g.*, *Voter Reference Found., LLC v. Torrez*, 727 F. Supp. 3d 1014, 1218 (D.N.M. 2024) (finding that New Mexico violated the NVRA's Public Inspection Provision by not disclosing voting records held in a state database); *Pub. Int. Legal Found. v. Chapman*, 595 F. Supp. 3d 296, 306 (M.D. Pa. 2022) (finding that Congress intended the NVRA's disclosure obligations to reach a broad array of activities and programs and Pennsylvania's registration database is in the universe of disclosable records). This Court, consistent with circuit precedent broadly interpreting the NVRA's public disclosure provision, should do the same. Accordingly, the request to dismiss or limit the public records disclosure claim should be denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety.

Date: December 20, 2024

Respectfully submitted,

Ryan Snow*
Javon Davis*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street, NW, Ste. 900
Washington, DC 20005
(202) 662-8600
rsnow@lawyerscommittee.org
jdavis@lawyerscommittee.org

/s/ Shanna Ports
Shanna Ports (VSB No. 86094)
Danielle Lang*
Brent Ferguson*
Simone Leeper*
Katherine Hamilton*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
sports@campaignlegalcenter.org
dlang@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
sleeper@campaignlegalcenter.org
khamilton@campaignlegalcenter.org

Orion Danjuma*
John Paredes*
THE PROTECT DEMOCRACY PROJECT, INC.
82 Nassau Street, # 601
New York, NY 10038
Telephone: (202) 579-4582
orion.danjuma@protectdemocracy.org
john.paredes@protectdemocracy.org

Benjamin L. Berwick*
THE PROTECT DEMOCRACY PROJECT, INC.
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Anna Dorman*
THE PROTECT DEMOCRACY PROJECT, INC.
200 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582
anna.dorman@protectdemocracy.org

John Powers*
Hani Mirza*
ADVANCEMENT PROJECT
1220 L Street Northwest, Suite 850
Washington, D.C. 20005
(202) 728-9557
jpowers@advancementproject.org
hmirza@advancementproject.org

*Attorneys for Plaintiffs Virginia Coalition for
Immigrant Rights, the League of Women Voters
of Virginia, the League of Women Voters of
Virginia Education Fund, and African
Communities Together*

*Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that on December 20, 2024, I electronically filed the above document with the Clerk of Court using the ECF system, which will provide electronic copies to any counsel of record.

/s/ Shanna Ports
Shanna Ports

## CERTIFICATE OF COMPLIANCE

I certify that this memorandum conforms to the typeface and page limitations set out in Local Civil Rule 7(F)(3).

/s/ Shanna Ports
Shanna Ports