## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

VIRGINIA COALITION FOR IMMIGRANT
RIGHTS, *et al.*,

               *Plaintiffs*,

      v.

SUSAN BEALS
*in her official capacity as Virginia Commissioner
of Elections, et al.*,

               *Defendants*.

Case No. 1:24-cv-1778 (PTG/WBP)

UNITED STATES OF AMERICA,

               *Plaintiff*,

      v.

COMMONWEALTH OF VIRGINIA, *et al.*,

               *Defendants*.

Case No. 1:24-cv-1807 (PTG/WBP)

## UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**INTRODUCTION**

In this consolidated case, Defendants the Commonwealth of Virginia, the Virginia State Board of Elections, and Susan Beals, in her official capacity as the Commissioner of Elections, move to dismiss various claims raised by the United States and Private Plaintiffs.  As to the United States, the Defendants move to dismiss its sole claim under Section 8(c)(2) of the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20507(c)(2), known as the Quiet Period Provision, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Defendants' motion fails for at least two reasons.

First, the Defendants are simply wrong to assert that the Quiet Period Provision does not apply to systematic efforts to remove purported noncitizens from the voter registration rolls.  The Provision's plain text contains no exception for the removal of voters suspected of being noncitizens.  And, as the Fourth Circuit explained at an earlier stage in this case, the Defendants' attempt to create that exception flouts the statute's plain text and "violates basic principles of statutory construction."  *Va. Coal. for Immigrant Rts. v. Beals*, No. 24-2071, 2024 WL 4601052, at *1 (4th Cir. Oct. 27, 2024).  Defendants' convoluted structural argument distorts the term "ineligible voters" as used in the Quiet Period Provision, interprets the Provision using wholly different language in *another* NVRA provision, and rewrites the Provision to apply to changes in residency only.  Their argument must be rejected.  While States can and should remove ineligible voters from their rolls, the Quiet Period Provision reflects Congress's judgment that systematic removal programs within 90 days of a federal election risk improper removal of eligible voters when the potential harm of that removal is greatest.  Notably, the Quiet Period Provision does not prevent Virginia from removing noncitizens based on individualized assessments during that same 90-day period.  Simply put, the Defendants' strained reading of the Quiet Period Provision

cannot square with the statute's terms, Congress's intent, or relevant caselaw.

Second, the Defendants' claim that the Commonwealth's voter registration removal program (Program) is not "systematic" is equally wrong.  52 U.S.C. § 20507(c)(2)(A).  The United States' complaint alleges that the Program hinges on mass data matching, the *sine qua non* of a "systematic" removal program covered by the Quiet Period Provision, and therefore creates—at the very least—a *plausible* violation of the NVRA sufficient for the United States' claim to proceed further.  And, per the complaint's non-conclusory factual allegations, the Program does not allow for individualized assessments of the citizenship status of any person targeted by it.  As alleged, Commonwealth and local election officials lack authority to investigate individual citizenship evidence or even decline to cancel the voter registrations of known United States citizens on the basis of those citizens' alleged noncitizen status.  Rather than permit any individualized inquiry, the Program puts the burden on targeted voters to affirm their citizenship.  It is therefore a paradigmatic example of a systematic program aimed at removing voters from the rolls, and thus the United States has more than met its initial pleading burden.  Stymied by the NVRA's plain language, the Defendants turn to an equally unpersuasive argument about its legislative history.

Finally, a Rule 12(b)(6) motion is simply the wrong vehicle to resolve factual disputes around the exact operation of the Program and its systematic nature.  *See Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992); *Ziegler v. Dunn*, No. 3:23-cv-480, 2024 WL 761860, at *10 (E.D. Va. Feb. 23, 2024).  The United States' complaint plausibly alleges that Virginia's noncitizen removal program is systematic and intended to remove the names of ineligible voters from the official lists of eligible voters.  *Ziegler*, 2024 WL 761860, at *2.  This Court should deny the Defendants' motion to dismiss.

**BACKGROUND**

**A.     Factual Background**

On August 7, 2024, exactly 90 days before the November 5, 2024, federal general election, Virginia's Governor issued Executive Order 35 formalizing the Commonwealth's Program aimed at removing purported noncitizens and requiring that Program to be carried out each day going forward.  *See* Compl. ¶ 20, *United States v. Virginia*, No. 1:24-cv-01807 (E.D. Va. Oct. 11, 2024), ECF No. 1 (*citing* Exec. Ord. No. 35 at 5) (Compl.).  The complaint alleges that the Program continued operating through the 90-day period preceding the November 5, 2024, federal general election.  *See id.* ¶¶ 40-55, 61.  The complaint further alleges that the Program is systematic and has a purpose of removing ineligible voters from the list of eligible voters.  *Id.* ¶¶ 20-39, 54, 61.

