**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| Virginia Coalition for Immigrant Rights, et al.,    ) <br> ) <br> ) <br>       Plaintiffs,    ) <br> ) <br> v.    ) <br> ) <br> Susan Beals, in her official capacity as ) <br> Virginia Commissioner of Elections, et al., ) <br> ) <br>       Defendants.    ) | Civil Action No. 1:24-cv-01778 |
| The United States of America,    ) <br> ) <br>       Plaintiff,    ) <br> ) <br> v.    ) <br> ) <br> The Commonwealth of Virginia, et al., ) <br> ) <br>       Defendants.    ) | Civil Action No. 1:24-cv-01807 |

**DEFENDANTS' REPLY BRIEF**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

Charles J. Cooper (*Pro Hac Vice*)
Joseph O. Masterman (*Pro Hac Vice*)
Bradley L. Larson (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants the Commonwealth of
Virginia, the Virginia State Board of
Elections, Susan Beals, John O'Bannon,
Rosalyn R. Dance, Georgia
Alvis-Long, Donald W. Merricks, Matthew
Weinstein, and Jason Miyares*

Jason S. Miyares
   *Attorney General*
Thomas J. Sanford (VSB #95965)
   *Deputy Attorney General*
Erika L. Maley (VSB #97533)
   *Solicitor General*
Graham K. Bryant (VSB #90592)
   *Deputy Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..........................................................................................ii

INTRODUCTION .................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I. Organizational Plaintiffs' Claims Are Not Justiciable ..........................................2

   A. Organizational Plaintiffs Lack Associational or Organizational.......................2

   B. The Organizational Plaintiffs' Quiet Period Claim Is Moot .................................6

   C. Organizational Plaintiffs Allege No "Ongoing" Violation of the Quiet Period...........8

   D. The Attorney General Must be Dismissed...........................................9

II. Each of the Claims Unique to the Organizational Plaintiffs Fails ...........................11

   A. The "Nondiscrimination" Claims Fails As A Matter Of Law ...........................11

   B. Organizational Plaintiffs' Federal-Form Claim Does Not Withstand Scrutiny...............13

   C. Plaintiffs' Records Claim Is Moot And Exceeds The Scope Of The NVRA ...................15

III. Plaintiffs' Concessions Demonstrate Why Their Quiet Period Claims Must Fail..................17

CONCLUSION....................................................................................................20

CERTIFICATE OF SERVICE ................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Legislative Black Caucus v. Alabama*,
    575 U.S. 254 (2015).............................................................................................3

*Allen v. Cooper*,
    895 F.3d 337 (4th Cir. 2018) ..........................................................................8

*Allen v. Wright*,
    468 U.S. 737 (1984)...........................................................................................6

*Arizona Alliance for Retired Americans v. Mayes*,
    117 F.4th 1165 (9th Cir. 2024) ........................................................................5

*Arizona v. Inter Tribal Council of Arizona*,
    570 U.S. 1 (2013)..............................................................................................13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................14, 15

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983).............................................................................................6

*Coakley v. Welch*,
    877 F.2d 304 (4th Cir. 1989) ..........................................................................8

*Connecticut Parents Union v. Russell-Tucker*,
    8 F.4th 167 (2d Cir. 2021) ...............................................................................4

*DeBauche v. Trani*,
    191 F.3d 499 (4th Cir. 1999) ..........................................................................8

*Do No Harm v. Pfizer, Inc.*,
    96 F.4th 106 (2d Cir. 2024) .............................................................................2

*Doyle v. Hogan*,
    1 F.4th 249 (4th Cir. 2021) .........................................................................9, 10

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024)...........................................................................................4

*FEC v. Wisconsin Right to Life*,
    551 U.S. 449 (2007)...........................................................................................6

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)...........................................................................................7

*FW/PBS, Inc. v. Dallas*,
   493 U.S. 215 (1990)...................................................................................................2

*Greater Birmingham Ministries v. Secretary of State of Alabama*,
   105 F.4th 1324 (11th Cir. 2024) ........................................................................16, 17

*Husted v. A. Phillip Randolph Institute*,
   584 U.S. 756 (2018).................................................................................................12

*Kadel v. Folwell*,
   100 F.4th 122 (4th Cir. 2024) (en banc) .................................................................12

*King v. Youngkin*,
   122 F.4th 539 (2024).......................................................................................9, 10, 11

*Kirtsaeng v. John Wiley & Sons, Inc.*,
   568 U.S. 519 (2013).................................................................................................19

*Knox v. Service Employees*,
   567 U.S. 298 (2012)............................................................................................6, 15

*Lane v. Holder*,
   703 F.3d 668 (4th Cir. 2012) ...............................................................................4, 5

*McBurney v. Cucinelli*,
   616 F.3d 393 (4th Cir. 2010) ...............................................................................9, 10

*Mi Familia Vota v. Fontes*,
   719 F. Supp. 3d 929 (D. Ariz. 2024) ................................................................12, 13

*Pub. Int. Legal Found. v. Bellows*,
   92 F.4th 36 (1st Cir. 2024)......................................................................................17

*Pulsifer v. United States*,
   601 U.S. 124 (2024).................................................................................................18

*RNC v. N. Carolina Bd. of Elections*,
   120 F.4th 390 (4th Cir. 2024) ..........................................................................3, 4, 5

*Roberts v. Sea-Land Servs., Inc.*,
   566 U.S. 93 (2012)...................................................................................................18

*S.C. Wildlife Fed'n v. Limehouse*,
   549 F.3d 324 (4th Cir.2008) .....................................................................................9

*Shaw v. Reno*,
   509 U.S. 630 (1993).................................................................................................12

*Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
713 F.3d 175 (4th Cir. 2013) ...............................................................7

*Strong Cmtys. Found. of Ariz. Inc. v. Richer*,
No. CV-24-02030, 2024 WL 4475248 (D. Ariz. Oct. 11, 2024)............................................5

