IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| VIRGINIA COALITION FOR<br>IMMIGRANT RIGHTS, *et al.*, )<br>)<br>*Plaintiffs*, )<br>)<br>v. )<br>)<br>SUSAN BEALS, )<br>*in her official capacity as Virginia* )<br>*Commissioner of Elections, et al.*, )<br>)<br>*Defendants*. ) | Civil Action No. 1:24-cv-1778 (PTG/WBP) |

## MEMORANDUM OPINION

This matter is before the Court on Defendants' Motion to Dismiss. Dkt. 121. Plaintiffs Virginia Coalition for Immigrant Rights ("VACIR"), League of Women Voters of Virginia and League of Women Voters of Virginia Education Fund (together "LWVVA" or "the League"), and African Communities Together ("ACT") (collectively, "Plaintiffs") filed this civil action against Defendants Susan Beals, in her official capacity as Virginia Commissioner of Elections; John O'Bannon, Rosalyn R. Dance, Georgia Alvis-Long, Donald W. Merricks, and Matthew Weinstein (collectively, "Virginia State Board of Elections Members"), in their official capacities; and Jason Miyares, in his official capacity as Attorney General of Virginia. Dkt. 23 ("Am. Compl.").

Plaintiffs allege that Defendants have violated several provisions of the National Voter Registration Act ("NVRA"): (1) Section 8(c)(2)(A), the 90-Day or Quiet Period Provision; (2) Section 8(b)(1), the Uniform and Nondiscriminatory Provision; (3) Section 5, the Accept and Use Provision; and (4) Section 8(i), the Public Disclosure Provision. Am. Compl. ¶¶ 77-94. At the outset, Defendants challenge justiciability. Defendants contend that: (1) Plaintiffs lack standing; (2) the Quiet-Period Provision claim is now moot; (3) the claims against Defendants generally are barred by sovereign immunity and *Ex parte Young*; and (4) specifically, Attorney General Jason

Miyares is not a proper party to this action under *Ex parte Young.* Dkt. 122 at 11-22. In the alternative, Defendants argue that Plaintiffs have failed to state a claim. *Id.* at 22-23. This matter was fully briefed, and the Court heard oral argument. Dkts. 122, 127, 131, 132, 141. For the reasons that follow, Defendants' Motion to Dismiss is granted in part and denied in part.

## I.  **BACKGROUND**

The following facts, taken from the Amended Complaint, are accepted as true for the purposes of this Motion:[1]

On August 7, 2024, exactly ninety days before the November 5, 2024 federal general election, "Virginia Governor Glenn Youngkin issued Executive Order 35 ("E.O. 35")," which instructed the Commissioner of the Department of Elections ("ELECT") to certify that procedures regarding daily updates to voter lists would be in place. Dkt. 26, Ex. 4 at 3; Am. Compl. ¶ 3. E.O. 35 directed ELECT to compare lists of individuals flagged as having inconsistent DMV records against the list of existing registered voters. Dkt. 26, Ex. 4 at 4. Once ELECT identifies a match between the lists, a local registrar is required "[to] notify any matches" that their registration will be canceled "unless they affirm their citizenship within 14 days." *Id.*; Am. Compl. ¶¶ 3-4. Plaintiffs define this procedure as the "Purge Program." Am. Compl. ¶¶ 3-4.

The Purge Program "affirmatively directs state agencies to identify and purge voters on a systematic and ongoing basis—including during the immediate lead up to the 2024 General Election." *Id.* ¶ 6. "The Purge Program systematically remove[d] Virginians from the voter rolls shortly before the November 2024 general election based solely on the fact that they were at one point identified as a potential noncitizens [sic]—according to databases from the DMV or other

---

[1] In considering a motion to dismiss for failure to state a claim, "a court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff[.]" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

sources." *Id.* ¶ 8. Voters were removed from the rolls "even if they have since become naturalized citizens and lawfully registered to vote." *Id.* ¶ 41. Because the Purge Program relies on records of DMV transactions, it specifically affects naturalized citizens. *Id.* ¶ 9. In order to become a naturalized citizen, a non-citizen must first become a legal permanent resident. *Id.* Legal permanent residents often transact with the DMV before becoming a citizen because they can obtain driver's licenses or other forms of identification which "remain valid for up to eight years." *Id.* ¶¶ 9-10. For this reason, "the Purge Program sweeps in . . . naturalized citizens." *Id.* ¶ 11.

Plaintiff VACIR is a non-profit organization, "comprised of 49 standing member organizations, including legal services providers, civil rights groups, and labor unions, each of which themselves work to support the immigrant community in Virginia through a variety of programs, including by assisting with voter registration and education for eligible naturalized citizens." *Id.* ¶ 20. VACIR's core activities include: (1) "removing language barriers to obtain government assistance[;]" (2) "oversight of immigration detention facilities[;]" and (3) "providing support for community mobilization around general voter registration efforts for New Americans." *Id.* ¶ 21. In addition, "VACIR's member organizations are membership organizations themselves whose members include substantial numbers of naturalized citizens." *Id.* ¶ 22. As a consequence of E.O. 35, VACIR "engag[ed] in direct multi-lingual public education and outreach to naturalized citizen voters about maintaining their voter registration and re-registering if they ha[d] been removed through the Purge Program" and "redirect[ed] general community voter registration and outreach programs toward specifically responding to E.O. 35 and the Purge Program." *Id.* ¶ 21.

Plaintiffs League of Women Voters of Virginia and League of Women Voters Education Fund "are nonpartisan, nonprofit, membership organizations." *Id.* ¶ 24. LWVVA's mission is to "increas[e] the number of registered voters and increas[e] voter turnout." *Id.* ¶¶ 25-26. The Purge Program "forced [LWVVA] to both broaden [its] 'check your registration' efforts beyond its

previously targeted audience and to expand its focus on naturalized citizens." *Id.* ¶ 26. LWVVA also has naturalized citizen members. *Id.* ¶ 29.

Plaintiff African Communities Together "is a nonpartisan, nonprofit membership organization of African immigrants." *Id.* ¶ 31. ACT's core activities include "assist[ing] African immigrants in obtaining critical services, provid[ing] resources and infrastructure for community and leadership development, and support[ing] community members to engage in civic life, including through education and assistance with voter registration and voting." *Id.* In 2024, ACT "operat[ed] a robust voter engagement program in Virginia." *Id.* ¶ 33. The Purge Program required ACT to redirect "its voter engagement program by developing and producing new public education materials, revising the resources and scripts used by canvassers and phone bankers, and re-training paid staff and volunteers in order to support voters." *Id.* ¶ 34. ACT also has members who are naturalized citizens. *Id.*

On August 20, 2024, seventy-seven days before the November 5, 2024 federal general election, Plaintiffs VACIR and LWVVA sent a letter to Defendant Beals, Defendant Miyares, the DMV, and the Office of the Governor requesting records pursuant to the Public Disclosure of Voter Registration Activities provision of the NVRA, 52 U.S.C. § 20507(i). *Id.* ¶¶ 7, 25, 75. Specifically, they requested records "relating to the removal from the voter registration rolls of" those who have been identified as potential non-citizens. *Id.* ¶ 75; Dkt. 23, Ex. 7. The NVRA confers a private right of action on any "person aggrieved by a violation of this chapter" to seek injunctive or declaratory relief: (1) upon notice to the chief election official of the State involved if it has not been corrected within 90 days after receipt of the notice or within 20 days after receipt of the notice and the violation occurred within 120 days before a federal election; or (2) if the violation occurred within 30 days before a federal election. 52 U.S.C. § 20510(b)(1)-(3).

