# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

|  |  |
|---|---|
| VIRGINIA COALITION FOR IMMIGRANT RIGHTS; LEAGUE OF WOMEN VOTERS OF VIRGINIA; AFRICAN COMMUNITIES TOGETHER; RINA SHAW; GENET SHIFERAW, <br><br> *Plaintiffs*, <br><br> v. <br><br> SUSAN BEALS, in her official capacity as Virginia Commissioner of Elections; JOHN O'BANNON, in his official capacity as Chairman of the State Board of Elections; ROSALYN R. DANCE, in her official capacity as Vice-Chairman of the State Board of Elections; GEORGIA ALVIS-LONG, in her official capacity as Secretary of the State Board of Elections; CHRISTOPHER P. STOLLE and J. CHAPMAN PETERSEN, in their official capacities as members of the State Board of Elections; and JASON MIYARES, in his official capacity as Virginia Attorney General, <br><br> *Defendants*. | Case No. 1:24-cv-01778 <br> Judge Patricia Tolliver Giles |

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Virginia Coalition for Immigrant Rights ("VACIR"), League of Women Voters of Virginia ("LWVVA" or "the League"), African Communities Together ("ACT"), Rina Shaw, and Genet Shiferaw bring this action against Susan Beals, in her official capacity as Virginia Commissioner of Elections; the Virginia State Board of Elections Members, in their official

1

capacities; and Jason Miyares, in his official capacity as Virginia Attorney General, and allege the following:

## INTRODUCTION

1.      The right to vote is fundamental and foundational to American democracy. Every American citizen has the right to vote, regardless of where they were born. This action challenges a voter purge effort (the "Purge Program") that patently violates Congress's framework for protecting these fundamental rights through the National Voter Registration Act ("NVRA"). Exactly 90 days before General Election Day 2024, Defendants announced the latest version of an effort to implement an ongoing program to systematically remove certain voters from the rolls. But federal law mandates that no such voter cancelation or list maintenance programs be conducted during the 90-day "quiet period" before an election. Congress prohibited such programs from occurring during this period to protect voter registration lists from the inevitable chaos of potentially inaccurate removals. Nevertheless, Defendants brazenly intensified their removal program the very day the quiet period commenced. Even the best designed list maintenance system undertaken with the best of intentions would be barred by federal law when so dangerously close to an election. That is reason alone to permanently enjoin the continued operation of Defendants' Purge Program within 90 days of any federal election.

2.      Moreover, Defendants' Purge Program is far from such a well-designed, well-intended list maintenance effort. It is an illegal, discriminatory, and error-ridden program that has directed the cancelation of voter registrations of naturalized and U.S.-born citizens. In a purported effort to flag potential noncitizens, Defendants' Purge Program relies on out-of-date information provided to the Department of Motor Vehicles, and perhaps other sources, _stretching back twenty years_. The State knows or should know that countless individuals who obtained driver's licenses

while legal permanent residents have become naturalized citizens, many even registering to vote during naturalization ceremonies. But Defendants make no effort to conduct any individualized analysis. Instead, they have classified persons who have at some point indicated they were noncitizens as presumptively ineligible to vote unless they receive and respond to a State missive within fourteen days and provide *more* evidence of their citizenship. This violates the NVRA in various ways, including the requirement that list maintenance programs be uniform and nondiscriminatory. Finally, Defendants have conducted their Purge Program under a shroud of secrecy and obfuscation, refusing to provide information or documentation about their system as it has unfolded. The NVRA mandates that states must be transparent about their voter removal programs, even when undertaken outside of the quiet period, far more so when conducted on the eve of a major election.

3. On August 7, 2024, only 90 days before the upcoming November 5 general election and 45 days before the start of early in-person voting, Virginia Governor Glenn Youngkin issued Executive Order 35 ("E.O. 35"), which provided instructions for the Purge Program of alleged noncitizens, relying on Va. Code § 24.2-427.[1] The Purge Program requires the Commissioner of the Department of Elections ("ELECT") to certify to the governor that there are procedures in place to make daily updates to the statewide voter registration list and "[r]emove individuals who are unable to verify that they are [U.S.] citizens to the Department of Motor Vehicles[.]" ECF No. 26-4 at 4-5; *see also* Va. Code § 24.2-427(B)-(C).

---

[1] The "Purge Program" as used herein refers to E.O. 35, Va. Code § 24.2-427, and actions taken to further Defendants' voter purge effort.

　　　Although E.O. 35 claims to order the implementation of Va. Code § 24.2-429, the process described in E.O. 35 more closely aligns with Va. Code § 24.2-427. *See* ECF No. 26-4 at 5. Plaintiffs therefore presume E.O. 35 intended to cite Va. Code § 24.2-427, but, either way, the Purge Program violates the National Voter Registration Act for the reasons stated herein.

4.      The Purge Program demands the expedition of interagency data sharing between the Department of Motor Vehicles ("DMV") and ELECT via a daily file of all alleged "non-citizens transactions, including addresses and document numbers." ECF No. 26-4 at 5. ELECT is then required to make daily updates to the voter rolls by comparing "the list of individuals who have been identified as non-citizens to the list of existing registered voters[.]" ECF No. 26-4 at 4-5. Once ELECT has identified these alleged noncitizens, ELECT sends the data to county registrars and directs them to "notify any matches of their pending cancellation unless they affirm their citizenship within 14 days" of sending the notice, and ultimately cancel the voter's registration if the registrar's office does not receive this affirmation. *Id.*; *see also* Va. Code § 24-2.427(B)-(C).

5.      The Purge Program also directs counties to refer voters removed for alleged noncitizenship to Commonwealth Attorneys for criminal investigation and potential prosecution. ECF No. 26-4 at 5. Some counties have also elected to refer those voters to Defendant Attorney General Miyares.

6.      The Purge Program by design and in implementation threatens the voting rights of eligible Virginia voters who are naturalized citizens. The Purge Program, ordered by Governor Youngkin and implemented by Defendants, affirmatively directs state agencies to identify and purge voters on a systematic and ongoing basis—including during the immediate lead up to the 2024 General Election and future federal elections—in direct violation of the 90-day quiet period mandated by the NVRA. 52 U.S.C. § 20507(c)(2)(A).

7.      Despite Plaintiffs' multiple requests, including through a letter from VACIR sent August 20, 2024, and a letter sent from VACIR and LWVVA on October 3, and in violation of the Public Disclosure of Voter Registration Activities provision of the NVRA, 52 U.S.C. § 20507(i), Defendant Beals has provided little information related to the Purge Program. Only through an

opposed expedited discovery motion and order, as well as a post-election response to VACIR's FOIA request did Defendant Beals provide the identities of the persons subject thereto. Although Plaintiffs still await the production of additional records they are entitled to under 52 U.S.C. § 20507(i)(1), what is already clear from Plaintiffs' and journalists' investigations and the clear directives in E.O. 35 is that the Purge Program relies on erroneous data—from the DMV and perhaps other sources—that includes both naturalized and U.S.-born U.S. citizens, was ongoing during the 90-day quiet period, and will continue removing eligible voters inside and outside the quiet period in the future.[2]

8.     The Purge Program systematically removes Virginians from the voter rolls solely on the fact that they were at one point identified as a potential noncitizens—according to databases from the DMV or other sources—even if they have since become naturalized citizens and lawfully registered to vote or even if they are U.S.-born citizens who were mistakenly identified as noncitizens.

