**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **Virginia Coalition for Immigrant Rights, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| | ) | **Civil Action No. 1:24-cv-01778** |
| **v.** | ) ) | |
| **Susan Beals, in her official capacity as Virginia Commissioner of Elections, et al.,** | ) ) ) | |
| **Defendants.** | | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**THE SECOND AMENDED COMPLAINT**

Charles J. Cooper *(Pro Hac Vice)*
Bradley L. Larson *(Pro Hac Vice)*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants Susan Beals, John O'Bannon, Rosalyn R. Dance, Georgia Alvis-Long, Christopher P. Stolle, J. Chapman Petersen, and Attorney General Jason Miyares*

Jason S. Miyares
   *Attorney General*
Kevin Gallagher (VSB #87548)
   *Solicitor General*
Thomas J. Sanford (VSB #95965)
   *Deputy Attorney General*
Graham K. Bryant (VSB #90592)
   *Principal Deputy Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ......................................................................................................................... 3

   I.    Statutory framework and factual background ................................................... 3

   II.   Procedural background ..................................................................................... 6

LEGAL STANDARD ................................................................................................................ 8

   I.    Plaintiffs' claims are jurisdictionally barred ................................................... 8

      A.   Plaintiffs lack Article III standing to sue for alleged NVRA violations ....... 8

          1.   Plaintiff Organizations lack standing. ............................................ 9

          2.   The Individual Plaintiffs Lack Standing ........................................ 14

      B.   Any Quiet Period Provision claim is moot .................................................... 15

      C.   Sovereign immunity also bars Plaintiffs' claim under the Quiet Period Provision and all claims against the Attorney General ....................................................... 17

   II.   Plaintiffs' claims are insufficient as a matter of law ....................................... 19

      A.   Defendants did not violate the NVRA's Quiet Period Provision ................... 20

          1.   The NVRA does not restrict removing noncitizens and other persons whose registrations were invalid *ab initio* ....................................... 20

          2.   Defendants' removal of noncitizens was "individualized" and not "systematic" ................................................................................... 24

          3.   The Individual Plaintiffs lack a cause of action .............................. 26

      B.   Defendants' process for removing noncitizens is nondiscriminatory ........... 26

      C.   Plaintiffs' claim for information under the NVRA fails ................................. 28

CONCLUSION ........................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Cooper,*
    895 F.3d 337 (4th Cir. 2018) ...............................................................................18

*Allen v. Wright,*
    468 U.S. 737 (1984) ....................................................................................11, 16

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983) ............................................................................................27

*Arcia v. Florida Sec'y of State,*
    772 F.3d 1335 (11th Cir. 2024) .........................................................................24

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
    570 U.S. 1 (2013) ........................................................................................23, 24

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..............................................................................................8

*Bland v. Roberts,*
    730 F.3d 368 (4th Cir. 2013) .............................................................................17

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ............................................................................................27

*Children's Healthcare is a Legal Duty, Inc. v. Deters,*
    92 F.3d 1412 (6th Cir. 1996) .............................................................................18

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ........................................................................................8, 14

*Clapper v. Amnesty International USA,*
    568 U.S. 398 (2013) .....................................................................................14, 15

*Coakley v. Welch,*
    877 F.2d 304 (4th Cir. 1989) .............................................................................18

*Columbia Gas Transmission, LLC v. Ott,*
    984 F. Supp. 2d 508 (E.D. Va. 2013) ..................................................................8

*Crawford v. Marion County Election Board,*
    553 U.S. 181 (2008) ............................................................................................27

*Davis v. FEC,*
    554 U.S. 724 (2008) ..............................................................................................8

*DeBauche v. Trani*,
    191 F.3d 499 (4th Cir. 1999) ....................................................................17

*Doyle v. Hogan*,
    1 F.4th 249 (4th Cir. 2021) ...............................................................18, 19

*Edelman v. Jordan*,
    415 U.S. 651 (1974).............................................................................17

*Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*,
    28 F.3d 1268 (D.C. Cir. 1994) ...............................................................12

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024)........................................................11, 12, 13, 14

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)........................................................................9, 16

*Goines v. Valley Cmty. Servs. Bd.*,
    822 F.3d 159 (4th Cir. 2016) ...................................................................5

*Greater Birmingham Ministries v. Secretary of State of Ala.*,
    105 F.4th 1324 (11th Cir. 2024) ....................................3, 20, 29, 30

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)......................................................................11, 13

*Husted v. A. Phillip Randolph Institute*,
    584 U.S. 756 (2018)......................................................................25, 27

*Laird v. Tatum*,
    408 U.S. 1 (1972)................................................................................15

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) .................................................................12

*Lewis v. Continental Bank Corp.*,
    494 U.S. 472 (1990).............................................................................16

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)......................................................................11, 13

*Luna Perez v. Sturgis Pub. Schs.*,
    598 U.S. 142 (2023).............................................................................23

*McBurney v. Cuccinelli*,
    616 F.3d 393 (4th Cir. 2010) .................................................................18

iii

*Merrill v. Milligan,*
142 S. Ct. 879 (2022) ..................................................................................24

*Mi Familia Vota v. Fontes,*
129 F.4th 691 (9th Cir. 2025) ................................................ *passim*

*Mi Familia Vota v. Fontes,*
152 F.4th 1153 (9th Cir. 2025) .............................................. *passim*

*Moore v. Flagstar Bank,*
6 F. Supp. 2d 496 (E.D. Va. 1997) ..........................................................11

*National Inst. of Health v. American Pub. Health Ass'n,*
145 S. Ct. 2658 (2025) ..............................................................................24

*Ohio River Valley Environmental Coalition, Inc. v. Timmermeyer,*
66 Fed. Appx. 468 (4th. Cir. 2003)............................................................3

*Outdoor Amusement Bus. Ass'n v. DHS,*
983 F.3d 671 (4th Cir. 2020) .....................................................................9

*Plotkin v. Lehman,*
No. 98–1638, 178 F.3d 1285, 1999 WL 259669 (4th Cir. Apr. 30, 1999) ..............8

*Project Vote/Voting for Am., Inc. v. Long,*
682 F.3d 331 (4th Cir. 2012) ...................................................................30

*Purcell v. Gonzalez,*
549 U.S. 1 (2006)......................................................................................24

*RNC v. North Carolina State Board of Elections,*
120 F.4th 390 (4th Cir. 2024) ............................................................13, 14

*Ross v. Reed,*
719 F.2d 689 (4th Cir. 1983) ...................................................................16

*Seminole Tribe of Fla. v. Florida,*
517 U.S. 44 (1996).....................................................................................17

*Spencer v. Kemna,*
523 U.S. 1 (1998)......................................................................................17

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016).....................................................................................8

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009)..............................................................................9, 11

iv

*Taubman Realty Grp. v. Mineta*,
  320 F.3d 475 (4th Cir. 2003) ...................................................................8

*Tennessee Conf. of the NAACP v. Lee*,
  105 F.4th 888 (6th Cir. 2024) .................................................................12

*Tennessee Conf. NAACP v. Lee*,
  139 F.4th 557 (6th Cir. 2025) ...................................................................3

*Trump v. Boyle*,
  145 S. Ct. 2653 (2025)............................................................................24

*United States Parole Comm'n v. Geraghty*,
  445 U.S. 388 (1980)................................................................................16

*Virginia Coalition for Immigrant Rights v. Beals*,
  2024 WL 4601052 (4th Cir. Oct. 27, 2024)..............................................7

*Virginia Coalition for Immigrant Rights v. Beals*,
  603 U.S. __, 2024 WL 4608863 (Oct. 30, 2024)................................7, 24

*Waste Mgmt. Holdings, Inc. v. Gilmore*,
  252 F.3d 316 (4th Cir. 2001) ..................................................................18

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990)................................................................................15

*Wisconsin Right to Life v. FEC*,
  551 U.S. 449 (2007)................................................................................17

*Ex parte Young*,
  209 U.S. 123 (1908)................................................................................17

