**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |
|---|---|
| VIRGINIA COALITION FOR IMMIGRANT RIGHTS, *et al.*,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>STEVEN KOSKI, in his official capacity as Virginia Commissioner of Elections, *et al.*,<br><br>    *Defendants*. | Case No. 1:24-cv-01778<br>Judge Patricia Tolliver Giles |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
THE REPUBLICAN NATIONAL COMMITTEE'S MOTION TO INTERVENE**

Defendants Steven Koski, in his official capacity as Virginia Commissioner of Elections; John O'Bannon, in his official capacity as Chairman of the State Board of Elections; Rosalyn R. Dance, in her official capacity as Vice-Chairman of the State Board of Elections; Georgia Alvis-Long, in her official capacity as Secretary of the State Board of Elections; Christopher P. Stolle and Sally Hudson,[1] each in their official capacity as a member of the State Board of Elections; and Jay Jones, in his official capacity as Virginia Attorney General (collectively "Defendants") state as follows for their memorandum in opposition to the Republican National Committee's ("the RNC") Motion to Intervene:

**INTRODUCTION**

More than four months after Jay Jones was elected as Virginia's next Attorney General, more than two months after Attorney General Jones assumed office, and a mere five days before

---

[1] John Chapman Petersen is no longer a member of the State Board of Elections ("SBE"). The new member of the SBE and the proper named Defendant is Sally Hudson.

the end of discovery in the instant litigation, the RNC moved to intervene in this case. Such intervention is inappropriate and should not be permitted. The RNC has failed to articulate a sufficient basis for its intervention by right or by permission and, therefore, its motion should be denied.

Through their complaint, Plaintiffs seek declaratory and injunctive relief against the Defendants – alleging that the "Purge Program" undertaken by former Governor Glenn Youngkin (as set forth in his Executive Order 35) violates the National Voter Registration Act by undertaking systematic voter roll maintenance during the federal election 90-day quiet period and that other aspects of Virginia's regular voter roll maintenance procedures throughout the year are not uniform and are discriminatory. This lawsuit was filed in fall 2024 and the RNC previously affirmatively declined to intervene. Only two developments have altered the status quo. As stated in their motion, the RNC seeks to intervene now because the parties may be undertaking settlement discussions – a normal and typical occurrence in any litigation at this late phase of the case. Also, former Governor Youngkin's Executive Order 35 was restated and replaced by Governor Spanberger's Executive Order 13, dated March 24, 2026. Neither change justifies the RNC's intervention as of right *nor* permissive intervention.

The RNC's request to intervene should be denied for multiple independent reasons. At the outset, the RNC should not be rewarded for being purposely dilatory. Intervention would needlessly inject a new party into litigation already pending for nearly two years. Discovery is all but concluded and the parties are in a post-discovery posture. Intervention as of right at the eleventh hour after deliberately remaining on the sidelines is prohibited as untimely by Fed. R. Civ. P. 24(a)(2). In addition, Fed. R. Civ. P. 24(a)(2) separately prohibits intervention as of right here because the RNC's interests are indistinguishable from the interests of every registered voter.

2

Even if sufficiently unique, the RNC's interests are adequately represented by the existing Defendants. Likewise, permissive intervention under Fed. R. Civ. P. 24(b)(3) is precluded because intervention would cause undue delay and would prejudice the existing parties' rights.

It appears the RNC actually seeks to reinstate, in its entirety, former Executive Order 35 ("EO 35"), promulgated by Virginia's previous governor. EO 35 effectively required certain regular reviews during the 90 days before a general election. But EO 35 was "restate[d] and replace[d]" by Governor Spanberger's Executive Order 13 ("EO 13"), effective March 24, 2026. Consequently, the procedures required by EO 35 no longer exist as directives to Virginia's executive branch. So, there is no lawful basis for any party, much less a putative intervenor, to litigate any entitlement to the continuation of EO 35.

The RNC's intervention may also be best understood not as an attempt to intervene to protect the language and purpose of Virginia Code § 24.2-427(C), an effort continuously and still pursued by the Defendants, but as RNC's attempt to resurrect and defend directives in a defunct executive order. As happened here, an executive order can be modified or overruled at the discretion of the current Governor, consistent with applicable law and Constitutional constraints.