The Program identifies voters as possible noncitizens if they respond "No" to questions about their United States citizenship status on certain forms submitted to the Virginia Department of Motor Vehicles (DMV).  *Id.* ¶ 25.  Voters who respond "No" are identified as possible noncitizens even if they have previously submitted voter registration forms where they have affirmed that they are U.S. citizens.  *Id.* ¶ 26.  The Virginia DMV sends the Department of Elections (ELECT) a list of purported noncitizens generated by the above process.  *Id.* ¶ 28. ELECT then attempts to match individuals on the list provided by the DMV to individuals on the voting rolls.  *Id.* ¶ 29.

ELECT regularly sends each local registrar the names of the purported noncitizens who appear on the voter roll in the registrar's jurisdiction.  *Id.* ¶ 30.  Upon receipt of a list from ELECT, the local registrar is required to review each entry on the list and confirm that it matches a voter on their jurisdiction's voter rolls.  *Id.* ¶ 31.  The local registrar must then send a Notice of

Intent to Cancel to each voter identified by the Program who appears on their jurisdiction's voter rolls.  *Id.* ¶ 34.  That Notice reads:

> We have received information that you indicated on a recent DMV application that you are not a citizen of the United States.  If the information provided was correct, you are not eligible to vote.  If the information is incorrect and you are a citizen of the United States, please complete the Affirmation of Citizenship form and return it using the enclosed envelope.  If you do not respond within 14 days, you will be removed from the list of registered voters.  If you believe this notice has been issued in error or have questions about this notification, please call the Office of General Registrar.

*Id.*  Prior to sending the notice, local registrars are not required to take any steps to confirm noncitizen status and indeed have no discretion to decline to send a notice.  *Id.* ¶¶ 32-33.  If the voter fails to respond within 14 days, the voter's registration is automatically removed from the voter rolls, and the voter is sent a Voter Registration Cancellation Notice.  *Id.* ¶ 35.  That notice informs the voter that the local registrar "has stricken [the voter's] name from the Voter Registration List" "on the basis of official notification from the Virginia Department of Elections that [the voter] failed to timely respond to a request to affirm [their] United States Citizenship within the 14 days allowed by the Code of Virgina (§24.2-427)."  *Id.*  The only action the Notice suggests a voter take if they believe the removal of their registration from the Voter Registration List is incorrect is to contact "this office."  *Id.* ¶ 37.  The Notice ends with the statement that the voter has been "Declared Non-citizen," based on their failure to respond to the Notice of Intent to Cancel.  *Id.* ¶ 36.  The Cancellation Notice does not tell voters they can re-register to vote, nor does it provide information on Virginia's Election Day voter registration process.  *Id.* ¶ 37.

### B.    Procedural Background

The United States filed suit on October 11, 2024.  *See generally* Compl.  The United States moved for a preliminary injunction on October 16, 2024.  *See* Mot. for Prelim. Inj., *United*

*States v. Virginia*, No. 1:24-cv-1807 (E.D. Va. Oct. 16, 2024), ECF No. 9.  At that time, another lawsuit brought by Private Plaintiffs challenging, among other things, the Defendants' violation of the Quiet Period Provision was already pending in this Court.  *See* Compl., *Va. Coal. for Immigrant Rts. v. Beals*, No. 1:24-cv-1778 (E.D. Va. Oct. 7, 2024), ECF No. 1.[1]  The Court consolidated the United States' case with the Private Plaintiffs' case on October 18, 2024.  *See* Consolidation Ord., ECF No. 65.  On October 24, 2024, this Court heard arguments on the United States' Motion for Preliminary Injunction.[2]  *See* Mot. Hr'g Mins., ECF No. 110.  On October 25, this Court enjoined the Defendants from continuing to remove voter registrations pursuant to the Program during the Quiet Period and ordered remedial action.  *See* PI Ord., ECF No. 112.

The Defendants' subsequent motions for stays of this Court's preliminary injunction order pending appeal were denied orally by this Court, Transcript at 38, ECF No. 120 (PI Transcript Day 2), and in large part by the Fourth Circuit, *see Va. Coal. for Immigrant Rts. v. Beals*, No. 24-2071, 2024 WL 4601052, at *1 (4th Cir. Oct. 27, 2024).[3]  The Fourth Circuit's order largely denying a stay recognized the applicability of the Quiet Period Provision to programs designed to remove noncitizens from voter rolls and affirmed the systematic nature of the Program.  *Id.*  The Defendants sought a stay in the United States Supreme Court, which was

---

[1] Unless indicated by a separate docket number, ECF references refer to the consolidated district court docket: *Va. Coal. for Immigrant Rts. v. Beals*, No. 1:24-cv-1778.