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009).................................................................2, 7

*United States v. Florida*,
870 F. Supp. 2d 1346 (N.D. Fla. 2012)..................................................12, 13, 17

*VCIR v. Beals*,
No. 24-2071, 2024 WL 4601052 (4th Cir. Oct. 27, 2024) ..................................................19

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
535 U.S. 635 (2002)...............................................................8

**Statutes**

18 U.S.C. § 611 ...............................................................11

52 U.S.C. § 20505 ...............................................................13

52 U.S.C. § 20506 ...............................................................13, 14

52 U.S.C. § 20507...............................................................*passim*

Va. Code § 24.2-104 ...............................................................9, 10

Va. Code § 24.2-427 ...............................................................10

Va. Code § 24.2-1004 ...............................................................11

**Other Authorities**

Va. Const. Art. II, § 1...............................................................11

*Voter*, The Compact Edition of the Oxford English Dictionary, Oxford University Press (1980) ...............................................................18

## INTRODUCTION

The Organizational Plaintiffs have failed to establish standing for any of their claims. Their alleged injuries result from their own spending choices, and they identify not a single member of their organizations who has been harmed directly. Additionally, the National Voter Registration Act's (NVRA) quiet period is over, and they have not shown that their—much less their unidentified members'—alleged injuries are reasonably likely to recur in a future election cycle. Nor have they explained why *Ex parte Young* allows their quiet period claim to proceed now that any violation is no longer "ongoing." This Court therefore lacks jurisdiction over their claims.

The response briefs also demonstrate why the claims fail on the merits. Organizational Plaintiffs' three solo claims, which the United States does not bring, are all fatally flawed. Their assertion that Defendants classify individuals based on national origin is disproven by their own factual allegations: Defendants apply the same process to everyone who self-identifies as a non-citizen, regardless of national origin. The process classifies individuals based on *citizenship*—a legal requirement to vote—not based on national origin or naturalized status. And their theory of how the NVRA's federal-form provision operates has no basis in the plain text of the statute. Under its plain terms, the provision is inapplicable to a post-registration verification system such as Virginia's. In addition, Organizational Plaintiffs do not even attempt to grapple with the text of the NVRA's Public Inspection Provision, instead openly asking this Court judicially to update it.

Plaintiffs' quiet period claim also fails. Plaintiffs admit that "registrants" cannot include persons who never met the registration criteria. *See* Org. Pl. Response at 21 & n.12; U.S. Response at 11. That concession fatally undermines their argument that the Quiet Period Provision applies to noncitizens because the NVRA uses the term "ineligible voter" as a subset of "registrants." *Compare* 52 U.S.C. § 20507(c)(2)(A) *with id.* § 20507(b)(2). The case should be dismissed.

1

**ARGUMENT**

**I.    Organizational Plaintiffs' Claims Are Not Justiciable**

**A.    Organizational Plaintiffs Lack Associational or Organizational Standing**

Organizational Plaintiffs have failed to establish either associational or organizational standing. As to associational standing, they contend only that a single anonymous member of the League of Women Voters of Virginia, who was allegedly removed from the voter rolls despite her status as an American citizen, allows that group to sue. ECF 103-1 (Suppl. Porte Decl.).[1]

A single unnamed member, who did not even submit a sworn declaration herself, is insufficient to establish associational standing. As the Supreme Court has explained, an organization must "identify [a] member[]" whose rights it seeks to vindicate. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). A hearsay statement that an unidentified person has suffered an injury is not "identifying" any allegedly injured member. *Id.* Such a statement provides no way to determine whether the standing requirements of injury-in-fact, causation, and redressability are met. For example, without her name, neither Defendants nor the Court have any way to determine whether she was on the voter rolls in the first place, was removed from the voter rolls during the quiet period, or reregistered to vote after being removed. For largely these reasons, there exists no mechanism for a litigant to shield her identity from the court when she is asserting her own rights, and the identification requirement likewise applies when an organization is asserting her rights on her behalf. *See Do No Harm v. Pfizer, Inc.*, 96 F.4th 106, 117 & n.6 (2d Cir. 2024). Without "identify[ing] the individual[]" who desires to invoke this Court's jurisdiction, Plaintiffs cannot meet their burden to establish standing. *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 235 (1990).

---

[1] Given their failure even to argue that VCIR or African Communities Together has established associational standing, they have conceded any such claim and rely exclusively on organizational standing for those groups. Org. Pl. Response at 10–12.

Organizational Plaintiffs appear to recognize that *Summers* presents a major hurdle for their anonymous-member theory but contend that *Summers* was "moderate[d]" in *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 270 (2015). Org. Pl. Response at 10–11 (citation omitted). But *Alabama Legislative Black Caucus*, if anything, confirms that identifying an injured member is required for associational standing. In *Alabama Legislative Black Caucus*, a district court had *sua sponte* dismissed a racial-gerrymandering claim because the plaintiff organization had failed to demonstrate that it had members living in the allegedly gerrymandered districts. 575 U.S. at 269. The Supreme Court reversed because there was at least some evidence indicating that the plaintiff organization had members in the districts, and the district court should have given the organization a chance to "provide a list of members" living in each district. *Id.* at 271. The district court's failure to follow proper procedures in determining whether the plaintiff organization had standing merited reversal; the Court did not dispense with *Summers*'s requirement to identify the harmed members. Indeed, the Supreme Court reversed precisely to afford the organization a fair opportunity to *identify* its injured members by providing a "list of members" to the court.[2] *Ibid.*

Nor have the Organizational Plaintiffs established organizational standing. At most, each organization is making an "uncompelled choice to expend resources." *RNC v. North Carolina Bd.*

---

[2] To the extent that Organizational Plaintiffs argue that they should not have to identify injured members due to "threats of prosecution and attendant intimidation," Org. Pl. Response at 11, those arguments are irrelevant to the jurisdictional analysis and fail on their own terms. If there is any citizen member of the plaintiff organizations erroneously removed from the voter rolls, such an individual faces no "threat[] of prosecution" for voting. And any noncitizen member who voted illegally could not support standing for any of the Organizational Plaintiffs' claims. Additionally, the Commonwealth is already aware of all persons who were removed from the voter rolls and can investigate any illegal voting. To the extent the Organizational Plaintiffs are contending that Defendants would retaliate against individuals for participating in litigation, they have provided no factual support whatsoever for such accusations, which are wholly baseless. Finally, to the extent that Organizational Plaintiffs are concerned about potential "intimidation" from third parties, Defendants would agree to a protective order sealing members' personal information. Plaintiffs cannot base their claims of associational standing on unidentified members.