4

On October 3, 2024, thirty-one days before the November 5, 2024 federal general election, Plaintiffs VACIR and LWVVA, pursuant to 52 U.S.C. § 20510(b)(2), sent Defendants this notice, stating that the Purge Program violated the NVRA.  Am. Compl. ¶ 7; Dkt. 23, Ex. 8.  On October 15, 2024, Plaintiffs VACIR, LWVVA, and ACT filed an Amended Complaint (Dkt. 23) as well as a Motion for Preliminary Injunction (Dkt. 26).[2]  Plaintiffs define the Purge Program as "the program under which Defendants have systematically removed Virginia registered voters from its voter registration list on the purported basis of non-citizenship and includes implementation of Va. Code Ann. § 24.2-427(C)."  Dkt. 26, Ex. 27 at 2 n.1. On October 24 and October 25, 2024, this Court held a hearing on the motion for preliminary injunction.  Dkts. 110-11.

On October 25, 2024, the Court ruled from the bench, granting in part and denying in part Plaintiffs' motion. Dkts. 111-12.  The Court enjoined Defendants from "continuing any systematic program intended to remove the names of ineligible voters from registration lists less than 90 days before the November 5, 2024, federal General Election." Dkt. 112 ¶ 2.  The Court also ordered Defendants to restore the registrations of all voters who had their registrations cancelled pursuant to Defendants' program after August 7, 2024. *Id.* ¶ 3.

On October 25, 2024, Defendants filed a notice of interlocutory appeal to the Fourth Circuit as to the Court's Order and filed a motion to stay this Court's Order.  Dkt. 113.  On October 27, 2024, the Fourth Circuit denied Defendants' motion to stay in all respects except as to paragraph 7 of this Court's Order.  Dkt. 116.  On October 30, 2024, the Supreme Court granted Defendants'

---

[2] On October 18, 2024, this Court consolidated the instant action with *United States v. Commonwealth of Virginia et al.*, Civ. Action No. 1:24-cv-1807, leaving this action as the lead case.  Dkt. 65.  On January 28, 2025, the United States filed a Notice of Voluntary Dismissal for its action, *United States v. Commonwealth of Virginia, et al.*, No. 1:24-cv-1807.  Dkt. 139. Therefore, this opinion only addresses the remaining Plaintiffs' claims.

motion for stay. Order Granting Stay, *Beals et al. v. Va. Coal. for Immigrant Rts., et al.*, 2024 WL 4608863, at *1 (Oct. 30, 2024).

## II.    STANDARD OF REVIEW

### A.    12(b)(1) Motion to Dismiss

Federal district courts are courts of limited subject matter jurisdiction as "[t]hey possess only that power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). As the Fourth Circuit has recognized, "a federal court is obliged to dismiss a case whenever it appears the court lacks subject matter jurisdiction." *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999) (citing Fed. R. Civ. P. 12(h)(3) (providing that the court may dismiss for lack of subject matter jurisdiction at "any time")).

"Standing 'is a threshold jurisdictional question' that ensures a suit is 'appropriate for the exercise of the [federal] courts' judicial powers.'" *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (alteration in original) (quoting *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001)). "The party invoking federal jurisdiction bears the burden of establishing [the elements of standing]," which are discussed below. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). When assessing whether the complaint alleges facts upon which jurisdiction can be based, the district court must treat the facts alleged in the complaint as true and grant the motion under Rule 12(b)(1) if the complaint fails to allege sufficient facts to invoke subject matter jurisdiction. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

### B.    12(b)(6) Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

6

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The plausibility requirement mandates that a plaintiff "demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Accordingly, a complaint is insufficient if it relies upon "naked assertions" and "unadorned conclusory allegations" devoid of "factual enhancement." *Id.* (first quoting *Iqbal*, 556 U.S. at 679; and then quoting *Twombly*, 550 U.S. at 557). When reviewing a motion brought under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

### III.    DISCUSSION

*12(b)(1) Subject Matter Jurisdiction*

### A.    Standing

In its oral ruling on the motion for preliminary injunction, the Court found that Plaintiffs had organizational standing.[3] Dkts. 111, 120 ("Prelim. Inj. Tr.") 6:12-14. The Court also determined that Plaintiffs likely have associational standing because they have identified a member of their organizations who would have standing to sue. Prelim. Inj. Tr. 7:16-20. The Court granted Plaintiffs' preliminary injunction only as to Count I—Quiet Period Provision of the NVRA, 52 U.S.C. § 20507(c)(2)(A). *Id.* 12:1-4, 13:8-19. Here, on a motion to dismiss, Plaintiffs must establish that they have standing to sue for each of their asserted violations of the NVRA. *Davis v. FEC*, 554 U.S. 724, 734 (2008). Accordingly, the Court will address each of the remaining counts in turn.

---

[3] At that stage, the United States was also a plaintiff in this action. The Court found there was no question that the United States had standing. Prelim. Inj. Tr. 6:9-11.

As stated above, in addition to Count I, Plaintiffs raise the following claims: (1) Count II—Uniform and Nondiscriminatory Provision of the NVRA,  52 U.S.C. § 20507(b)(1); (2) Count III—Accept and Use Provision of the NVRA, 52 U.S.C. §§ 20508(b)(1), 20505(a)(1)-(2); and (3) Count IV—Public Disclosure Provision of the NVRA, 52 U.S.C. § 20507(i). Am. Compl. ¶¶ 81-94.  With the exception of Count IV—Public Disclosure Provision, Counts II and III are based on the same conduct: Defendants' implementation of the Purge Program. *Id.* ¶¶ 81-90.  In this case, the Court finds that Plaintiffs have standing based on either theory of direct organizational standing or associational standing under Article III of the Constitution. *See N.C. State Conf. of NAACP v. N.C. State Bd. of Elections*, 283 F. Supp. 3d 393, 399 (M.D.N.C. 2017).