9.     Governor Youngkin's ordered Purge Program, by design, identifies and classifies based on national origin without considering naturalized citizenship status. It then relies on that classification to mark individuals for removal from the voter rolls. The data and methodology that

---

[2] *See, e.g.*, Elizabeth Beyer et al., *Meet some Virginians who almost lost their right to vote after being declared 'noncitizens'*, Cardinal News (Oct. 25, 2024), https://perma.cc/28UY-JAXK; Jude Joffe-Block, *U.S. citizens are among the voters removed in Virginia's controversial purge*, National Public Radio (Oct. 30, 2024), https://perma.cc/EPU9-8ALW; Dave Ress, *'A Surprise to me' Virginia voter roll purge cuts nearly 300 in Richmond region*, Richmond Times-Dispatch (Nov. 1, 2024), https://perma.cc/UJV2-J78G; Jackie Benson, *'Why would they do that?' Decades-long resident learns he was purged from Virginia voter rolls*, NBC4 (Oct. 31, 2024), https://www.nbcwashington.com/news/local/why-would-they-do-that-decades-long-resident-purged-from-virginia-voter-rolls/3755997/; Evan Goodenow, *Virginia voter roll purge includes Loudoun residents who say they're eligible*, Loudon Times-Mirror (Oct. 31, 2024), https://perma.cc/2BKZ-YGEX; Rene Marsh, *US citizens caught in Virginia's voter purge aimed at noncitizens speak out*, CNN (Nov. 2, 2024), https://www.cnn.com/2024/11/02/politics/us-citizens-caught-in-virginias-voter-purge/index.html.

form the basis of the Purge Program discriminate based on national origin. Many naturalized citizens have had interactions with the DMV prior to becoming a citizen. That is because all naturalized citizens were once legal permanent residents, and legal permanent residents are permitted to obtain driver's licenses and other forms of state identification, which can remain valid for up to eight years.

10.    E.O. 35 claimed that Virginia has made "unprecedented strides in improving . . . protection against non-citizen registration," ECF No. 26-4 at 2, but evidence overwhelmingly shows that noncitizen registration and voting is vanishingly rare in Virginia and across the United States, and voter purges aimed at *alleged* noncitizens primarily prevent *eligible* naturalized citizens from casting ballots.

11.    In its implementation, the Purge Program arbitrarily sweeps in both naturalized citizens and U.S.-born citizens not targeted by the program. While U.S.-born citizens would only be marked as noncitizens in DMV data due to user error in mistakenly checking the wrong box or leaving a box unchecked during electronic transactions with the DMV, the Purge Program has also erroneously removed from the voter rolls at least some eligible voters who are U.S.-born citizens.

12.    Plaintiffs include nonprofit organizations whose missions are to help eligible Virginians register and vote and to provide services to Virginia's immigrant communities, including by providing education and assistance to Virginia's naturalized citizens in voter registration and voting. The organizations' members include naturalized and U.S.-born eligible U.S. citizens whose registrations are at risk under the Purge Program. Plaintiffs also include U.S. citizens who were erroneously purged by Defendants' Purge Program.

13.    The Purge Program, including E.O. 35 and Va. Code § 24.2-427(C), harm Plaintiffs VACIR, LWVVA, and ACT directly because, instead of registering additional new voters and

providing programs for Virginia's immigrant community, they have and will continue to spend time and money (1) identifying new citizens, including those who have been targeted for removal or purged; (2) educating the public, in particular new citizens, on how to respond to being targeted for removal and ensuring that they remain registered or, if they were purged, how to reregister; (3) assisting new citizens who have been targeted for removal with defending their registrations and right to vote; (4) ensuring that any voters who are affected by the Purge Program who are required to vote using a provisional ballot have their votes counted. It further harms Plaintiffs because they have members who are naturalized citizens. The Purge Program harms Plaintiffs Shiferaw and Shaw by improperly removing them from the voter rolls and putting their right to vote in future elections at risk.

14.    The Purge Program violates the NVRA because it constitutes systematic voter list maintenance within 90 days preceding a federal election, and discriminatorily identifies naturalized citizens for removal and is not being carried out uniformly. *See* 52 U.S.C. § 20507(b)(1), (c)(2)(A). Defendant Beals has further violated the Public Disclosure of Voter Registration Activities provision of the NVRA, 52 U.S.C. § 20507(i), by refusing to provide Plaintiffs with the list of voters identified as potential noncitizens within a reasonable amount of time despite having had those records in her office's possession and continuing to withhold relevant information about the Purge Program. Plaintiffs therefore respectfully request that the Court declare the Purge Program unlawful, enjoin Defendants from implementing the Purge Program, restore all unlawfully removed voters to the rolls and provide public and individualized notice thereof, produce the requisite records under the Public Disclosure of Voter Registration Activities provision of the NVRA, and afford Plaintiffs all other just and proper relief.

## JURISDICTION AND VENUE

15.    This action is brought pursuant to 52 U.S.C. § 20510(b), which provides that "[a] person who is aggrieved by a violation of [the NVRA] . . . may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation."

16.    This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1357 because the claims in the action arise under the laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction to grant declaratory and injunctive relief and all other forms of relief available under federal law, including 28 U.S.C. §§ 2201 and 2202.

17.    This Court has personal jurisdiction over the Defendants, who are all elected or appointed officials and citizens of Virginia.

18.    Venue is proper in this district under 28 U.S.C. § 1391(b) because the Defendants engage in their official duties in this District, because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because at least one Defendant resides in this District and all Defendants are Virginia residents.

## PARTIES

### Plaintiffs

19.    Plaintiff **Virginia Coalition for Immigrant Rights** is a multi-racial and multi-ethnic coalition of member organizations that exists to win dignity, power, and quality of life for all immigrant and refugee communities. VACIR seeks to create a Virginia where immigrant and refugee communities have full access to family, civic, economic, and social life.

20.    VACIR is comprised of 49 standing member organizations, including legal services providers, civil rights groups, and labor unions, each of which themselves work to support the

immigrant community in Virginia through a variety of programs, including by assisting with voter registration and education for eligible naturalized citizens.[3] VACIR unifies those organizations and supports them in achieving their shared goals, including by providing mini-grants to members to operate programs directed at assisting with voter registration and education for eligible naturalized citizens.

21.    VACIR's member organizations include among their membership many naturalized citizens who are at risk of being purged by Defendants' Purge Program. K.V. is among those members. Ms. V. serves as the Executive Director of a member organization of VACIR. Ms. V. is a U.S citizen and a resident of Arlington. She was naturalized in September 2022 and registered to vote soon thereafter in time to vote in the 2022 federal election. Prior to naturalization, Ms. V. obtained a driver's license in Virginia. She continues to use that same license. Ms. V. has routinely voted in every federal election since she became a registered voter and she wants to vote in future elections.

---

[3] As of the filing of this Complaint, VACIR standing member organizations are ACLU People Power – Fairfax; ACLU of Virginia; African Communities Together; American Jewish Committee; AYUDA; Bread for the World; Centreville Immigration Forum; Church World Service; Coalition of Asian Pacific Americans of Virginia; Congregation Action Network; Cornerstone; Domestic Workers Alliance; Dream Project; Dreamers Mothers In Action; Edu Futuro; EMGAGE; Fuego Coalition; Hamkae Korean Community Center; Hispanic Organization of Leadership and Action; Jewish Community Relations Council; Just Neighbors; Korean American Association of Northern Virginia; Latina Institute for Reproductive Justice; League of United Latin America Citizens; Legal Aid Justice Center; Multicultural Community Center; Neighbor's Keeper; New Virginia Majority Education Fund; Northern Virginia Affordable Housing Alliance; NoVA Labor; Progress Virginia; Sacred Heart Catholic Community Center; SEIU 512; SEIU 32BJ; Shirlington Employment and Education Center; Sin Barreras; Tenants and Workers United; The Commonwealth Institute for Fiscal Analysis; Unitarian Universalist for Social Justice; United Food and Commercial Workers Local 400; Virginia Civic Engagement Table; Virginia Coalition of Latino Organizations; Virginia Community Health Worker Association; Virginia Immigration Intercollegiate Alliance; Virginia Interfaith Center for Public Policy; Virginia League of Planned Parenthood; Virginia League of Women Voters; Virginia Organizing; Virginia Poverty Law Center; and Voices for Virginia's Children.