**Statutes**

52 U.S.C. § 207................................................................................................19

52 U.S.C. §§ 20501 *et seq*.................................................................................3

52 U.S.C. § 20503..............................................................................................4

52 U.S.C. § 20504..............................................................................................4

52 U.S.C. § 20507...................................................................................... *passim*

52 U.S.C. § 20510.......................................................................................26, 27

National Voter Registration Act of 1993 ..........................................................1

Va. Code § 24.2-404 .................................................................................................6, 26

Va. Code § 24.2-410.1 ...................................................................................................5

Va. Code § 24.2-420.1 ...................................................................................................6

Va. Code § 24.2-427 ................................................................................................6, 18

**Other Authorities**

*Eligible*, The American Heritage Dictionary, Houghton Mifflin Co. (2nd Coll. Ed. 1985) ..................................................................................................................22

*Eligible*, The Compact Edition of the Oxford English Dictionary ...............................22

*Eligible*, Merriam-Webster, https://tinyurl.com/5c79v97t.........................................22

Executive Order 35 .......................................................................................................6

Executive Order 53 .......................................................................................................6

Fed. R. Civ. P. 12.........................................................................................................7

*Ineligible*, The American Heritage Dictionary .............................................................22

Michael Herz, *Law Lags Behind: FOIA and Affirmative Disclosure of Information*, 7 Cardozo Pub. L., Pol'y & Ethics J. 577 (2009) ...............................29

*Photocopy*, The American Heritage Dictionary of the English Language (3d ed. 1992) .................................................................................................................30

*Voter*, The Compact Edition of the Oxford English Dictionary, Oxford University Press (1980) ......................................................................................................22

*Voter*, Merriam-Webster, https://tinyurl.com/2s32xcve ...........................................22

## INTRODUCTION

A handful of advocacy organizations and two individuals ask this Court to hold unlawful and permanently enjoin Virginia's processes for removing self-identified noncitizens from its voter rolls, particularly within the 90-day "quiet period" before a federal election. See 52 U.S.C. § 20507(c)(2)(A). This Court should dismiss the claims. Although some arguments Defendants raise for dismissal will be familiar to the Court, others (especially those relating to the individual plaintiffs) are new.

Plaintiffs' complaint should be dismissed for lack of jurisdiction. Even after amending their complaint for a second time, Plaintiffs have failed to identify a single person who was wrongly removed from the voter rolls and unable to vote. Plaintiffs have likewise failed to properly allege an injury in their capacities as organizations. Because the quiet period is over, there is no ongoing violation of federal law that would allow the Plaintiffs to invoke the *Ex parte Young* exception to the Commonwealth's sovereign immunity.

Plaintiffs' complaint also fails to state a claim on the merits. Pursuant to longstanding Virginia law, Virginia notifies noncitizens that they will be removed from the voter rolls after they expressly declare their noncitizen status on a Department of Motor Vehicles (DMV) form or when they self-identify as noncitizens in recently verified documentary proof on file with DMV. And before any individual is actually removed from the rolls, the local registrar sends the individual a notice advising him that he can remain registered to vote by returning an affirmation of citizenship in a pre-addressed mailer within 14 days.

Plaintiffs' central claim is that Virginia's removal of noncitizens within 90 days of a federal election violated the so-called "Quiet Period Provision" of the National Voter Registration Act of 1993 (NVRA), which prohibits States from "systematically" removing "ineligible voters" from

the voter rolls within 90 days of a federal election, with exceptions for certain properly registered voters who since became ineligible to vote, such as upon a voter's death or felony conviction. 52 U.S.C. § 20507(c)(2). Plaintiffs fail to state a claim, however, because the Quiet Period Provision does not apply at all to the removal of *noncitizens*—who have never been eligible to vote in the first place—from the rolls. See *Mi Familia Vota v. Fontes*, 129 F.4th 691, 756 (9th Cir. 2025) (Bumatay, J., dissenting). The plain meaning of the text of the Quiet Period Provision, confirmed by its structure and purpose, demonstrates that there are no temporal restrictions on when States may remove individuals who were never eligible to vote. The registrations of noncitizens, as well as others who were never eligible to become "registrants" or "voters" as those terms are used in the Act, were invalid *ab initio*. The NVRA's removal provisions thus do not apply to noncitizens, as six Judges on the Ninth Circuit recently concluded. See *Mi Familia Vota v. Fontes*, 152 F.4th 1153, 1166 (9th Cir. 2025) (Nelson, J., dissenting from the denial of rehearing en banc). Virginia's noncitizen removal process is also highly accurate—despite over a year of litigation, Plaintiffs have not identified a single citizen who was mistakenly removed from the rolls and unable to vote—and makes *individualized* eligibility determinations, not the kind of "systematic" determinations prohibited within the 90-day period.

This Court should also dismiss Count II. Virginia's use of Alien Identification Numbers to search the federal Systematic Alien Verification for Entitlements (SAVE) database does not discriminate against naturalized citizens. The NVRA's requirement that voter-roll maintenance be "nondiscriminatory" only prohibits (1) laws that discriminate against a protected class on their face, and (2) laws enacted with a discriminatory intent. 52 U.S.C. § 20507(b)(1). The term "nondiscriminatory" does not impose a disparate-impact standard. Finally, Plaintiffs also fail to state a claim under the public-inspection provision of the NVRA, as the only federal appellate

court to address that claim has concluded that States have no duty to "produce" documents under a statute that only allows those documents to be "inspect[ed]." See *Greater Birmingham Ministries v. Secretary of State of Ala.*, 105 F.4th 1324 (11th Cir. 2024).

Although this Court was unpersuaded by some of these arguments when directed against the First Amended Complaint, Defendants' positions have recently been endorsed by numerous judges. *Mi Familia Vota*, 129 F.4th at 714–15 (Bumatay, J., dissenting); *Mi Familia Vota*, 152 F.4th at 1166 (Nelson, J., dissenting from the denial of rehearing en banc); *Tennessee Conf. NAACP v. Lee*, 139 F.4th 557 (6th Cir. 2025). Likewise, the Second Amended Complaint attempts to bolster Plaintiffs' claims by adding parties who can point to no injury and thus lack standing even under this Court's previous motion-to-dismiss ruling. And because Plaintiffs waited to file their Second Amended Complaint until after Defendants noticed their interlocutory appeal, Defendants once again move to dismiss the complaint to protect their sovereign immunity. Otherwise, the Fourth Circuit may conclude that the filing of the Second Amended Complaint moots Defendants' pending appeal from the denial of their motion to dismiss the First Amended Complaint. See, *e.g.*, *Ohio River Valley Environmental Coalition, Inc. v. Timmermeyer*, 66 Fed. Appx. 468, 472 (4th. Cir. 2003) (per curiam). This motion to dismiss the Second Amended Complaint is therefore necessary to protect Defendants' right to an interlocutory appeal of an adverse sovereign-immunity ruling.

## BACKGROUND

### I.    Statutory framework and factual background

Congress enacted the National Voter Registration Act in 1993 to promote eligible citizens' participation in federal elections. 52 U.S.C. §§ 20501 *et seq*; see *Mi Familia Vota*, 129 F.4th at 753–77 (Bumatay, J., dissenting) (describing the structure of the NVRA). The NVRA demands

"each State shall establish procedures to register to vote . . . by application made simultaneously with an application for a motor vehicle driver's license." 52 U.S.C. § 20503(a)–(a)(1); see generally *id.* § 20504. These procedures require that "each State shall . . . ensure that any *eligible applicant* is registered to vote in an election." *Id.* § 20507(a)–(a)(1) (emphasis added). "[I]f the *valid voter registration form* of the applicant is submitted to the appropriate State motor vehicle authority," then the applicant must be "registered," *id.* § 20507(a)(1)(A) (emphasis added), and added to the "list of eligible voters," *id.* § 20507(a)(3).