Moreover, if the Motion to Intervene were to be granted, the Defendants would then be adverse not only to Plaintiffs, who seek relief the Defendants oppose, but also to a new partisan entity seeking to enforce policy preferences which no party in the case desires and which is not an appropriate reason for intervention. In effect, the RNC's intervention would impermissibly allow it to impose a former Governor's policy—a policy that was rescinded and replaced by the current office-holder. That is a position not articulated or described in any part of the litigation of this case to date. To alter the nature of the case, however, both at this late date and in this sweeping manner, is not permissible under Rule 24.

3

The RNC fails to satisfy the requirements for intervention as of right under Federal Rule of Civil Procedure 24(a)(2) and further fails to establish any basis for permissive intervention under Rule 24(b). Accordingly, its motion should be denied. To the extent the RNC wishes to offer its views in this matter to the Court, *amicus curiae* participation—not full-party intervention—is the appropriate vehicle.

## ARGUMENT

### I.    The RNC is Not Entitled to Intervention as of Right Under Rule 24(a)(2).

Under Rule 24(a)(2), a court must permit anyone to intervene 1) who files a "timely" motion, 2) who "claims an interest relating to the property or transaction that is the subject of the action," 3) who is "so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest," and 4) whose interest is not "adequately represent[ed]" by "existing parties." Fed. R. Civ. P. 24(a)(2). The movant bears the burden of establishing each element. *Stuart v. Huff*, 706 F.3d 345, 349 (4th Cir. 2013). The RNC cannot carry its burden.

#### A.    The Motion to Intervene Is Untimely

Timeliness is a threshold requirement for intervention under both Rule 24(a) and Rule 24(b). *NAACP v. New York*, 413 U.S. 345, 365 (1973). Whether a request to intervene is timely "is to be determined from all the circumstances" and rests within the sound discretion of the court. *Id.* at 366. In the Fourth Circuit, courts consider three factors: "first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion." *Alt v. EPA*, 758 F.3d 588, 591 (4th Cir. 2014). Each factor weighs against the RNC's intervention here.

As to element one, this case has progressed far beyond its initial stages. The action was filed in 2024, has been litigated through a second amended complaint, and discovery was set to

close on March 30, 2026—just five days after the RNC filed its motion on March 25, 2026. Although a brief extension through the end of April has been granted for limited remaining discovery, the case is well into its final pretrial stage. The RNC's suggestion that the case is not "so near to its final resolution" that intervention would "arrest the momentum of the lawsuit" is belied by the procedural record. Inserting a new party at this juncture—no matter how willing that party claims it will be to abide by existing deadlines—necessarily alters the litigation dynamics in favor of unnecessarily extending the time of the case's conclusion.

As to element two, the RNC's intervention would prejudice the existing parties. The RNC claims that it will not seek additional discovery. Despite the RNC's assertions, it is improbable that the addition of a new party who claims independent litigation interests will not necessitate the need for discovery from any of the parties. An intervening party has all the privileges of any other party. It may file motions, raise objections, participate in dispositive briefing, and take positions at trial. An intervening party may seek to introduce evidence at trial or in advance of summary judgment or raise questions or issues that will require the parties to respond, perhaps with evidence of their own. Even if the RNC were to refrain from propounding discovery, the existing parties would be at a distinct disadvantage if they were to proceed to trial without discovering the basis of RNC's claims, the evidence it intends to present at trial, or numerous other pieces of information ordinarily exchanged in the course of a case. In addition, judicial economy would be thwarted if the RNC were permitted to enter the case at such a late date. The myriad ways that the RNC, by its own admission, perceives itself to be adverse to all the other parties in the case will likely complicate, delay, or increase the expense of this litigation. Indeed, the RNC explicitly states that it will raise arguments and advocate different positions than those adopted by the existing defendants. ECF No. 234-1 at 13 (RNC's interests "are likely adverse" to the Defendants). Existing

5

parties must have the opportunity to fully inquire about the foundation, premise, or support for these arguments. These inquiries will be a source of additional complexity, burden, and potential delay. The parties are preparing for summary judgment briefing, and the introduction of a new party will disrupt the Court's carefully managed schedule and upend the litigation in its final stages.