[2] The Court in this consolidated hearing also heard argument on Private Plaintiffs' Motion for a Preliminary Injunction. *See* ECF No. 110.

[3] In the Fourth Circuit, Defendants have filed an unopposed request to dismiss the appeal as moot and an opposed request to vacate this Court's preliminary injunction order and the Fourth Circuit's stay decision.  *See* Mot., *Va. Coal. for Immigrant Rts. v. Beals*, No. 24-2071 (4th Cir. Dec 2, 2024), ECF 32. Both requests are pending.

granted on October 30, 2024, without accompanying rationale.[4]  *See Beals v. Va. Coal. for Immigrant Rts.* 603 U.S. __, 2024 WL 4608863 (Mem.) (Oct. 30, 2024).

On November 21, 2024, the Defendants moved to dismiss the United States' claim under Rule 12(b)(6) for failure to state a claim.  *See* Mot. to Dismiss, ECF No. 121; Br. in Supp. of Mot. to Dismiss, ECF No. 122 (MTD Br.).

### C.  Statutory Background

Section 8(c)(2) of the NVRA, the Quiet Period Provision, restricts states from continuing systematic programs to remove voters from the rolls during the 90-day period preceding a federal election.  *See* 52 U.S.C § 20507(c)(2).  It requires a "State [to] complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."  *Id.* § 20507(c)(2)(A).  In enacting the Quiet Period Provision, Congress sought to require that "State outreach activity, such as the mailing of list verification notices or conducting a canvas, must be concluded not later than 90 days before an election."  S. Rep. No. 103-6, at 18-19 (1993); *see also* H.R. Rep. No. 103-9, at 16 (1993) ("This requirement applies to the State outreach activity such as a mailing or a door-to-door canvas and requires that such activity be completed by the 90-day deadline.").

---

[4] The Supreme Court did not in its order granting the Defendants' application for a stay supply any reasoning, and certainly did not express an opinion, about any of the arguments defendants raise in their Motion to Dismiss.  *See Beals v. Va. Coal. for Immigrant Rts.* 603 U.S. __, 2024 WL 4608863 (Mem.) (Oct. 30, 2024).  A Supreme Court stay order does not bind this Court's review of Defendants' Motion to Dismiss.  *See, e.g.*, *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring) ("The stay order is not a ruling on the merits, but instead simply stays the District Court's injunction *pending a ruling on the merits.*") (emphasis in original).

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint under Rule 8(a) and does not concern factual contests, the merits of the claim, or defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992); *Byers v. City of Richmond*, No. 3:23-cv-801, 2024 WL 4295232, at *8-9 (E.D. Va. Sept. 25, 2024). The complaint must contain sufficient non-conclusory factual allegations that, when assumed to be true, state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the complaint enables the court to draw a "reasonable inference" of the defendant's liability. *Id.* Plausibility is not a "probability requirement" but does necessitate more than a "sheer possibility." *Id.* (quoting *Twombly*, 550 U.S. at 556). As a result, plaintiffs must allege more than "formulaic recitation of the elements" or "naked assertions" without factual enhancement. *Id*. (quoting *Twombly*, 550 U.S. at 555, 557). Non-conclusory facts in the complaint are assumed to be true, the complaint must be viewed in the light most favorable to the plaintiff, and all reasonable inferences that can be drawn from the complaint must be drawn in the plaintiff's favor. *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020); *see also Stewart v. Evelyn*, No. 3:24-cv-84, 2024 WL 4193899, at *4 (E.D. Va. Sept. 13, 2024); *Byers*, 2024 WL 4295232, at *11; *Benton v. Berkshire Richmond LLC*, No. 3:23-cv-704, 2024 WL 4149735, at *1 (E.D. Va. Sept. 11, 2024).

**ARGUMENT**

**A. The United States' allegations plead a Quiet Period Provision Violation by Defendants.**

The United States' complaint states a claim for a Quiet Period Provision violation. It alleges that the Program, launched on the 90th day before the November 5, 2024, federal general

election and continuing thereafter, aimed to systematically remove the names of ineligible voters from the official list of registered voters during the relevant period. The complaint contains sufficient factual allegations to draw a strong inference of the Defendants' liability.