*of Elections*, 120 F.4th 390, 396 (4th Cir. 2024). And as the Fourth Circuit recently confirmed, an organization cannot "spend its way into standing." *Ibid.* The harm from the government action must "*directly* impact Plaintiffs' core organizational missions." *Id.* (quoting *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 394 (2024)) (emphasis added). It is not sufficient that the organization voluntarily chose to divert its resources to oppose the government action, even if such opposition comports with the plaintiff's "core mission." *Connecticut Parents Union v. Russell-Tucker*, 8 F.4th 167, 173–75 (2d Cir. 2021); *see also Alliance for Hippocratic Med.*, 602 U.S. at 394 (reaffirming that "[a]n organization cannot manufacture its own standing" merely "by expending money to gather information and advocate against the defendant's action"); *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) ("Although a diversion of resources might harm the organization by reducing the funds available for other purposes, it results not from any actions taken by the defendant, but rather from the organization's own budgetary choices." (cleaned up)).

All the harms the Organizational Plaintiffs allege mirror those that the Supreme Court concluded were insufficiently "direct" in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). In *Alliance for Hippocratic Medicine*, the plaintiff organization fundamentally opposed "elective abortion and . . . FDA's relaxed regulation of mifepristone." *Id*. at 396. It expended resources "inform[ing]" the organization's "members and the public about risks posed by" the government action and "engag[ing] in public advocacy and public education" about the government action. *RNC*, 120 F.4th at 396. The Organizational Plaintiffs here make materially identical arguments about "expend[ing] . . . resources to counteract . . . immediate confusion and misinformation" allegedly created by the government action, Am. Compl. ¶ 26, and "educating the public, in particular new citizens, on how to respond to being targeted for removal and ensuring that they remain registered or, if they were purged, how to reregister," *id*. ¶ 13. Nor can the alleged

harm of deploying "resources to rapidly understand the impact of" the challenged action establish standing. *Id.* ¶ 26. If that were enough, every person who spends time reading and interpreting a statute would be injured and have standing to sue.

Organizational Plaintiffs' reliance on *RNC v. North Carolina Board of Elections* is misplaced. That case, like many before it, recognized that "'mere expense' does not constitute an injury in-fact." 120 F.4th at 396 (quoting *Lane*, 703 F.3d at 675). *RNC* concluded that the Republican National Committee had standing to challenge a Board of Elections' refusal to remove persons who failed to provide "their driver's license number or the last four digits of their social security number on their application" to vote because the failure stymied the RNC's *pre-existing* voter-integrity efforts. *Id.* at 398. *RNC* accords with the Ninth Circuit's analysis of the interplay between *Havens Realty* and *Alliance for Hippocratic Medicine*: "the organization must show that the new policy directly harms its *already-existing* core activities." *Arizona All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1177 (9th Cir. 2024). As Judge Diaz explained in his *RNC* concurrence, "an organization 'must show that a challenged governmental action directly injures the organization's pre-existing core activities and does so *apart* from the plaintiffs' response to that governmental action.'" *RNC*, 120 F.4th at 410 (quoting *Strong Cmtys. Found. of Ariz. Inc. v. Richer*, No. CV-24-02030, 2024 WL 4475248, at *8–10 (D. Ariz. Oct. 11, 2024)). The Organizational Plaintiffs have made no such showing here; each of their alleged harms flows from the voluntary reallocation of resources and not from direct harm to their preexisting activities.[3]

---

[3] To the extent that Organizational Plaintiffs contend that Defendants have impaired their pre-existing mission because they removed from the rolls individuals that the Plaintiffs assisted in registering to vote, they have provided no factual support for any such theory. Again, Plaintiffs fail to identify a single citizen member erroneously removed from the rolls. *See* p. 2, *supra*. And as to the one unnamed alleged member in the hearsay declaration, Plaintiffs do not even assert that they had assisted that alleged member's initial registration. *See* ECF 103-1 (Suppl. Porte Decl.).

They have not established organizational standing.

**B.     The Organizational Plaintiffs' Quiet Period Claim Is Moot**

In addition, any injury supporting Organizational Plaintiffs' quiet period claim can no longer be traced to an unlawful act by the Defendants (because the quiet period has ended), nor be redressed by a favorable ruling from this Court (because the 2024 election has come and gone). Their claim is thus nonjusticiable on mootness grounds as well.

Any alleged injury to members is now moot because the quiet period has ended, thus indisputably allowing Virginia systematically to remove individuals from the voter rolls on the basis of noncitizenship. *Allen v. Wright*, 468 U.S. 737, 751 (1984) (requiring injury to be traced to an "unlawful" action). Likewise, any current injuries to their organizations from removals are no longer traceable to an *unlawful* act of the Defendants. *Id.* The Organizational Plaintiffs may continue to conduct voter outreach and check-your-registration programs, but those choices are no longer tied to an allegedly unlawful policy of the Defendants under the Quiet Period Provision. And for any past injuries, an injunction would grant no relief, so there is no way for this Court to redress them. *Knox v. Serv. Emps.*, 567 U.S. 298, 307 (2012).