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560.  A plaintiff must show that (1) she has suffered or will suffer an injury in fact; (2) that the injury was caused or will be caused by the defendant; and (3) that the injury likely would be redressed by the requested judicial relief. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) ("*Hippocratic Med.*") (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  If the plaintiff is an organization, it may also "sue on [its] own behalf for injuries [it has] sustained" so long as it meets the same injury in fact, causation, and redressability standards which apply to individuals. *Id.* at 393-394 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)).  An organizational plaintiff also has standing to sue on behalf of one of its members who was harmed, commonly understood as associational or representational standing. *Hippocratic Med.*, 602 U.S. at 393-96.  In general, the standing inquiry focuses on the defendant's challenged conduct. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

With respect to organizational standing, Defendants do not challenge whether Plaintiffs' injury was caused by Defendants' conduct or whether their injury can be redressed by a favorable decision.  Defendants only challenge whether Plaintiffs have suffered an injury in fact. Dkt. 122

at 14-17. An organization has standing to sue on its own behalf when the defendant's actions interfere with the organization's "core business activities." *Hippocratic Med.*, 602 U.S. at 395. An organization cannot, however, "spend its way into standing by expending money to gather information and advocate against [a] defendant's action." *Id.* at 394. However, "when an action perceptibly impairs an organization's ability to carry out its mission and consequently drains . . . the organization's resources," the organization can establish an injury in fact. *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020) (quoting *Havens Realty Corp.*, 455 U.S. at 379) (citation modified); *N.C. All. for Retired Ams. v. Hirsch*, 2024 WL 3507677, at *6 (E.D.N.C. July 19, 2024). The Fourth Circuit recognizes a difference between a choice to expend resources in response to threats to the organization's core mission and expending resources merely because an organization disagrees with a policy choice. *RNC v. N.C. State Bd. of Elections*, 120 F.4th 390, 395-96, 409 (4th Cir. 2024).

Plaintiffs argue that they have standing because their core activities include voting counseling and efforts to assist naturalized citizens in checking voter registration and getting them to re-register; Defendants' program necessarily impairs these efforts. Dkt. 127 at 7, 9-10. This Court agrees. Indeed, as the Court stated in its preliminary injunction ruling, Plaintiffs have sufficiently alleged that the Purge Program has directly affected and interfered with their core mission and activities. Prelim. Inj. Tr. 7:1-25.

Lead Plaintiff VACIR attests that as an umbrella foundation for several smaller immigrant rights groups, each of its members has been harmed by the Purge Program. Dkt. 26, Ex. 23 ("VACIR Decl.") ¶¶ 5-6. Plaintiff LWVVA attests that the Program has made it difficult to provide clear and updated information regarding voter rolls and voter registration while also making it harder for them to focus on increasing voter turnout and participation in favor of monitoring registration status. Dkt. 26, Ex. 24 ("LWVVA Decl.") ¶¶ 26-29. Plaintiff ACT attests

that the Purge Program interfered with their entire voter outreach strategy for the upcoming election, forcing them to refocus on maintaining the voter registration status of their members rather than on promoting greater voter participation.  Dkt. 26, Ex. 25 ("ACT Decl.") ¶¶ 14-17. ACT also identified "voter access and participation" as "central to its mission." *Id.* ¶ 5.  ACT had to divert resources away from supporting its core activities to address the impacts of E.O. 35.  *Id.* ¶ 19.  Therefore, Defendants' program interferes with ACT's core mission of increasing voter access and participation and LWVVA's core activities of increasing voter turnout and participation.  This analysis does not change with respect to Counts II and III since Defendants' alleged failure to comply with the Accept and Use Provision and Uniform and Nondiscriminatory Provision harm Plaintiffs in the same way.

*RNC v. North Carolina State Board of Elections* is squarely on point.  120 F.4th 390 (4th Cir. 2024).  There, the Fourth Circuit found that the plaintiffs' asserted injury, caused by the North Carolina Board of Elections' alleged violation of the Help America Vote Act of 2002, was sufficient to allege organizational standing.  *Id.* at 398.  Specifically, the plaintiffs alleged that their core mission was "organizing lawful voters and encouraging them to support Republican candidates at all levels of government," and that they "expend[ed] significant time and resources fighting for election security and voting integrity across the nation." *Id.* at 397.  The State Boards' alleged violation impaired this core mission and forced them to divert more resources to combat election fraud, frustrating their voter outreach efforts.  *Id.*  Moreover, the Fourth Circuit considered *Hippocratic Med* to arrive at its conclusion.  *Id.* (citing 602 U.S. 367 (2024)).  Thus, Plaintiffs are correct that a diversion of resources is clearly sufficient to allege organizational standing so long as it is the consequence of harm done to a plaintiff's core activities.

Here, Plaintiffs allege much the same injuries as the *RNC* plaintiffs.  Plaintiffs assert that Defendants' violations of the NVRA impair their core mission of providing voting counseling,

voter outreach, among other initiatives, which consequently force them to divert their resources to re-register voters. Am. Compl. ¶¶ 26, 34; Dkt. 26, Ex.1 at 24. Defendants argue that Plaintiffs must allege direct harm to pre-existing core activities, but this is not what the Fourth Circuit explicitly said. Dkt. 132 at 4-5. The Fourth Circuit required no more than what Plaintiffs allege here to establish organizational standing for the *RNC* plaintiffs. Thus, this Court declines to require more of Plaintiffs.[4]

Even if the test required Plaintiffs to allege direct harm to pre-existing core activities, Plaintiffs have sufficiently alleged that Defendants' program has stymied their "organizational and voter outreach efforts" because they have to re-train staff and volunteers and expend more resources encouraging and educating voters on how to check their registration. *RNC*, 120 F.4th at 397. There is no meaningful distinction between "diverting more resources to combat election fraud" and diverting resources to retrain staff to counsel voters who were at risk of being purged or educating voters about checking their registration status. *Id.* In *RNC* and in this case, the plaintiffs alleged that some "action[] or inaction" of the state board of elections impacted their core mission and activities. *Id.* at 396-97. Therefore, Plaintiffs have sufficiently alleged they have sustained an injury in fact to establish organizational standing under both Supreme Court and Fourth Circuit precedent.

This Court also finds that Plaintiffs have sufficiently alleged that Defendants' conduct caused their injuries. If Defendants' program had not removed voters from the rolls, Plaintiffs would not have had to, among other things, divert resources by educating voters and retraining staff to ensure their members and other voters re-registered or remained registered. Because

---

[4] The Court notes that Judge Diaz's concurrence in *RNC* does suggest that he would apply a "stricter view" of organizational standing. *See* 120 F.4th at 410-11 (collecting cases from other courts that have expressed wariness that diverting resources is enough).

Plaintiffs seek a declaration that the Virginia statute and Defendants' Purge Program violated the NVRA and to permanently enjoin Defendants from implementing this Program in the future, this Court is therefore capable of redressing their injury.

As stated above, Plaintiffs have established organizational standing. But even if they had not, they also have associational standing. Defendants argue that Plaintiffs do not have associational standing because they have not disclosed the identities of any of their members who were harmed by Defendants' program. Dkt. 122 at 11-14. Plaintiffs contend that they need not disclose the identity of a member who was harmed by Defendants' program if the individual's interest in anonymity outweighs the public's interest in disclosure and prejudice to the opposing party. Dkt. 127 at 10-12.

Neither party is exactly correct. "A plaintiff can establish 'representational standing' to sue on its members' behalf when '(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit.'" *N.C. State Conf. of the NAACP*, 283 F. Supp. 3d at 399-400 (quoting *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)). The Fourth Circuit only requires that an organization specifically allege that "one identified member had suffered or would suffer harm." *Id.*

Here, the parties appear to dispute whether Plaintiffs have identified a member with standing to sue in their own right. Plaintiff LWVVA attests that it has identified a member who was harmed by Defendants' program and thus has associational standing. Dkt. 103, Ex. 1 ("Porte Decl.") ¶ 3. Defendants insist that Plaintiffs must identify their member by their legal name. Dkt 132 at 2-3. To support their position, Defendants rely on *Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 114 (2d Cir. 2024) ("*Do No Harm I*") (concluding that on a motion for preliminary injunction "a

12

plaintiff association seeking to establish standing on the basis of injuries to its members identify
at least one injured member by name best aligns with Supreme Court precedent"). However, their
reliance is misplaced.