22.     The Purge Program has harmed and will continue to harm VACIR and its members in various ways. VACIR has had to divert significant resources away from its activities including removing language barriers to obtain government assistance, oversight of immigration detention facilities, providing support for community oversight to the Temporary Protected Status program, advocacy activities related to expanding state programs affecting immigrant communities including Medicare expansion, and providing support for community mobilization around general voter registration efforts for New Americans. VACIR has instead had to divert those resources toward responding to and attempting to mitigate the effects of E.O. 35 and the Purge Program in erroneously removing eligible voters from the rolls and intimidating eligible naturalized citizens from participating in voter registration and voting. VACIR's response to the Purge Program is ongoing and includes investigating the Purge Program through submitting public records requests and spending thousands of dollars to cover the costs of production, engaging in direct multi-lingual public education and outreach to naturalized citizen voters about checking and maintaining their voter registration and re-registering if they have been removed through the Purge Program, and supporting its members to adjust and redirect general community voter registration and outreach programs toward specifically responding to E.O. 35 and the Purge Program, including through educating, identifying and assisting naturalized citizen voters with checking their voter registration status and how to re-register if they have been removed. VACIR has continued to conduct outreach to purged voters and its member organizations that serve populations that include purged voters or those in danger of being purged by Defendants' Program. Outreach to purged voters includes informing such voters about what happened to them, the current public understanding of the Purge Program, how their ability to vote may be affected in the future, and steps they can take to check their status and remain registered.

23.     A number of VACIR's member organizations are membership organizations themselves whose members include substantial numbers of naturalized citizens, including EMGAGE, African Communities Together, SEIU 32BJ, Hamkae Center, Latina Institute for Reproductive Justice-Virginia, Domestic Workers Alliance, NoVA Labor, and Tenants and Workers United. These organizations' naturalized citizen members are at particular risk of being purged because they may have previously self-identified as noncitizens with the Virginia DMV while applying for a driver's license and then later registered to vote through another means after obtaining their citizenship. As a direct result of E.O. 35 and the Purge Program, these members must now constantly re-check their registration status, may be forced to provide additional documentation to vote, may be intimidated from registering to vote or voting due to the Purge Program and the explicit public threat of investigation or prosecution in E.O. 35, and face other burdens due to the Purge Program.

24.     A number of VACIR's member organizations have also been directly harmed by being forced to divert resources away from core activities including providing direct support and assistance to community members through a variety of programs and toward responding to and attempting to mitigate the effects of E.O. 35 and the Purge Program in erroneously removing eligible voters from the rolls and intimidating eligible naturalized citizens from participating in voter registration and voting.

25.     Plaintiff **League of Women Voters of Virginia**, formed under Section 501(c)(3) of the Internal Revenue Code, is a nonpartisan, nonprofit, membership organization that seeks to encourage informed and active participation in government, work to increase understanding of major public policy issues, and influence public policy through education and advocacy. LWVVA is a state League of the national League of Women Voters, which was founded in 1920 as an

outgrowth of the struggle to win voting rights for women, has more than a million members and supporters, and is organized in more than 750 communities in all 50 states and the District of Columbia. LWVVA has approximately 2,000 members across the state of Virginia. Some of LWVVA's members are naturalized citizens. A.S. is one such member. Mrs. S. is a naturalized member of the League and is a resident of Fairfax County. Mrs. S. voted in the 2024 election and plans to vote in the future.

26.     LWVVA is comprised of dues-paying members who volunteer in Virginia communities to provide voter services. LWVVA has no paid employees or staff involved with the operation of the League. Through its volunteer leaders, LWVVA provides regular training to its members and to its nonpartisan partners to assist Virginians, including those who are naturalized citizens, in getting registered, voting, and confirming their registration status. LWVVA has also arranged required Virginia training for third party voter registration for its members and nonpartisan partner organizations. LWVVA does this work as a part of its mission to protect the right to vote for Virginia voters and considers its work registering voters, encouraging them to vote, and confirming their registration to be an expression of those core values. LWVVA uses voter registration assistance as a part of a larger dialogue about a citizen's voter registration, voting plan, and the importance of voter turnout: the goal is to ensure all eligible Virginia voters are registered to vote, have a plan to vote, and can and do actually vote.

27.     The Purge Program has harmed and will continue to harm the League and its members in various ways. First, the League has diverted and will continue to divert resources to counteract the harms created by the Purge Program. At the most consequential period of time for the League's core mission activities, the League first had to use its resources to rapidly understand the impact of E.O. 35 and its effect on Virginia voters. When the League learned of the Purge

Program's identification of eligible Virginian voters for removal, the League had to expend its resources to counteract the immediate confusion and misinformation created by the Purge Program. The broadest way of doing so without amplifying false claims of noncitizen voting was to expand announcements for all Virginians to check their registration, even those who have no changes in their voter profile. The Purge Program has forced the League to both broaden these "check your registration" efforts beyond its previously targeted audience and to expand its focus on naturalized citizens. For instance, the League has already spent at least $600 to create, translate into multiple languages, and distribute a public service announcement (PSA) throughout the state reminding voters of their right to vote and instructing them to check that their registration is valid before Election Day. The League created and distributed the PSA in direct response to the Purge Program, to ensure that all Virginia voters—including voters that the League has registered and voters who are League members—are registered and are able to vote on Election Day, in furtherance of the League's goals of registering eligible voters and ensuring all eligible voters can vote. In direct response to the Purge Program, the League also increased its budget for digital media impressions on mobile devices by $2,000. These PSAs were necessary because the Purge Program has deregistered thousands of Virginians, including Virginians eligible to vote, and has unquestionably intimidated many more naturalized Virginians who are now less likely to vote for fear of criminal investigation and prosecution. Following expedited discovery and FOIA responses from localities, the League sent approximately 7,000 postcards to registrants identified by the Commonwealth as being purged on the basis of noncitizenship, incurring over $4,000 in costs. The Purge Program has decreased and will continue to decrease the number of registered Virginia voters and decrease voter turnout, directly harming the League's mission of increasing the number

13

of registered voters and increasing voter turnout. The PSA was necessary to ameliorate those harms.

28.     Separately, the League has devoted and will continue to devote resources and members' time to counteract the effects of the Purge Program, such as by helping members and registered voters determine whether they remain eligible and by helping voters who are purged restore their eligibility. This includes direct outreach and public outreach to voters removed on the basis of alleged noncitizenship and naturalized citizens through media, such as the League President's September 2024 interview at Spanish speaking radio station WRKE 100.3 LP-FM. These efforts continue for future state and federal elections. The League has continued to conduct outreach to purged voters, informing such voters about what happened to them, the current public understanding of the Purge Program, how their ability to vote may be affected in the future, and steps they can take to check their status and remain registered. The League has dedicated and continues to dedicate its member resources to attending monthly county Electoral Board meetings across the Commonwealth to understand effects of the Purge Program in each locality, as well as to piece together how the Program works in order to then accurately educate and communicate with members, voters, and the public. And in the League's communications in the Commonwealth, the League must now consistently remind people to check their registration and answer subsequent questions about the problems created by the Purge Program. These communications are further complicated by the Purge Program, because the League must navigate talking about naturalized citizen disenfranchisement without frightening eligible voters into not voting.

29.     The League is further burdened by diverting its coordination resources with other non-profits towards understanding and addressing the effects of the Purge Program rather than coordinating on voter assistance programs. Absent such diversion, the League would spend its

money and member time on getting out the vote for general elections and planning its advocacy activities. It would also hold more voter registration drives.

30.     Aside from resource diversion, the Purge Program directly harms the League's mission. When voters are unlawfully purged, it decreases the number of voters in Virginia, contrary to the League's mission of increasing the number of registered voters and voter turnout. When voters are intimidated or must take additional steps to remain registered, it harms the League's mission of ensuring that voting is easy and open for all eligible Virginians.

31.     The Purge Program also harms the League's members. The League's membership includes naturalized citizens, and those members are at particular risk of being purged because they may have previously self-identified as noncitizens with the Virginia DMV. Those members must constantly re-check their registration status, may need to provide additional documentation to vote, are intimidated by the Purge Program and the threat of investigation or prosecution, and face other burdens due to the Purge Program.

32.     Further, Defendant Beals's refusal to release information about the Purge Program harms LWVVA's mission. LWVVA continues to be denied information essential to understanding and educating the public about the Purge Program and to properly assisting impacted voters. This lack of information is undermining the League's goal to ensure all eligible Virginia voters are registered to, can, and do vote.