Along with requiring States to allow "eligible applicants" to "register[]," the NVRA imposes restrictions on removing such "registrants" from the rolls. 52 U.S.C. § 20507(a)(3). Under the NVRA's General Removal Provision, a person who is an "eligible applicant" and has submitted a "valid" registration form to vote "may not be removed from the official list of eligible voters except" in four enumerated circumstances: voter request, death of the voter, voter felony conviction or mental incapacity, and change in voter residence (if certain procedures are followed). *Id.* § 20507(a)(3)–(4).

The restrictions on removing "registrants" from the list of "eligible voters" are tighter close to federal elections. Section 8(c)(2), the NVRA's Quiet Period Provision, prohibits States from "systematically" removing "ineligible voters" from the rolls within 90 days of a federal election. *Id.* § 20507(c)(2)(A). It incorporates by cross-reference three of the four exceptions for removals under the General Removal Provision—voter request, death of the voter, and voter felony conviction or mental incapacity. *Id.* § 20507(c)(2).

To ensure that the Commonwealth's voter rolls remain accurate while also complying with the NVRA, Virginia amended its election laws in 2006 to require the Virginia DMV to send to the Virginia Department of Elections (ELECT) the information of any individual who declares himself

to be a noncitizen on a DMV form. Va. Code § 24.2-410.1. ELECT checks that person's information against the Virginia Election and Registration Information System (VERIS) to ensure that these self-declared noncitizens are not included on the voter rolls. Second Amended Complaint (SAC) ¶ 49 (ECF No. 182). As Plaintiffs allege, a match generally "requires an exact match of Social Security Number, first name, last name, and date of birth." *Id.* ¶ 48. Only if there is a match does ELECT forward the information to the local registrars, who then manually "reviews the match to determine if the non-citizen and registered voter identified by VERIS [are] the same person." *Id.* ¶ 49 (quotation marks omitted).

ELECT's general policy is to send local registrars only the records of persons who affirmatively and contemporaneously declare that they are not citizens on a DMV form. See ECF No. 23-1 (Letter from Commissioner Beals to Governor Youngkin) (requiring "declar[ations]" of noncitizenship).[1] It did, however, also previously work with the DMV in an ad hoc review of records to ensure that persons who engaged in DMV transactions within the prior year, and who had documents on file with DMV showing noncitizen status, were not improperly on the voter rolls. *Ibid.* To ensure that any individuals who had subsequently become naturalized citizens were not mistakenly removed, the DMV verified these individuals' information through the Department of Homeland Security's SAVE database. *Id.* at 2–3 ("DMV is conducting verification, using [SAVE], of applicants who present documents indicating legal presence (i.e., non-citizenship)"). The SAVE database shows whether a legal alien resident has subsequently obtained citizenship by searching that person's Alien Identification Number. Only those persons registered to vote who

---

[1] Rather than reattach exhibits, the Second Amended Complaint cross-references exhibits attached to the First Amended Complaint. See, *e.g.*, SAC ¶ 56. Defendants do the same. See, *e.g.*, *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (on a motion to dismiss, a court may consider "documents that are explicitly incorporated into the complaint by reference" and "those attached to the complaint as exhibits").

had noncitizen documents on file with the DMV and who also were confirmed as current noncitizens in a fresh SAVE search were transmitted to the local registrars for each jurisdiction to act upon as part of that review. *Ibid.*

When ELECT concludes that a person is not a citizen and is on the voter rolls, ELECT sends the person's information to the local general registrar for further individualized review. See SAC ¶¶ 49–50. Virginia law requires "general registrars to delete . . . the name of any voter who . . . is known not to be a United States citizen by reason of" that person's self-declaration of noncitizen status or "based on information received from the . . . SAVE Program." Va. Code § 24.2-404(A)(4); see *id.* § 24.2-427(C). If the registrar determines that the noncitizen and the registered voter are the same person, then the registrar will mail the individual a "Notice of Intent to Cancel" that individual's registration to vote. Va. Code § 24.2-427(C). Only if the individual fails to respond to the Notice of Intent to Cancel is he removed from the voter rolls. SAC ¶ 52. But that individual can still reregister to vote (including on election day) without needing to show any documentation; he can simply reregister. Va. Code § 24.2-420.1. Neither Governor Youngkin's Executive Order 35 (issued on August 7, 2024) nor Executive Order 53 (issued on September 12, 2025) created these longstanding statutory processes.

## II.    Procedural background

In October of 2024, Plaintiffs filed a complaint challenging the legality of Virginia's longstanding noncitizen removal process used to ensure that only American citizens are registered and able to vote.[2] See First Amended Compl. ¶¶ 1–14 (ECF No. 23). Plaintiffs alleged that Virginia's individualized process for removing noncitizens from its voter rolls, as required by

---

[2] The United States also filed a similar suit under the NVRA, which has since been voluntarily dismissed. ECF No. 140.

Virginia law, violates the NVRA by amounting to: (1) "systematic voter list maintenance within 90 days preceding a federal election"; (2) discrimination against naturalized citizens; and (3) an impermissible requirement that "voters . . . provide additional proof of U.S. citizenship" beyond that required in the NVRA's federal registration form. *Id.* ¶ 14. Plaintiffs also brought a claim that they are entitled to certain voting information under the NVRA's "public inspection" provision. See *ibid.*; 52 U.S.C. § 20507(i). They named as defendants Virginia Commissioner of Elections Susan Beals, the members of the Board of Elections, and Attorney General Jason Miyares (collectively "Defendants"). FAC ¶¶ 35–37.

Plaintiffs moved for a preliminary injunction on Counts I and II, which this Court granted only with respect to Count I. See ECF No. 112. The Fourth Circuit denied a stay pending appeal, see *Virginia Coalition for Immigrant Rights v. Beals*, 2024 WL 4601052 (4th Cir. Oct. 27, 2024), but the Supreme Court granted an identical motion, see *Virginia Coalition for Immigrant Rights v. Beals*, 603 U.S. __, 2024 WL 4608863 (Oct. 30, 2024) (mem.).

After the 2024 election passed, Defendants moved to dismiss the First Amended Complaint, but this Court denied the motion with respect to all Counts except Count III. ECF No. 153. Defendants noticed an interlocutory sovereign-immunity appeal with respect to all counts against the Attorney General and Count I as to all Defendants. ECF No. 165–66. That appeal is now pending. Plaintiffs then obtained leave to file a Second Amended Complaint over Defendants' opposition, which adds two new individuals as plaintiffs and adds facts related to Plaintiffs' earlier standing and *Ex parte Young* arguments. Defendants now move to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction and failure to state a claim. See Fed. R. Civ. P. 12(b)(1), (6).

## LEGAL STANDARD

Plaintiffs bear the burden of establishing subject-matter jurisdiction and standing. *Taubman Realty Grp. v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003). To survive a motion to dismiss "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation and citation omitted). Although this Court rejected some of Defendants' arguments in its ruling on their previous motion to dismiss, ECF No. 153, the law-of-the-case doctrine does not forbid a district court from revisiting previous conclusions. *Columbia Gas Transmission, LLC v. Ott*, 984 F. Supp. 2d 508, 523 (E.D. Va. 2013); *Plotkin v. Lehman*, No. 98–1638, 178 F.3d 1285, 1999 WL 259669, at *1 (4th Cir. Apr. 30, 1999) (per curiam).

## ARGUMENT

The Second Amended Complaint should be dismissed. Plaintiffs lacked standing at the outset of this case and still do. Even if they had standing, their quiet-period claim is moot and also barred by sovereign immunity. Finally, Plaintiffs cannot prevail on the merits because they fundamentally misunderstand how the relevant parts of the NVRA operate.

## I.    Plaintiffs' claims are jurisdictionally barred

### A.    Plaintiffs lack Article III standing to sue for alleged NVRA violations

No Plaintiff has standing to sue. Standing requires the plaintiff to demonstrate (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Standing is not dispensed in gross, which means that each plaintiff must establish standing for each claim and type of relief against each defendant. *Davis v. FEC*, 554 U.S. 724, 734 (2008). For prospective relief, the requisite harm must be ongoing or imminent. See *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983).