Finally, the third factor also weighs against the RNC's intervention. The RNC's explanation for its delay is unpersuasive, and its reliance on *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 323 F.R.D. 553 (E.D. Va. 2018) to excuse that delay is misplaced. In *Steves*, the court found the intervenors' delay excusable because "the Intervenors' failure to file their motions until this late stage ha[d] more to do with JELD-WEN's tactics than the Intervenors' own actions." *Steves & Sons, Inc. v. JELD-WEN, Inc.* 323 F.R.D. 553, 558 (E.D. Va. 2018). That finding rested on a specific and extraordinary factual background that bears no resemblance to the circumstances here.

Late in the *Steves* case, JELD-WEN engaged in a series of deliberate litigation maneuvers that unexpectedly created the need for intervention – for the first time. *Id.* at 560-61. When JELD-WEN filed its counterclaims, it was "confronted . . . with the choice of suing all defendants in Texas, or suing only Steves in this Court" and chose the latter, leading the intervenors to reasonably conclude they would not be sued individually. *Id*. at 560. JELD-WEN then litigated its counterclaims in federal court for nearly six months before abruptly filing a lawsuit against the intervenors in Texas state court, less than two weeks after the court dismissed several of its counterclaims. *Id.* The court found that this maneuver "strongly suggests that JELD-WEN changed its litigation strategy primarily to avoid the Court's adverse ruling." *Id*. JELD-WEN then moved to voluntarily dismiss its federal counterclaims entirely, a motion the court denied. *Id*. at 561. In essence, *Steves* was a case in which a party's tactical forum-shopping and strategic maneuvering

6

directly and unforeseeably implicated the intervenors' individual interests for the first time, prompting their intervention. The intervenors had no reason to intervene until those tactics unfolded. The RNC's situation in the case at bar is different in every material respect.

The RNC has been aware of this litigation and any stake in its outcome since the case's inception. The RNC is a sophisticated, national organization that routinely monitors and intervenes in election-law litigation across the country—including in a virtually identical NVRA challenge in Arizona, *DNC v. Hobbs*, No. 2:22-cv-01369 (D. Ariz.), where the RNC sought intervention at the outset. The RNC claims it delayed acting here because its interests were "adequately represented" by the former Republican Attorney General, an acknowledgement that the RNC knew of this case and its interest all along. The *Steves* intervenors, by contrast, "could have reasonably concluded that JELD-WEN would never sue them in any forum[,]" *Id*. at 560, because the prospect of individual liability "diminished with each month that JELD-WEN litigated its counterclaims." *Id*. at 560, n.6. No comparable logic applies here. The RNC's interest in Virginia's election laws did not diminish over time; its putative interests remained constant and fully known throughout.

Second, the event that purportedly triggered the RNC's need to intervene, the new Attorney General's indication that he was exploring a resolution to the case, was entirely foreseeable. The RNC knew in November 2025 that a new Governor and Attorney General would take office on January 20, 2026, and the possibility that a change in administration might lead to a change in litigation posture is an inherent and well-known risk in cases where government officials are named defendants. The RNC tacitly admits as much when its declarant explicitly stated that the RNC stopped believing its interests were being adequately represented on the sole basis that the new Attorney General was of a different political party. ECF No. 234-1, Ex. A, ¶ 13 ("The RNC previously believed its interests to be adequately represented by former *Republican* Attorney

General Jason Miyares. But since Attorney General Miyares has left office, the RNC no longer believed its interests are being adequately represented in this case by the new *Democratic* Attorney General Jay Jones.") (emphasis added).

The election of Governor Spanberger and Attorney General Jones occurred more than four months prior to the RNC's motion to intervene. The RNC had ample time to prepare and file a motion before this, the eleventh hour. Instead, the RNC waited more than two months after Attorney General Jones assumed office and filed only five days before the discovery cutoff. In *Steves*, the triggering event for the intervention was genuinely unforeseeable. Here, given the RNC's focus on the party affiliation of Attorney General Jones the RNC could and should have anticipated its objections to this scenario and acted accordingly. Notably, it is the RNC that is engaged in gamesmanship here. As early as October 2024, legal counsel for the RNC contacted the Office of the Virginia Attorney General regarding possible intervention. It did not, however, move to intervene. The RNC's willful delay, resulting in an untimely motion to intervene ought not be rewarded with the tactical advantages it may realize by a late entry into the case and the logistical, financial, and orderly administration consequences it would impose on the existing parties.