The Defendants offer two arguments in challenging the United States' sole claim: (1) the Quiet Period Provision does not apply to the removal of noncitizens; and (2) the Commonwealth's Program was not "systematic" within the meaning of the NVRA. Both arguments fail. The Defendants' Motion to Dismiss should be denied.

### 1. The Quiet Period Provision's limit on systematic removal programs includes those aimed at removing noncitizens.

The Commonwealth's Program is subject to the Quiet Period Provision. The Quiet Period Provision governs systematic efforts to remove voters from the rolls—including those suspected of being noncitizens—within 90 days of an election. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1343-48 (11th Cir. 2014); *see also Ala. Coal. For Immigrant Just. v. Allen*, No. 2:24-cv-1254, 2024 WL 4510476 (N.D. Ala. Oct. 16, 2024). During the 90-day Quiet Period states may not conduct "*any program* the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A) (emphasis added). The phrase "any program" carries an "expansive meaning." *Arcia*, 772 F.3d at 1344 (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)); *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (same). That wide-ranging prohibition accomplishes Congress's purpose of preventing mistaken cancellations that, when carried out close to an election, pose a heightened "risk of disfranchising eligible voters" via systematic removals. *Arcia*, 772 F.3d at

1346; *see also id.* (noting that, during the 90-day period, the "calculus changes" in favor of avoiding incorrect removals because of insufficient time to "rectify any errors").

The NVRA sets out only three categories of removals not subject to the Quiet Period Provision—those (1) at the request of the registrant, (2) because of a criminal conviction or mental incapacity, or (3) because the registrant has died.  *See* 52 U.S.C. § 20507(c)(2)(B) (cross-referencing 52 U.S.C. § 20507(a)(3)(A) and (B), (4)(A)).  Those categories are exclusive.  *See Arcia*, 772 F.3d at 1345.  "Noticeably absent from the list of exceptions" to the Quiet Period Provision "is any exception for removal of non-citizens."  *Id.*; *see also Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1092-93 (D. Ariz. 2023) (same), *appeal docketed*, No. 24-3188 (9th Cir. May 17, 2024); Transcript of Mot. Hr'g Ex. 1 at 6, *Ala. Coal. For Immigrant Just. v. Allen*, No. 2:24-cv-1254 (N.D. Ala. Oct.16, 2024) (finding that, because an Alabama program "modified voter lists on a basis, other than registrant's request for removal, criminal conviction, or mental incapacity, or death, the program was subject to the" Quiet Period Provision, and explaining that, if Alabama's process in that case was "not a program within the meaning of the National Voter Registration Act, it's difficult for the Court to imagine what would qualify as a program").

Finding no carveout for "noncitizens" in the Quiet Period Provision's text, the Defendants conjure a convoluted argument, largely based on the General Removal Provision, a separate provision not at issue in this case, in an effort to show that the Quiet Period Provision excludes programs to remove suspected noncitizens.  That argument seems to flow as follows: (i) the NVRA's General Removal Provision, 52 U.S.C. § 20507(a)(3), specifies that "the name of a registrant may not be removed from the official list of eligible voters" except at the request of the registrant or because of death, criminal conviction, mental incapacity, or change of residence;

(ii) the General Removal Provision does not bar the removal from the voter rolls of persons, like noncitizens, who are not eligible to vote at the time of registration; (iii) noncitizens, minors, fictitious persons, and others who were never eligible to register thus are not "registrants" covered by the General Removal provision in the first place; and (iv) by extension, such never-eligible persons also are not "ineligible voters" within the meaning of the Quiet Period Provision. MTD Br. at 24-32.  But strained logic and tortuous textual analysis are no basis to dismiss the United States' complaint.

The Defendants' labyrinthine argument that the Quiet Period Provision does not apply to programs to remove noncitizens upends the statute's plain meaning.  "[U]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (quoting *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006)).  Yet the Defendants' argument ignores the plain meaning of the term "ineligible voters."  The ordinary meaning of "voter" is "one that votes," and the ordinary meaning of "ineligible" is "not eligible" or "not qualified."  *Voter* & *Ineligible*, Webster's Third New International Dictionary of the English Language (3d ed. 1981).  One who is not eligible or qualified to vote describes a noncitizen voter.  And no speaker would use the term "ineligible voter" the way the Defendants assert that Congress must have here, that is, to describe *exclusively* voters who were eligible to vote at some point in the past but are no longer eligible. *See* MTD Br. at 27-29.  In doing so, the Defendants invoke an alternative definition of "voter" to mean an *eligible* voter, or as they phrase it, someone with a "legal right to vote." *Id.* at 28.  But that is not what the word "voter" means in the context of the phrase "ineligible voter": no ordinary use of that term envisions a voter who is both "eligible" and "ineligible" at the same time.  The Defendants address this by arguing that there are "ineligible voters" who are in fact

10

eligible in some jurisdictions, *id.* at 29 n.3, but Defendants provide no reason or evidence as to why Congress would have used the term "ineligible voter" in such a tortured manner.  Such choplogic must be rejected.