Instead of contending that their claim remains live, Organizational Plaintiffs argue that they satisfy the exception for claims capable of repetition yet evading review. But that exception to the mootness doctrine requires a "reasonable expectation" that the *same party* will be once again subject to the same harm, *FEC v. Wisconsin Right to Life*, 551 U.S. 449, 462 (2007), and Organizational Plaintiffs cannot make that showing for either of their ostensible injuries.

To start, Organizational Plaintiffs do not come close to making a "reasonable showing" that their anonymous member will be "subjected to the alleged illegality" once again. *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). For that to happen, she would need to check the wrong box at the DMV once more or somehow fall through the cracks of USCIS's SAVE database and

then once again fail to return a Notice of Intent to Cancel—all during a *future* quiet period. Again, Plaintiffs present only a barebones hearsay declaration regarding a single unnamed member, and the declaration states that she has voted in the past without an issue, undercutting the already-speculative possibility that a recurring problem exists. *See* ECF 103-1 (Suppl. Porte Decl.).

Instead of proving that an actual identified member who has been harmed will again likely be harmed in the same way, Organizational Plaintiffs contend that no such requirement exists. They argue that the possibility that any unknown member of their organizations may be harmed in the future is enough to keep this case alive under the capable-of-repetition-yet-evading-review exception. Org. Pl. Response at 15. But Organizational Plaintiffs do not attempt to square that argument with the Supreme Court's contrary pronouncements that an organization must identify a specific injured member for the case to be justiciable and not rely on a mere probability that some unknown member will be injured. *Summers*, 555 U.S. at 499; *see also, e.g.*, *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184–85 (4th Cir. 2013). The exceptions to mootness do not somehow erase this requirement. *Cf. Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000) ("[I]f a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum.").

Nor do the alleged injuries to the organizations themselves have a "reasonable expectation" of recurring. Their alleged diversion-of-resources injuries are inherently one-offs, such as training staff about the logistics of Virginia's noncitizen removal process, expending resources to "understand the impact of E.O. 35 and its effect on Virginia voters," and redrafting "scripts used by canvassers and phone bankers." Am. Compl. ¶¶ 26, 34. None of these alleged injuries would require additional work repeating these efforts in the future and therefore would not require the

organizations to divert resources in the next election cycle. Instead of explaining how they will actually be injured once again in the future, Organizational Plaintiffs baldly state that "any extension of the Purge Program into the next quiet period will harm Plaintiffs in all the ways Plaintiffs were harmed by the previous quiet period purge." Org. Pl. Response at 15. That conclusory assertion does not satisfy their burden to demonstrate future harm.

### C.   Organizational Plaintiffs Allege No "Ongoing" Violation of the Quiet Period

The quiet period ended the day after the 2024 election. *See* 52 U.S.C. § 20507(c)(2)(A). Plaintiffs agree that the Quiet Period Provision no longer even arguably poses any legal barrier to the systematic removal of noncitizens from the voter rolls. Organizational Plaintiffs thus are not alleging an "ongoing" violation of federal law, *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002), and state sovereign immunity shields Defendants from suit.

An ongoing violation of law, required by *Ex parte Young*, did not exist in the first place and certainly does not exist now that the 2024 General Election has concluded; consequently, "the alleged violation of federal law occurred entirely in the past." *DeBauche v. Trani*, 191 F.3d 499, 505 (4th Cir. 1999). Although the Organizational Plaintiffs contend that they will be injured by *future* actions of the Defendants that *will be* unlawful, the possibility of future injury in this context is insufficient to "establish an *ongoing* violation of federal law to qualify for relief under *Ex parte Young*." *Allen v. Cooper*, 895 F.3d 337, 355 (4th Cir. 2018). This case is much like *Allen*. There, the alleged violation had ceased, and the plaintiff alleged that the defendant would likely reviolate in the future. *Ibid.* But the Fourth Circuit declined to "conflate[] the *Ex parte Young* exception with the doctrine of mootness" and concluded that no "ongoing" violation existed. *Ibid.*

The cases cited by Organizational Plaintiffs involve materially different fact patterns and cannot overcome *Allen*'s conclusion that mootness exceptions do not port over to the *Ex parte Young* context. For example, in *Coakley v. Welch*, 877 F.2d 304, 305, 307 n.2 (4th Cir. 1989), the

Fourth Circuit held that a state employee could use *Ex parte Young* to challenge termination of his employment on due-process grounds, even though all the process had occurred in the past. *Ibid.* The reason was that the State continued to harm him every day by keeping him out of his rightful employment. *Ibid.* Unlike the quiet period claim here, the allegedly illegal action taken to terminate the *Coakley* plaintiff did not become unequivocally legal while that lawsuit progressed.

### D.     The Attorney General Must be Dismissed

Sovereign immunity also unequivocally bars Organizational Plaintiffs' claims against the Attorney General because their response fails to identify any special relation he has to enforcing the Virginia laws they challenge. The Fourth Circuit's recent decision in *King v. Youngkin*, 122 F.4th 539, 548 (2024), confirms that the Attorney General is an improper defendant. An official has the requisite special relation only when he has both "*proximity to* and *responsibility for* the challenged state action." *McBurney v. Cucinelli*, 616 F.3d 393, 399 (4th Cir. 2010). Otherwise, "the officer is merely a representative of the State who cannot be sued because allowing such a suit would essentially make the State a party." *King*, 122 F.4th at 548 (quoting *Doyle v. Hogan*, 1 F.4th 249, 254 (4th Cir. 2021)). The "[g]eneral authority to enforce the laws of the state" is insufficient to meet this test. *South Carolina Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008).