It is worth noting that the plaintiff in that case was seeking a preliminary injunction—
which is not the current posture of this case. Moreover, *Do No Harm I* was recently vacated and
remanded by the Second Circuit. *Do No Harm v. Pfizer Inc.*, 126 F.4th 109 (2d Cir. 2025) ("*Do
No Harm II*") (per curiam). In *Do No Harm II*, the court reheard the case and concluded that the
district court erred in dismissing the entire complaint merely because an organizational plaintiff
failed to establish standing sufficient to secure a preliminary injunction. 126 F.4th at 121-22. In
reversing the dismissal, the Second Circuit noted that at the pleading stage—as on a motion to
dismiss—general allegations would suffice. *Id.* The Second Circuit also noted that "[i]t is well
settled that 'a plaintiff's burden to demonstrate standing increases over the course of litigation.'"
*Id.* at 119 (quoting *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011)) (citation modified).
This is because, in the Second Circuit, "a plaintiff's burden to demonstrate standing will normally
be no less than that required on a motion for summary judgment." *Id.* (quoting *Cacchillo*, 638
F.3d at 404). However, "[t]he burden for establishing standing at the dismissal stage is lower."
*Id.* at 114. Thus, the Second Circuit agreed with the plaintiffs that at the pleading stage general
factual allegations are sufficient. *Id.*

Neither party has offered Fourth Circuit authority on this point. Defendants argue that
without the anonymous member's name they have no way to determine "whether she was on the
voter rolls in the first place, was removed from the voter rolls during the quiet period or reregistered
to vote after being removed." Dkt. 132 at 2. However, this inquiry is inappropriate at the pleading
stage, as it does not address whether Plaintiffs have sufficiently pled facts to establish associational
standing. Relatedly, Defendants do not directly or factually challenge LWVVA's affidavit

attesting that one of their members has been harmed.

With respect to Plaintiffs' arguments about anonymity, Plaintiffs also offer out-of-circuit authority to support their proposition that public disclosure of their member's name is unnecessary. *See American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024). In that case, which concerned a motion for preliminary injunction, the Eleventh Circuit held that an organizational plaintiff was not required to identify affected members by their legal names to establish its standing. *Id.* at 773. In doing so, the court relied on a Fourth Circuit decision addressing individual standing. *Id.* (citing in *B.R. v. F.C.S.B.*, 17 F.4th 485 (4th Cir. 2021)). Indeed, in *B.R.*, the Fourth Circuit reasoned that an individual plaintiff had standing to sue despite not initially disclosing her name because "what she alleged was real" and showed that "she possessed the kind of personal stake necessary for standing—i.e., that she suffered a concrete and particularized injury caused by the defendants and redressable by the court." 17 F.4th at 493-94 (citation modified). Moreover, unlike *Do No Harm*, the challenge to the *B.R.* plaintiff's standing occurred at the pleading stage. To the extent Plaintiffs' burden is higher to secure a preliminary injunction, *American Alliance for Equal Rights* suggests that even on a motion for preliminary injunction, a failure to identify members by name may not be a threat to standing. In any event, this Court is persuaded that, at this stage, it is not necessary that an organizational plaintiff alleging associational standing disclose the identity of the specific member that was harmed as long as they allege a sufficient injury to a member.

For the reasons stated above, Plaintiffs have sufficiently alleged that they have organizational and associational standing to assert their claims as to Counts II and III. With respect to Count IV, the Court also finds that Plaintiffs VACIR and LWVVA have organizational standing. Plaintiffs submitted the notice they sent to Defendants regarding Defendants' failure to comply with the statute and provide responsive documents. VACIR Decl. ¶¶ 17, 20; Dkt. 26, Ex. 16.

Since the statute requires such disclosure, Plaintiffs VACIR and LWVVA have sufficiently alleged that they have suffered an injury in fact, caused by Defendants, which this Court may redress in ordering Defendants' compliance.

**B.    *Ex parte Young***

Before reaching the merits of Plaintiffs' remaining counts, Defendants raise two challenges to the suit under the Eleventh Amendment and *Ex parte Young*. 209 U.S. 123 (1908). First, Defendants contend that state sovereign immunity shields Defendants from suit because Plaintiffs no longer allege an *ongoing* violation of federal law. Dkt. 132 at 8 (citing *Allen v. Cooper*, 895 F.3d 337, 355 (4th Cir. 2018)). Second, Defendants argue that Attorney General Miyares is not a proper party to the suit because he bears no special relation to the law at issue. *Id.* at 10. The Court addresses each of these arguments in turn.

The Court finds that Plaintiffs have sufficiently alleged an ongoing violation of federal law to support an action under *Ex parte Young*. "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)) (citation modified). Defendants argue that Plaintiffs seek injunctive relief for conduct that occurred entirely in the past. Dkt. 132 at 8. Plaintiffs contend that the relief they seek is sufficiently prospective because they seek a permanent injunction to prevent the Purge Program from ever being implemented before a federal election and to place removed voters back on the rolls. Dkt. 127 at 16.

According to Defendants, "the possibility of future injury in this context is insufficient to 'establish an ongoing violation of federal law to qualify for relief under *Ex parte Young*.'" Dkt.

132 at 8 (citing *Allen*, 895 F.3d at 355). The test, however, is not as simple as it may appear. What matters is whether a plaintiff seeks to remedy ongoing harm, not just whether the challenged action occurred in the past. Indeed, the Fourth Circuit has held that "a future injunction is not made retrospective merely because it recognizes that an ongoing violation of law is the result of a past wrong." *CSX Transp., Inc. v. Bd. of Pub. Works of State of W.Va.*, 138 F.3d 537, 541 (4th Cir. 1998) (citing *Coakley v. Welch*, 877 F.2d 304 (4th Cir. 1989)).

Plaintiffs note that Defendants' authority involved "one-time events that are unlikely to recur." Dkt. 127 at 17 n.8. Thus, Defendants' reliance on *DeBauche v. Trani* and *Allen v. Cooper* is misplaced. 191 F.3d 499 (4th Cir. 1999); 895 F.3d 337 (4th Cir. 2018). The *DeBauche* plaintiff sought to prevent his future exclusion from debates, and the *Allen* plaintiff sought to prevent North Carolina from further infringing their copyrights. *DeBauche*, 191 F.3d at 505; *Allen*, 895 F.3d at 354-55. In both cases, the Fourth Circuit essentially concluded that the plaintiffs' fears amounted to conjecture and were not ongoing violations. In *DeBauche*, the defendants' actions were a one-time event, and the Court found it unlikely that the defendant, a university president, would exclude plaintiff from a subsequent gubernatorial debate. 191 F.3d at 505. In *Allen*, North Carolina had concededly stopped infringing on the plaintiff's copyright by removing the allegedly infringing materials. 895 F.3d at 354-55.