33.     Plaintiff **African Communities Together** is a nonpartisan, nonprofit membership organization of African immigrants fighting for civil rights, opportunity, and a better life for African immigrants and their families. Founded in 2013, ACT empowers African immigrants to integrate socially, advance economically, and engage civically.  ACT assists African immigrants in obtaining critical services, provides resources and infrastructure for community and leadership

development, and supports community members to engage in civic life, including through education and assistance with voter registration and voting. ACT provides multilingual assistance to African immigrants related to immigration, jobs, civic participation, and other needs.

34.     ACT has approximately 12,460 members nationally, with approximately 1,079 residing in Virginia. Many of ACT's members are naturalized citizens. ACT's members pay voluntary membership dues. They participate in monthly membership meetings, leadership trainings, issue-specific campaign committees, and civic engagement. They also engage in public advocacy through collective actions and personal storytelling, volunteer work through community-focused programs, and many attend a national membership convention.

35.     ACT operates a robust voter engagement program in Virginia. The 2024 program targeted 85,000 registered voters in African immigrant communities, and consisted of six full-time paid staff, including a lead organizer, three field organizers, and two phone-bank leads, as well as ACT members who contribute on a volunteer basis. The 2025 program targets 30,000 registered voters in African immigrant communities and enlists over 300 volunteers in direct voter contact. ACT's voter engagement program provides multilingual education and assistance with all aspects of voting and encourages voters to participate through outreach and engagement about the important role voting plays in shaping the opportunities and issues facing African immigrant communities.

36.     The Purge Program operated by Defendants has harmed and will continue to harm ACT and its members in various ways. ACT has had and continues to divert its staff and resources from other core activities toward attempting to mitigate the harms to its members and to Virginia's African immigrant community caused by E.O. 35 and the Purge Program. This has required redirecting its voter engagement program by developing and producing new public education

materials, revising the resources and scripts used by canvassers and phone bankers, conducting direct outreach to ACT members identified on the removal lists obtained through expedited discovery and information requests, re-training paid staff and volunteers in order to support voters who may have been sent a removal notice or removed from the rolls by educating and assisting them in maintaining their voter registration and re-registering if necessary, as well as reassuring voters about their eligibility and mitigating any intimidating effect related to the threat of referral to law enforcement and criminal investigation and prosecution as laid out in E.O. 35. Efforts to educate, identify, and assist ACT members and the public removed or at risk of removal continue after the 2024 election and in anticipation of upcoming elections. Many ACT members who are naturalized citizens may have been sent a removal notice, removed from the rolls, or are at heightened risk of imminent removal due to having obtained a driver's license prior to becoming a citizen and having yet to update their DMV records.

37.    Plaintiff **Rina Mary Shaw** is a U.S.-born citizen and resident of Chesterfield, Virginia. Ms. Shaw was born and raised in Virginia and has been a resident in Virginia her entire life.

38.    Ms. Shaw registered to vote in 2020. She was a registered voter in September of 2024, planning to vote in the 2024 federal election, when she received a notice in the mail from Missy Vera, the General Registrar for Chesterfield County informing her of Chesterfield County's intention to remove her from the rolls because she was purportedly (and inaccurately) deemed to be a noncitizen. While Ms. Shaw returned an affirmation of citizenship to the Chesterfield Registrar within two weeks of receiving the notice, she was removed from the voter registration list anyway. She learned she had been purged from the voter rolls after a reporter from National Public Radio called her and informed her of her status. After calling the Chesterfield Registrar's

office and affirming, once again, that she is a U.S. citizen, Ms. Shaw was placed back on the rolls. After her removal and ensuing confusion, Ms. Shaw ultimately was able to cast her ballot. Ms. Shaw remains confused, anxious, and fearful that she will be purged from the voter rolls again before the next election and is concerned about whether she will be permitted to vote in the future.

39.     Plaintiff **Genet Shiferaw** is a U.S. citizen and a resident of Woodbridge, Prince William County, Virginia. Plaintiff Shiferaw was born in Ethiopia, sought asylum in the U.S. due to the political violence occurring in her country of birth in approximately 2006 and became a U.S. citizen in approximately 2012. Prior to naturalization, Ms. Shiferaw self-identified as a noncitizen when she obtained a Virginia resident identification card.

40.     Plaintiff Shiferaw registered to vote during her naturalization ceremony in Fairfax County, Virginia, where LWVVA regularly engages in voter registration drives, ECF No. 26-24 at 5, and voted for the first time in the 2012 presidential election. She planned and prepared to vote in the 2024 election. On Election Day, Ms. Shiferaw was informed she was not a registered voter and would have to use same-day registration to cast a provisional ballot. Ms. Shiferaw used same-day registration and submitted a provisional ballot on Election Day.

41.     Ms. Shiferaw was never notified why she was removed from the rolls and is concerned about whether her vote counted last November. When Ms. Shiferaw checked her voter registration status on the Virginia Department of Elections website in March 2025, there was no record that she was a registered voter or that she had voted in the November 2024 election. She called the office of the General Registrar and Director of Elections for Fairfax County and was told that she was a registered voter and that her vote was counted in the prior election, but the person on the phone directed her to the FOIA officer when she inquired if they could send her a record that her November 2024 ballot was counted. Ms. Shiferaw has since received her voter

registration card. Ms. Shiferaw is confused, worried, and fearful about whether her voter registration will be cancelled and whether she will be permitted to vote in the future. Ms. Shiferaw does not want to be put in the same position when she votes in the next federal election, uncertain of whether she was able to exercise her right to vote and whether her vote counted. She now faces additional burdens by being forced to re-check her registration status and is concerned about having to submit additional documentation. Faced with the public threat of investigation or improper prosecution by the Attorney General, Ms. Shiferaw is fearful about what might happen if she attempts to exercise her right to vote in the future.

**<u>Defendants</u>**

42.     Defendant **Susan Beals** is the Virginia Commissioner of Elections. The Commissioner of Elections is the "principal administrative officer" of the Department of Elections, Va. Code § 24.2-102(B), and "the chief state election officer responsible for the coordination of state responsibilities under the National Voter Registration Act," *id*. § 24.2-404.1. Defendant Beals is also responsible for ensuring the implementation of the Purge Program by "certify[ing] in writing to the Governor" that the Purge Program's requirements are being met. ECF No. 26-4 at 4. As the head of the Department of Elections, she is also responsible for generating the Purge Program's daily list of voters alleged to be noncitizens. *Id.* at 4. Defendant Beals is sued in her official capacity.

43.     Defendant **John O'Bannon** is the Chairman of the State Board of Elections ("the Board"); **Rosalyn R. Dance** is the Vice-Chairman of the Board; **Georgia Alvis-Long** is the Secretary of the Board; and **Donald W. Merricks** and **Matthew Weinstein** are members of the Board (collectively "State Board of Election Members"). They are all sued in their official capacities. "The State Board, through the Department of Elections, shall supervise and coordinate

19

the work of the county and city electoral boards and of the registrars to obtain uniformity in their practices and proceedings and legality and purity in all elections." Va. Code § 24.2-103(A). It is the duty of the Board to "make rules and regulations and issue instructions and provide information consistent with the election laws to the electoral boards and registrars to promote the proper administration of election laws." *Id.*

44.    Defendant **Jason Miyares** is the Attorney General of Virginia. Under Virginia law, the Attorney General has "full authority to do whatever is necessary or appropriate to enforce the election laws or prosecute violations thereof." Va. Code § 24.2-104(A); ECF No. 26-4 at 5. Defendant Miyares endorsed the Purge Program, claiming credit for E.O. 35's original announced purge of 6,303 alleged noncitizens from the voter rolls.[4] Registrars and County Electoral Boards have since referred to Defendant Miyares for criminal investigation and possible criminal prosecution of additional individuals whose voter registration was cancelled because of the Purge Program. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

I.      **The Purge Program and Governor Youngkin's Announcement of E.O. 35**

45.    Governor Youngkin announced E.O. 35 on August 7, 2024—exactly 90 days before the 2024 General Election on November 5 and 45 days before the start of early in-person voting. ECF No. 26-4. With this timing, every subsequent voter removal until Election Day was necessarily within the NVRA's quiet period. The same will be true during every 90-day period before subsequent federal elections.

---

[4] Jason Miyares (@JasonMiyaresVA), X (Aug. 7, 2024, 1:57 PM), https://perma.cc/6JGJ-KLJD ("6,303. That's the number of noncitizens identified and removed from Virginia's voting rolls under our watch. I'm proud of my office's work to help ensure election integrity.").