### 1.    Plaintiff Organizations lack standing.

A membership organization can establish Article III standing in two ways. It can show that at least one of its members has standing and that the organization can properly represent the member's interests (associational standing), or it can satisfy the traditional standing test itself (organizational standing). The Plaintiff Organizations here establish neither.

The Plaintiff Organizations lack associational standing. A membership organization "has associational standing when at least one of its 'identified' members 'would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Outdoor Amusement Bus. Ass'n v. DHS*, 983 F.3d 671, 683 (4th Cir. 2020) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

After over a year of litigation and even with the help of expedited discovery, the Plaintiff Organizations still have not identified a single member of any of their organizations that has standing. See *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Instead, Plaintiffs attempt to generate associational standing by asserting that they have many unnamed members who are naturalized citizens, see SAC ¶ 31, some of whom may have been erroneously removed from the voter rolls. Not only is this theory based on pure speculation, but it is also simply a reprisal of the probabilistic-standing theory that the Supreme Court rejected in *Summers*. See 555 U.S. at 498. In that case, the Supreme Court held that even if there were a "statistical probability" that one of the organization's roughly 700,000 members would suffer an injury in fact, Article III still required the organization to "make specific allegations establishing that at least one *identified member* had suffered or would suffer harm." *Id*. at 497–98 (emphasis added).

The new allegations in the Second Amended Complaint describing pseudonymous members of the Plaintiff Organizations are still inadequate to establish associational standing. SAC ¶¶ 21, 25. Plaintiffs now point out two individuals, using only their initials, who Plaintiffs allege are American citizens and are members of at least one Plaintiff Organization. SAC ¶¶ 21, 25. But Plaintiffs do *not* allege that those individuals have been removed from the voter rolls at any point. Not before the 2024 election and not after. They allege simply that "A.S." and "K.V." are naturalized citizens who are a member of the League of Women Voters of Virginia and the executive director of an unidentified "member organization of VACIR," respectively. *Id.* ¶¶ 21, 25. Plaintiffs do not state that A.S. or K.V. has suffered any sort of injury, such as being removed from the voter rolls and not being reinstated in time to vote. *Ibid.* To the contrary, Plaintiffs allege that K.V. has voted in the past without any issue. *Id.* ¶ 21 ("Ms. V. has routinely voted in every federal election since she became a registered voter."). The addition of A.S. and K.V. to the complaint does nothing but demonstrate that Plaintiffs cannot find even a single identifiable person harmed by Virginia's efforts to remove noncitizens from the voter rolls. This Court previously relied on a document attached to a reply brief—a declaration from Joan Porte, ECF No. 103-1— as establishing associational standing. That declaration described an alleged member of the League of Women Voters of Virginia who was purportedly improperly removed from the voter rolls within 90 days of the 2024 federal elections. ECF No. 153 at 12–13. This Court should no longer rely on that declaration. If the unnamed person described in the Porte Declaration actually had standing, Plaintiffs presumably would have included facts about that person in their Second Amended Complaint. Instead, they conspicuously left out any allegations about that person and instead included facts about two uninjured members. SAC ¶¶ 21, 25. Nor did Plaintiffs attach the Porte Declaration to their Second Amended Complaint or even reference it. See *Moore v. Flagstar Bank*,

6 F. Supp. 2d 496, 500 (E.D. Va. 1997) (considering documents attached to a complaint at the motion-to-dismiss stage). Given that Plaintiffs made a deliberate choice not to rely on the unnamed person in the Porte Declaration, this Court should rule that Plaintiffs have failed to establish associational standing.[3]

Plaintiffs' failure to name a single member with standing, even after possessing the list of persons removed from the voter rolls for over a year, is unsurprising. As Defendants have maintained throughout this case, Virginia's practices for removing noncitizens from the voter rolls are accurate, and in the event there is a mistake, Virginia allows same-day reregistration. The only thing that Plaintiffs have shown to date is that the process works.

Plaintiffs likewise lack organizational standing. Organizations have standing "to sue on their own behalf for injuries they have sustained," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n. 19 (1982), but they still must satisfy the same standards for injury-in-fact, causation, and redressability that apply to individuals, *id.* at 378–79. Doing so is "substantially more difficult" when it is a third party who the law is being enforced against, not the organization itself. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). In meeting this heightened burden, "an organization may not establish standing simply based on" harm to its interests, "because of strong opposition to the government's conduct" or by "expending money to gather information and advocate against the defendant's action." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

The Second Amended Complaint, like the first, establishes no more than abstract organizational interests and voluntary budgetary decisions based on those interests. *Ibid.* The harm

---

[3] Defendants maintain that associational standing requires the identity of the relevant member to be disclosed. See *Summers*, 555 U.S. at 499. But because Plaintiffs now have zero individuals who could plausibly have standing, that point is less relevant.

that the Plaintiff Organizations repeatedly and commonly allege is that they were forced to "divert significant resources" away from voter-outreach and other community-building activities and "toward . . . attempting to mitigate the effects" of the so-called "Purge Program" on third parties. SAC ¶¶ 22, 24, 36. But the Fourth Circuit has long held that an organization's "own budgetary choices" concerning the allocation of funds, such as "educating members, responding to member inquiries, or undertaking litigation in response to legislation," are not enough to establish an injury in fact. *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (quoting *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)); see also *Tennessee Conf. of the NAACP v. Lee*, 105 F.4th 888, 903 (6th Cir. 2024) (per curiam) (explaining that "the decision to spend money to minimize the alleged harms" to other parties caused by government action did not supply organizational standing). Likewise, the Supreme Court has recently reaffirmed that an organization cannot establish standing simply because it feels compelled "to inform the public" or third parties about what they perceive as government-inflicted harm. *Alliance for Hippocratic Med.*, 602 U.S. at 395.

Far from bolstering it, the additional allegations in the Second Amended Complaint only undermine the Plaintiff Organizations' organizational-standing claim. For instance, the League of Women Voters of Virginia now alleges that it "has dedicated and continues to dedicate its member resources to attending monthly county Electoral Board meetings across the Commonwealth to understand effects of the Purge Program in each locality, as well as to piece together how the Program works in order to then accurately educate and communicate with members, voters, and the public." SAC ¶ 28. But expanding resources to gather information and educate members of the community is exactly what *Alliance for Hippocratic Medicine* held was insufficient to confer standing. 602 U.S. at 394 (explaining that "engaging in public advocacy and public education"

cannot grant standing). And if mere efforts to "understand" a law and its effects are sufficient to establish standing, then every single person in the country has standing to challenge every law. SAC ¶ 28.

Plaintiffs rely on *Havens Realty Corp.*, 455 U.S. at 368, as did this Court when it denied the previous motion to dismiss, ECF No. 153 at 9. But "*Havens* was an unusual case" that courts should not "extend . . . beyond its context," *Alliance for Hippocratic Med.*, 602 U.S. at 396, and it cannot rescue the Plaintiff Organizations' deficient standing claims. The plaintiff in that case, a housing-counseling provider, sent employees commonly referred to as "testers" to determine whether a real estate company was falsely telling black renters that no units were available. *Havens Realty Corp.*, 455 U.S. at 366 & n.1, 368. The Supreme Court held that the employer plaintiff suffered an injury in fact because lying to its employee testers "perceptibly impaired [the plaintiff's] ability to provide counseling and referral services." *Id.* at 379. As the Supreme Court explained, lying to the plaintiff's employees "directly affected and interfered with [the plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Alliance for Hippocratic Med.*, 602 U.S. at 395. That case thus dealt with a unique type of business injury and does not stand for the proposition that the diversion of resources based on an injury to a third party meets the "substantially more difficult" test to establish standing through an indirect harm. *Lujan*, 504 U.S. at 562. Indeed, because it was an employee of the organization in *Havens* that was discriminated against, that organization arguably did not even need to meet the heightened requirements to show standing through an injury to a third party.