Third, the RNC cannot credibly characterize what it claims is a change in posture as a "tactic" of the sort that excused the delay in *Steves*. The "tactics" in *Steves* were deliberate litigation maneuvers by the opposing party: strategic forum-shopping, an abrupt change in litigation strategy to avoid an adverse ruling, and an attempted voluntary dismissal of counterclaims. Here, the Defendants have not engaged in any such gamesmanship or posturing as "tactics." Discovery in this matter is almost at a close, and settlement discussions at this late stage in litigation are a routine and encouraged feature of litigation. The mere possibility of settlement,

8

and the RNC's displeasure with that possibility, does not establish a concrete, particularized threat to the RNC's interests that would excuse months of deliberate inaction.

The RNC's delay is inconsistent with the diligence demanded by Rule 24. *See NAACP v. New York*, 413 U.S. at 365–66. The RNC knew of this case from its inception, knew which of its interests might be at stake, affirmatively declined to intervene at an earlier stage, and made a strategic choice to rely on the defense by a prior Attorney General, even after his electoral defeat. That gamble is precisely the kind of calculated risk that the timeliness requirement is designed to guard against. *Alt*, 758 F.3d at 591 (finding that intervenor's motion was untimely where it "gambled and lost in the execution of [its] litigation strategy."). The RNC should not be permitted to wait months after a political transition in state government and then claim that the predictable and legally required transition created an urgency necessitating its intervention in a nearly-concluded case.

**B.      The RNC Lacks a Sufficiently Direct and Legally Protectable Interest.**

To intervene as of right, the RNC must demonstrate "an interest relating to the property or transaction that is the subject of the action" and show that "disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." Fed. R. Civ. P. 24(a)(2). The interest must be "direct and substantial[,]" and "significantly protectable[.]" *Kalos v. Wisenbaker Holdings, LLC*, No. 1:10CV1335 JCCTCB, 2011 WL 761239, at *1 (E.D. Va. Feb. 23, 2011) (quoting *Teague v. Bakker*, 931 F.2d 259, 260–61 (4th Cir.1991)). Additionally, a "mere 'general' interest in the subject matter of the litigation will not constitute a protectable interest within the meaning of" Rule 24(a)(2); rather, "the intervenor's claim must bear a close relationship to the dispute between the existing litigants and ... be direct, rather than remote or contingent."

9

*NISH v. Cohen*, 191 F.R.D. 94, 97 (E.D. Va. 2000) (citing *Dairy Maid Dairy, Inc. v. United States*, 147 F.R.D. 109, 111 (E.D. Va. 1993)).

The RNC's interests fail to clear this threshold. The RNC appears to claim three interests: (1) a general interest in a "fair process" and "election integrity"; (2) a competitive interest in the electoral success of Republican candidates; and (3) organizational resource-diversion injuries. None is sufficient to justify the RNC's intervention.

The RNC's interests in ensuring a "fair process" and "election integrity" are hardly unique and are indistinguishable from the interest of every registered voter in the Commonwealth. *See League of Women Voters v. Virginia State Board of Elections*, 458 F.Supp. 3d 460 (W.D. Va. 2020) (denying intervention to registered voters who claimed an interest in election integrity, holding that "[t]here is nothing that distinguishes the Prospective Intervenors' interest in this case from that of any other eligible voter in Virginia."); *but see League of Women Voters of Virginia v. Virginia State Bd. of Elections,* No. 6:20-CV-00024, 2020 WL 2090678 (W.D. Va. Apr. 30, 2020) (in same case as prior parenthetical, allowing the Republican Party of Virginia to permissively intervene when the defendants and plaintiff had proposed a consent decree, saying that "while the decision to settle rather than litigate could in some circumstances fall within the boundaries of a litigation decision on which allied parties may disagree . . . the proposed consent decree appears to facilitate all relief Plaintiffs seek . . . [a]nd, on these concessions, the RPV has disagreed.").

This is precisely the kind of abstract, generalized interest about which courts caution when considering an attempt to intervene as of right. All participants in the election – voters, political parties, and candidates – share an interest in the integrity of the electoral process. *See League of Women Voters*, 458 F.Supp. 3d at 460. That a national political party can articulate this interest with particular fervor does not transform the interest into the direct, substantial, and legally

10

protectable interest Rule 24(a)(2) requires. Further, the RNC's reliance on *Bost v. Illinois State Board of Elections*, 146 S. Ct. 513 (2026), is misplaced. *Bost* addressed Article III standing—a distinct inquiry from Rule 24 intervention. Even if the RNC could establish Article III standing (which Defendants do not concede), standing alone does not entitle a party to intervene. *See Stuart*, 706 F.3d at 349 (requiring satisfaction of all Rule 24(a)(2) elements).