But the Defendants go further.  They attempt to salvage their strained definition of "ineligible voter" by contending that the meaning of that phrase must be dictated by the meaning of "registrant" in a *different* part of the statute, the General Removal Provision.  *See* MTD Br. at 25-26; 52 U.S.C. § 20507(a).  This argument also fails.  As an initial matter, the NVRA's General Removal Provision is not at issue in this case, and resolving the United States' Quiet Period claim does not require this Court to reference the General Removal Provision, much less interpret it.  The Defendants rely on contextual clues in a provision adjacent to the General Removal Provision to argue the term "registrant" in the General Removal Provision refers only to persons eligible to vote when they registered.  *See* MTD Br. at 24-25.  They explain that a provision adjacent to the General Removal Provision requires States to "ensure that any *eligible* applicant is registered to vote" upon the submission of a "*valid* voter registration form."  52 U.S.C. § 20507(a)(1) (emphasis added); *see also* MTD Br. at 24-25.  That provides a contextual indication that a "registrant" is someone who validly registered.  And that understanding explains why the General Removal Provision limits removals to grounds that can arise after a valid registration, such as death, criminal conviction, mental incapacity, or a change of residence—and why those limited exceptions do not yield the implausible result that the General Removal Provision prohibits States from removing noncitizens, minors, or others who were never validly registered to begin with.

But there is no similar contextual indication that the term "ineligible voters" in the Quiet Period Provision is limited to individuals who were validly registered and previously eligible to

vote.  Defendants offer no sound argument for why this Court should assume that the term "ineligible voters" in the Quiet Period Provision is similarly limited.  Indeed, Defendants' argument that "ineligible voters" as used in the Quiet Period Provision must be limited to voters who were once properly registered eligible voters but who at some point became ineligible is unsupported by the language and purpose of the Quiet Period Provision as compared to the General Removal Provision.  A familiar principle of statutory interpretation provides that, throughout a statute, "different terms usually have different meanings."  *Pulsifer v. United States*, 601 U.S. 124, 149 (2024); *see Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 102 n.5 (2012).  This Court need not depart from that principle by assigning the same meaning to "registrant" and "voter" here—particularly when Congress recognized in another voting-related statute, the Help America Vote Act, that voting rolls may erroneously include "*voters* who are not registered or who are not eligible to vote."  52 U.S.C. § 21083(a)(2)(B)(ii) (emphasis added). Congress intended the General Removal Provision to generally prevent registration cancellations on improper grounds but intended the Quiet Period Provision to serve the wholly different purpose of preventing erroneous disenfranchisement of eligible voters close to an election.  *See Arcia*, 772 F.3d at 1346 ("Eligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote. This is why the 90 Day Provision strikes a careful balance: It permits systematic removal programs at any time except for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest.")

Under the Defendants' cramped view, and as Defendants admit, the Quiet Period Provision would prohibit only programs systematically removing ineligible voters for changes in residency in the 90 days before a federal election.  MTD Br. at 25; *see also Arcia*, 772 F.3d at 1348 (explaining that this interpretation would limit the Quiet Period Provision to "only … the

removal of registrants who become ineligible to vote after moving to a different state"). That cannot be so. Congress broadly wrote the Quiet Period Provision to prohibit "*any* program" that systematically removes the names of "ineligible voters" (not "registrants") and excluded only programs removing voters based on request of the registrant, death, and criminal conviction or mental capacity. 52 U.S.C. § 20507(c)(2) (emphasis added); *see also Arcia*, 772 F.3d at 1344 (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)) (recognizing that the phrase "any program" carries an "expansive meaning"); *Ali*, 552 U.S. at 219 (same). If the Defendants' narrow reading were Congress's goal, Congress would have simply barred any systemic program to remove names from rolls based on a change of residence during the Quiet Period, saving dozens of words and three cross-references. Congress's rejection of this "ready alternative" is strong evidence that "Congress did not in fact want what [Defendants] claim." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017). This is especially true given that Congress has otherwise limited provisions of the NVRA to removals based on "changed residence" when it wishes to. 52 U.S.C. § 20507(d); *see also* 52 U.S.C. § 20507(a)(4)(B) and (c)(1). Reading a restriction in the General Removal Provision into the Quiet Period Provision's more expansive language would defeat Congress's goal of prohibiting the kinds of removals most likely to result in mistakes during the period "when the risk of disfranchising eligible voters is the greatest." *Arcia*, 772 F.3d at 1346.