The Fourth Circuit has rejected Organizational Plaintiffs' theory that because the Attorney General has "full authority to do whatever is necessary or appropriate to enforce the election laws or prosecute violations thereof," Va. Code § 24.2-104(A), he has a special relation to the challenged statute, Org. Pl. Response at 17–18. Dismissing a similar argument in *King*, the Fourth Circuit held that it "has never recognized a 'special relationship' via . . . a related powers theory of *Ex parte Young*, and [it] decline[d] to do so" in that case. *King*, 122 F.4th at 548; *see also Doyle*, 1 F.4th at 256–57 (rejecting various similar theories when the defendants lacked direct

prosecutorial authority). The laws that Organizational Plaintiffs challenge charge ELECT and the local registrars with removing noncitizens from the voter rolls—not the Attorney General. *See* Va. Code § 24.2-427(C). The administrative task of managing the voter rolls does not involve "enforc[ing] the election laws" against anyone, and it would not be "proper," or even possible, for the Attorney General to usurp the management role that the Code of Virginia gives to different entities. Va. Code § 24.2-104(A); *see Doyle*, 1 F.4th at 255 (examining the enforcement provisions in the act itself). Thus, the very provisions Organizational Plaintiffs rely upon "make[] clear that" the Attorney General has no role "in deciding" who is a noncitizen who must be removed from the voter rolls or "in executing that" removal. *King*, 122 F.4th at 548. Instead, ELECT and the local registrars bear that responsibility. Thus, the Attorney General's general authority to "enforce the election laws" or prosecute noncitizens who vote illegally, even if "related" in the abstract to other election-law statutes, *id.*, does not establish a special relation to enforcement of the challenged laws regarding the identification and removal of noncitizens from the voter rolls.

Nothing that the Attorney General has posted on social media changes his legal authority. That the Attorney General noted the number of noncitizens removed over the past two years and stated that he is "proud of [his] office's work to help ensure election integrity" has no bearing on whether his office itself has authority to remove noncitizens from the voter rolls. *Ibid.* It does not.

Accordingly, the Attorney General is not a proper defendant under *Ex parte Young* because he "has not acted or threatened to" enforce the laws at issue and bears no special relation to them. *McBurney*, 616 F.3d at 402. To be sure, the Attorney General can prosecute noncitizens who vote illegally. But Plaintiffs do not claim that noncitizens are entitled to vote; they claim that noncitizens cannot be systematically removed from the rolls within 90 days of an election. The Attorney General has no role in, and no legal authority over, the removal process. *See King*, 122 F.4th at

548.

## II.    Each of the Claims Unique to the Organizational Plaintiffs Fails

### A.    The "Nondiscrimination" Claims Fails as a Matter of Law

The three claims brought solely by the Organizational Plaintiffs are all fundamentally flawed. First, the claim that Virginia law violates the NVRA's requirement to be "nondiscriminatory" fails. 52 U.S.C. § 20507(b)(1). As Defendants have explained, the term "nondiscriminatory" in voting statutes means that States cannot facially discriminate against protected classes nor enact statutes with the intent to discriminate based on a protected class. *See* ECF 122 at 35–37. Organizational Plaintiffs here disclaimed any disparate-impact theory of liability in the preliminary-injunction hearing for good reason, *see* ECF 119 at 58–59, and do not attempt to argue it in their motion-to-dismiss briefing, Org. Pl. Response at 22 (single quote from senate report). Instead, they contend that Virginia's policy of "singl[ing] out individuals who were once identified in DMV records as noncitizens" for SAVE searches facially discriminates on the basis of "national origin and thus also citizenship classification," *i.e.* naturalized citizenship. *Ibid*. Organizational Plaintiffs apparently concede that Defendants' process of removing those who self-identify as noncitizens on DMV forms is *not* discriminatory: this process applies alike to every person who self-identifies and in no way "singles out" anyone based on national origin.

A classification based on whether a person has presented documents indicating that he is not a citizen is also not a classification based on national origin or naturalized citizenship, nor is it a proxy for either. Noncitizens cannot legally vote. *See* 18 U.S.C. § 611; Va. Const. Art. II, § 1; Va. Code § 24.2-1004(B)(iii). Virginia's use of noncitizen documents to trigger a SAVE search does not "single out" naturalized and foreign-born citizens based on those statuses; it captures *noncitizens*, the people most likely to use *noncitizen* documents. And the Complaint does not allege that DMV runs a SAVE search on naturalized or foreign-born citizens who do not present

11

noncitizen documents to the agency. Drawing lines based on the presentation of noncitizen documents is thus not the "explicit . . . distinction[ ]" on the basis of national origin or naturalized status required to show an impermissible classification. *Shaw v. Reno*, 509 U.S. 630, 643 (1993).

Nor is the presentation of noncitizen documentation to DMV a "proxy" for discrimination based on a protected trait. *Kadel v. Folwell*, 100 F.4th 122, 151 (4th Cir. 2024) (en banc). Such a proxy must be "very clear[ ]" on the face of the statute to constitute facial discrimination. *Ibid.* But here, the presentation of noncitizen documentation to a state agency is, obviously, highly relevant to the question whether a person is a citizen, a legal qualification to vote. And the Organizational Plaintiffs do not dispute that the intent of the Defendants is to determine lack of citizenship, not national origin or naturalized citizenship. Org. Pl. Response at 23. Indeed, the function of DMV's SAVE searches is precisely to distinguish between those who remain noncitizens and those who have subsequently become naturalized citizens, so that the latter need not take any action to remain on the voter rolls. ECF 92-1, at ¶¶ 23–31.