Here, Defendants' program is neither a one-time event, nor have the removed voters been reinstated. As Plaintiffs note, Defendants' program includes "the process outlined in E.O. 35, and Va. Code § 24.2-427(C)," and they seek to prevent its implementation before any future federal election. Dkt. 127 at 17 n.9. To the extent Defendants believe their program is lawful, the possibility that they will continue to operate their program is far less speculative and moves toward a certainty. As Plaintiffs allege, individuals removed from the voter rolls through the Purge Program remain removed unless they received and responded to Defendants' Notice of Intent to

16

Cancel.[5]  Am. Compl. ¶¶ 43-44, 46.  To the extent citizens were systematically removed from these rolls within 90 days of a federal election and have not been restored, reinstating these voters' registrations would be prospective relief which would cure an ongoing violation of federal law. *Id.* ¶¶ 48, 78-79; Dkt. 127 at 16.

Moreover, the Fourth Circuit has already held that requesting the injunctive remedy of reinstatement in the employment context satisfies *Ex parte Young*.  *Coakley v. Welch*, 877 F.2d 304, 305, 307 n.2 (4th Cir. 1989); *CSX Transp., Inc.*, 138 F.3d at 541.  Reinstating voters' registration is similarly prospective.  Dkt. 127 at 16 (citing *Coakley*, 877 F.2d at 305, 306 n.2 and *CSX Transp., Inc.*, 138 F.3d at 541).  Further, a permanent injunction would prevent voters who were removed and re-registered from being removed all over again ahead of the next federal general election.  Therefore, the Court finds that Plaintiffs have sufficiently alleged an ongoing violation of federal law sufficient to sustain an action under *Ex parte Young*.

As for the propriety of the Attorney General in this suit, Defendants argue that he is not a proper party to this suit because "the Attorney General has no role 'in deciding' who is a noncitizen who must be removed from the voter rolls or 'in executing that' removal." Dkt. 132 at 10 (quoting *King v. Youngkin*, 122 F.4th 539, 548 (4th Cir. 2024)).  According to Defendants, because the Attorney General has not acted or threatened to enforce the laws at issue, he bears no special relation to them.  *Id.*  In contrast, Plaintiffs argue that the Attorney General is a proper party because Virginia law grants him the authority to enforce, investigate, and prosecute violations of the election laws. Dkt. 127 at 17-18; *see also* Va. Code Ann. § 24.2-104(A).  Moreover, Plaintiffs assert that because the Attorney General is authorized to bring a civil action for violations of the elections law, he has the authority to seek prospective relief which provides a connection between

---

[5] Voters who realized they were removed in time to re-register may have done so.

the Attorney General and the act's enforcement.  Dkt. 127 at 18 (citing *Doyle v. Hogan*, 1 F.4th 249, 257 (4th Cir. 2021)).

This Court agrees with Plaintiffs.  Under *Ex parte Young*, to sue a state officer, there must be a "'special relation between the officer being sued and the challenged' government action." *King v. Youngkin*, 122 F.4th 539, 548 (4th Cir. 2024) (quoting *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010)).  "A 'special relation' requires both 'proximity to and responsibility for the challenged state action.'"  *Id.*  "The officer sued must be able to enforce, if he so chooses, the specific law the plaintiff challenges."  *Id.* at 549 (quoting *Doyle*, 1 F.4th at 255).  Virginia Code § 24.2-104(A) grants the Attorney General the full authority to enforce the election laws and prosecute violations thereof.  Defendants draw the challenged action too narrowly by focusing on whether the Attorney General makes the determination to remove voters from the rolls.  After ELECT and the registrars forwards the names of voters who were removed, the Attorney General then chooses whether to investigate and prosecute the referrals. Va. Code Ann. §§ 24.2-104, 24.2-1019.  Thus, the Attorney General unambiguously has the authority to enforce the law or practice Plaintiffs challenge.

In *King v. Youngkin*, the Court excused Virginia's governor from suit because the power to restore someone's right to vote was not the same as deciding "who to disenfranchise or executing that disenfranchisement." 122 F.4th at 548-49.  The Fourth Circuit concluded that under Virginia's constitution, being convicted of a felony automatically made someone ineligible to vote without action from the governor or secretary.  *Id.*  In *Doyle v. Hogan*, the Fourth Circuit excused the Governor, Secretary, and Attorney General because under the relevant statute, none of them had the authority to decide whether to bring a disciplinary proceeding.  1 F.4th 249, 256 (4th Cir. 2021).  Specifically, the Attorney General lacked a special relationship because the Attorney General did not have control over "enforcing the Act."  *Id.*

18

Here, Plaintiffs seek to prevent the Attorney General from conducting investigations based off the referrals from the Purge Program and by extension civil actions against those referred. Am. Compl. at 31-32 ¶¶ (c), (h), (i), (l); Dkt. 127 at 18 n.10. Under Virginia law, neither ELECT nor local registrars have the power to conduct investigations or initiate a civil action, but the Attorney General can decide whether to take action regarding ELECT referrals. Va. Code. §§ 24.2-404.4, 24.2-104, 24.2-104.1. As the Fourth Circuit noted in *Doyle*, the requisite enforcement authority can "come from the 'particular act' being challenged, a more general law providing enforcement authority, or 'the general duties of the officer.'" 1 F.4th at 255 (quoting *Ex parte Young*, 209 U.S. at 157-58).[6] Based on Plaintiffs' claims, the Attorney General has "some connection with the enforcement of the act." *Id.* at 254-55. Accordingly, this Court finds that the Attorney General is a proper party to this suit.

After determining that Plaintiffs have sufficiently alleged organizational and associational standing, that the instant suit is not barred by sovereign immunity against Defendants, and that the Attorney General is a proper party to this litigation, the Court turns to whether Plaintiffs have alleged sufficient facts to plausibly state their claims.

*12(b)(6) Failure to State a Claim*

### C.    Count I—Quiet Period Provision

Plaintiffs have stated a claim for violation of the Quiet Period Provision of the NVRA. 52 U.S.C. § 20507(c)(2)(A). As a preliminary matter, now that the 2024 federal general election day has passed, Defendants argue that Plaintiffs' claims are now moot. Dkt. 122 at 17. In addition,

---

[6] In *Doyle*, the Fourth Circuit suggested that the authority to seek prospective relief may "provide an adequate connection between the Attorney General and the enforcement of the Act to permit suit under *Ex parte Young*." 1 F.4th at 257. In the end, *Doyle* did not definitively answer that question. Nonetheless, this Court finds it is unnecessary to address it because Plaintiffs have alleged the referrals and investigations are ongoing and that is part of the conduct they seek to enjoin.

Defendants argue that the exception to mootness requires a reasonable expectation that the same party will once again be subject to the same harm. *Id.* at 18. Moreover, Defendants reason that in order for their members to be subjected to the same harm, they would have to "check the wrong box at the DMV once more" or not appear in the SAVE database and not return the Notice of Intent to Cancel. Dkt. 132 at 7. Plaintiffs contend that in the Fourth Circuit, reasonable expectation does not require certainty and thus, to the extent that Defendants' program is carried out as Plaintiffs allege, their members very well could be erroneously removed from the voter rolls again. Dkt. 127 at 14. This Court agrees with Plaintiffs.