46.     In his August announcement, Governor Youngkin was clear that the Purge Program had already begun, explaining that between January 2022 and July 2024, 6,303 voters were removed from the voter rolls based on DMV data shared with ELECT. ECF No. 26-4 at 3. He also explained that the Program uses a systematic, ongoing process saying, "We verify the legal presence and identity of voters using DMV data and other trusted data sources to **update our voter rolls daily**, not only adding new voters, but **scrubbing the lists** to remove those that should not be on it, like . . . non-citizens that have accidentally or maliciously attempted to register."[5]

47.     The Purge Program is intended to and does operate systematically: it requires "daily updates" to cancel the voter registrations of individuals identified as potential non-U.S. citizens based on faulty and outdated data without a meaningful and individualized inquiry into its accuracy. *See* ECF No. 26-4 at 4-5.

48.     Section 7.3 of the 2021 MOU indicates that a successful "match" between a record in Virginia's voter file and a record in the DMV database requires an exact match of Social Security Number, first name, last name, and date of birth. ECF No. 26-3 at 8. In the event a registrant does not provide a Social Security Number, then DMV matches on first name, last name, and date of birth. *Id*.

49.     ELECT operators are given little, if any, guidance or criteria directing how to determine if a purported "match" between the records in the voter file and DMV database is accurate or false based on other information available to the operator. Voter Registration List Maintenance Department of Motor Vehicles: Full SBE & Non-Citizen Files Section 4.1 merely

---

[5] *Governor Glenn Youngkin Issues Executive Order to Codify Comprehensive Election Security Measures to Protect Legal Voters and Accurate Counts*, Office of the Governor (Aug. 7, 2024), https://perma.cc/DD7M-JGHZ (emphasis added).

states, "[t]he GR reviews the match to determine if the non-citizen and registered voter identified by VERIS is the same person" without any further explanation or elaboration. ECF No. 92-8 at 20.

50.    "In the event a DMV record indicating that an individual is a noncitizen matches to a record in Virginia's voter file, an 'Affirmation of United States Citizenship form' must be sent to a registrant along with a letter entitled 'Notice of Intent to Cancel.' That letter informs the voter that '[w]e have received information that you indicated on a recent DMV application that you are not a citizen of the United States.'" ECF No. 26-2 at 7.

51.    According to Defendants, neither the DMV, ELECT, nor county officials are required to take any action to verify the veracity of the information suggesting an individual flagged through the Purge Program is in fact a noncitizen prior to sending the 14-day notice and initiating the removal process, instead putting the burden entirely on the voter to re-affirm their citizenship or face removal.

52.    Defendants have stated that if the registrant affirmatively responds and mails the local registrar a completed Affirmation of Citizenship form within 14 days, and it is received and processed in time, then the registrant is removed from the list of flagged individuals, which officials describe as the "Declared Non-Citizen Hopper." ECF No. 26-2 at 7.

53.    "With respect to people who do not return the Affirmation of Citizenship form, the Notice of Intent to Cancel provides that '[i]f you do not respond within 14 days, you will be removed from the list of registered voters.'" ECF No. 26-2 at 7.

54.    The Purge Program further requires that registrars "immediately notify the Commonwealth's Attorney for their jurisdiction of this alleged unlawful conduct." ECF No. 26-4 at 5.

## II.        Implementation of the Purge Program

55.        Virginians were removed from the rolls in the 90-day "quiet period" as a result of the Purge Program, and more will be removed in future quiet periods until it is enjoined.

56.        ELECT has confirmed that it and registrars are daily receiving "non-citizen data" from the DMV and daily "[r]emoving individuals who declare or provide documentation indicating non-citizenship status and who do not respond to an affirmation of citizenship notice." ECF No. 23-1 at 2. Indeed, ELECT and the DMV entered a new Memorandum of Understanding on September 3, 2024, ensuring the daily data exchanges will occur. ECF No. 23-2.

57.        Counties are using these daily updates from ELECT to remove Virginians from the voter rolls. For example, Arlington, Fairfax, and Loudoun Counties have all followed ELECT's instructions and cancelled the registrations of voters as a result of the Purge Program. ECF Nos. 23-3, 23-4, 23-5. Loudoun County confirmed eight cancellations in August for alleged noncitizenship, ECF No. 23-6 at 9, and Fairfax confirmed 49 cancellations as a result of the Purge Program, ECF No. 23-5 at 8.

58.        The 49 voter registration cancellations in Fairfax County were all due to a failure of the voter to reply affirming their citizenship within 14 days of the notice being sent. Originally, 66 voters were identified and noticed as alleged noncitizens, but 17 voters responded confirming their citizenship "and re-registered within the 14-day requirement." ECF No. 23-5 at 8. A member of the Fairfax County Electoral Board acknowledged that "his understanding was that many of these individuals are citizens who inadvertently checked the wrong box or did not check any box for the citizenship question on the DMV website" but also noted that registrars are unable to do research into the source of the noncitizen DMV demarcation because "the local election offices

have 'no way of knowing' how the individual answered the DMV citizenship question." ECF No. 23-5 at 8.

59. Arlington and Loudoun Counties also all referred alleged noncitizen voters to the Commonwealth Attorneys for their jurisdictions for criminal investigation and potential prosecution. ECF Nos. 23-3, 23-5. Arlington County has also referred alleged noncitizens to Defendant Attorney General Miyares for investigation and potential prosecution. ECF No. 23-3.

60. During a September 30, 2024, Board of Elections hearing, Prince William Registrar Eric Olsen indicated that he has been asking registrants to re-verify that they are U.S. citizens even if they have previously returned an Affirmation of United States Citizenship Form to his office.

61. At the September 30 meeting, Mr. Olsen said: "[w]e looked at 162 individuals that were listed as noncitizens in the VERIS system. Forty-three of those have voted. We looked at all forty-three of those. Every single one of them had verified their citizenship previously. Some by as many as five times. All had Social Security Numbers. And we had to cancel them because of state protocol, but we also didn't see any issue that they had done anything illegal."[6] ECF No. 26-2 at 10.

62. According to Defendants, over 1,600 voters were removed on the basis of alleged noncitizenship between August 7, 2024 and October 21, 2024. ECF No. 110-1. Further, between January 2022 and July 2024, Defendants confirmed that they removed over 6,300 registrants on the basis of alleged noncitizenship. ECF No. 26-4 at 3.

63. Defendants' Purge Program continues unabated as confirmed by county Electoral Board minutes. Every month, county Electoral Boards confirm the continuation of the program

---

[6] Prince William County Office of Elections, *PWC Electoral Board Meeting – September 30, 2024*, YouTube, at 00:29:00 (Sep. 30, 2024), https://www.youtube.com/watch?v=Zr0LSt3xwCk.

through cancelations on the basis of alleged noncitizenship and referrals to Commonwealth Attorneys.[7] Many of these cancellations continue despite piling public evidence and widespread acknowledgment of the error ridden Program. Just in the month of February, the Electoral Boards of Fairfax, Prince William County, and Arlington, spoke of the Program's errors. The Fairfax General Registrar reported that of the 26 cancellations sent by ELECT to Fairfax voters, seven were sent in error and one voter re-registered immediately indicating at least a 30% error rate.[8] Prince William General Registrar noted the cancellation of a U.S. born citizen that had lived in the county for over 14 years and an estimated a 50% Program error rate.[9] Meanwhile, the Arlington Electoral Board noted that when some registrants update their address at the DMV and are subsequently flagged for removal, the county does not receive the update address from the DMV and so the Program then sends the intent to cancel notice to the registrant's old address.[10]

---

[7] *See, e.g.*, Fairfax County Electoral Board Meeting Minutes (Feb. 6, 2025), https://www.fairfaxcounty.gov/elections/sites/elections/files/Assets/Documents/PDF/DRAFTMinutes%20-%20020625(v2).pdf; Loudon County February Electoral Board Meeting (Feb. 6, 2025), https://lfportal.loudoun.gov/LFPortalInternet/Browse.aspx?startid=308878&row=1&dbid=0 (9 reported cancellations); Arlington Elections Office, *Electoral Board Meeting – January 14, 2025*, YouTube, at 00:21:50-00:23:25 (Jan. 14, 2025), https://www.youtube.com/watch?v=XPf14fNfxlE; Prince William County Office of Elections, *PWC Electoral Board Meeting – February 5, 2025*, YouTube, at 1:04:00-1:09:00 (Feb. 5, 2025), https://www.youtube.com/watch?v=AQxAfumKVTQ.