In a similar vein, this Court relied on *RNC v. North Carolina State Board of Elections* in the previous motion-to-dismiss opinion, but that case is not dispositive. *RNC* held that an organization may have standing to challenge a law that directly harms its *already existing*

13

activities. 120 F.4th 390, 398 (4th Cir. 2024); see also *id.* at 410 (Diaz, J., concurring) ("[A]n organization 'must show that a challenged governmental action directly injures the organization's pre-existing core activities and does so *apart* from the plaintiffs' response to that governmental action.'").[4] The Plaintiff Organizations do not allege how removing noncitizens from the voter rolls harms their existing activities, besides from their own decisions to reallocate funds to help third parties.

## 2. The Individual Plaintiffs Lack Standing

The Second Amended Complaint adds two individual plaintiffs—Rina Shaw and Genet Shiferaw—but neither has standing. Both Shaw and Shiferaw are allegedly citizens who were removed from the voter rolls. But the Second Amended Complaint also acknowledges that both were able to reregister to vote and cast a ballot in the 2024 election. SAC ¶¶ 38–41. Thus, even assuming that they previously suffered a cognizable injury from being mistakenly, and temporarily, removed from the voter rolls, that injury ceased when they were restored to the rolls in time to vote—long before they joined this case. It is black-letter law that a past injury is insufficient to state a claim for prospective relief. *Lyons*, 461 U.S. at 106.

Shaw and Shiferaw thus must rely on the allegation that they are "confused, anxious, and fearful that [they] will be purged from the voter rolls again." SAC ¶¶ 38, 41. But the Supreme Court has already rejected this kind of fear-based standing without an underlying injury that is ongoing or imminent. In *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), the Court held that fear of an injury does not establish standing unless the injury itself is "certainly

---

[4] This Court appeared to interpret Judge Diaz's concurrence as disagreeing with the majority opinion in *RNC* and advocating for a "'stricter view' of organizational standing" than the majority did. ECF No. 153 at 11 n.4. But Judge Diaz joined the majority in full and was referencing the "stricter view" of organizational standing that other district courts had applied after *Alliance for Hippocratic Medicine*. He was not arguing for a different standard than the majority applied.

impending." See *id.* at 410. Otherwise, the "fear[] of hypothetical future harm" could provide a backdoor to Article III standing even if the harm itself was insufficiently imminent. *Id.* at 416. Or, as the Supreme Court explained in *Laird v. Tatum*, 408 U.S. 1 (1972), "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* at 13–14.

Shaw and Shiferaw's alleged confusion, anxiety, and fear that they will be removed from the voter rolls is not caused by a "certainly impending" injury. *Clapper*, 568 U.S. at 410. They provide no evidence at all to support their claim that they may be mistakenly removed from the voter rolls before the 2026 federal election, much less in the 90 days before that election. To the contrary, that both acknowledge they are presently registered to vote undermines any claim that they might be removed from the rolls in the future. SAC ¶¶ 38, 41.

Further, Ms. Shiferaw lacks standing for another reason: she never alleges that she was removed during the quiet period or for being a purported noncitizen. She alleges that "[o]n Election Day, [she] was informed she was not a registered voter and would have to use same-day registration to cast a provisional ballot." SAC ¶ 40. The fact she *learned* on election day that she was not registered, however, says nothing about when she was removed from the voter rolls. Nor does the fact that she was removed indicate that she was removed for being a noncitizen. There is nothing in the Second Amended Complaint that even hints at the reason she was removed from the voter rolls. Without alleging "when" and "why," Shiferaw cannot establish standing for either Count I or Count II.

## B. Any Quiet Period Provision claim is moot

Plaintiffs' claim that Virginia has violated the NVRA's Quiet Period Provision is moot, even if they had standing in the first place. The Constitution's "case-or-controversy requirement subsists through all stages of federal judicial proceedings . . . . [I]t is not enough that a dispute was

15

very much alive when suit was filed." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990). The plaintiff's stake in the lawsuit "must continue throughout its existence." *Friends of the Earth, Inc., v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000). Therefore, if "intervening factual . . . events effectively dispel the case . . . the federal courts are powerless to decide the questions presented." *Ross v. Reed*, 719 F.2d 689, 693–94 (4th Cir. 1983).

With the 2024 election in the rear-view mirror, Plaintiffs no longer have any stake in their quiet-period claims. Any harm to the organizations themselves from the removal of self-identified noncitizens from the voter rolls can no longer be linked to "allegedly unlawful conduct" by Defendants. *Allen*, 468 U.S. at 751. Any continuing effect on the "mission" of the organizations is now due to the removal process occurring *outside of* the 90-day quiet period. See 52 U.S.C. § 20507(c)(2)(A) (restricting removal only within 90 days of a federal election).

This Court previously held that the capable-of-repetition-yet-evading-review exception applied, ECF No. 153 at 20, but new facts undercut the assumption that Plaintiffs will once again be harmed. Most relevantly, Governor-elect Spanberger won the November election and will succeed Governor Youngkin by the time the next federal election is held in June of 2026. It is wholly speculative whether the Governor-elect will continue to implement what Plaintiffs call the "Purge Program." And even if Governor-elect Spanberger does continue to remove noncitizens from the voter rolls, it is unclear what that process will look like. Given these contingencies, and especially in light of Plaintiffs' focus on executive orders subject to future gubernatorial action, there is no longer a "reasonable expectation that the same complaining party will be subject to the same action again." *Wisconsin Right to Life v. FEC*, 551 U.S. 449, 462 (2007).[5]

---

[5] Because no member of the Plaintiff Organizations has standing in her own right, there is no need to discuss whether any individual members may be removed from the voter rolls once more. ECF No. 153 at 21 n.7.

C.    Sovereign immunity also bars Plaintiffs' claim under the Quiet Period Provision and all claims against the Attorney General

States are generally immune from suit unless they consent or Congress has validly abrogated their sovereign immunity, neither of which has happened here. See *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54, 58 (1996). Sovereign immunity applies in full force to alleged past violations of law, even if an equitable remedy is sought. See *Edelman v. Jordan*, 415 U.S. 651, 666 (1974). The *Ex parte Young* exception to Defendants' constitutional immunity from suit can apply only to the extent that Plaintiffs seek relief that is both "prospective" and targeted against "*ongoing* violations of federal law." *Bland v. Roberts*, 730 F.3d 368, 390 (4th Cir. 2013) (emphasis added); see *Ex parte Young*, 209 U.S. 123 (1908).

The conduct challenged by Plaintiffs in the Quiet Period Provision claim—initiating the removal of noncitizens from the rolls during the 90 days prior to the 2024 election—"occurred entirely in the past." *DeBauche v. Trani*, 191 F.3d 499, 505 (4th Cir. 1999). And to the extent that the ELECT Defendants continue to remove noncitizens from the voter rolls, their actions do not constitute an "ongoing" violation because those actions are not prohibited by the Quiet Period Provision.

Previously, this Court reasoned that placing a person back on the voter rolls could remedy an "ongoing" violation that occurred in the past, ECF No. 153 at 17, but no such persons are identified in the Second Amended Complaint. Without alleging the existence of an individual who would be placed back onto the rolls, Plaintiffs cannot rely on an analogy between reinstatement in the voting and employment context. See *ibid.*; *Coakley v. Welch*, 877 F.2d 304, 305, 307 n.2 (4th Cir. 1989). And to the extent that this Court relied on the fact that Defendants may remove individuals during a quiet period *in the future* to establish an ongoing violation, that holding is in

tension with *Allen v. Cooper*, 895 F.3d 337 (4th Cir. 2018), which refused to "conflate[] the *Ex parte Young* exception with the doctrine of mootness." *Id.* at 355.

Further, sovereign immunity bars all claims—not just the quiet-period claim—against the Attorney General. The *Ex parte Young* exception applies only to officials who bear a "special relation" to "the challenged statute." *McBurney v. Cuccinelli*, 616 F.3d 393, 399, 402 (4th Cir. 2010) (quotation marks omitted). As this Circuit has explained, the "[g]*eneral authority* to enforce the laws of the state" is insufficient to satisfy the *Ex parte Young* exception to a State's sovereign immunity. *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001) (quoting *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996)). "[T]he officer sued must be able to enforce, if he so chooses, the specific law the plaintiff challenges." *Doyle v. Hogan*, 1 F.4th 249, 254–55 (4th Cir. 2021).