The RNC's competitive-harm theory is similarly insufficient. Plaintiffs' claims concern the timing of voter-roll maintenance procedures under the NVRA—not whether noncitizens may register or vote. The assertion that inaccurate voter rolls will "hinder the electoral prospects of candidates running as Republicans," is the very definition of a generalized political interest rather than a legally protectable one. In *One Wisconsin Institute, Inc. v. Nichol*, 310 F.R.D. 394, 397 (W.D. Wis. 2015), the court denied intervention to legislators and voters in a voting rights case, finding that an interest in "fraud-free elections" was not a legally protectable interest under Rule 24(a)(2). Similarly, in *United States v. Fla.*, No. 4:12CV285–RH/CAS, 2012 WL 13034013, at *1 (N.D. Fla. Nov. 6, 2012), the court denied intervention to organizations asserting an interest in accurate voting rolls because "these asserted interests are the same for the proposed intervenors ... as for every other registered voter in the state." The RNC's assertion that it has a particularized interest because it "spend[s] untold time and resources," ECF No. 234-1 at 7, seeking to elect Republican candidates does not transform a generalized interest in election administration into a direct legal stake in this litigation. Every political party and advocacy organization devotes resources to elections; that expenditure does not create an entitlement to intervene in every case touching on election procedures.

Further, as noted above, neither Plaintiffs nor Defendants are arguing that noncitizens should be permitted to register or vote. The issue, rather, is the best way to maintain voter

11

registration rolls consistent with available technology, data sources, and legal requirements. The RNC's assumptions that Virginia's procedures will change, that the changes will result in materially inaccurate voter rolls, that those inaccuracies will affect the RNC's data, and that such data effects will prejudice Republican candidates are speculative assumptions that cannot be meaningfully tested in the time remaining for the conduct of this litigation. Moreover, such speculative, attenuated interests do not satisfy the requirement of a "direct and substantial interest." *Matter of Richman*, 104 F.3d 654, 659 (4th Cir. 1997).

The resource-diversion theory is likewise speculative and contingent on a number of remote factors. The RNC's declaration asserts that if noncitizen registrations remain on Virginia's voter rolls, the RNC would need to divert resources to verify voter data, monitor for fraud, and adjust campaign strategy. It beggars belief that the RNC, in the absence of its participation in this litigation or even in the wake of prevailing in this litigation if it were allowed to intervene, would cease work verifying voter data or monitoring for election fraud. Its asserted injuries are entirely hypothetical. They depend on a chain of contingencies: that Plaintiffs will prevail on the merits, that noncitizens will remain on the rolls, that those registrations will be sufficiently numerous to affect the RNC's operations, and that the RNC will be unable to obtain accurate data through other means. An interest this attenuated and contingent on multiple layers of speculation about future events is precisely the kind of "remote or contingent" interest that falls short of Rule 24(a)(2). *See NISH*, 191 F.R.D. at 96; *Ohio Valley Envtl. Coal., Inc. v. McCarthy*, 313 F.R.D. 10, 21 (S.D. W. Va. 2015) (a "significantly protectable interest" requires that the applicant "stand to gain or lose by the direct legal operation" of the judgment). The RNC does not stand to gain or lose by the direct legal operation of any judgment in this case; it is not a regulated party, not a voter whose registration is at stake, and not a state official charged with enforcing the challenged statute.

12

### C.    Existing Defendants Adequately Represent the RNC's Interests.

Even if the RNC's alleged interests could demonstrate a protectable interest, its Motion to Intervene fails because the existing Defendants adequately represent the interests that the RNC seeks to claim as its own unique interests. A presumption of adequate representation arises when a proposed intervenor and an existing government party share the same "ultimate objective"— here, defending the validity of Virginia's voter list maintenance statutes. *Stuart*, 706 F.3d at 352 (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)). The RNC "can overcome this presumption only with a showing of adversity of interest, collusion, or nonfeasance." *Id.* at 352.