Indeed, Defendants' only argument as to why the meaning of "registrant" under the General Removal Provision affects the meaning of "ineligible voter" under the Quiet Period Provision is that the Quiet Period Provision cross-references the General Removal Provision. *See* MTD Br. at 28. But "cross-references do not prove that two provisions are coextensive." *North Carolina ex rel. Regan v. United States*, 7 F.4th 160, 169 (4th Cir. 2021) (internal

13

quotation marks and brackets omitted) (citing *Salinas v. United States R.R. Ret. Bd.*, 592 U.S. 188, 197-98 (2021)).  And the cross reference in the Quiet Period Provision is limited.  That provision states that it does not preclude removal of names from official lists of voters "*on a basis* described in" paragraph (3)(A) or (B) or (4)(A) of the General Removal Provision.  52 U.S.C. 20507(c)(2)(B)(i) (emphasis added).  The cross reference only incorporates the *reasons* for removal of a registrant listed in those subsections and not the term "registrant."  *See Ramey v. Dir., Office of Workers' Comp. Programs*, 326 F.3d 474, 477 (4th Cir. 2003) (explaining that, "[i]n a statute of specific reference . . . only the appropriate parts of the statute referred to are considered"); *cf. Hui v. Castaneda*, 559 U.S. 799, 809 (2010) (holding that statute, by its terms, incorporated by cross-reference only the "remedy" of other statute).  Thus, the meaning of "ineligible voter" in the Quiet Period Provision is not contingent on the meaning of "registrant" in the General Removal Provision.

The Eleventh Circuit, after considering the applicability of the Quiet Period Provision to a program like the Commonwealth's, rejected the arguments the Defendants advance here.  *See Arcia*, 772 F.3d, at 1343-48.  Consistent with this Court's preliminary injunction order and the Fourth Circuit's decision largely denying the Defendants' application for a stay, the Eleventh Circuit held that the Quiet Period Provision applied to noncitizen removal programs.  *Id.* at 1344 ("The [NVRA] is premised on the assumption that citizenship is one of the requirements for eligibility to vote … Thus, Secretary Detzner's program to remove non-citizens was a program to remove 'ineligible voters.'").

But the Defendants reject *Arcia*.  They argue that the Eleventh Circuit failed to consider their General Removal Provision-based textual argument.  MTD Br. at 30-32.  Although the General Removal Provision was not at issue in that case (as it is not at issue here), *see id.* at 31-

32; *see also Va. Coal. for Immigrant Rts. v. Beals*, No. 24-2071, 2024 WL 4601052, at *1 (4th Cir. Oct. 27, 2024), the Defendants nevertheless complain that the *Arcia* court's refusal to engage with the General Removal Provision was a failure to interpret the NVRA as a coherent whole.  But the *Arcia* court's determination that it need not engage with the General Removal Provision was no oversight.  That court instead explained that reading the General Removal Provision to prohibit the removal of noncitizens from the voter rolls would "create grave constitutional concerns."  *Arcia*, 772 F.3d at 1346.  But, seeing no constitutional concerns preventing a finding that *the Quiet Period Provision* prohibits removal of noncitizens, and not convinced that the two provisions needed to be considered in tandem, the court declined to interpret the General Removal Provision.  *Id.* at 1346-47.

Finally, the Defendants argue that the *Arcia* court erred in applying the *expressio unius* canon of interpretation to the Quiet Period Provision because *expressio unius* could not be applied to the General Removal Provision.  MTD Br. at 31.  They are wrong.  As noted, the General Removal Provision is not at issue and does itself permit the removal of noncitizens, because noncitizens are not registrants as described in the General Removal Provision.  *See supra* p. 11-12.  And even if this Court were to analyze that provision, the different language in the two provisions defeats the Defendants' argument.  Their attempt to undo the reasonable application of the *expressio unius* canon to the Quiet Period Provision by pointing to the General Removal Provision should be rejected.