The pair of district court decisions on which Organizational Plaintiffs rely do not move the needle. Org. Pl. Response at 23. Both *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 999 (D. Ariz. 2024), and *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012), relied on a disparate-impact theory that, as explained in Defendants' opening brief, the Supreme Court rejected in *Husted v. A. Phillip Randolph Institute*, 584 U.S. 756 (2018). *See* ECF 122 at 37. Organizational Plaintiffs' only response is that the *Husted* plaintiffs "had not brought a claim under § 20507(b)(1)." Org. Pl. Response at 23. Yet the Supreme Court *specifically* referenced that provision when ruling that the NVRA requires discriminatory *intent*. *See Husted*, 584 U.S. at 779 (noting that "[t]he NVRA prohibits state programs that are discriminatory, *see* § 20507(b)(1)," but that the dissent "has not pointed to any evidence in the record that Ohio instituted or has carried

out its program with discriminatory intent"). Any contrary rulings in *Mi Familia Vota* or *Florida* are therefore in error. Moreover, in *Florida*, which *Mi Familia Vota* relied upon, the removal program did not use SAVE verification as a safeguard, greatly increasing the effect on naturalized citizens and distinguishing it from the facts at bar. *See Florida*, 870 F. Supp. 2d at 1350; *Mi Familia Vota*, 719 F. Supp. 3d at 999. Indeed, the *Florida* court appeared to agree that using the SAVE database could cure any "probabl[e]" violation of section 8(b)(1). 870 F. Supp. 2d at 1350–51. These cases thus do nothing to advance the Organizational Plaintiffs' argument.

**B.**     **Organizational Plaintiffs' Federal-Form Claim Does Not Withstand Scrutiny**

The Organizational Plaintiffs' response confirms that their third claim, that the Defendants are failing to "accept and use" the federal voter-registration form, fails on its face. *See Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1, 5 (2013) (quoting 52 U.S.C. § 20505(a)(1)). They argue that asking a small subset of registered persons to later affirm their citizenship after they have presented contradictory information to DMV means that Defendants failed to "accept and use" the form in the first instance. Org. Pl. Response at 25. But registration of voters and list maintenance are two different processes. The requirement to "accept and use" the federal form only applies to the first, and in no way prohibits asking for verification before removing those who appear to have improperly registered. 52 U.S.C. § 20506(a)(1). Organizational Plaintiffs do not attempt to show that a person who uses the federal form is not *registered* to vote in Virginia; rather, they argue that the person could be asked to reaffirm his citizenship at a later date if he subsequently submitted contrary evidence. *Id.*[4] It is thus unsurprising that the Organizational

---

[4] Organizational Plaintiffs also contend that a program ostensibly for the purpose of removing ineligible persons would run afoul of sections 6 and 9 of the NVRA if a State immediately removed anyone who did not provide documents proving citizenship. Org. Pl. Response at 25–26. But there is no need to consider such a hypothetical situation here, because it bears no resemblance to the facts that the Organizational Plaintiffs have alleged. By the

Plaintiffs' complaint consistently claims that Defendants improperly *remove* persons from the rolls, not that they fail to *register* them in the first place. Am. Compl. ¶¶ 8, 11–14, 78–79.

Organizational Plaintiffs attempt to salvage their legally flawed claim by arguing that "even if Defendants' theory were correct" as to the NVRA's interpretation, "it would not resolve Count Three as applied to the alleged practice of requiring additional information at the time of registration." Org. Pl. Response at 25 n.17. The problem with this argument (among others) is that their Complaint alleges no facts demonstrating that Defendants have required "additional information at the time of registration." *Id.* The only allegation that could even be read to concern the registration process states that Defendants added "an additional requirement that certain voters provide additional citizenship information about themselves as part of the State's DMV data checks and motor voter forms." Am. Compl. ¶ 89. But that bare allegation is not close to sufficient to state a claim under Rule 8 and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In any event, the remainder of the Complaint shows that the referenced "DMV data checks" do not concern the registration process. The only DMV data checks mentioned occur *after* a person has been registered to vote. *See, e.g.*, Am. Compl. ¶¶ 11, 83. These "checks" thus provide no support for the brief's conclusory assertion that Virginia is adding requirements to the registration process.

The unsupported allegation that Virginia has inserted "an additional requirement" as part of the "motor voter forms" is just as conclusory and unsupported. Am. Compl. ¶ 89. Nowhere does the Complaint allege facts about this supposed "additional requirement," leaving nothing but "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

---

Organizational Plaintiffs' own admission, Defendants do *not* apply the removal process to every person, nor do they require any additional documentary proof of citizenship. Am. Compl. ¶¶ 25–34. Instead, they only require an affirmation for the small percentage of those registered who provide DMV with contradictory information about their citizenship. Am. Compl. ¶¶ 25–26, 34.

Organizational Plaintiffs do not explain what the additional requirement in the motor voter forms is, to whom it applies (aside from "certain voters"), or even whether failing to meet it means that the Defendants would reject the federal form.[5] Without pleading any facts related to the motor voter forms, this bare allegation does not save Count III from dismissal.

### C.   Plaintiffs' Records Claim Is Moot and Exceeds the Scope of the NVRA

The Organizational Plaintiffs' claim under the NVRA's Public Inspection Provision also fails, both because it is moot and because they do not demand "public inspection" of records, 52 U.S.C. § 20507(i), as opposed to having the records produced for them.

First, Defendants have complied with their records requests, thus mooting their claim. *See* ECF 122 at 45; *Knox v. Serv. Emps.*, 567 U.S. 298, 307 (2012). Plaintiffs' records requests directed ELECT to provide "an estimate of [] costs . . . in advance of supplying the requested records." Am. Compl. ¶ 75 & Ex. 7 at 5; *see also* Am. Compl., Ex. 8 at 11 (same). ELECT did so and met with the Organizational Plaintiffs to discuss their requests and the corresponding cost estimate. *Ibid*. Based on the agreement reached at that meeting, ELECT provided multiple rounds of nonprivileged responsive documentation, including a list of "voters identified as potential noncitizens," Am. Compl. ¶ 93; memoranda of understanding between Virginia agencies; sample correspondence; internal operating procedures, and more. The parties did not agree on the timeframe for provision of the "list of individuals cancelled due to being declared a non-citizen." Am. Compl. ¶ 76 & Ex. 9 at 2. That list is the only specific record identified in the Complaint that Organizational Plaintiffs claimed they were entitled to but had not received. Am. Compl. ¶ 93. But it is undisputed that Organizational Plaintiffs now have that list. Org. Pl. Response at 27.