Article III requires that a case or controversy remain live for the Court to retain subject-matter jurisdiction over the suit. *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007). One exception to this requirement is for disputes "capable of repetition, yet evading review." *Id.* "The exception applies where '(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" *Id.* (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). "The second prong of the 'capable of repetition' exception requires a 'reasonable expectation' or a 'demonstrated probability' that 'the same controversy will recur involving the same complaining party.'" *Id.* at 463 (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam)). In the Fourth Circuit, "[e]lection-related disputes qualify as 'capable of repetition' when 'there is a reasonable expectation that the challenged provisions will be applied against the plaintiffs again during future election cycles.'" *Sharma v. Hirsch*, 121 F.4th 1033, 1039 n.1 (4th Cir. 2024) (quoting *Lux v. Judd*, 651 F.3d 396, 401 (4th Cir. 2011)) (citation modified).

The Amended Complaint alleges that Defendants' program erroneously removes citizens from the voter rolls because they once filled out a DMV record that indicated they were not a citizen, despite other documentation indicating that they are a citizen. Am. Compl. ¶¶ 60-64.

Plaintiffs attest that their affected member had even voted previously but was nonetheless removed. Porte Decl. ¶ 4. The Court is not persuaded by Defendants' self-serving and circuitous argument that because the member voted in the past "without an issue" makes the likelihood that the same harm will recur speculative. Dkt. 132 at 7. Accepting Plaintiffs' allegations as true, Defendants offer no reason why, if Defendants were to renew their program before a subsequent federal election cycle, the program would not affect this same member again.[7]

As for Plaintiffs' organizational standing, Defendants argue that Plaintiffs' efforts to combat the program in this iteration would not be duplicated. Dkt. 122 at 17-18. This Court disagrees. If Defendants implemented their program again, Plaintiffs would still need to divert resources to training staff and conducting outreach to once again ensure that their registered members successfully re-register and monitor their registration status. Indeed, as stated above, Plaintiffs have every reason to anticipate that they would need to support the member that was removed in a future election. Thus, Plaintiffs would be harmed in the same or similar manner. Therefore, there is a reasonable expectation that Defendants' Purge Program will be applied against Plaintiffs as an organization or as representatives again. Plaintiffs' injuries meet the exception for mootness, because they are capable of repetition yet evading review. Accordingly, this Court finds their Quiet Period Claim is not moot.[8]

Turning to the substance of Defendants' arguments regarding the Quiet Period Provision, Defendants first re-raise their argument that Plaintiffs have failed to state a claim for violation of

---

[7] Even assuming that this program was conducted in prior elections, Defendants offer no explanation for why Plaintiff LWVVA's member would be removed only in this cycle or any reason to believe that the problem would not recur in a subsequent cycle.

[8] Defendants do not appear to challenge the duration requirement of the exception. This being an election case, the Court is satisfied that Defendants' actions as alleged are short enough in duration to escape review.

the Quiet Period Provision because their program was not systematic. Dkt. 122 at 32. According to Defendants, the Purge Program is individualized because it "focuses narrowly on specific individuals who have declared themselves to be noncitizens and involves contacting each such individual—twice." *Id.* at 22-23. The Court disagrees.

The Quiet Period Provision provides that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). This Court already ruled that Plaintiffs have demonstrated a high likelihood of success on the merits as to this claim when it granted Plaintiffs' preliminary injunction. Dkts. 111, 112. This would not have been possible if Plaintiffs had not stated a claim as a matter of law. Again, this Court rejects Defendants' contention. Because Plaintiffs allege that Defendants' program "does not require communication with or particularized investigation into any specific individual," Plaintiffs have sufficiently alleged that Defendants' program is systematic. *VACIR v. Beals*, 2024 WL 4601052, at *1 (4th Cir. Oct. 27, 2024). The Fourth Circuit has affirmed that "[a] process is systematic if it uses a 'mass computerized data-matching process' to identify and confirm names for removal without 'individualized information or investigation.'" *Id.* (quoting *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014)). As this Court has already stated, because Plaintiffs allege that Defendants' program involves little more than comparing ELECT lists against the voter rolls and matching names and identities, Defendants' program is necessarily systematic.

Defendants also re-raise the same statutory interpretation argument they presented to this Court on the motion for preliminary injunction. Dkt. 122 at 24. Defendants assert that the Quiet Period Provision does not apply to non-citizens because they were never eligible applicants and, in turn, could never become a "registrant" or "voter" within the meaning of the statute. *Id.* In

Defendants' view, the Quiet Period Provision cannot include noncitizens because then States would be prevented from ever removing them from the rolls. *Id.* at 27. This Court still finds these arguments unpersuasive and also adopts the Fourth Circuit's rejection of them. The Fourth Circuit reasoned that Defendants' contentions: (1) collapse distinctions between "voters" and "eligible voters[;]" (2) assumes "different words in different provisions" have the same meaning; and (3) ignores the plain meaning of the word "registrant." *VACIR*, 2024 WL 4601052, at *2 (defining registrant as one that registers or is registered). In sum, Defendants' argument "violates basic principles of statutory construction by focusing on a differently worded statutory provision that is not at issue here and proposing a strained reading of the Quiet Period Provision to avoid rendering that other provision absurd or unconstitutional." *Id.* at *1.

Although the Supreme Court granted Defendants' motion for a stay, without the Supreme Court's reasoning, it does not follow that the Court necessarily repudiated the Fourth Circuit's reasoning.[9] This Court declines to overread the Supreme Court's decision. Moreover, it bears repeating that the word "registrant" does not appear in the provision at issue. For the second time, the Court rejects Defendants' tortured reading. Thus, this Court still concludes that Plaintiffs have sufficiently pled a violation of the Quiet Period Provision and denies Defendants' Motion to Dismiss as to Count I.

### D.    Count II—Uniform and Nondiscriminatory Provision

Count II alleges that Defendants' Purge Program has violated the NVRA because it is discriminatory. Am. Compl. ¶¶ 81-84. Plaintiffs allege that Defendants' Purge Program "by design singles out individuals who were once identified in DMV records as noncitizens and

---

[9] Indeed, it appears that, at best, the Supreme Court merely preferred the case go through the litigation and appeal process while staying this Court's Order in the interim. Order Granting Stay, *Beals v. VACIR*, 24-2071 (Oct. 30, 2024).

subjects them to scrutiny not generally faced by U.S.-born citizens." Dkt. 127 at 22 (quoting Am. Compl. ¶¶ 60, 70-71). As a result, it discriminates against naturalized citizens. In their Motion, Defendants contend that Plaintiffs have conceded that Defendants' process is not discriminatory because their process applies to anyone who "self-identifies" as a non-citizen, rather than applying solely based on national origin. Dkt. 132 at 11. They argue that their process classifies individuals based on the documents they present indicating citizenship, and it is not a proxy for national origin because non-citizens cannot legally vote. *Id.* at 12.