[8] Fairfax County Electoral Board Meeting Minutes (Feb. 6, 2025), https://www.fairfaxcounty.gov/elections/sites/elections/files/Assets/Documents/PDF/DRAFTMinutes%20-%20020625(v2).pdf (In January "ELECT cancelled the registration records for 26 individuals identified as potential non-citizens. Of those 26, one re-registered after the cancellation, and seven were sent in error by ELECT").

[9] Prince William County Office of Elections, *PWC Electoral Board Meeting – February 5, 2025*, YouTube, at 1:04:00-1:09:00 (Feb. 5, 2025), https://www.youtube.com/watch?v=AQxAfumKVTQ.

[10] Arlington Elections Office, *Electoral Board Meeting – January 14, 2025*, YouTube, at 00:21:50-00:23:25 (Jan. 14, 2025), https://www.youtube.com/watch?v=XPf14fNfxlE.

## III.    The Purge Program's Impact on Naturalized Citizens

64.    The Purge Program has resulted and will continue to result in the cancellation of the voter registration of naturalized U.S. citizens. Even though naturalized citizens have the same fundamental right to vote as U.S.-born citizens, the Purge Program systematically jeopardizes the voting rights of naturalized citizen voters. The Purge Program requires naturalized citizens to provide further citizenship verification to stay on the rolls or, if they do not do so within 14 days, confirms their removal and refers them for criminal investigation and prosecution.

65.    Data from U.S. Citizenship and Immigration Services (USCIS) shows that thousands of Virginia residents are naturalized every year. In Fiscal Year 2024, the most recent full year for which state-specific data is available, 24,900 Virginia residents became naturalized citizens.[11] Naturalization applications generally increase in advance of general elections,[12] and, according to USCIS data, there are still an estimated 289,054 lawful permanent residents in Virginia eligible to naturalize.[13]

66.    The Census Bureau has found that roughly 61% of naturalized citizens are registered to vote.[14]

67.    To become a naturalized citizen, a person must first be a lawful permanent resident (often colloquially called a "green card holder") for years. The sole exceptions are for a small number of people who become naturalized citizens due to certain service in the U.S. military or

---

[11] *Naturalization Statistics*, USCIS (Jan. 24, 2025), https://perma.cc/ZB3M-XK7E (last visited Sep. 30, 2025).

[12] Holly Straut-Eppsteiner, Cong. Rsch. Serv., R43366, U.S. Naturalization Policy (2024).

[13] *Eligible to Naturalize Dashboard*, USCIS, https://perma.cc/244E-954Q (last visited Sep. 30, 2025).

[14] *Table 11: Reported Voting and Registration Among Native and Naturalized Citizens, by Race, and Region of Origin: November 2022*, U.S. Census Bureau (Apr. 2023), https://perma.cc/M4LR-2QY7 (last visited Sep. 30, 2025).

who were previously noncitizen nationals of the United States because they were born in certain U.S. territories. For that reason, all (or virtually all) naturalized citizens in Virginia lived in the United States for years before they were citizens, as noncitizens and lawful permanent residents.[15]

68.     Virginia drivers' licenses, permits, and special identification cards are available to citizens and noncitizens alike including legal permanent residents, "conditional resident alien[s]," approved applicants for asylum, and entrants into the United States in refugee status. Va. Code § 46.2-328.1(A). Those forms of identification can remain valid during the applicant's authorized stay in the United States, up to the legal limit of eight years. *Id*. at §§ 46.2-328(B); 330(A).

69.     Because a person must ordinarily be a lawful permanent resident for years before becoming a naturalized citizen, and because a lawful permanent resident may obtain a driver's license, permit, or special identification card in Virginia, it is extremely likely that many naturalized citizen residents of Virginia had a noncitizen exchange with the DMV prior to naturalization.

70.     This means that an individual could obtain a driver's license or form of identification as a non-U.S. citizen and subsequently become a U.S. citizen and lawfully register to vote—for example by using a paper voter registration form at their naturalization ceremony— without updating their DMV record to reflect their citizen status. *See* Va. Code §§ 46.2-328.1(A),

---

[15] In addition, some children born outside the U.S. who were legal permanent residents become U.S. citizens by operation of law, in what is called "derived citizenship." These children are not required to go through the naturalization process or obtain any documentation when they become citizens. When they turn 18, they can register to vote if they are otherwise eligible. Individuals with derived citizenship were typically children when at least one parent became a naturalized citizen. *See Policy Manual, Chapter 4 - Automatic Acquisition of Citizenship after Birth (INA 320)*, USCIS, https://perma.cc/BZZ6-M4QW (last visited Sep. 30, 2025). Derived citizens are subject to the same unlawful practices as naturalized citizens under the Purge Program, and the claims regarding the unlawfulness of the Purge Program with respect to naturalized citizens in this lawsuit apply equally to derived citizens—since they, too, were previously legal permanent residents and could have interacted with the DMV before becoming citizens.

330(A). Under these circumstances, the DMV's records would still indicate that an eligible voter was not a U.S. citizen at the time they obtained their identification, thereby improperly and erroneously triggering the removal process.

71.     Some individuals may have interactions with the DMV that do not result in their citizenship information being corrected or updated in the database, which increases the likelihood that the citizenship information contained in the DMV database is outdated for some individuals.

72.     The DMV does not require people to show additional proof of citizenship or lawful residence when they renew their drivers' licenses (so long as they showed such proof since 2004 for legal permanent residents or 2020 for asylees or refugees).[16] Thus citizens who became naturalized *over the last twenty years* would likely not have updated citizenship documents on file with the DMV if they obtained a driver's license before their naturalization. The Purge Program directly threatens the voting rights of these citizens.

73.     Upon information and belief, eligible voters often mistakenly leave a box empty or check the wrong box during electronic transactions with the DMV in a way that indicates they are not a citizen despite having already confirmed their citizenship while registering to vote, thereby improperly and erroneously triggering the removal process. ECF No. 23-5 at 7. This can impact naturalized citizens as well as U.S.-born U.S. citizens.

74.     Further, naturalized citizens in Virginia overwhelmingly come from communities of color that have historically been subject to discrimination in the exercise of their voting rights. For instance, in fiscal year 2022, the top five countries of origin for the 27,324 naturalized Virginia

---

[16] *Virginia's Legal Presence Law*, Virginia Department of Motor Vehicles, available at https://perma.cc/3HXX-8MFP (last visited Oct. 3, 2024).

residents were: India (2,060), Afghanistan (1,803), Pakistan (1,357), Philippines (1,356), and El Salvador (1,685).[17]

75.    In other states, state officials have created similar legally flawed programs in reliance on information provided when an individual obtained a driver's license. In each of those cases, public reporting and lawsuits have uncovered that the programs targeted naturalized citizens.

76.    Registration is the largest obstacle to voting in the United States. H.R. Rep. No. 103-9, at 3 (1993) ("Public opinion polls, along with individual testimony . . . indicate that failure to become registered is the primary reason given by eligible citizens for not voting. It is generally accepted that over 80 percent of those citizens who are registered vote in Presidential elections.").

77.    In passing the NVRA, Congress acknowledged that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3).

78.    Defendants have not taken effective steps to ensure that individuals flagged by the Purge Program are not in fact U.S. citizens, even though (1) DMV data regarding citizenship is known to be outdated and unreliable as an indicator of current citizenship status, and (2) noncitizen designation or transactions in the DMV data are often the sole criterion to trigger voter registration cancellation. Because the Purge Program by design singles out individuals who were once identified in DMV records as noncitizens and subjects them to scrutiny not generally faced by U.S.-born citizens, the Purge Program discriminates based on national origin and against naturalized citizens.