The Attorney General of Virginia plays no role in enforcing Va. Code § 24.2-427(C). That law requires the "*general registrar[s]*" to "mail notice promptly to all persons known by him not to be United States citizens by reason of a report from the Department of Motor Vehicles . . . or from the Department of Elections based on information received from the Systematic Alien Verification for Entitlements Program (SAVE Program)." *Ibid.* (emphasis added). It does not give the Attorney General any role to play in the removal of noncitizens from the voter rolls.

This Court previously held that the Attorney General is a proper party because he has "full authority to enforce the election laws," including criminal prosecution of individuals who unlawfully vote. ECF No. 153 at 18. The ability to prosecute voter fraud, however, does not make the Attorney General the proper *Ex parte Young* defendant for a suit under the Quiet Period Provision or nondiscrimination provision. 52 U.S.C. §§ 20507(c)(2)(A); 20507(b)(1). Both provisions regulate the *process* for removing individuals from the voter rolls but say nothing about

18

investigating individuals who vote illegally. Plaintiffs fail to actually identify the "the specific law" that the Attorney General would apply against them. *Doyle*, 1 F.4th at 254–55.[6]

## II. Plaintiffs' claims are insufficient as a matter of law

Plaintiffs cannot state a claim. As a threshold matter, the NVRA's Quiet Period Provision does not apply to the removal of noncitizens from the voter rolls, just as it does not apply to the removal of minors or fictitious persons. As six judges on the Ninth Circuit have persuasively explained since Defendants filed their motion to dismiss the First Amended Complaint, the Quiet Period Provision only applies to the removal of *voters* who validly registered in the first place but who subsequently became ineligible, such as those who have since been convicted of a felony or have changed their residence. See *Mi Familia Vota*, 129 F.4th at 714–15 (Bumatay, J., dissenting); *Mi Familia Vota*, 152 F.4th at 1166 (Nelson, J., dissenting from the denial of rehearing en banc). Plaintiffs' quiet period claims also fail because Virginia's process for removing noncitizens is a highly individualized process to update voter rolls, not a "systematic" program. 52 U.S.C. § 207(c)(2)(A). Far from the kind of bulk mailing and door-to-door canvassing that Congress contemplated as "systematic" programs, the Commonwealth's noncitizen removal process focuses narrowly on specific individuals who have declared themselves to be noncitizens and involves contacting each such individual—twice—to give the individual an opportunity to correct the record by affirming his citizenship.

The additional two NVRA claims also fail. The "nondiscriminatory" claim under 52 U.S.C. § 20507(b)(1) should be dismissed because the noncitizen removal process is facially neutral and

---

[6] This point is equally applicable on the merits of the claims against the Attorney General. For instance, the Quiet Period Provision states "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). It says nothing about investigations for unlawful voting.

not enacted with discriminatory intent. Likewise, the claim for information related to Virginia's process used to remove noncitizens from the voter rolls has been rejected by the only federal appellate court to address it. See *Greater Birmingham Ministries*, 105 F.4th at 1332.

### A.    Defendants did not violate the NVRA's Quiet Period Provision

Plaintiffs claim that Defendants violated the NVRA's Quiet Period Provision, which prohibits the removal of some classes of individuals from the voter rolls within 90 days of an election. See 52 U.S.C. § 20507(c)(2). Their claims fail for at least two reasons: first, the Quiet Period Provision does not apply to the removal of individuals who were never eligible to register in the first place, such as noncitizens; and second, Virginia's process was not "systematic" within the meaning of the provision.

### 1.    The NVRA does not restrict removing noncitizens and other persons whose registrations were invalid *ab initio*

The NVRA's Quiet Period Provision does not apply to the removal of individuals, such as noncitizens, whose registrations were void *ab initio* and thus who were never eligible to vote in the first place. See *Mi Familia Vota*, 129 F.4th at 753 (Bumatay, J., dissenting). Virginia's removal of noncitizens within 90 days of the election therefore does not violate the provision.

The NVRA governs "the administration of voter registration for elections for Federal office." 52 U.S.C. § 20507(a). Section 8 provides that "State[s] shall . . . ensure that any *eligible applicant* is registered to vote." *Id.* § 20507(a)(1) (emphasis added). The instruction is simple: applicants who are "eligible" must be "registered" by the State. *Ibid.* The inverse is equally obvious: those who are not "eligible" shall not be "registered." *Ibid.*; see also *Mi Familia Vota*, 129 F.4th at 754 (Bumatay, J., dissenting).

Section 8 then provides various ways that an applicant with a "valid voter registration form" can register, such as through the DMV. See *id.* § 20507(a)(1)(A)–(D) (emphasis added).

Once the "eligible applicant['s]" "valid voter registration form" is accepted, the statute refers to him as a "registrant," and provides him certain protections from removal. *See id.* § 20507(a)(3); *see also Mi Familia Vota*, 129 F.4th at 754 (Bumatay, J., dissenting). Section 8 next provides, in the General Removal Provision, how a "registrant" can be permissibly removed from the list of "eligible voters." 52 U.S.C. § 20507(a)(3). The "name of a registrant may" be removed only in four enumerated circumstances: voluntary removal of the registrant, felony conviction or adjudication of mental incapacity, death of the registrant, or change in residence. *Id.* § 20507(a)(3)–(4).

The removal restrictions become stricter in the 90 days before a federal election. At that point, the Quiet Period Provision prohibits "systematic" removal programs targeting a subset of registrants: "ineligible voters." *Id.* § 20507(c)(2). Carved out of this prohibition, however, are three of the four exceptions from the General Removal Provision: request of the registrant, criminal conviction or mental incapacity, and death of the registrant. *Id.* § 20507(c)(2)(B).

In short, an "eligible applicant" becomes a "registrant" upon filing a "valid voter registration form," and is then protected from removal from the "list of eligible voters" unless such removal is pursuant to one of four enumerated exceptions. 52 U.S.C. § 20507(a)(1)(A)–(D). Within 90 days of an election, the rules get stricter, with the "systematic" removal of "ineligible voters" being prohibited, subject to three of the four exceptions. *Id.* § 20507(c)(2)(A). But the NVRA does not prohibit the removal from the voter rolls of persons, such as noncitizens and minors, who were never "eligible applicant[s]" to begin with and thus could not become "registrant[s]" or "voters" in the first place. *Id.* § 20507(a)(1), (3), (c)(2)(B); *Mi Familia Vota*, 129 F.4th at 755 (Bumatay, J., dissenting) ("[F]oreign citizens are excluded from the terms 'registrant[s],' 'eligible voters' and 'ineligible voters.'"). It follows that the Quiet Period Provision

does not cover noncitizens at all. Accordingly, Virginia's removal of noncitizens within 90 days of the election did not violate federal law. *Mi Familia Vota*, 152 F.4th at 1166 (Nelson, J., dissenting from the denial of rehearing en banc) ("Ineligible voters . . . comprise individuals eligible to vote at the time of their registration who become ineligible to vote subsequently." (cleaned up)).

The plain text of the Quiet Period Provision confirms this logical chain. The term "voter," standing alone, excludes noncitizens. A "voter" is "one who has a right to vote." *Voter*, The Compact Edition of the Oxford English Dictionary, Oxford University Press (1980); see *Voter*, Merriam-Webster, https://tinyurl.com/2s32xcve (last accessed Nov. 6, 2025) (a person who "votes or has the legal right to vote"). The adjectives "eligible" or "ineligible" then divide the term "voters" into two subsets of "voters." An "eligible voter" is a person who is "qualified" to participate in a given election. *Eligible*, The American Heritage Dictionary, Houghton Mifflin Co. (2nd Coll. Ed. 1985); see *Eligible*, Merriam-Webster, https://tinyurl.com/5c79v97t (last accessed Nov. 6, 2025) (same); *Eligible*, The Compact Edition of the Oxford English Dictionary ("Fit or proper . . . for an office or position"). On the other hand, an "ineligible voter" is a person who had the "right to vote" but is "not qualified" in a given election. *Ineligible*, The American Heritage Dictionary. For example, a voter or registrant could become ineligible because he has moved away, been convicted of a felony, or been declared mentally incapacitated. See 52 U.S.C. § 20507(a)(3)(B), (a)(4)(B).[7]

---

[7] The argument that "voter" and "registrant" cannot be rough synonyms is unpersuasive: § 20507 uses the terms interchangeably. *Compare, e.g.*, 52 U.S.C. § 20507(a)(3) (referring to when a "registrant" may "be removed" from the "list of eligible voters") and (a)(4) (referring to when "ineligible voters" may be removed from the "list of eligible voters," including upon "death of the registrant" or "change in residence of the registrant"); see *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 148 (2023) (holding that "contextual clues persuade us" that federal statute used two different terms "as synonymous").