The RNC has not made any such showing. The core of the RNC's inadequacy argument is that Attorney General Jones may pursue settlement or may not defend the challenged statute as vigorously as his predecessor. But speculation about what a government defendant might do in the future is not evidence of present inadequacy. Indeed, the Motion to Intervene identifies no filing, statement, or other indication by any Defendant that any of the Defendants have asserted or believe that Virginia Code Section 24.2-427(C) is unconstitutional. A proposed intervenor's mere "disagree[ment] with the [government's] reasonable litigation tactics" does not establish inadequacy. *Stuart*, 706 F.3d at 353. In fact, the Fourth Circuit recognizes the very real harm to the government's defense of a statute if intervention is liberally granted:

> [T]o permit private persons and entities to intervene in the government's defense of a statute upon only a nominal showing would greatly complicate the government's job. Faced with the prospect of a deluge of potential intervenors, the government could be compelled to modify its litigation strategy to suit the self-interested motivations of those who seek party status, or else suffer the consequences of a geometrically protracted, costly, and complicated litigation. In short, "the business of the government could hardly be conducted if, in matters of litigation, individual citizens could usually or always intervene and assert individual points of view."

13

*Id*. at 351 (quoting 6 *Moore's Federal Practice* § 24.03[4][a][iv][A] (3d ed.2011)). The Attorney General remains the named Defendants' legal representative, and the Defendants have not abandoned their defense. Unless and until the Defendants affirmatively cease to defend the statute, the RNC's conjecture does not overcome the presumption. *See id.*

The RNC points to the provision of EO 13 directing election officials to cease certain voter list maintenance activities as evidence that the executive branch will not defend the statute. But an executive order directed at agency operations is not the same as a litigation concession. Even if it were, EO 13 does not concede the unconstitutionality of any provision of Virginia law. Moreover, the Attorney General retains independent authority and obligation to defend Virginia law in pending litigation. The RNC may disagree with the policy direction of the current administration, but policy disagreement is not nonfeasance.

The RNC concedes that it intends to raise "similar arguments" to those the previous Attorney General advanced and that it will file a proposed answer mirroring the existing defense. ECF No. 234-1 at 5. This concession undercuts the RNC's own argument. If the RNC's defense is substantially the same as the existing defense, then its interest is, by definition, adequately represented. *Stuart*, 706 F.3d at 352–53. Indeed, Defendants continue to actively defend this action, including by pursuing an appeal to the Fourt Circuit Court of Appeals on sovereign immunity grounds and on the basis that Plaintiffs face no ongoing harm following the conclusion of the 2024 federal election.

The RNC's reliance on *Berger v. North Carolina State Conference of NAACP*, 597 U.S. 179 (2022), does not aid the RNC's position. In *Berger*, the Supreme Court addressed intervention by legislative leaders authorized by state law to defend state statutes—a circumstance not present here. The RNC is not a state actor; it is a private political organization with no statutory

14

authorization to defend Virginia law. *Berger* reinforced that the analysis turns on the specific relationship between the government party and the proposed intervenor, and it does not eliminate the presumption of adequate representation where the government is actively defending the statute at issue.

At bottom, the RNC appears dissatisfied with the litigation posture of a new Virginia Attorney General. ECF No. 234. But speculation about how existing defendants might litigate a case is not a basis for intervention under the Federal Rules. *Stuart*, 706 F.3d at 352. There is a burden on "the putative intervenor [to] mount a strong showing of inadequacy. To hold otherwise would place a severe and unnecessary burden on government agencies as they seek to fulfill their basic duty of representing the people in matters of public litigation." *Id.* The RNC's interests, to the extent they are cognizable, are represented by the existing Defendants, a fact that militates against intervention. *See Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513 (2026).

## II.     The RNC is not Entitled to Permissive Intervention Under Rule 24(b).

As an alternative to intervention under Rule 24(a), the RNC requests permissive intervention pursuant to Rule 24(b). The RNC asserts as a basis for intervention that Virginia Code § 24.2-427(C) "plainly requires systematically removing noncitizens from Virginia's voter rolls within 90 days of an election." ECF No. 234-1 at 2, 12. But that Code section contains no reference to any requirement for "systematic" review much less any requirement for such review during the 90-day quiet period before a general election. [2] The RNC fails to demonstrate sufficient

---

[2] Virginia Code § 24.2-427(C) reads, in its entirety, as follows:

> The general registrar shall mail notice promptly to all persons known by him not to be United States citizens by reason of a report from the Department of Motor Vehicles pursuant to § 24.2-410.1 or from the Department of Elections based on information received from the Systematic Alien Verification for Entitlements Program (SAVE Program) pursuant to subsection E of § 24.2-404 prior to cancelling their registrations. The notice shall inform the person of the report from

justification to outweigh the undue delay and prejudice its intervention would cause to the adjudication of the original parties' rights.