Defendants' reliance on a district court opinion in the Eleventh Circuit issued prior to and abrogated by *Arcia*, *United States v. Florida*, 870 F.Supp.2d 1346 (N.D. Fla. 2012), is unavailing.  Every district court to consider the issue since *Arcia* has reached the same conclusion: the Quiet Period Provision applies to noncitizen removal programs.  *See, e.g.*, *Mi*

*Familia Vota*, 691 F. Supp. 3d at 1902-93.  Indeed, a district court in Alabama recently enjoined

a similar program to the one that the complaint alleges the Defendants have employed here.  *See*

*Ala. Coal. For Immigrant Just.*, 2024 WL 4510476.  And Defendants' reliance on *Bell v.*

*Marinko*, 367 F.3d 588, 591-92 (6th Cir. 2003), is misplaced.  *Bell* did not address, or even cite,

the Quiet Period Provision; it also did not discuss the removal of suspected noncitizens or

systematic removals of any sort.  *See id.*

The Quiet Period Provision reflects Congress's intent to protect eligible voters from the

unintended harms of an election-eve purge regardless of the type of ineligible voters at whom the

purge is directed.  Defendants' attempt to read the Provision through the prism of the General

Removal Provision, which is not at issue here, is logically flawed and unpersuasive.

> **2.   The United States sufficiently alleges that the Program is systematic and any putative "fact dispute" is irrelevant to the plausibility of the United States' claim.**

The United States' complaint sufficiently alleges that Virginia's noncitizen removal

process is systematic.  A removal program that proceeds without "any reliable first-hand

evidence specific to the voters" targeted is "the type of 'systematic' removal prohibited by the

NVRA." *N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16-cv-1274, 2016

WL 6581284, at *5 (M.D.N.C. Nov. 4, 2016); *see also Arcia*, 772 F.3d at 1344 (holding "a mass

computerized data-matching process to compare the voter rolls with other state and federal

databases, followed by the mailing of notices" and without any "individualized information or

investigation" to be systematic for purposes of the Quiet Period Provision); *Bell*, 367 F.3d at 590

n.2, 592 (setting out examples of individualized "investiga[ions] and examin[ations]"); *Majority*

*Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d 1348, 1354-55 (M.D. Ga. 2020)

(contrasting systematic programs and "individualized inquiries").  Virginia matches across

databases—specifically, between the Department of Motor Vehicles database and the voter

registration database—followed by form letters in a process like *Arcia*. *See* Compl. ¶¶ 27-32.

That process is, by definition, systematic.

Yet Defendants claim their process is individualized because they use contemporaneous

data in the form of a person's attestation. MTD Br. at 33-35. This Court has already rejected

this argument. *See* PI Transcript Day 2, 16:16-21 ("Although the Defendants argue that this

process was somehow individualized because it started with an individual transaction at the

DMV, which prompted the reports, and then, because there were individual letters sent out at the

end, that does not make this an individualized inquiry. It is simply checking data fields, matching

in mass."). And rightly so. At best, Virginia possesses two contradictory data points about the

citizenship status of any registered voter the Program snared, because every person who registers

to vote in Virginia has attested on their voter registration form that they are a United States

citizen. Va. Code § 24.2-418. But a voter is caught up in the Program when, despite having

attested to U.S. citizenship when registering to vote, DMV data reflects that a person indicated

on certain forms submitted to the DMV that the person is not a U.S. citizen. *See* Compl. ¶¶ 25-

26. The factual allegations contained within the United States' complaint provide that Virginia

begins a removal process with contradictory pieces of data and no further investigation; as such,

the process is not individualized and thus is systematic in nature. *See N.C. State Conf. of the

NAACP*, 2016 WL 6581284, at *5 (finding a removal program that that proceeds without "any

reliable first-hand evidence specific to the voters" targeted to be "systematic").

Defendants next argue that the review by ELECT and local registrars, along with the

ability to respond to the form letters, makes the Program individualized. *See* MTD Br. at 32-34.

Yet reviews by ELECT and local registrars, as the complaint alleges, are limited to identity and

do not consider any specific citizenship evidence.  *See* Compl. ¶¶ 29, 32-33; PI Transcript Day 2, 16:22-17:1.  The Program contains no rigorous individualized inquiry to minimize the chance of mistaken voter registration cancellations during the Quiet Period—the time "when the risk of disfranchising eligible voters is the greatest."  *Arcia*, 772 F.3d at 1346; *see also* PI Transcript Day 2, 14:21-16:15.  Instead, as the United States' complaint makes plain, the Program relies exclusively on contradictory results of mass database matching that cannot, absent meaningful individualized inquiry, be used to "remove the names of ineligible voters from the official lists of eligible voters" within 90 days of a federal election.  *See* 52 U.S.C. § 20507(c)(2)(A); Compl. ¶¶ 33, 35, 38; *see also* PI Transcript Day 2, 16:16-17:2.  This is underscored by the allegations that local registrars and ELECT lack discretion to avert cancellation even if they have reason to believe the voter is a United States citizen.  *See* Compl. ¶¶ 32, 33, 38.