---

[5] Plaintiffs also argue that Executive Order 35 requires additional information to register to vote. But it does no such thing. Executive Order 35 requires DMV to "verify applicants' proof of identity and legal status" when "issuing a credential such as a driver's license." ECF 26-4. This part of Executive Order 35 thus applies to obtaining "credential[s]," not registering to vote.

Organizational Plaintiffs now vaguely argue that Defendants "have not produced all records related to their implementation of the Purge Program." Org. Pl. Response at 28. Yet they do not identify any specific requests that remain outstanding, much less allege that they have accepted the estimated cost for fulfilling such a request. Organizational Plaintiffs' conclusory assertion that Defendants have not produced some unspecified records cannot keep this claim alive in the face of Defendants' voluminous production and Plaintiffs' own demand for cost estimates.

And in any event, Organizational Plaintiffs ask for relief that the statute does not support. The relevant provision allows for "public inspection" of certain records. 52 U.S.C. § 20507(i). Organizational Plaintiffs do not offer *any* alternative reading of the phrase "public inspection" and instead chide the Defendants for relying "on *Greater Birmingham Ministries v. Secretary of State of Alabama*, 105 F.4th 1324 (11th Cir. 2024), an out of circuit case that does not create binding precedent." Org. Pl. Response at 29. This statement is ironic, given Plaintiffs' heavy reliance on a different Eleventh Circuit case in their Quiet Period Provision arguments. Defendants do not rely on *Greater Birmingham Ministries* because it is binding, but because it correctly interprets the Public Inspection Provision: the phrase "public inspection" at the time the NVRA was enacted had a well-defined meaning that required only access to—not *production* of—documents. 105 F.4th at 1333.

Instead of making a textual argument, Organizational Plaintiffs make policy arguments for judicially updating the NVRA through a "practical reading" that accounts for "advances in technology." Org. Pl. Response at 29. But it is not this Court's job to judicially update statutes. Congress could have created an obligation for States to produce relevant records instead of allowing interested parties to "inspect[]" the records themselves. 52 U.S.C. § 20507(i). FOIA had drawn this distinction for years before Congress passed the NVRA in 1993. *Greater Birmingham*

16

*Ministries*, 105 F.4th at 1332–33.[6] Organizational Plaintiffs' doomsday predictions about the demise of the Public Inspection Provision are also overblown. The only question here is how the documents can be viewed, not whether the NVRA allows them to be shielded from public scrutiny.

## III.   Plaintiffs' Concessions Demonstrate Why Their Quiet Period Claims Must Fail

Finally, the Quiet Period claims should also be dismissed. The Organizational Plaintiffs, United States, and Defendants all agree that the term "registrant" in the NVRA does not include persons, such as noncitizens, whose registrations were invalid *ab initio*. Org. Pl. Response at 21 & n.12; U.S. Response at 10. This concession fatally undermines the claims because, as demonstrated in Defendants' opening brief, the NVRA uses the phrase "ineligible voter" to reference a subset of "registrant[s]." ECF 122 at 29–31 & n.4. Thus, if a person whose registration was void *ab initio* is not a "registrant," he is not an "ineligible voter" for the purposes of the NVRA's Quiet Period Provision either. 52 U.S.C. § 20507(c)(2)(A).

"[B]y definition, someone who is being 'removed' has already registered, so an 'ineligible voter' is a 'registrant.'" *Florida*, 870 F. Supp. 2d at 1350. The entire structure of § 20507 thus shows that the NVRA uses "ineligible voter" to describe a subset of "registrant[s]." Perhaps the clearest example is section 8(a)(4). That provision requires States to "conduct a general program that makes a reasonable effort to remove the names of *ineligible voters* from the official lists of eligible voters by reason of—(A) the death of the *registrant*; or (B) a change in the residence of the *registrant*." 52 U.S.C. § 20507(a)(4) (emphasis added) (formatting altered). This provision contemplates a list of "eligible voters" that has some "ineligible voters" on the list who need to be removed. *Ibid.* Crucially, it refers to these "ineligible voters" as "registrants," which shows that in

---

[6] The cases cited by Organizational Plaintiffs are irrelevant to the meaning of the phrase "public inspection" because each concerned which documents the NVRA covered, not how they must be disclosed. *See, e.g.*, *Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36, 47 (1st Cir. 2024).

order to be an "ineligible voter," (or an "eligible voter" for that matter) one must have been a "registrant" in the first place. *Id.*

It would be illogical for the NVRA to refer to "ineligible voters" as "registrant[s]" if the former term was broader than the latter. Under Plaintiffs' interpretation, section 8(a)(4) would simultaneously require States to "make reasonable efforts to remove" persons whose registrations were void *ab initio*, and prohibit them from doing so for some of these persons, as only "registrant[s]" can be removed under that section. *Id.* (allowing removal "by reason of—the death of the registrant; or a change in the residence of the registrant") (formatting altered). Courts should avoid interpreting a statute to mandate absurd or contradictory actions, and only Defendants' interpretation avoids such a result. *See Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012).

Plaintiffs' interpretation creates another paradox because it requires the term "voter" to refer to a person who cannot legally register and whose illegal vote would be void. A person who cannot cast a valid ballot is not a "voter," eligible or otherwise. Plaintiffs' interpretation of the Quiet Period Provision would also bar Defendants from systematically removing any person from the rolls due to noncitizenship. But not every person on the rolls has previously voted. *See* ECF 26-22, at 4–5. Plaintiffs do not even attempt to explain how the term "voter" can encompass those who are neither legally entitled to vote nor have even cast void ballots. Defendants' interpretation of "voter," tying the term to the "right to vote," avoids these textual problems entirely. *Voter*, The Compact Edition of the Oxford English Dictionary, Oxford University Press (1980).