The "uniform" and "nondiscriminatory" provision of the NVRA requires that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." 52 U.S.C. § 20507(b)(1). The statute does not explicitly define nondiscriminatory, nor does it appear to require discriminatory *intent* in assessing whether a program or activity is discriminatory. *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 999 (D. Ariz. 2024) ("*Mi Familia Vota I*"), and *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012), both recognized that programs which had a discriminatory *impact* on naturalized citizens likely violated the NVRA's uniform and non-discriminatory requirements. Indeed, the Ninth Circuit recently held that Arizona's program violated Section 8(b) of the NVRA because its "citizenship checks" are "'likely to have a discriminatory impact on [naturalized] citizens.'" *Mi Familia Vota v. Fontes*, 129 F.4th 691, 714-15 (9th Cir. 2025) ("*Mi Familia Vota II*") (quoting *Florida*, 870 F. Supp. 2d at 1350).

At this stage, the Court accepts Plaintiffs' allegations as true. *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 263 (4th Cir. 2021). To the extent Plaintiffs allege that Defendants' program "singles out individuals who were once identified in DMV records as noncitizens and subjects them to scrutiny not generally faced by U.S.-born citizens," they have

24

sufficiently alleged that the Purge Program discriminates based on national origin and against naturalized citizens. Am. Compl. ¶ 70. Specifically, Plaintiffs allege that naturalized citizens are more likely to have a "noncitizen exchange with the DMV prior to naturalization," and persons who naturalize would not necessarily have updated documents on file with the DMV. *Id.* ¶ 60. Rather than challenge Plaintiffs' allegation about the accuracy and adequacy of Defendants' process, Defendants focus on framing the program as applying to anyone who "self-identifies" as a non-citizen.

Yet, Plaintiffs also allege that this program applies to citizens "who have previously attested to their U.S. citizenship under penalty of perjury" but have also at one point checked a box indicating that they may have been a non-citizen. *Id.* ¶ 71. Thus, Defendants' program flags registrations for cancellation who have indicated that they *may have been* a non-citizen at some point but otherwise attested to being a citizen. Because Plaintiffs have alleged that naturalized citizens, people who were at one-point non-citizens, are more likely to have their registrations flagged for cancellation, Plaintiffs have alleged Defendants' program has a discriminatory impact.[10]

As Plaintiffs contend, they are not required to allege facts sufficient to demonstrate discriminatory intent. Contrary to Defendants' assertion, *Husted v. A. Philip Randolph Institute* did not concern the Uniform and Nondiscriminatory Provision of § 20507(b)(1) because "respondents did not assert a claim under that provision." 584 U.S. 756. 779 (2018). Thus, that case offers no clarity on what Plaintiffs must allege here. Indeed, although the Supreme Court noted that Justice Sotomayor did not identify evidence of discriminatory intent to support her

---

[10] Even when facing higher burdens, plaintiffs have shown that similar programs were discriminatory and in violation of the NVRA. *Mi Familia Vota I* was decided on a motion for summary judgment and *United States v. Florida* on a motion for temporary restraining order. 719 F. Supp. 3d at 999; 870 F. Supp. 2d at 1350.

argument in dissent, this acknowledgment does not indicate that a showing of discriminatory intent is required under § 20507(b)(1). *Id.* Moreover, Defendants have not cited any other authority suggesting that a plaintiff must allege discriminatory intent to sufficiently state a claim under this provision. To the contrary, as stated *supra*, other courts have found discriminatory impact to be sufficient. *See Mi Familia Vota I*, 719 F. Supp. 3d at 999; *Florida*, 870 F. Supp. 2d at 1350. This Court finds these cases to be persuasive. Therefore, Plaintiffs have sufficiently stated a claim for violation of the Uniform and Nondiscriminatory Provision of the NVRA and so Defendants' Motion to Dismiss as to Count II is denied.

E.    **Count III—Accept and Use Provision**

Count III alleges that by requiring certain voters to reaffirm their citizenship, Defendants are violating the NVRA's directive that voters need only complete a voter registration form to be registered for federal elections. Am. Compl. ¶ 88. According to Plaintiffs, this violates the "accept and use" provision. 52 U.S.C. §§ 20505(a)(1)-(2) ("Section 6"), 20508(b)(1) ("Section 9").

Defendants contend that Plaintiffs fail to state a claim for violations of Sections 6 and 9 of the NVRA as a matter of law. Specifically, they argue that voter registration and list maintenance are distinct processes, and Sections 6 and 9 of the NVRA only govern registration. Dkt. 132 at 13; *see also* 52 U.S.C. §§ 20505(a)(1)-(2), 20508(b)(1). Defendants assert that Plaintiffs allege "Defendants improperly remove persons from the rolls, not that they fail to register them in the first place." Dkt. 132 at 14. Furthermore, according to Defendants, Plaintiffs' allegation about this additional requirement is conclusory and unsupported given Plaintiffs' allegation that the DMV data checks "occur after a person has been registered to vote." *Id.* In response, Plaintiffs contend that they have stated a claim because they allege that Defendants' program essentially requires applicants to "complete additional paperwork before allowing them to vote." Dkt. 127 at 25 (citing Am. Compl. ¶¶ 2, 39, 88-89). The Court agrees with Defendants.

26

The NVRA sets forth restrictions and requirements for States to follow when establishing procedures to register people to vote in federal elections. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 5 (2013) ("*ITCA*"). The NVRA's stated purposes are:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
>
> (2) to make it possible for Federal, State, and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
>
> (3) to protect the integrity of the electoral process; and
>
> (4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b).

Specifically, Section 6 of the NVRA provides that "[e]ach State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission . . . for the registration of voters in elections for Federal office." 52 U.S.C. § 20505(a)(1). Section 9 states that the mail voter registration form "may require only such identifying information . . . and other information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1).

In *ITCA*, the Supreme Court held that states subject to the NVRA may not impose greater requirements than those provided by the federal Registration Form. 570 U.S. at 15. However, the completion of a federal form does not guarantee that an applicant will be registered. *Id.* A state may nevertheless deny registration if they possess information "establishing the applicant's ineligibility." *Id.* (quotations omitted). Plaintiffs read *ITCA* to require that states may operate any removal programs only after they have, in good faith, accepted federal and state Forms as "complete and sufficient registration application[s]." Dkt. 127 at 24 (citing *ITCA*, 570 U.S. at 9). Plaintiffs submit that finding otherwise would allow states to circumvent the NVRA "by relabeling

27

their processes." *Id.* at 26. In addition, they contend that Defendants "factual assertion and other assurances" that their program is "a good-faith list maintenance effort cannot be accepted as true." *Id.* at 27.

Neither party offers clear authority on how narrowly or broadly courts have construed the Accept and Use Provision at this stage. *ITCA*, however, is not helpful here because it concerned a straightforward challenge to whether Arizona's evidence of citizenship requirement *prior* to registration violated the accept and use requirement. 570 U.S. at 15. Likewise, Plaintiffs' reliance on *Fish v. Kobach* also misses the mark as it concerned Section 5 of the NVRA. Dkt. 127 at 24-25 (citing 840 F.3d 710, 737 (10th Cir. 2016)). Section 5 provides a "state motor voter form 'may require only the minimum amount of information necessary' for state officials to carry out their eligibility-assessment and registration duties." *Fish*, 840 F.3d at 733 (quoting § 20504(c)(2)(B)). In *Fish*, the Tenth Circuit established a presumption that an attestation requirement is the minimum information necessary to register an applicant. *Id.* at 737. In both of these cases, the Supreme Court and Tenth Circuit seem to refer to these provisions of the NVRA as regulating the registration process. *See id.* at 745 ("Congress intended that the motor voter form would—at least presumptively—constitute the beginning and the end of the registration process."); *ITCA*, 570 U.S. at 9-10 ("[The Accept and Use Provision] might mean that a State must accept the Federal Form as a complete and sufficient registration application; or . . . that the State is merely required to receive the form willingly and use it somehow in its voter registration process.").