---

[17] *Profiles on Naturalized Citizens*, U.S. Dep't of Homeland Sec., Office of Homeland Sec. Statistics, https://perma.cc/TH9Q-3S9P.

79. Beyond its patent violation of the NVRA's quiet period, Virginia's Purge Program subjects naturalized citizens who have previously attested to their U.S. citizenship under penalty of perjury—as all other Virginia voters do—to a duplicative, arbitrary, and discriminatory process to remain registered and vote. Giving voters less than two weeks to complete that process (including the time it takes to receive, complete and mail back the form) exacerbates the burdens imposed by the Purge Program. The deadline increases the likelihood that U.S. citizens are removed from the voter rolls by this process even though they are eligible to vote.

80. The increased likelihood of purging naturalized citizens combined with the failure of Defendants to verify citizenship before purging voters is confirmed by the numerous public statements made by naturalized citizens in Virginia confirming they received a cancellation notice or were removed from the rolls shortly before the November 2024 election.[18]

## IV. The Purge Program's Impact on U.S.-Born Citizens

81. The Purge Program has resulted and will continue to result in the cancellation of the voter registration of U.S.-born citizens,[19] such as Plaintiff Shaw. Individuals interacting with

---

[18] *See, e.g.*, Evan Goodenow, *Virginia voter roll purge includes Loudoun residents who say they're eligible*, Loudon Times-Mirror (Oct. 31, 2024), https://perma.cc/2BKZ-YGEX (Lorie Ann P. Hernandez and Ever A. Umana Monterrosa, both naturalized citizens); Madison Schlegel, *voter in Hampton's experience to re-register*, 13 News Now (Nov. 1, 2024), https://perma.cc/AD6N-3J6X (Caroline Arthur, naturalized citizen); Rene Marsh and Danya Gainor, *US citizens caught in Virginia's voter purge aimed at noncitizens speak out*, CNN (Nov. 2, 2024), https://perma.cc/2XPU-QVSV (Rachel Xu, Fatima Bashir, Saule Bohoney, and Abdullah Al Mosawa, all naturalized citizens); Jude Joffee-Block, *U.S. citizens are among the voters removed in Virginia's controversial purge*, National Public Radio (Oct. 30, 2024), https://perma.cc/EPU9-8ALW (Carolina Diaz Tavera, naturalized citizen).

[19] *See, e.g.*, Elizabeth Beyer et al., *Meet some Virginians who almost lost their right to vote after being declared 'noncitizens'*, Cardinal News (Oct. 25, 2024), https://perma.cc/28UY-JAXK (Dennis Henson and Lawrence Otey, both U.S.-born citizens); Fox 5 DC Digital Team, *Woman born and raised in Virginia among 1,600 voter registrations canceled: 'I don't understand'*, Fox 5 (Oct, 29, 2024), https://perma.cc/GQ7H-ABMT (Shantae Martin, U.S.-born citizen); Jude Joffee-Block, *U.S. citizens are among the voters removed in Virginia's controversial purge*, National

the DMV through electronic transactions often mistakenly select the wrong box in fields prompting the individual to indicate whether they are a U.S. citizen.

82.    At least some individuals who are U.S. citizens mistakenly check the box indicating they are not a citizen, which would result in the individual being flagged in the DMV's noncitizens transactions list.

83.    Because the Purge Program requires the DMV to transmit the list of noncitizen transactions to ELECT on a daily basis, DMV staff may not be able to identify and correct any user errors by U.S. citizens mistakenly indicating they are not a citizen prior to transmitting the list to ELECT, leading to these citizens being erroneously identified to ELECT as potential noncitizens.

## V.    Plaintiffs' Thwarted Effort to Obtain Information from the State

84.    On August 20, 2024, Plaintiff VACIR sent a letter to Defendant Beals, Defendant Miyares, the DMV, and the Office of the Governor requesting copies of all records relating to the removal from the voter registration rolls of Virginia registered voters on the basis that they have been identified as a potential "non-citizen." ECF No. 23-7. The request was made pursuant to the Public Disclosure of Voter Registration Activities provision of the NVRA, 52 U.S.C. § 20507(i). Defendant Beals made only a limited initial production of responsive records, despite a September 9 meeting with Defendant Beals's staff and numerous emails discussing the specific records responsive to the request.

---

Public Radio (Oct. 30, 2024), https://perma.cc/EPU9-8ALW (Nadra Wilson and Rina Shaw, both U.S.-born citizens); Dave Ress, *'A Surprise to me' Virginia voter roll purge cuts nearly 300 in Richmond region*, Richmond Times-Dispatch (Nov. 1, 2024), https://perma.cc/UJV2-J78G (Eric Terrell,  Christine Rabassa, Rina Shaw, and McKenzie Puffenbarger, all U.S.-born citizens); Rene Marsh and Danya Gainor, *US citizens caught in Virginia's voter purge aimed at noncitizens speak out*, CNN (Nov. 2, 2024), https://perma.cc/E68A-3QMS (Nadra Wilson, U.S.-born citizen).

85.    On October 3, 2024, Plaintiffs VACIR and LWVVA sent a letter entitled "Notice of Violation of National Voter Registration Act and Demand for Remediation and Documents" to Defendants Beals and Miyares. ECF No. 23-8. That letter, sent pursuant to the NVRA (52 U.S.C. § 20510(b)(2)), informed Defendants Beals and Miyares that the Purge Program violates the three provisions of the NVRA listed in Counts One through Three, *infra*. The letter also demanded records pursuant to 52 U.S.C. § 20507(i)(1), including, among other things: individualized voter information for voters affected by the Purge Program; instructions provided to Boards of Registrars regarding implementation of E.O. 35; and communications between Defendant Beals and Defendant Miyares regarding the Purge Program. ELECT responded to that letter on October 7, 2024, asserting that its "established voter list maintenance processes comply with all applicable state and federal laws" and that it will provide the list of individuals canceled due to being declared a non-citizen within 90 days from the date of VACIR's August request. ECF No. 23-9 at 2.

86.    Following submission of Plaintiffs' Complaint on October 7, 2024, and Motion for Expedited Discovery on October 8, 2024, Plaintiffs were granted Expedited Discovery on October 21, 2024, which included registration information for voter registration applicants denied registration based on alleged non-citizenship from August 7, 2024, to October 21, 2024. On November 20, ELECT provided a voter file of individuals cancelled on citizenship grounds between January 15, 2022, and August 20, 2024, in response to VACIR's NVRA information request. Defendant Beals continues to withhold several of the records VACIR requested in its August 20 information requestion and is entitled to pursuant to 52 U.S.C. § 20507(i)(1), including: communications between ELECT, county officials, and any third parties concerning the Purge Program, "data collected by the DMV that identifies non-citizens" as described in E.O. 35, records

evidencing all aspects of the process by which the DMV uses SAVE, records related to individuals who established their citizenship following receiving a notice, records related to any investigations into noncitizens for registering or voting, among other records. ECF No. 23-7 at 2.

## CLAIMS

## COUNT ONE
**Violation of the National Voter Registration Act, 52 U.S.C. § 20507(c)(2)(A)**
(*Ex parte Young*, 52 U.S.C. § 20510)
All Plaintiffs Against All Defendants

87.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

88.    The NVRA requires that Virginia complete "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" "not later than 90 days prior to the date of a[n] . . . election for Federal office." 52 U.S.C. § 20507(c)(2)(A). This provision, called the "90-Day Provision," means that Virginia may not take any steps to implement any program to systematically remove voters within the 90-day period before the date of a general election—the quiet period.

89.    The Purge Program violates the NVRA's 90-Day Provision because it (1) is a program with the purpose of systematically removing voters from the rolls within 90 days of federal elections and (2) was not completed before the 90-day quiet period before the 2024 general election, was not completed before the 90-day quiet period before the 2024 primary elections, and will continue during the quiet periods preceding future federal elections.