Thus, the Quiet Period Provision restricts programs with the "purpose" of "systematic[ally]" removing voters—those who had the "right to vote," but who are no longer "qualified" to vote in a given election (for instance, because they moved to a different jurisdiction). See *Mi Familia Vota*, 152 F.4th at 1166 (Nelson, J., dissenting from the denial of rehearing en banc). The plain text of the Quiet Period Provision therefore does not prohibit removing from the rolls individuals who never could have validly registered in the first place because such individuals were never "eligible voters" or even "ineligible voters." 52 U.S.C. § 20507(c)(2)(A). They are not "voters" or "registrants" at all. Therefore, States are free to systematically remove noncitizens, as well as minors and fictitious persons, at any time including within 90 days of an election, without running afoul of the NVRA.

To the extent that any confusion remains, the canon of constitutional avoidance counsels against interpreting "voter," eligible or ineligible, to include noncitizens. Doing so would lead to "absurd results and raise serious constitutional concerns." *Mi Familia Vota*, 129 F.4th at 756 (Bumatay, J., dissenting). States decide who can vote, and the Supreme Court has explained that it would "raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013). Going even further to prohibit States from removing noncitizens without an individualized inquiry would, at a bare minimum, raise "serious constitutional doubts" about the quiet period's validity. *Ibid.*

This Court previously concluded that noncitizens were protected by the Quiet Period Provision, but Defendants respectfully request that it reconsider its ruling. The primary basis for the Court's holding was the Fourth Circuit's denial of the stay pending appeal. See ECF No. 153 at 22–23. But the Supreme Court disagreed with the Fourth Circuit and granted the stay. *Beals*,

2024 WL 4608863. And since then, the Supreme Court has reiterated that lower courts should take heed of its rulings, even those on the emergency docket. See *Trump v. Boyle*, 145 S. Ct. 2653 (2025); see also *National Inst. of Health v. American Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (mem.) (Gorsuch, J., concurring in part) (similar). This Court's conclusion that "at best, the Supreme Court merely preferred the case go through the litigation and appeal process while staying this Court's Order in the interim," ECF No. 153 at 23 n.9, appears inconsistent with Supreme Court caselaw. Indeed, under any standard for granting a stay pending appeal in the *Purcell v. Gonzalez*, 549 U.S. 1 (2006), context, the merits are a crucial stay factor. *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring in grant of applications for stays).

### 2. Defendants' removal of noncitizens was "individualized" and not "systematic"

Even if this Court does not reconsider its holding that the NVRA's Quiet Period Provision applies to the removal of persons who were never eligible to vote, Virginia's process does not have the "purpose" of "systematic[ally]" removing voters from its rolls. 52 U.S.C. § 20507(c)(2)(A).

The Quiet Period Provision prohibits States from operating any "program" whose "purpose" is to "systematic[ally]" remove voters from the rolls fewer than 90 days before the election. 52 U.S.C. § 20507(c)(2)(A). But the Quiet Period Provision allows removals during this 90-day period if the actions are performed on an individualized basis. See 52 U.S.C. § 20507(c)(2)(B); see also *Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1348 (11th Cir. 2024) ("[T]he 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information, even within the 90–day window.").

Virginia's method for determining citizenship falls on the "individualized" side of the line. *Arcia*, 772 F.3d at 1348. As Plaintiffs readily admit, DMV forwards the names of individual self-declared noncitizens to ELECT, which matches them to the VERIS database, generally by using

24

"an exact match of Social Security Number, first name, last name, and date of birth." SAC ¶ 48. If the individual appears to match a person on the voter rolls, ELECT forwards the self-declared noncitizen to the local registrar who then manually reviews each entry on the list. See *id.* ¶ 49. There is a third step of individualized review when the local registrar mails the Notice of Intent to Cancel to each self-declared noncitizen, at which point he has an individual opportunity to address any issue with ELECT's records by mailing back within 14 days a pre-printed form affirming his citizenship. *Id*. ¶ 53. As the Supreme Court has noted with respect to this very type of procedure, "a reasonable person with an interest in voting is not likely to ignore notice of this sort" and thus can be expected to "take the simple and easy step of mailing back the preaddressed, postage prepaid card." *Husted v. A. Phillip Randolph Institute*, 584 U.S. 756, 779 (2018). And if he does not return the pre-printed affirmation of citizenship, he is sent a Voter Registration Cancellation Notice, which invites him *a second time* to contact the local registrar to correct any mistake concerning his citizenship.

The process thus begins with a personal attestation of noncitizenship, requires multiple levels of review to ensure a match, and ends in the removal of that person from the voter rolls only after he has been sent two letters offering opportunities for an individual corrective response. And, as the new allegations relating to Ms. Shaw point out, a person who believes she has been wrongly removed from the rolls can simply call and have her name put back on. SAC ¶ 41. This is the definition of an individualized process.

ELECT did conduct a one-time *ad hoc* examination of the voter rolls using legal presence documents indicating noncitizenship on file in DMV, coupled with a *fresh* search of the SAVE database. See ECF No. 23-1 at 3-4; Va. Code § 24.2-404(E) ("The Department shall apply to participate in the [SAVE Program] for the purposes of verifying that voters listed in the Virginia

voter registration system are United States citizens."); see also SAC ¶ 8 (alleging that Defendants use "databases from the DMV or other sources"). But the *ad hoc* search—which was separate from the individualized process of removing self-declared noncitizens described above—was not "systematic" either. The same individualized verification procedures as described were used, from ELECT's matching process to the local registrars' manual review and sending of letters. In any event, the *ad hoc* examination is not ongoing and therefore cannot be the basis of prospective relief in this suit. See Part C, *supra*.

### 3.    The Individual Plaintiffs lack a cause of action

Even if this Court concludes that Plaintiffs are correct on the meaning of the Quiet Period Provision, Plaintiffs Shaw and Shiferaw should be dismissed from this case because they lack a cause of action to sue. The NVRA only allows "aggrieved" parties who have notified the relevant state officer to initiate a lawsuit. 52 U.S.C. § 20510(b)(1). After notice, if "the violation is not corrected," the aggrieved party can sue in federal district court. *Id*. § 20510(b)(2)

Any potential "violation" of the NVRA that would have made Shaw and Shiferaw "aggrieved parties" had long been "corrected" by the time they even notified the relevant Virginia officer, much less filed this lawsuit. 52 U.S.C. § 20510(b)(1). As Shaw and Shiferaw concede, they were able to cast votes in 2024 and are currently entitled to vote because they are on the voter rolls. SAC ¶¶ 38, 41. Thus, any potential NVRA violation with respect to them was "corrected." 52 U.S.C. § 20510(b)(1). And because only uncorrected NVRA violations authorize a person to sue, their claims must be dismissed. *Ibid.*

### B.    Defendants' process for removing noncitizens is nondiscriminatory

Plaintiffs' second count alleges that Virginia's process for removing noncitizens does not qualify as "nondiscriminatory" under the NVRA. 52 U.S.C. § 20507(b)(1). This Court previously

held that Plaintiffs stated a claim because the term "nondiscriminatory" creates a disparate-impact standard. ECF No. 153 at 24–25. Defendants ask that the Court reconsider the holding.