A court "may" grant permissive intervention if the would-be intervenor "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In exercising this discretion, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Permissive intervention is "wholly discretionary." *Stuart*, 706 F.3d at 349.

In *Stuart*, the appellate court upheld the lower court's rejection of the motion to intervene, citing with approval the lower court's conclusion that "'[a]dding three groups of intervenors would necessarily complicate the discovery process and consume additional resources of the court and the parties.'" *Id*. And "that permitting intervention would likely 'result in undue delay in adjudication of the merits, without a corresponding benefit to existing litigants, the courts, or the process' because 'the existing [d]efendants are zealously pursuing the same ultimate objectives' as the appellants." *Id*.

This Court should deny permissive intervention for the same reasons it should deny intervention pursuant to Rule 24(a). The motion is untimely. Discovery is functionally complete. The parties are preparing for dispositive motions. Adding a new party at this stage would inject unnecessary complexity into the final phases of this case. The RNC's promise that it will not seek additional discovery and will abide by existing deadlines does not eliminate the prejudice. A new party, by virtue of its status, has rights to brief, argue, and participate at every stage. The RNC has

the Department of Motor Vehicles or from the Department of Elections and allow the person to submit his sworn statement that he is a United States citizen within 14 days of the date that the notice was mailed. The general registrar shall cancel the registrations of such persons who do not respond within 14 days to the notice that they have been reported not to be United States citizens.

16

made clear that its purpose in intervening is to press arguments the current defendants may not press—meaning the Court and the parties will face additional briefing, additional argument, and the potential for divergent positions among defendants. This is precisely the kind of complication that weighs against intervention pursuant to Rule 24(b)(3).

**III.    Amicus Curiae Participation is Appropriate "Recourse" for the RNC.**

The RNC need not serve as a silent bystander in this case. It may seek leave to participate as *amicus curiae*. Courts recognize "that amici often make useful contributions to litigation." *Id*. at 355. In *Stuart*, the fact of this "alternative avenue[] of expression" in the form of *amicus* participation "reinforce[d the Fourth Circuit's] disinclination to drive district courts into multi-cornered lawsuits by indiscriminately granting would-be intervenors party status and all the privileges pertaining thereto." *Id.* at 355. As an *amicus*, the RNC could present legal arguments at the summary judgment and trial phases without the burdens and privileges of full-party intervention—including the additional briefing, discovery rights, and potential for divergent defendant positions that counsel against intervention here. Indeed, given that the RNC does not seek to engage in discovery in the case, and in light of its assertions that it seeks to help the Court and the parties in case because "'good lawyers sometimes miss things'" and to "'bring perspective that others miss or choose not to provide'" and otherwise believes it is "'worthwhile [for the Court and parties] to receive input'" from the RNC, ECF No. 234-1 at 15, its participation as an *amicus* would seem to meet all those normative goals.

17

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny the Republican National Committee's Motion to Intervene.

Respectfully submitted,

STEVEN KOSKI, in his official capacity as Virginia Commissioner of Elections, JOHN O'BANNON, in his official capacity as Chairman of the State Board of Elections, ROSALYN R. DANCE, in her official capacity as Vice-Chairman of the State Board of Elections, GEORGIA ALVIS- LONG, in her official capacity as Secretary of the State Board of Elections, CHRISTOPHER P. STOLLE and SALLY HUDSON, in their official capacities as members of the State Board of Elections, and JAY C. JONES, in his official capacity as Virginia Attorney General

By Counsel

/s/ Cullen D. Seltzer
Cullen D. Seltzer (VSB No. 35923)
Heather Hays Lockerman (VSB No. 65535)
Ana C. Franzoni (VSB No. 99352)
SANDS ANDERSON PC
919 East Main Street, Suite 2300
P.O. Box 1998
Richmond, Virginia 23219
Office: (804) 648-1636
Fax: (804) 783-7291
cseltzer@sandsanderson.com
hlockerman@sandsanderson.com
afranzoni@sandsanderson.com
Counsel for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of April 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties.

_/s/    Cullen D. Seltzer_