Similarly, merely sending form letters to the affected individuals does not undermine the allegations of the Program's systematic nature.  Rather than conducting an individualized inquiry to determine which data point is accurate, the Commonwealth places the burden on the voter to affirm their citizenship within 14 days or have their registration cancelled.  *See* Compl. ¶¶ 34-35, 38.  That is a violation of the Quiet Period Provision.  *Cf. N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16-cv-1274, 2018 WL 3748172, at *7 (M.D.N.C. Aug. 7, 2018) (explaining that requiring challenged voters to prove their eligibility during the Quiet Period "demonstrates precisely why Congress prohibited states from conducting systematic programs to remove ineligible voters within 90 days of a federal general election"); *Mi Familia Vota*, 691 F. Supp. 3d at 1085-86, 1092-94 (holding state statute requiring voter to affirm citizenship when county recorder "obtain[ed] information" that the voter was a noncitizen violated the Quiet Period Provision).  In addition, the mailed notices *Husted* discussed were part

18

of the minimum process the NVRA requires in any program to remove voters based on a change of residence. *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 764-66, (2018). If Defendants were correct that a mailed notice without more renders a program nonsystematic *per se*, then few, if any, NVRA-compliant programs for removing voters based on a change of residence would be subject to the Quiet Period Provision. But address verification programs—including the mailing of verification notices—are the quintessential examples of the sort of systematic programs that must be "concluded not later than 90 days before an election." S. Rep. No. 103-6, at 19 (1993).

Defendants' legislative history arguments fare no better. The House Report merely gives examples of activities that need to be completed by the 90-day mark, not a comprehensive list. *See* H.R. Rep. No. 103-9, at 16 (1993) ("This requirement applies to the State outreach activity *such as* a mailing or a door-to-door canvas and requires that such activity be completed by the 90-day deadline.") (emphasis added). It is also incorrect that these examples—mailings and door-to-door canvasses—are different than the process used by the Defendants. The Defendants also resurrect the already-rejected idea that this process must be individualized and thus different from the examples in the House Report, because an individual indicated a noncitizen status on a DMV form. That the recipients of the form letters are based in part on data matching from a registrant's own notation on a form is irrelevant. *See Arcia*, 772 F.3d at 1344. The notices are identical (save for the name and address) and sent in batches. *See* Compl. ¶¶ 34-35. Therefore, the notices mailed out through Virginia's removal Program are identified in the legislative history as improper under the Quiet Period Provision.

Because the Program does not depend on "individualized information or investigation" to identify voters, to rectify conflicting information, or even to prevent misidentification, the United

States' complaint sufficiently alleges that the Program is "systematic" and thus a violation of the Quiet Period provision. *Arcia*, 772 F.3d at 1344. To the extent the parties contest the way the Program functions, the United States' factual allegations, which must be taken as true, establish the plausibility of the Quiet Period Provision violation. *See First Am. Title Ins. Co. v. Chesapeake Holdings GSG, LLC*, 633 F. Supp. 3d 789, 800 (E.D. Va. 2022).

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the Defendants' Motion to Dismiss for failure to state a claim.

Date:  December 20, 2024

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

JESSICA D. ABER
United States Attorney
Eastern District of Virginia

*/s/ Kevin Muench*
R. TAMAR HAGLER
RICHARD A. DELLHEIM
SEJAL JHAVERI
KEVIN MUENCH
BRIAN REMLINGER
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W
Washington, D.C. 20530
Tel:     (202) 307-2767
Email: Kevin.Muench@usdoj.gov

*/s/ Matthew J. Mezger*
MATTHEW J. MEZGER
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Ave.
Alexandria, VA 22314
Tel:     (703) 299-3741
Fax:     (703) 299-3983
Email:  Matthew.Mezger@usdoj.gov


CHRISTOPHER R. KAVANAUGH
United States Attorney
Western District of Virginia

*/s/ Christopher R. Kavanaugh*
United States Attorney
United States Attorney's Office
Western District of Virginia
255 West Main Street
Charlottesville, VA 22902
Tel:     (434) 293-4283
Email:Christopher.Kavanaugh@usdoj.gov