Plaintiffs also argue that "registrant" and "voter" cannot be interpreted to have largely the same meaning, because "different terms usually have different meanings." *Pulsifer v. United States*, 601 U.S. 124, 149 (2024). But there is no "canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing."

*Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 540 (2013). And any possible presumption that different terms have different meanings does not support Plaintiffs here because their interpretation also requires two different terms in the NVRA to have the same meaning. Section 8(b)(2) of the NVRA restricts the removal of "any *person* from the official list of voters" based on a failure to vote in prior elections. 52 U.S.C. § 20507(b)(2) (emphasis added). The term "person," unlike "voter" or "registrant," naturally covers all individuals regardless of whether they were supposed to be on the rolls in the first place. If Plaintiffs are correct that "voter" includes individuals who were never eligible to register, then "voter" means the same thing as "person" in section 8(b). 52 U.S.C. § 20507(b)(2). Thus, Plaintiffs' theory does not actually avoid interpreting different words in the NVRA to mean "roughly the same thing." *Kirtsaeng*, 568 U.S. at 540.

Plaintiffs fight the text and structure of the NVRA by relying on the Fourth Circuit's nonbinding unpublished order denying Defendants' motion for a stay pending appeal. But that reliance is puzzling for two reasons. First, the Supreme Court later granted Defendants' stay motion, so Plaintiffs are relying on reasoning that the Supreme Court has already rejected. Second, the Plaintiffs themselves reject major parts of the Fourth Circuit's reasoning, such as its definition of "registrant" as "one that registers or is registered." *Compare VCIR v. Beals*, No. 24-2071, 2024 WL 4601052, at *2 (4th Cir. Oct. 27, 2024) *with* Org. Pl. Response at 21 & n.12; U.S. Response at 10. Rather than helping their arguments, Plaintiffs' reliance on the repudiated stay order shows why Plaintiffs must be wrong.

Furthermore, Organizational Plaintiffs' policy argument respecting the scope of the Quiet Period Provision is unpersuasive. They contend that Defendants' interpretation would "permit states to remove any eligible citizens so long as the states used the correct pretense of suspected noncitizenship." Org. Pl. Response at 21. Not so. The fact that the Quiet Period Provision does not

apply to the removal of noncitizens would not affirmatively *authorize* States to engage in discriminatory or otherwise pretextual removals of "eligible citizens." The Constitution and all other applicable voting laws continue to apply in full force.

Finally, Plaintiffs offer a variety of reasons that Virginia's process for removing noncitizens from the voter rolls is "systematic," but each is refuted by the facts alleged in their complaints. For instance, the United States complains that Defendants' removal process "proceeds without any reliable first-hand evidence specific to the voters targeted." U.S. Response at 16 (cleaned up). But Virginia *does* have clearly "reliable" data in the form of *self-reported* responses and SAVE search results. Moreover, when ELECT sends the names of potential matches to the local registrars, the local registrars conduct a *manual review* of each potential match to ensure that the matches are actually the same person. Am. Compl. ¶¶ 41–42.

Plaintiffs also complain that Virginia's process involves electronic matching across datasets. Org. Pl. Response at 20; U.S. Response at 16–17. But "using databases" cannot possibly be the test to determine whether a removal process is systematic or individualized. If a State ran a large data-matching process and then hired a private investigator to check every person who was flagged as a noncitizen, the investigation would certainly be "individualized," even though it started with a data-matching process. The better test, the commonsense test, is whether the State solicits a specific response from the specific individual suspected of being subject to removal before taking any action, and Virginia passes that test.

## CONCLUSION

This Court should dismiss both complaints with prejudice.

Dated: January 9, 2025                    Respectfully submitted,

                                          **COMMONWEALTH OF VIRGINIA;**
                                          **VIRGINIA STATE BOARD OF ELECTIONS;**
                                          **SUSAN BEALS**, in her official capacity as Virginia
                                          Commissioner of Elections; **JOHN O'BANNON**,
                                          in his official capacity as Chairman of the State
                                          Board of Elections; **ROSALYN R. DANCE**, in her
                                          official capacity as Vice-Chairman of the State
                                          Board of Elections; **GEORGIA ALVIS-LONG**, in
                                          her official capacity as Secretary of the State Board
                                          of Elections; **DONALD W. MERRICKS** and
                                          **MATTHEW WEINSTEIN**, in their official
                                          capacities as members of the State Board of
                                          Elections; and **JASON MIYARES**, in his official
                                          capacity as Virginia Attorney General


                                          By:      */s/ Erika Maley*


Charles J. Cooper *(Pro Hac Vice)*           Jason S. Miyares
Joseph O. Masterman *(Pro Hac Vice)*             *Attorney General*
Bradley L. Larson *(Pro Hac Vice)*           Thomas J. Sanford (VSB #95965)
COOPER & KIRK, PLLC                              *Deputy Attorney General*
1523 New Hampshire Avenue, N.W.              Erika L. Maley (VSB #97533)
Washington, D.C. 20036                           *Solicitor General*
Tel: (202) 220-9600                          Graham K. Bryant (VSB #90592)
Fax: (202) 220-9601                              *Deputy Solicitor General*
ccooper@cooperkirk.com

*Counsel for Defendants the Commonwealth of*   Office of the Attorney General
*Virginia, the Virginia State Board of*        202 North Ninth Street
*Elections, Susan Beals, John O'Bannon,*       Richmond, Virginia 23219
*Rosalyn R. Dance, Georgia Alvis-Long,*        (804) 786-7704 – Telephone
*Donald W. Merricks, Matthew Weinstein, and*   (804) 371-0200 – Facsimile
*Jason Miyares*                                SolicitorGeneral@oag.state.va.us

## **CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on January 9, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all parties of record.

*/s/ Erika Maley*
Erika L. Maley (VSB #97533)
*Counsel for Defendants*