Although Plaintiffs are right to be wary of a process that would erode the purpose of the Accept and Use Provision, Defendants have the better argument. These provisions specifically concern aspects of the registration process. 52 U.S.C. §§ 20505(a)(1), 20508(b)(1). The NVRA explicitly prescribes a process that allows states to remove voters from the voter rolls, which Plaintiffs accept. 52 U.S.C. §§ 20507(c), (d). *ITCA* also counsels that the Accept and Use

Provision requires that States accept and use the Federal Form as a "complete and sufficient *registration application*." 570 U.S. at 9, 15 (emphasis added). Plaintiffs do not allege that Defendants' program prevented individuals from properly registering to vote in the first instance. In Plaintiffs' view, Defendants' process creates an unnecessary voter registration requirement in the registration process. Am. Compl. ¶ 89. But Plaintiffs do not allege facts demonstrating how Defendants' program is part of the registration process. They allege that Defendants' program removes voters from the voter rolls at some indeterminate point after registering.[11] *Id.* ¶¶ 40-47, 88.

Critically, Plaintiffs' own allegations seem to admit a distinction. Plaintiffs allege that Defendants do not "verify the veracity of the information" they receive "prior to . . . initiating the *removal* process." *Id.* ¶ 44 (emphasis added). The inescapable conclusion is that in order to appear on the rolls, the Commonwealth would have needed to accept the voter's registration. Because Plaintiffs have not sufficiently alleged that the Purge Program interferes with the registration process, this Court finds that Plaintiffs have failed to allege facts sufficient to state a claim for violation of the Accept and Use Provision of the NVRA.[12] Therefore, the Court dismisses Count III.

## F.    Count IV—Public Disclosure Provision

Count IV claims that Defendants have violated the Public Disclosure Provision of the

---

[11] Although Plaintiffs specifically allege that operating the Purge Program after the Quiet Period violates the Quiet Period Provision, Counts II and III allege that the Program, as described, violates the respective NVRA provisions whether conducted inside or outside of the Quiet Period.

[12] Plaintiffs contend that this Court should not dismiss this claim before discovery because discovery would reveal more information about how Defendants' program operates. Dkt. 127 at 24. Since Plaintiffs do not allege that Defendants' program prevents voters from registering in the first instance and offer no other authority supporting Plaintiffs' reading, this Court still finds that Plaintiffs' allegations are insufficiently pled to state a claim for a violation of the Accept and Use Provision.

NVRA because they failed to provide the documents Plaintiffs are entitled to under the statute. *Id.*

¶¶ 91-94. As another preliminary matter, Defendants first argue that Count IV is moot. Defendants

assert that they have already provided the documents they were required to provide under the

statute and which Plaintiffs requested on the face of their Complaint. Dkt. 122 at 42-43. Plaintiffs

assert that this claim is not moot because Defendants have yet to produce or otherwise make

available:

> all records related to their implementation of the Purge Program, including records
> evidencing their process for identification and removal of voters identified;
> information concerning which voters responded to the notices of removal; and
> information regarding all persons who have been subject to investigations as a
> result of the Purge Program.

Dkt. 127 at 28. Moreover, Plaintiffs contend that their claim is not moot because it also fits the

capable of repetition yet evading review exception, and to hold otherwise would allow states "to

simply withhold records until the action becomes moot." *Id.* This Court agrees with Plaintiffs.

The Public Disclosure Provision provides:

> [e]ach State shall maintain for at least 2 years and shall make available for public
> inspection and, where available, photocopying at a reasonable cost, all records
> concerning the implementation of programs and activities conducted for the
> purpose of ensuring the accuracy and currency of official lists of eligible voters,
> except to the extent that such records relate to a declination to register to vote or to
> the identity of a voter registration agency through which any particular voter is
> registered.

52 U.S.C. § 20507(i)(1).

A claim is moot "only when it is impossible for a court to grant any effectual relief

whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 307 (2012)

(citation modified). This claim is not moot to the extent that Plaintiffs seek a declaratory judgment

that Defendants' failure to provide these records for public inspection when statutorily required

violated this provision. This claim is also not moot because Plaintiffs plainly identify the

additional records they seek in their Prayer for Relief. Am. Compl. at 31-32. Plaintiffs note that

Defendants have failed to produce "*all* records related to their implementation of the Purge Program." Dkt. 127 at 28. Therefore, Plaintiffs' claim cannot be moot because certain records remain outstanding. To the extent this Court may further order Defendants to make these records available, this Court is capable of granting Plaintiffs relief.

As to the merits of Plaintiffs' claim, Defendants next argue that Plaintiffs' claim exceeds the scope of "public inspection of records" because they seek *electronic* production of these records. Dkt. 122 at 43-44. Defendants also note that it is undisputed that they provided: (1) a "list of voters identified as potential noncitizens[;]" (2) "the entire list of instances of removals since January of 2022 until the issuance of Executive Order 35[;]" and (3) "the entire Virginia Voter File snapshot through October 21, 2024." *Id.* at 43. Therefore, Defendants contend that Plaintiffs are now in possession of any lists they requested.

With respect to Defendants' contention that Plaintiffs are not entitled to electronic production, Plaintiffs assert that any discussion of the means of disclosure is premature at this stage as Defendants have not argued that "they have made all requested records available for public inspection." Dkt. 127 at 29. Plaintiffs contend that the Public Disclosure provision of the NVRA is broad in that it covers "'all records' related to any effort by the state to ensure the 'accuracy and currency' of voter registration lists." *Id.* (citing 52 U.S.C. § 20507(i)(1)). The Court agrees with Plaintiffs. The Fourth Circuit has approved of Plaintiffs' reading that "all records" is broad and even the neighboring provision of the statute fails to limit the content or type of records it covers. *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 336-38 (4th Cir. 2012). Because Plaintiffs allege that (1) Defendants failed to initially make these records available upon request on August 20, 2024, and on October 3, 2024, and (2) Plaintiffs have requested all records concerning the implementation of the Purge Program, some of which are still outstanding, Plaintiffs have sufficiently stated a claim for violation of the Public Disclosure Provision of the NVRA. The

31

Court denies Defendants' motion as to Count IV.

<u>**CONCLUSION**</u>

For the reasons stated above, Defendants' Motion to Dismiss for Failure to State a Claim and for Lack of Jurisdiction is **GRANTED** in part and **DENIED** in part. The motion is granted as to Count III and denied in all other respects. Count III is dismissed.

A separate order will issue.

Entered this 12th day of August, 2025.
Alexandria, Virginia

/s/

Patricia Tolliver Giles
United States District Judge