90.    The NVRA provides that "[i]f the violation occur[s] within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State . . . before bringing a civil action." 52 U.S.C. § 20510(b)(3). By its own terms, the Purge Program is ongoing, with potential purges occurring daily. ECF No. 26-4 at 4-5. The

Complaint was filed within 30 days of the November 5, 2024 election for Federal office. Plaintiffs could, therefore, bring a civil action without notice to Virginia's chief election official.[20]

## COUNT TWO
**Violation of the National Voter Registration Act, 52 U.S.C. § 20507(b)(1)**
(*Ex parte Young*, 52 U.S.C. § 20510)
Plaintiffs VACIR, LWVVA, ACT, and Shiferaw Against All Defendants

91.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

92.    The NVRA requires that voter list maintenance programs be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1).

93.    The Purge Program violates the NVRA's requirement that voter list maintenance programs be "uniform" and "nondiscriminatory" because it identifies registered voters based on national origin and type of citizenship status. Because Defendants' Purge Program is triggered by DMV data indicating a voter had previously been identified as a noncitizen, the Purge Program is directed at individuals who were formerly noncitizens. It inevitably and predictably (indeed, by design) identifies and places burdens on citizens born outside the United States whom Defendants know or should know may be naturalized.

94.    The NVRA provides that "[i]f the violation occur[s] within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State . . . before bringing a civil action." 52 U.S.C. § 20510(b)(3). By its own terms,

---

[20] Because this amended complaint adds no new Defendants, and Defendants have been on notice of their violations of the NVRA, no additional NVRA notice is required for Plaintiffs to amend their complaint. *See e.g.*, *Delgado v. Galvin*, No. 12-CV-10872, 2014 WL 1004108, at *9 (D. Mass. Mar. 14, 2014) (permitting plaintiffs to amend complaint to "add additional factual allegations to the complaint concerning NVRA violations" without having to provide additional notice.) However, Plaintiffs Shaw and Shiferaw did, through counsel, send a Notice of Violation of National Voter Registration Act and Demand for Remediation and Documents on March 21, 2025.

the Purge Program is ongoing, with potential purges occurring daily. ECF No. 26-4 at 4-5. The Complaint was filed within 30 days of the November 5, 2024 election for federal office. Plaintiffs could, therefore, bring a civil action without notice to Virginia's chief election official.[21]

### COUNT THREE

95.     This Court dismissed Plaintiffs' Count Three in its August 12, 2025 Order on Defendants' Motion to Dismiss. ECF No. 154. Plaintiffs include Count Three here to keep consistent the reference to Plaintiffs' claims across this Court's record.

### COUNT FOUR

**Violation of the National Voter Registration Act, 52 U.S.C. § 20507(i)**
(*Ex parte Young*, 52 U.S.C. § 1983)
Plaintiffs VACIR and LWVVA Against Defendant Beals

96.     Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

97.     The Public Disclosure of Voter Registration Activities provision of the NVRA provides that states "shall maintain for at least 2 years and shall make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1). The Public Disclosure Provision covers individualized records for registered voters subject to removal programs. *See Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257 (4th Cir. 2021); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012); *see also* 52 U.S.C. 20507(i)(2).

---

[21] *See* note 20, *supra*.

98.    Defendant Beals has thus violated the Public Disclosure of Voter Registration Activities provision of the NVRA by refusing to provide Plaintiffs with the list of voters identified as potential noncitizens within a reasonable time period despite having those records in her office's possession at the time Plaintiff VACIR requested these records on August 20 and when Plaintiffs VACIR and LWVVA requested records on October 3, and continuing to withhold additional responsive records in her office's possession.

99.    Defendant Beals's and her office's withholding of records prior to the election and continuing refusal to provide the requested records up to and including the time of filing of this amended complaint is certainly unlawful and the remaining requested records must be produced immediately.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

a.    Declare that Va. Code § 24.2-427(C), E.O. 35, and all aspects of Defendants' Purge Program violate the NVRA;

b.    Declare that Defendant Beals's failure to produce records requested by Plaintiff VACIR on August 20, 2024, and by Plaintiffs VACIR and LWVVA on October 3, 2024, violated the Public Disclosure Provision of the NVRA, and that Defendant Beals's continuing failure to produce remaining responsive records continues to violate the Public Disclosure Provision of the NVRA;

c.    Permanently enjoin Defendants from implementing Va. Code § 24.2-427(C), E.O.35, and all aspects of the Purge Program and from cancelling any voter's registration as part

of the Purge Program or on the basis of failing to respond to a notice letter issued as a result of the implementation of the Purge Program;

      d.     Order Defendants Beals and State Board of Election Members to instruct all Virginia county registrars to place back on the rolls in active status any persons whose voter registration was cancelled or marked inactive as part of the Purge Program, except for any voter who responded to a notice letter by affirming that they are not a U.S. citizen, and instruct that all impacted voters should be allowed to cast regular ballots if they appear at the polls so long as they are otherwise eligible to do so;

      e.     Order Defendants Beals and State Board of Election Members to instruct all Virginia county registrars to send letters to affected voters retracting the notice letters already sent out on the basis of the Purge Program;

      f.     Order all Defendants to take all such steps and instruct Virginia county registrars to take all such steps as are necessary to alert the public and all individuals who were sent notice letters as a result of the implementation of the Purge Program that the notice letters sent pursuant to the Purge Program are being rescinded, that all eligible voters whose voter registration was cancelled or marked inactive due to the Purge Program may vote;

      g.     Order Defendants Beals and State Board of Election Members to retract all referrals made to Virginia law enforcement for investigation or prosecution of individuals made based on the Purge Program;

      h.     Order all Defendants to take all such steps as are necessary and to instruct Virginia county registrars to take all such steps as are necessary to alert the public and all individuals whose voter registration was cancelled or marked inactive due to the Purge Program that no voter will be

criminally investigated or prosecuted on the basis of the Purge Program, absent specific, individualized information that they have violated a law;

   i.  In the alternative, if the relief requested in subsections (c) to (h) above is not granted in its entirety, order all Defendants to cease implementation of the Purge Program within 90 days of any future federal election pursuant to 52 U.S.C. § 20507(c)(2)(A);

   j.  Order all Defendants to provide Plaintiffs with all records concerning the implementation of the Purge Program, including, but not limited to, the lists of the names and addresses and other individualized data available of all persons to whom removal notices were sent between January 15, 2022 and the date that inspection of the records is made, including information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made, records evidencing all aspects of the process by which the DMV uses SAVE, as well as the lists of the names and addresses and all other individualized data available of all persons who have been subject to investigation for alleged violations of law as a result of the Purge Program and all records related to such investigations;

   k.  Award Plaintiffs their costs and reasonable attorneys' fees in this action;

   l.  Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

   m.  Grant Plaintiffs such other relief as this Court may deem just and proper.

Date: October 23, 2025      Respectfully submitted,

/s/ Shanna Ports
Shanna Ports (VSB No. 86094)
Ryan Snow*         Danielle Lang*
Javon Davis*         Brent Ferguson*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS  Simone Leeper*
UNDER LAW         Katherine Hamilton*
1500 K Street, NW, Ste. 900    CAMPAIGN LEGAL CENTER
Washington, DC 20005      1101 14th Street NW, Suite 400

(202) 662-8600
rsnow@lawyerscommittee.org
jdavis@lawyerscommittee.org

Orion Danjuma*
John Paredes*
THE PROTECT DEMOCRACY PROJECT, INC.
82 Nassau Street, # 601
New York, NY 10038
Telephone: (202) 579-4582
orion.danjuma@protectdemocracy.org
john.paredes@protectdemocracy.org

Benjamin L. Berwick*
Anna Dorman*
THE PROTECT DEMOCRACY PROJECT, INC.
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org
anna.dorman@protectdemocracy.org

Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
sports@campaignlegalcenter.org
dlang@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
sleeper@campaignlegalcenter.org
khamilton@campaignlegalcenter.org

John Powers*
Hani Mirza*
ADVANCEMENT PROJECT
1220 L Street Northwest, Suite 850
Washington, D.C. 20005
(202) 728-9557
jpowers@advancementproject.org
hmirza@advancementproject.org

*Attorneys for Plaintiffs Virginia Coalition for
Immigrant Rights, the League of Women Voters
of Virginia, African Communities Together,
Rina Shaw, and Genet Shiferaw*

*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I certify that on October 23, 2025 I electronically filed the above document with the Clerk

of Court using the CM/ECF system, which will provide electronic copies to any counsel of record.


/s/ Shanna Ports
Shanna Ports