In addition to the language in *Husted*, 584 U.S. at 779, implying that "discriminatory intent" was required to violate the nondiscrimination provision, a long line of election-law precedent interprets the term to mean "without discriminatory intent" or "not facially discriminatory." Only a year before Congress enacted the NVRA, the Supreme Court weighed in on the constitutionality of a statute that prohibited "write-in" votes. See *Burdick v. Takushi*, 504 U.S. 428, 430 (1992). There was no question that the statute had a disparate impact on certain political groups, yet the Supreme Court applied the doctrinal test for politically "nondiscriminatory" regulations because the statute made no classifications on its face and was not enacted with discriminatory intent. *Id.* at 434. Likewise, the Supreme Court used the term "nondiscriminatory" as a synonym for "generally applicable" in *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983), which was also decided before the enactment of the NVRA. *Id*. at 788 n.9. The Supreme Court has continued to use the term "nondiscriminatory" to reference intentional or facial discrimination since then. For example, in the Supreme Court's marquee case concerning voting regulations that have a disparate impact, *Crawford v. Marion County Election Board*, 553 U.S. 181, 196–97, 206 (2008), both Justice Stevens's plurality and Justice Scalia's concurrence described Indiana's voter-ID law as "nondiscriminatory" because it was facially neutral.

To be sure, these cases did not concern alleged discrimination based on national origin (as compared to political viewpoint or race), but the fact remains that the term "nondiscriminatory" has been consistently used in the election-law context to refer to policies that do not discriminate facially or intentionally. This Court instead relied on two out-of-circuit cases that appeared to read "nondiscriminatory" to create a disparate-impact standard, ECF No. 153 at 24, but neither of them

undertook any in-depth analysis of the term or discussed the Supreme Court's consistent usage of "nondiscriminatory" to mean facially neutral.

Properly viewing "nondiscriminatory" in light of these precedents, Defendants plainly comply with the NVRA because they are not classifying *anyone* based on that person's national origin or status as a naturalized citizen. A person is subject to the noncitizen removal process only when that person states contemporaneously on a DMV form that he is not an American citizen, or when his DMV documentation, confirmed by a fresh SAVE search, indicates a lack of citizenship. SAC ¶ 70; ECF No. 23-2 at 3–4. Nothing in this process discriminates against individuals on the basis of naturalized citizenship or national origin. If a natural-born citizen erroneously answers "no" to the citizenship question on a DMV form, he is treated the same as a naturalized citizen who erroneously checks the "no" box. The complaint makes no allegations to the contrary. Both individuals will receive a letter in the mail asking them to clarify their citizenship and will remain on the rolls if they respond to the letter confirming their citizenship status. SAC ¶ 50.

## C.    Plaintiffs' claim for information under the NVRA fails

Plaintiffs' claim under the NVRA's public-inspection provision should also be dismissed. See 52 U.S.C. § 20507(i) ("Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."). Plaintiffs allege that Defendant Beals violated their right to "public inspection" by "refusing to provide Plaintiffs with the list of voters identified as potential noncitizens." SAC ¶ 98.

Plaintiffs have failed to state a claim. The public-inspection provision of the NVRA does not give any person an unfettered right to *receive* state voting records in any way he pleases. As the Eleventh Circuit has made clear, the phrase "public inspection" has definite meaning in the

information-litigation realm, and it does not require the *production* of documents. *Greater Birmingham Ministries*, 105 F.4th at 1332.

The phrase "public inspection" was transplanted from its original location in FOIA's "reading room provision," which allowed individuals to come to the agency in-person and review documents in a physical room. Michael Herz, *Law Lags Behind: FOIA and Affirmative Disclosure of Information*, 7 Cardozo Pub. L., Pol'y & Ethics J. 577, 586–87, 591 (2009). If a document was available for "public inspection," it was "exempted from an agency's FOIA obligation to produce records upon request." *Greater Birmingham Ministries*, 105 F.4th at 1332. Thus, the "public inspection" requirement does not force States to produce documents to private parties. 52 U.S.C. § 20507(i). It simply requires them to open the doors to the file room if the party shows up in person and requests to see them.

Plaintiffs do not request in-person access to a file room in Richmond. They request that Defendants produce the requested records. ECF No. 23-7 (copy of document request). Production and inspection are not the same thing, and a right to one does not create a right to the other. See *Greater Birmingham Ministries*, 105 F.4th at 1332. They therefore fail to state a claim under the "public inspection" provision. 52 U.S.C. § 20507(i)

Plaintiffs do not attempt to plead facts sufficient to invoke the photocopy requirement in the Public Inspection Provision, and for good reason. That provision mandates that States "shall" provide for, "where available, photocopying [of voting records] at a reasonable cost." 52 U.S.C. § 20507(i). This provision, as it plainly states, creates a mandatory duty to (1) furnish "photocopies" when they are (2) "available" to create at a (3) reasonable price. *Ibid.* The complaint does not attempt to explain how "photocop[ies]" of the electronic data it requests are "available." 52 U.S.C. § 20507(i)(1). Indeed, the word "photocopy" does not appear in the complaint a single

29

time. Without these allegations, the complaint does not create a plausible inference that Plaintiffs are entitled to relief.

Even if Plaintiffs did attempt to invoke this provision, their attempt would fail. A photocopy is "a photographic reproduction of (printed or graphic material)." *Photocopy*, The American Heritage Dictionary of the English Language (3d ed. 1992). And as the Eleventh Circuit plainly put it, a "photocopy" does not "include electronic production." *Greater Birmingham Ministries*, 105 F.4th at 1334. "As any former intern can tell you, if your boss asks for a photocopy of a document, you walk over to the photocopier, feed the original into the machine, and return with a physical, printed copy." *Ibid.* One cannot "photocopy" a database. The complaint is clear that the data being sought is contained in "databases," and does not seek paper copies of physical files. SAC ¶¶ 8, 48, 49, 71.

This Court concluded otherwise, but it did so based on a seeming misunderstanding of Defendants' argument. The Court construed Defendants' argument to be that electronic records were *per se* excluded. ECF No. 153 at 31. But Defendants' argument is that they have no obligation to "produce" any records whatsoever. That is what the Eleventh Circuit held in *Greater Birmingham Ministries*, and that decision is correct. Because Defendants have no obligation to produce documents, it is irrelevant that the NVRA's public-inspection provision covers a broad category of documents. *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 336–38 (4th Cir. 2012). What documents the NVRA covers and what the NVRA requires parties to do with those documents are two different questions.

## CONCLUSION

This Court should dismiss the complaint.

Dated: November 6, 2025

Respectfully submitted,

**SUSAN BEALS**, in her official capacity as Virginia Commissioner of Elections; **JOHN O'BANNON**, in his official capacity as Chairman of the State Board of Elections; **ROSALYN R. DANCE**, in her official capacity as Vice-Chairman of the State Board of Elections; **GEORGIA ALVIS-LONG**, in her official capacity as Secretary of the State Board of Elections; **CHRISTOPHER P. STOLLE**, and **J. CHAPMAN PETERSEN**, in their official capacities as members of the State Board of Elections; and **JASON MIYARES**, in his official capacity as Virginia Attorney General

By:   */s/ Thomas J. Sanford*
          Thomas J. Sanford (VSB #95965)
          *Deputy Attorney General*

Jason S. Miyares
  *Attorney General*
Kevin M. Gallagher (VSB #87548)
  *Solicitor General*
Graham K. Bryant (VSB #90592)
  *Principal Deputy Solicitor General*

Charles J. Cooper *(Pro Hac Vice)*
Bradley L. Larson *(Pro Hac Vice)*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

*Counsel for Defendants Susan Beals, John O'Bannon, Rosalyn R. Dance, Georgia Alvis-Long, Christopher P. Stolle, J. Chapman Petersen, and Attorney General Jason Miyares*

31

## **CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on November 6, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all parties of record.

            */s/ Thomas J. Sanford*
            Thomas J. Sanford (VSB #95965)
            *Deputy Attorney General*